UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

TARA RULE,

Plaintiff,

-against-

JONATHAN BRAIMAN, DONNA KIRKER,
LISA WEST, CHRISTINE CALISTRI (TOWERS),
ALBANY MED HEALTH PARTNERS (SYSTEMS),
GLENS FALLS HOSPITAL, SARATOGA HOSPITAL,
MALTA MED EMERGENT CARE

Defendants

Case No. 1:23-cv-01218-BKS-CFH

Index No.

Jury Trial: Yes

# COMPLAINT:

### Preliminary Statement:

1. Plaintiff Tara Rule is a 32 year old disabled patient from Round Lake, New York whose primary insurance provider is Federal Medicare, and secondary NYS Medicaid who suffers from a disabling genetic disorder, Ehlers Danlos Syndrome (EDs).

2. Plaintiff sought care from defendant  Dr. Jonathan Braiman, a neurologist who is employed by the Department of Neurology at Glens Falls Hospital, a voluntary non-profit private hospital that receives federal funding and accepts federal Medicare and state Medicaid located in Glens Falls, NY in Warren County.

3. Glens Falls Hospital is owned by Albany Med Health Partners (Systems).

4. Albany Med Health Partners (Systems)  is a voluntary non-profit private hospital that receives federal funding and accepts federal Medicare and state Medicaid located in the city of Albany, NY in Albany County.

5. Defendant Donna Kirker, MS, RN, NEA-BC, Dr. Jonathan Braiman's superior, is the Sr. Vice President / Patient Services and Chief of Nursing at Glens Falls Hospital, a voluntary non-profit private hospital in the town of Glens Falls, NY in Warren County that receives federal funding and accepts federal Medicare and state Medicaid.

6. Defendant Lisa West is the Administrative Director of Emergency Services at Saratoga Hospital, a voluntary non-profit private hospital that receives federal funding and accepts federal medicare and state medicaid, located in Saratoga Springs, NY in Saratoga County.

7. Saratoga Hospital is owned by Albany Med Health Partners (Systems).

8. Defendant Christine Calistri (Towers) NP is a nurse practitioner employed by Malta Med Emergent Care, a voluntary non-profit private hospital that receives federal funding and accepts federal medicare and state medicaid and is located in the town of Malta, NY in Saratoga County.

9. Malta Med Emergent Care is owned by Albany Med Health Partners (Systems).

10. Albany Med Health Partners (Systems), Glens Falls Hospital, Saratoga Hospital and Malta Med Emergent Care are in the Northern District of New York.

11. Dr. Marc Price, D.O, an employee of Albany Med Health Partners (Systems) was the plaintiff's primary care physician.

12. Saratoga Headache Center is a neurology clinic that specializes in the treatment of cluster headaches and is a partner of Albany Med Health Systems (Partners), Saratoga Hospital, and Glens Falls Hospital. [1]

## 1. THE PARTIES

13. Albany Medical Health System is a regionally governed, not-for-profit health system serving Northeastern New York.

14. Based upon information and belief, Dr. Jonathan Braiman, M.D., is a doctor who specializes in and is currently employed by Glens Falls Hospital.

15. Based upon information and belief, Donna Kirker is the Sr. Vice President / Patient Services and Chief of Nursing at Glens Falls Hospital.

16. Based upon information and belief, Lisa West is the Administrative Director of Emergency Services at Saratoga Hospital.

17. Based upon information and belief, Christine Calistri (Towers) is a nurse practitioner at Malta Med Emergent Care, Glens Falls Hospital and Saratoga Hospital.

18. Glens Falls Hospital is a voluntary non-profit private hospital that receives federal funding and accepts federal Medicare and state Medicaid located in Glens Falls, NY in Warren County and serves Northeastern New York.

19. Saratoga Hospital is a voluntary non-profit private hospital that receives federal funding and accepts federal medicare and state medicaid, located in Saratoga Springs, NY in Saratoga County and serves Northeastern New York.

20. Malta Med Emergent Care is a joint venture of Albany Med and Saratoga Hospital [2] in Malta, New York and serves Northeastern New York.

---

[1] https://www.albanymed.org/
[2] https://www.maltamed.org/about-us

# II. JURISDICTION AND VENUE

21. This court has jurisdiction over Albany Med Health Partners (Systems), Glens Falls Hospital, Saratoga Hospital and Malta Med Emergent Care and its respective employees as each entity is within the Northern District of New York and the events occurred within the Northern District of New York.

22.  This Court has subject matter jurisdiction pursuant to The Affordable Care Act §1557, as Plaintiff asserts federal claims under The Affordable Care Act §1557 42 U.S.C. § 18001, 18116 , §1557, et seq.

23.  This Court has subject matter jurisdiction pursuant to PUBLIC LAW 88-352-JULY 2, 1964, (78 Stat. 241), Vol. II, P.L. 88-352, § 601.

24. This Court has subject matter jurisdiction over The Health Insurance Portability and Accountability Act of 1996 (HIPAA) Title 42, § 1320d et seq, CFR Title 45, § 160 § 164.

25. This court has subject matter jurisdiction over Public Law 104-191, 42 CFR §489.24 The Emergency Medical Treatment and Labor Act (EMTALA).

26. This court has subject matter jurisdiction over 18 U.S.C. § 242 Deprivation of Rights Under Color of Law, § 241 Conspiracy Against Rights, General Conspiracy Statute USC § 371.

27.  This court has subject matter jurisdiction over 42 U.S.C. §§ 12101 et seq. The Americans with Disabilities Act (ADA)

28.  This court has subject matter jurisdiction over 18 US code § 1035 - False Statements Relating to Healthcare.

29.  This court has subject matter jurisdiction over False Claims Act (31 U.S.C. §§ 3729-3733).

30.  This court has subject matter jurisdiction over the Age Discrimination Act of 1975 (42 U.S.C. § 6101-6107) §6102, Prohibition of discrimination.

31. This court has subject matter jurisdiction over the 42 U.S.C. § 1395cc(f) Patient Self-Determination Act (PSDA).

32. This Court has subject matter jurisdiction over this action pursuant to [28 U.S.C. § 1331] as the action arises under federal law.

- 33. Venue is proper in this district under [28 U.S.C. § 1391(b)] as the events giving rise to the claims occurred within this district.

34. This court has subject matter jurisdiction over 45 C.F.R. §§ 160, 164

35. This court has supplemental jurisdiction under § 28 USC 1367(a) over state claims for Malpractice.

36. This court has supplemental jurisdiction under § 28 USC 1367(a) over state claims for Negligence.

37. This court has supplemental jurisdiction under § 28 USC 1367(a) over state claims for Intentional

Infliction of Emotional Distress.

38. This court has supplemental jurisdiction under § 28 USC 1367(a) over state claims for Negligent Infliction of Emotional Distress.

39. This court has supplemental jurisdiction under § 28 USC 1367(a) over state claims for Harassment.

40. This court has supplemental jurisdiction under § 28 USC 1367(a) over state claims for Invasion of Privacy.

41. This court has supplemental jurisdiction under § 28 USC 1367(a) over state claims for Retaliation.

# TABLE OF CONTENTS:

The Affordable Care Act §1557 42 U.S.C. § 18001, 18116 , §1557, et seq ……………………………………………………Pg. 9

PUBLIC LAW 88-352-JULY 2, 1964, (78 Stat. 241) Vol. II, P.L. 88-352, § 601 ……………………………………………………Pg. 15

42 U.S.C. Age Discrimination Act of 1975 § 6101-6107 ……………………………………………………………………………Pg. 21

42 U.S.C. § 1395cc(f) Patient Self-Determination Act (PSDA) ……………………………………………………Pg. 23

18 US code § 1035 - False Statements Relating to Healthcare ……………………………………………………………Pg. 26

PUB.LAW 104-191 Title 42 §1320d et seq, CFR Title 45, §160 §164 Health Insurance Portability & Accountability Act (HIPAA) ....Pg 27

New York Public Health Law Article 29-B ……………………………………………………………………………………Pg.29

18 U.S.C. § 242 § 241 § 371, 42 U.S.C. § 1983……………………………………………………………………………Pg.31

42 CFR §489.24 The Emergency Medical Treatment and Labor Act (EMTALA) ……………………………………………………Pg. 37

18 U.S.C. § 1347 (Health Care Fraud) ………………………………………………………………………………………Pg. 41

42 U.S.C. §§ 12101 et seq. The Americans with Disabilities Act ………………………………………………………………Pg. 43

Negligence ( § 28 USC 1367(a)) ………………………………………………………………………………………………Pg. 46

Negligence *per se* ( § 28 USC 1367(a)) ……………………………………………………………………………………Pg. 52

Malpractice ( § 28 USC 1367(a)) ……………………………………………………………………………………………Pg. 55

Intentional Infliction of Emotional Distress (IIED) …………………………………………………………………………Pg. 57

Invasion of Privacy ( § 28 USC 1367(a)) ……………………………………………………………………………………Pg. 59

Harassment ( § 28 USC 1367(a)) ……………………………………………………………………………………………Pg 60

Negligent Infliction of Emotional Distress (NIED) ( § 28 USC 1367(a)) …………………………………………………………Pg. 63

# LEGAL CASES:

*Rendell-Baker v. Kohn*, 457 U.S. 830 (1982)..............................................................*Pg. 11*

*Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974)..............................................*Pg. 12*

*Golden v. Zwickler*, 394 N.Y.S.2d 827 (N.Y. App. Div. 1977).........................................*Pg 13*

*Blum v. Yaretsky*, 457 U.S. 991 (1982)............................................................................*Pg 13*

*Weinreb v. Xerox Business Services, LLC* ....................................................................*Pg. 14*

*Kessler v. Westchester County Dept. of Soc. Servs.*, 461 F.3d 199 (2d Cir. 2006) .......*Pg. 15, 17*

*Doe v. NYSARC Trust Serv., 2020* ....................................................................................*Pg 16*

*U.S. Dist. LEXIS 177574* ..................................................................................................*Pg 16*

*Coddington v. Adelphi Univ.* ...........................................................................................*Pg 16*

*Goonewardena v. N Shore Long Island Jewish Health Sys., 2012* ...............................*Pg 16*

*U.S. Dist. LEXIS 187361* ................................................................................................*Pg 16*

*Verhagen v. Olarte, 1989 U.S. Dist. LEXIS 13881.* .......................................................*Pg 16*

*United States v. University Hospital, 729 F.2d 144 (2d Cir. 1984)* ..............................*Pg 17*

*Pennhurst State School and Hospital v. Halderman, 451 U.S. 1 (1981)* .......................*Pg. 17*

*Davis v. Monroe County Board of Education, 526 U.S. 629 (1999)* ............................*Pg. 20*

*Sedima, S.P.R.L. v. Imrex Co., Inc. (1985)* .................................................................*Pg. 26*

*Costa-Conniff v. St. Vincent's Health System, Inc. (2017)* .........................................*Pg. 30*

*Doe v. Guthrie Clinic, Ltd. (2014)* ...............................................................................*Pg. 30*

*Hass, 216 U.S. at 479-480. In Hammerschmidt* ...........................................................*Pg. 31*

*United States v. Gallup, 812 F.2d 1271, 1276 (10th Cir. 1987)* ...................................*Pg.*

*31*

*Conover, 772 F.2d at 771*............................................................................................*Pg. 31*

*United States v. Hopkins, 916 F.2d 207 (5th Cir. 1990)* .................................................*Pg. 31*

*Estelle v. Gamble, 429 U.S. 97 (1976)* ...........................................................................*Pg. 34*

*Monell v. Department of Social Services, 436 U.S. 658 (1978)* .....................................*Pg. 36*

*Dennis v. Sparks, 449 U.S. 24 (1980)* ...........................................................................*Pg. 36*

*Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970)* ........................................................*Pg. 36*

*Munoz v. River Parishes Hospital (5th Cir. 2013)* ..........................................................*Pg. 37*

*42 U.S.C. § 1395dd(e)(1)* ...............................................................................................*Pg. 37*

*Hardy, 164 F.3d at 792* ...................................................................................................*Pg. 38*

*Swafford v. Maricopa County Public Hospital (2002)* .....................................................*Pg 39*

*Tatum v. Black (1991)* .....................................................................................................*Pg 39*

*Estate of Behringer v. WCA Hospital (2013)* ..............................................................*Pg 39*

*Oliveira v. Providence Health System of Southern California (2004)* ..........................*Pg 40*

*Roe v. Lewisville Memorial Hospital (2008)* ...............................................................*Pg 40*

*United States v. Carroll Towing* ....................................................................................*Pg 46, 49*

*City of Revere v. Massachusetts General Hospital (1983)* ............................................*Pg 50*

*West v. Atkins (1988)* .....................................................................................................*Pg 50*

*Zinman v. Shalala (D.N.J. 2003)* ...................................................................................*Pg 51*

*Knepper v. Ogden Regional Medical Center (D. Utah 2006*..........................................*Pg 51*

*Dwyer v. American Express Co. (S.D.N.Y. 2007)* ……………………………………………………………………………………………………*Pg* 52

*Whalen v. Roe, 429 U.S. 589 (1977)* ………………………………………………………………………………………………………*Pg* 54

*Talley v. California, 362 U.S. 60 (1960)* ………………………………………………………………………………………*Pg* 54

*Plyler v. Doe, 457 U.S. 202 (1982)* …………………………………………………………………………………………………*Pg* 55

# FACTUAL ALLEGATIONS:

42.  Plaintiff suffers from a disabling genetic disorder called Ehlers Danlos Syndrome (EDs) (hypermobile subtype) which causes severe pain and medical complications. (Exhibit A1). [3]

43.  Plaintiff sought care from Dr. Jonathan Braiman, M.D., for a comorbid condition to EDS known as cluster headaches (also known as "suicide headaches"), [1], a disease that may be the most painful condition known to

---

[3]

1) Chronic pain in EDS is highly prevalent and associated with regular use of analgesics;

2) Pain is more prevalent and more severe in the hypermobility type than in the classic type;

3) Pain severity is correlated with hypermobility, dislocations, and previous surgery;

4) Pain is correlated with low nocturnal sleep quality; and

5) Pain contributes to functional impairment in daily life, independent of the level of fatigue.

From this large cohort of EDS patients, we conclude that pain is common and severe in EDS.

Pain is related to hypermobility, dislocations, and previous surgery and associated with moderate to severe impairment in daily functioning. Therefore, treatment of pain should be a prominent aspect of symptomatic management of EDS.

"*Pain in ehlers-danlos syndrome is common, severe, and associated with functional impairment.*" PubMed 2010 Sep;40(3):370-8.

medical science. [4]

44.  Plaintiff had been experiencing a resurgence of cluster headaches that were previously diagnosed and treated by her past neurologist, Dr. Richard Brooks at Ellis Neurology, who retired in 2020.

45.  Plaintiff was referred to Dr. Jonathan Braiman for preventative, non-narcotic treatment for the condition, cluster headaches and had an appointment on September 14, 2022.

46.  On or about September 14, 2022, Plaintiff discussed in detail current medications, medication allergies, past failed treatments for cluster headaches, EDs, and comorbid conditions with Dr.Braiman.

47.  Dr. Braiman informed the Plaintiff that safe, effective treatments were available for cluster headaches, however he could not prescribe them to the Plaintiff, claiming that her health insurance company would not cover any treatments that are teratogenic in nature, or have the potential to cause birth defects.

48. Plaintiff informed Dr. Braiman that her insurance company  fully covered, without issue,  her current treatment for her autoimmune condition as prescribed by her rheumatologist (Cellcept, Mycophenolate Motefil) and that these treatments were teratogenic. (Exhibit T)

49. Dr.  Braiman told the Plaintiff that her current treatment, Cellcept, did not cause birth defects. Cellcept, commonly prescribed for autoimmune diseases, lists "significant risk for birth defects and miscarriage."

50. Plaintiff encouraged Jonathan Braiman to look up the effects Cellcept can have on a fetus.

51. Dr. Braiman looked up the side effects Cellcept can have on a fetus and read them aloud and the plaintiff began recording at this time, as was her right under one party consent laws and an absence of hospital policy regarding recording of medical appointments ( add exhibits for hospital recording policies (Exhibit U - Recordings, Braiman.)

52. Dr. Braiman asked the Plaintiff what she would do in the event of a pregnancy, to which the Plaintiff responded she would have to get an abortion - (Exhibit U - Recordings, Braiman) a decision  based on recommendations by her genetic doctor, who informed her pregnancy can be life threatening, incidents of complications is high, the high likelihood of passing the disorder onto offspring (especially due to the plaintiffs case being inherited by her mother), as well as the impossibility of testing a fetus for Ehlers Danlos in utero. (Exhibit B1)

---

[4] The term "headache" does not adequately convey the severity of the condition; the disease may be the most painful condition known to medical science.[17][18]

Dr. Peter Goadsby, Professor of Clinical Neurology at University College London, a leading researcher on the condition has commented:

"Cluster headache is probably the worst pain that humans experience. I know that's quite a strong remark to make, but if you ask a cluster headache patient if they've had a worse experience, they'll universally say they haven't. Women with cluster headaches will tell you that an attack is worse than giving birth. So you can imagine that these people give birth without anesthetic once or twice a day, for six, eight, or ten weeks at a time, and then have a break. It's just awful."[19]

https://en.wikipedia.org/wiki/Cluster_headache

53. Dr. Braiman asked the Plaintiff, "Why? Because of the Ehlers Danlos?" to which the Plaintiff responded, "Yes, and because of the Cellcept." (Exhibit U - Recordings, Braiman)

54. Dr. Braiman responded, "Well, no – you can get scans and tests to see if these things (birth defects) occur, but it's trickier now with the way things are going." (Exhibit U - Recordings, Braiman) (See Exhibit B-1 regarding the inability to test the fetus)

55. Dr. Braiman told the Plaintiff that she should "think deeply" (Exhibit U - Recordings, Braiman) about her current medication regimen prescribed by another provider due to its potential for birth defects, as well as her decision to terminate a non-consensual pregnancy due to concerns outlined in exhibit B-1.

56. Dr. Braiman told the Plaintiff she would need to "bring her (male) partner in on the conversation" regarding her medical care and treatment. (Exhibit U - Recordings, Braiman)

57. Plaintiff reminded Dr. Braiman that her partner had a vasectomy and that pregnancy wasn't a concern. (Exhibit U - Recordings, Braiman.)

58. Plaintiff asked Dr. Braiman if the treatments he was unwilling to prescribe would be safe and effective for those who have gone through menopause and hence were no longer of childbearing age to which Dr. Braiman replied, "Yeah, they would be." Plaintiff then asked Dr. Braiman, "So, the only reason you won't prescribe me these treatments is because I could get pregnant?" Dr. Braiman replied, "How's your sleep?" (Exhibit U - Recordings, Braiman)

59. Dr. Braiman refused to provide the Plaintiff with informed consent and he refused to tell the Plaintiff the names, risks, and benefits of all available treatments.

60. Dr. Braiman suggested a number of off-label treatments that, as the Plaintiff had already discussed with Dr. Braiman, she had already tried and failed. (Exhibit U - Recordings, Braiman)

61. Dr. Braiman told Plaintiff he could try a medication without potential teratogenic effects that Plaintiff had already tried and failed.  (Exhibit A)

62. On or about September 22, 2022, Dr. Braiman sent in an injectable medication (Aimovig) to the Plaintiff's pharmacy without her consent or discussing the risks and benefits of the medication. (Exhibit A, Exhibit H1)

63. Plaintiff's insurance was hesitant to cover the medication due to its risks, other medications Plaintiff had failed in the past, comorbid conditions, and allergies to similar drug classes resulting in serious complications, as well as the cost of the medication. On or about September 15, 2022, plaintiff spoke to her insurance provider, Humana medicare, who informed her that the provider would need to appeal their decision to refuse coverage for Aimovig

64. Plaintiff's insurance, federal Medicare, informed her that Dr. Braiman had sent the medication to the pharmacy and, as a result,  it had pushed the Plaintiff over her insurance limit, requiring her to pay for her other treatments. (Insurance record available upon request.)

65. Plaintiff returned the medication to the pharmacy after reading the warnings and side effects due to the fact that taking the medication (Aimovig) could have resulted in serious injury or death. (Exhibit A)

66. Dr. Braiman informed the Plaintiff that he would not be willing to prescribe any medication to her that had the potential to cause birth defects, despite those options being safer and more effective for the Plaintiff.

67. Dr. Braiman denied the Plaintiff safe, effective treatment for her disabling condition due to her age and sex.

68. Dr. Braiman refused the Plaintiff informed consent and denied the Plaintiff treatment options based solely on the potential for pregnancy, despite the Plaintiff repeatedly assuring Dr. Braiman that pregnancy was neither a possibility nor a concern. (Exhibit P)

69. Dr. Braiman informed the Plaintiff he would not discuss or prescribe treatment options that have the potential to cause birth defects due to Plaintiffs age and sex, despite the Plaintiff expressing that pregnancy was not possible due to the Plaintiff's partner's vasectomy (Exhibit U - Recordings, Braiman) as well as the life-threatening complications that would arise due to her disability. (Exhibit B-1)

70. Plaintiff was denied informed consent as Dr. Braiman refused to tell the Plaintiff the names, risks, and benefits of all available options and ultimately prescribed a medication the plaintiff did not agree to or understand the risks and benefits of that would have harmed the plaintiff.

71. On or about September 22 according to conflicting documents, (Exhibit H1), Plaintiff was prescribed medication without her consent that could have resulted in injury or death, but that would have been safe for a hypothetical fetus.  (Exhibit A)

72. On September 15, 2022, Plaintiff made a formal complaint to Glens Falls Hospital Patient Relations. (Exhibit B)

73. On September 21, 2022, Plaintiff experienced complications due to the untreated cluster headaches and went to the emergency department at Malta Med Emergent Care to try and stabilize her vitals, which were dangerously out of range due to the pain of the untreated condition. (Exhibit C)

74. On or about September 21, 2022, Plaintiff arrived at the emergency department crying, sweating, shaking, and with heightened blood pressure and pulse due to the pain. (Exhibit C)

75. The Plaintiff's attending physician at Malta Med Emergent Care was the defendant, Christine Calistri (Towers), Nurse Practitioner. (Exhibit C1)

76. Plaintiff received one round of non-narcotic migraine cocktail and oxygen therapy, which did not stabilize her condition. (D1)

77. Christine Calistri (Towers)  ordered additional IV medications to be administered to the Plaintiff as soon as the Plaintiff's initial IV bag was finished. (Exhibit D)

78. Plaintiff's nurse, Jenni Gailor RN, informed the Plaintiff that she was being discharged from Malta Med Emergent Care without transfer because Glens Falls Hospital called them and told her to discharge Plaintiff for "live streaming"

79. Plaintiff asked for additional information and Jenni Gailor stated she was not sure and that she would send in the Plaintiffs attending, Christine Calistri (Towers)

80. The Plaintiff began recording on her cell phone.

81. Christine Calistri (Towers) entered the Plaintiff's room with Jenni Gailor and several other unknown employees.

82. Armed security guards walked over to the Plaintiff's room and stood outside of the door in the hallway.

83. Christine Calistri (Towers) told the Plaintiff that, "the Chief Nursing Officer of Glens Falls Hospital (Defendant Donna Kirker), called the Chief Nursing Officer of Saratoga Hospital (Defendant Lisa West), who called (their) Emergency Department Director (name unknown), who called (their) Charge Nurse (name unknown), to say that (she, the Plaintiff) was live streaming." (Recordings -Malta Med)

84. Plaintiff was not live streaming and denied the allegations. (Exhibit G) Malta Med Emergent Care and Albany Med Health Partners (Systems) had no policies regarding social media use on September 21, 20222. (Exhibit F)

85. Plaintiff asked how anyone from another hospital system would know that she was in the emergency department, to which Defendant Christine Calistri (Towers) responded, "They gave your room number," and, "They looked you up on the tracker." (Recordings - Malta Med)

86. Jenni Gailor told the Plaintiff, "We searched your name." (Recordings Malta Med)

87. Defendant Christine Calistri (Towers) told the Plaintiff that live streaming in the hospital was "100% illegal." (Recordings - Malta Med)

88. The claim that the Plaintiff was live streaming was false. There are no applicable laws, regulations, or rules criminalizing or otherwise outlawing the conduct alleged by Defendant Christine Calistri (Towers), nor were there any applicable policies regarding the use of social media use or recording devices by either Malta Med Emergent Care or Albany Med Health Partners. (Exhibit F)

89. Defendant Christine Calistri (Towers) told the Plaintiff, "I don't know what you did, and I don't really care because you're lying (about live streaming)." (Recordings - Malta Med)

90. Plaintiff continued to deny the allegations, to which Defendant Christine Calistri (Towers) responded, "Okay. Alright, whatever. You can take it up with security and our legal department." (Recordings - Malta Med)

91. Malta Med Emergent Care's audit trail noted that Defendant Lisa West had called Malta Med Emergent Care and spoke to the Charge Nurse and the Defendant Christine Calistri and provided the Plaintiff's room number as well as instructions to ask the Plaintiff to, "stop live streaming or to be escorted off premises." (Exhibit E)

92. Malta Med Emergent Care's audit trail notes that Defendant Lisa West, who was at the time stationed at Saratoga Hospital, stated that Defendant Donna Kirker called her from Glens Falls Hospital.

93. At the time Plaintiff was being asked to leave the premises, Plaintiff was not stabilized and records indicate her blood pressure and pulse were still abnormally high. (Exhibit C)

94. Plaintiff was not transferred to another facility to stabilize her condition.

95. On September 21, 2022, the Plaintiff's boyfriend left a negative Google review of the facility wherein he did not mention the plaintiffs name or any identifying information.

96. On September 30, 2022, the Plaintiff's boyfriend, an unauthorized party to receive Plaintiff's private health information, received a Facebook message from Defendant Christine Calistri (Towers) wherein she disclosed the Plaintiff's private health information. (Exhibit H)

97. Defendant Christine Calistri (Towers) claimed that her children were receiving threats over the aforementioned Google Review made by Plaintiff's boyfriend. (Exhibit H)

98. On October 1, 2022, Defendant Christine Calistri (Towers) sent another Facebook message to Plaintiff's boyfriend in which she stated that she sought him out on social media after he left a negative Google review of Malta Med Emergent Care stating "it's no mystery who you are.", despite the fact that the plaintiff's boyfriend made no mention of the plaintiff's name in his google review. (Exhibit H)

99. Plaintiff made formal complaints to Glens Falls Hospital, Saratoga Hospital, Malta Med Emergent Care, and Albany Med Health Partners (Systems) in which the plaintiff included recordings of the events and screen shots of the messages sent by Christine Calistri (Towers) to the plaintiffs boyfriend via social media. (Exhibit E1)

100. On or about November 4, 2022, Malta Med Emergent Care sent a letter to the Plaintiff stating that they had conducted a formal investigation and determined that, "no impermissible HIPAA violations occurred." (Exhibit I)

101. Plaintiff made a formal report (Exhibit E1) to the NYS Department of Education against Defendant Christine Calistri (Towers).

102. On or about May 22, 2023,  the NYS Department of Education stated Defendant Christine Calistri (Towers) would face the prosecutor for the disciplinary board but provided no remedies for the plaintiff as she was informed that remedies could be sought through district court. (Exhibit J)

103. Plaintiff hired her family attorney to subpoena the internal audit trail from Malta Med Emergent Care.

104. Medical records (Exhibit K) obtained by the Plaintiff show that additional treatment ordered while Plaintiff was in the emergency room on September 21, 2022 were canceled immediately following the call from Defendant Lisa West, and that this action was signed off on by Christine Calistri (Towers).

105. Medical records show that Christine Calistri (Towers) had written that the Plaintiff was "feeling better, which was normal" and that the Plaintiff "requests to be discharged", which was false and contradicted notes input to the hospital's pharmacy for additional treatment. (Exhibit K, Exhibit L)

106. Malta Med Emergent Care's audit trail noted instructions to escort the Plaintiff off the property, directly contradicting the discharge paperwork. (Exhibit L)

107. Insurance documents (Exhibit M)  show that Christine Calistri (Towers) attempted to bill Plaintiff's insurance for services that were never provided, including the additional treatment that had been ordered and subsequently canceled.

108. Insurance documents (Exhibit M) obtained by the Plaintiff show that the Plaintiff's insurance company denied the claim due to a lack of consent forms signed by the Plaintiff.

109. Insurance documents obtained by the Plaintiff show that forged documents were sent to the insurance company on September 28, 2022, one week after the plaintiffs stay in the hospital. (Exhibit M)

110. HIPAA consent forms and a consent to bill insurance form were sent to the Plaintiff's insurance company containing a forged  signature that was not authorized by Plaintiff stating that verbal consent was given on September 28th, 2022, despite no such consent ever being given. (Exhibit M, Exhibit N)

111. No correspondence ever took place between Malta Med Emergent Care and the Plaintiff on September 28, 2022.

112. The consent documents that were not authorized by the plaintiff were signed off by a provider whose name does not appear to be listed anywhere within the Albany Med Health system. (Exhibit N)

113. Plaintiff attempted to contact Patient Relations representative Anthony Montello, multiple times from September 21 2022 - August 2023. Anthony Montello did not respond after the initial correspondence. (Exhibit O, Exhibit E1)

114. Plaintiff made several phone calls to Defendant Lisa West, in hopes of trying to resolve the issue but Plaintiff did not receive a response.

115. Plaintiff made several attempts to resolve these issues with Malta Med Emergent Care, Saratoga Hospital, Glens Falls Hospital, and Albany Med Health Partners (Systems), but the Plaintiff did not receive a response. (Exhibit E1)

116. Plaintiff remains without any preventative or remediating treatments for her erratic and unpredictable cluster headaches, due to the lack of appropriate treatment and due care from Dr.Braiman.

117. Defendants Donna Kirker (Glens Falls Hospital) and Lisa West (Saratoga Hospital) were unauthorized individuals under state and federal patient privacy laws including HIPAA and were not involved in the Plaintiff's care at Malta Med Emergent Care.

118. Defendants Donna Kirker (Glens Falls Hospital) and Lisa West (Saratoga Hospital) were at separate facilities from where the Plaintiff was receiving care. (Exhibit R)

119. On or about October 25, 2022, plaintiff was denied as a new patient by Saratoga Headache Center, a partner company of Albany Med Health Partners (Systems), Saratoga Hospital, and Glens Falls Hospital (Exhibit I-1). The facility was accepting new patients (confirmation of phone recording available upon request from the court), the facility accepted the plaintiffs insurance, and they treated cluster headaches.

120. On or about December 22, 2022, plaintiff's primary care provider, Marc Price, DO., an employee of Albany Med Health Partners (Systems) committed patient abandonment against the plaintiff and her mother, cutting her off from all medications and medical services with no legitimate reason given and without notice. (Exhibit J-1)

121. Exhaustive action was taken by the plaintiff as complaints were submitted to Albany Med Health Partners (Systems), Glens Falls Hospital (Exhibit B, S)  Saratoga Hospital (Exhibit I) and Malta Med Emergent Care (Exhibit F-1) - no resolution or corrective measures were taken by any of the facilities.

122. Exhaustive action was taken by the plaintiff through HHS OCR. (Exhibit G1) and no relief or corrective actions have been offered to the plaintiff.

123. Exhaustive action was taken by the plaintiff through NYS Division of Human Rights - Meghan Ginsberg informed the plaintiff that only one of the parties would be investigated and no further action could be taken by the plaintiff once the investigation was concluded - Ms. Ginsberg told the plaintiff she should annul her complaint with the Division and bring the case to state court.  (Exhibit G1).

124. Exhaustive action was taken by the plaintiff through NYS Department of Education - on May 22, 2023, NYS Department of Education informed the plaintiff that Christine Calistri (Towers) would be facing the prosecutor of the disciplinary board. (Exhibit J) No relief was offered to the plaintiff.

125. Albany Med Health Partners (Systems) has significant influence over the policies and practices of Glens Falls Hospital, Saratoga Hospital, and Malta Med Emergent Care.

126. Albany Med Health Partners (Systems), as the parent organization, owes a duty of care to patients treated within its subsidiary hospitals, including Glens Falls Hospital, Saratoga Hospital, and Malta Med Emergent Care, and this duty of care extends to ensuring that subsidiary hospitals comply with all relevant and applicable laws, regulations, and ethical standards.

# FIRST CAUSE OF ACTION:

(42 U.S.C. 18116 , §1557, The Affordable Care Act)

127.  Plaintiff restates and incorporates by reference the preceding paragraphs above as if fully set forth herein.

128.  The allegations contained in Paragraphs *45-71* constitute discriminatory policies and practices that are unlawful pursuant to the ACA §1557

129.  The discriminatory policies and practices of  Dr.Braiman, Albany Med Health Partners' (Systems) and Glens Falls Hospitals (a subsidiary of Albany Med Health Partners) violate Section 1557 of the Affordable Care Act.

130. Glens Falls Hospital and its parent company, Albany Med Health Partners (Systems) is located in Warren County and Albany County, New York - The Northern New York District Court Circuit has jurisdiction over both Glens Falls Hospital and Albany Med Health Partners (Systems).

131. Plaintiff exhausted all proper administrative remedies and avenues (Paragraphs *72, 121, 122-123*), and this Court thus has jurisdiction over violations of the Affordable Care Act pursuant to 42 U.S.C. § 18041[5].

132. Dr. Braiman, Glens Falls Hospital and Albany Med Health Partners (Systems) are in violation of the ACA § 1557:

    1.    ACA makes it unlawful for any health care provider that receives funding from the Federal government to :

        a. **Refuse to treat an individual §1557(a) – or to otherwise discriminate against the individual** – based on race, color, national origin, **sex, age** or **disability**.

---

[5] 42 U.S.C. § 18041 This section grants jurisdiction to the United States district courts for resolving disputes related to the ACA. It outlines the process for challenging certain actions or inactions under the ACA, allowing for legal remedies and judicial review.

      b. **Denial or Withholding of Treatment or Services** § 1557(b): Deny or withhold treatment, services, privileges, free and equal use of public **accommodation**, or otherwise receiving equal care on the basis of family status, **sex, gender**, **age,** disability, race, or national origin.

133. ACA imposes similar requirements on health insurance issuers that receive federal financial assistance. **Health care providers** and insurers are barred, among other things, from **excluding or adversely treating an individual on any of these prohibited bases.**

134. Dr. Braiman excluded and adversely treated the Plaintiff under the aforementioned prohibited bases of age, sex and disability when he refused to provide treatment options to Patient because of her sex, or female organs, in addition to her age (child bearing years)

135.  Dr. Braiman has personal liability as he is considered a state actor in this case based on the Second Circuits **Close Nexus Test:**

      **A. Government Funding:**

          The hospital employing Dr. Braiman, Glens Falls Hospital/Albany Med Health Partners (Systems) receives federal funding and accepts federal Medicare and state Medicaid. It is well-established that government funding creates a close nexus between a private entity and the state (*Rendell-Baker v. Kohn*, 457 U.S. 830 (1982), suggesting that Dr. Braiman's actions are, at least in part, influenced by government involvement.

          In *Rendell-Baker*, the Supreme Court considered whether a private school receiving substantial government funding could be deemed a state actor subject to constitutional constraints. The private school in question was a nonprofit corporation that operated an alternative high school under a contract with the state. The school received a large portion of its funding from the government and was providing education to students who had been referred by public school authorities. The teachers and staff were not public employees, but the school was heavily entwined with state policies and funding.

      **Legal Rationale:**

          The Court, in its decision, acknowledged that "extensive state regulation" and "pervasive entwinement" of the private entity's operations with the government could transform the private entity into a state actor for constitutional purposes. The Court held that the government's extensive funding, regulation, and involvement in the school's functions were sufficient to consider the school as a state actor.

      **Key Quote:**

          The opinion stated, "Entwinement may be enough so that a state responsibility attaches to the restraint and, through the restraint, to the constitutional deprivation."

      **Significance:**

          *Rendell-Baker* is significant in establishing that the level of government funding and involvement in the operations of a private entity can, under certain circumstances, lead to a determination that the private entity is a state actor. This, in turn, subjects the private entity to

constitutional constraints, even though it is not a direct government entity.

**B. Public Function:**

While it is true that hospitals are generally considered private entities, many aspects of their operations amount to the performance of a public function. Medical care is a service that the state often deems a public function. (*Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974). Dr. Braiman's role in the provision of medical care, a service traditionally considered a public function, brings him within the ambit of the joint action test.

In the *Jackson* case, a utility company terminated electrical service to a customer without notice or a hearing. The customer argued that the termination of essential services without due process violated his constitutional rights.

**Legal Rationale:**

The Supreme Court, in its decision, recognized that certain functions and services are so essential to the public that they become imbued with a public nature, even when provided by a private entity. The Court stated that essential services such as electricity, when provided by a regulated utility, become a "public function" subject to constitutional constraints.

**Key Quote:**

The Court noted, "Activities that are traditionally associated with sovereignty are 'public functions' for constitutional purposes."

**Significance:**

*Jackson v. Metropolitan Edison Co.* is significant in establishing the principle that certain essential services, including those related to health and well-being, can be considered public functions when provided by private entities. While this case specifically addressed utility services, the reasoning behind the recognition of public functions is applicable to services like medical care, which is crucial for public health and welfare.

**C. Regulation:**

The extent of state regulation over the hospital and its physicians, including Dr. Braiman, is significant. The comprehensive regulatory framework imposed by state authorities, such as medical licensing requirements and quality control standards, help demonstrate that the state is deeply involved in overseeing the hospital's activities. *Golden v. Zwickler*, 394 N.Y.S.2d 827 (N.Y. App. Div. 1977).

In *Golden v. Zwickler*, the plaintiff alleged medical malpractice against a hospital and individual doctors. The court addressed the issue of whether the hospital was an "arm of the state," which could potentially implicate the state's immunity from certain types of lawsuits.

**Legal Rationale:**

The court considered various factors to determine the state's involvement in hospital activities. It noted the existence of comprehensive regulations governing hospitals, including licensing requirements, quality control standards, and the supervision of medical personnel. The court concluded that these regulatory mechanisms demonstrated a significant state role in overseeing the hospital.

**Key Quote:**

"While the hospital is a private, nonprofit corporation, the State has, by comprehensive regulation, affirmatively acted to ensure that the hospital provides adequate and appropriate medical care to the public it serves."

**Significance:**

*Golden v. Zwickler* is significant in establishing that the existence of a comprehensive regulatory framework imposed by state authorities on hospitals can indicate deep state involvement in overseeing their activities. This involvement may have implications for issues such as sovereign immunity and the extent to which a hospital may be considered an "arm of the state" for legal purposes.

**D. Government Contracts:**

Dr. Braiman and the hospital in which he practices have entered into specific contractual agreements with state and federal agencies to provide healthcare services creating a close nexus between his actions and the state. *Blum v. Yaretsky, 457 U.S. 991 (1982)*.

In *Blum v. Yaretsky, 457 U.S. 991 (1982)*, the Supreme Court considered the involvement of doctors in a nursing home that participated in Medicaid, a state and federally funded healthcare program. The Court held that the state's regulatory control and funding of the nursing home created a sufficiently close nexus between the doctors' actions and the state, subjecting their decisions to constitutional scrutiny.

136. Declaring that Dr. Braiman acted with intentional discrimination :

**1. Violation of Title IX and Section 1557 of the ACA:**

Title IX and Section 1557 of the Affordable Care Act (ACA) prohibit sex discrimination in educational programs and activities, as well as in healthcare settings. Denying a patient medication based on their sex or reproductive capacity can be interpreted as a form of discrimination in violation of these federal laws.

**2. Disparate Treatment Based on Sex:**

Intentional sex discrimination can be demonstrated by showing that a patient is treated differently based on their sex. Denying medication options to a female patient solely because she can get pregnant is a clear example of disparate treatment. If a male patient with a similar medical condition is provided medication, while a female patient is denied equal care and options solely because of her reproductive capacity, it indicates a discriminatory motive.

### 3. Pervasive Stereotyping and Gender Bias:

Sex discrimination claims can be supported by evidence of pervasive stereotypes and gender bias. Denying medication to a patient who has the physical capacity to get pregnant reflects ingrained stereotypes and biases about women's roles and abilities. These stereotypes argue that the denial of medication is based on gender bias and not legitimate medical reasons.

137. Plaintiff is entitled to private right to damages under ACA:

### 1. Statutory Right to Damages:

Under the ACA, individuals have a statutory right to be free from discrimination on the basis of age, sex, or other protected characteristics in any health program or activity receiving federal financial assistance. The ACA expressly prohibits discrimination and the denial of benefits based on these protected characteristics. Therefore, when a violation of these anti-discrimination provisions occurs, it gives rise to a claim for damages.

### 2. Congressional Intent for Remedies:

The ACA was enacted with the intent to ensure that individuals receive equal access to healthcare services without discrimination. To effectuate this intent, **Congress included provisions that allow for the enforcement of these anti-discrimination provisions through legal remedies, including damages.** Congress recognized the importance of providing remedies to individuals who suffer harm due to ACA violations.[6] Section 1557 of the ACA allows for the enforcement of anti-discrimination provisions through legal remedies, including damages. The key provisions include:

  a. **Scope of Application:**

The anti-discrimination provisions apply to a broad range of entities, including health programs and activities administered by federal executive agencies, any state or local agency administering a health program or activity receiving federal financial assistance, health insurers participating in the Health Insurance Marketplaces, and any other entity established under Title I of the ACA.

---

[6] **Section 1557 of the Affordable Care Act (42 U.S.C. § 18116):**

- Subsection (b)(3)(B) of this section explicitly states that the enforcement mechanisms available for violations of the nondiscrimination provisions include the procedures, remedies, and rights set forth in Title VI of the Civil Rights Act of 1964.
  Subsection (b)(3)(B) of Section 1557 of the Affordable Care Act (42 U.S.C. § 18116) incorporates the enforcement mechanisms from Title VI of the Civil Rights Act of 1964. The specific enforcement mechanisms available under Title VI include:
  **Administrative Remedies:** Complaints can be filed with the Office for Civil Rights (OCR) within the Department of Health and Human Services (HHS).
  **Judicial Action:** Individuals have the right to file a private right of action in federal court if administrative remedies are exhausted.
  **Withholding of Federal Financial Assistance:** Agencies administering federal financial assistance may terminate or suspend assistance for non-compliance.
  .

b.   **Remedies and Enforcement:**

Section 1557 incorporates the enforcement mechanisms and remedies provided under Title VI of the Civil Rights Act of 1964. This includes the availability of private causes of action for individuals who experience discrimination, with remedies such as injunctive relief, compensatory damages, and attorneys' fees.

c.   **Coordination with Other Laws:**

The ACA clarifies that the enforcement mechanisms under Section 1557 are in addition to those under other federal laws prohibiting discrimination. This ensures that individuals can seek remedies under both Section 1557 and other relevant anti-discrimination statutes.

**3. Remedies under Section 1557:**

Section 1557 of the ACA specifically incorporates federal civil rights statutes, including Title IX and the Age Discrimination Act of 1975. These statutes provide remedies, including damages, for individuals who experience discrimination based on sex and age. Therefore, when the ACA incorporates these statutes, it also incorporates the available remedies, including the right to seek damages. As the plaintiff suffered and continues to suffer damages from her lack of treatment for her disabling condition, cluster headaches, plaintiff is entitled to damages.

**4. Individual Right to Bring Claims:**

The ACA provides individuals with the right to bring private actions against entities or individuals who engage in discriminatory practices under Section 1557. These private actions can include claims for damages when a violation of the ACA's anti-discrimination provisions results in harm to the individual.

**5. Equal Access to Healthcare Services:**

The primary goal of the ACA's anti-discrimination provisions is to ensure equal access to healthcare services for all individuals, regardless of their age, sex, or other protected characteristics. When a violation of these provisions leads to an individual being denied healthcare benefits or subjected to discrimination, that individual should have the opportunity to seek compensation for the harm suffered, which may include damages.

Based on the statutory rights and congressional intent under the ACA allows individuals to seek damages when they have experienced discrimination or violations of the anti-discrimination provisions which emphasizes the importance of providing remedies to individuals who have suffered harm as a result of ACA violations and the role of damages in deterring discriminatory practices.

138. Declaring that Dr. Braiman acted with intentional discrimination :

**1. Violation of Title IX and Section 1557 of the ACA:**

Title IX and Section 1557 of the Affordable Care Act (ACA) prohibit sex discrimination in

educational programs and activities, as well as in healthcare settings. Denying a patient medication based on their sex or reproductive capacity is interpreted as a form of discrimination in violation of these federal laws.

### 2. Disparate Treatment Based on Sex:

Intentional sex discrimination can be demonstrated by showing that a patient is treated differently based on their sex. **Denying medication options to a female patient solely because she can get pregnant is a clear example of disparate treatment.** If a male patient with a similar medical condition is provided medication, while a female patient is denied solely because of her reproductive capacity, it indicates a discriminatory motive.

### 3. Pervasive Stereotyping and Gender Bias:

Sex discrimination claims can be supported by evidence of pervasive stereotypes and gender bias. Denying medication to a patient who can get pregnant may reflect ingrained stereotypes and biases about women's roles and abilities. These stereotypes argue that the denial of medication is based on gender bias and not legitimate medical reasons.

### 4. Prima Facie Case of Intentional Discrimination:

In order to prove a prima facie case for intentional discrimination, the plaintiff must prove the following:

#### a. The plaintiff must prove she is a member of the protected class:

**Age:** *Show that the plaintiff belongs to a protected age group. In the context of medical treatment, this typically involves demonstrating that the plaintiff is a certain age.* Plaintiff's age, 32 means she is of "childbearing age", and establishes that the plaintiff is of a certain age. (14-44/55 years old).[7]

**Sex:** *Demonstrate that the plaintiff is a member of a protected sex or gender, and the discrimination is based on this characteristic.* Plaintiff is a member of the protected class : Female.

#### b. Qualified Individual:

*Establish that the plaintiff is qualified for the medical treatment sought. This might include showing that the plaintiff meets the necessary medical criteria for the treatment.* Plaintiff was qualified for the medication(s) in question by Dr. Braiman's own account of the treatments being "Safe and effective" for cluster headaches.

#### c. Adverse Action:

*Demonstrate that the plaintiff suffered an adverse action. In this case, the adverse action would be the denial of medical treatment.* The plaintiff continued to suffer from cluster headaches as a result of Jonathan Briamans actions.

#### d. Similarly Situated Individuals:

---

[7] "*Childbearing Years*" National Institute of Health, USA
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7316319/

*Identify a similarly situated individual or individuals who did not share the plaintiff's protected characteristic but were treated more favorably:*

Plaintiff was denied safe medication and medication options based on her and sex, and this denial was not due to legitimate, nondiscriminatory reasons as plaintiff expressed that pregnancy is not an option, possibility, nor concern. As her sex is what constitutes her ability for pregnancy, a member of a non protected class would have been treated differently.

**e. Causal Connection:**

*Show a causal connection between the plaintiff's protected characteristic (age or sex) and the adverse action (denial of medical treatment). This involves providing evidence that age or sex was a motivating factor in the decision.* The denial of safe and effective medication was based on the intention to treat the plaintiff less favorably due to her sex. The refusal of bodily autonomy and informed consent against the plaintiff based on her physical capacity to become pregnant due to her sex, regardless of her decision not to become pregnant, leaves only the option that the medication refusal was based on sex alone.

**5. Absence of a Legitimate Medical Justification:**

There is no legitimate medical justification for denying the medication and medication options as the plaintiff outlined the number of reasons why pregnancy was not an issue, nor was it a concern. The denial is based solely on a plaintiff's *ability* to get pregnant and as such, sex is the sole determining factor in the denial.

**6. Retaliation for Exercising Reproductive Rights:**

Denying medication based on reproductive capacity may also be viewed as retaliation for exercising reproductive rights. As the plaintiff was denied medication as a punitive measure for her reproductive choices, Dr. Braiman acted committed intentional sex discrimination.

139. Declaring that Dr. Braiman's actions violate Section 1557 in the following ways which validate a private cause of action:

**1. Direct Incorporation of Age and Sex Discrimination:**

Section 1557 of the ACA expressly prohibits discrimination on the basis of age and sex, among other factors, under any health program or activity receiving federal financial assistance. This means that the ACA itself serves as the corresponding civil rights statute predicate for age and sex discrimination claims. Therefore, it is not necessary for the Plaintiff to plead a separate statutory predicate, such as the Age Discrimination Act or Title IX, to assert a valid claim under Section 1557.

**2. Clear Statutory Language:**

**The language of Section 1557 is unambiguous in its inclusion of age and sex as prohibited grounds of discrimination.** It does not create any requirement to plead a corresponding statute because the ACA itself serves as the comprehensive federal statute addressing

discrimination in healthcare settings.

**3. Congressional Intent:**

Congress's intent when enacting the ACA was to eliminate discrimination in healthcare, including age and sex-based discrimination. This intent is reflected in the plain language of Section 1557. There is no indication in the legislative history or the ACA's text that Congress intended to require a separate statutory predicate for claims under Section 1557 for age or sex discrimination.

**4. Relevant Cases:**

*Weinreb v. Xerox Business Services, LLC Distinction:*

The case of *Weinreb v. Xerox Business Services, LLC.* In Weinreb, the court required the plaintiff to plead a corresponding civil rights statute predicate because the plaintiff was seeking to assert a claim under the Americans with Disabilities Act (ADA), which was not explicitly incorporated into the ACA. In this Plaintiff's case, age and sex discrimination are explicitly addressed within Section 1557, and, therefore, a separate predicate statute is not required.

**5. Purpose of Section 1557:**

Section 1557 was enacted to eliminate discrimination in healthcare settings, and it would defeat the purpose of the ACA to require claimants to navigate through a complex web of multiple statutes when the ACA itself directly addresses the discrimination they are experiencing.

140. Declaring that Glens Falls Hospital, Saratoga Hospital, Malta Med Emergent Care, Donna Kirker, Lisa West, and Christine Calistri (Towers) are party to the discrimination.

141. After the plaintiff's initial complaint regarding the discriminatory actions of Dr. Braiman to his employer on September 15, 2022, Glens Falls Hospital (Albany Med Health Partners/Systems) - Donna Kirker, Lisa West, and Christine Calistri (Towers), who were all employees or representatives of the healthcare facility where Dr. Braiman practices and the mother company, Albany Med Health Systems and its subsidiaries (Glens Falls Hospital, Saratoga Hospital, Malta Med Emergent Care) and it's employees, Donna Kirker, Lisa West, and Christine Calistri (Towers) engaged in actions that can be reasonably interpreted as retaliatory in nature. (Plaintiff reinstates *78-98*)

142. These retaliatory actions included, but were not limited to :

1. Threats of legal action against the plaintiff.

2. Interference with the plaintiff's treatment.

3. Efforts to dissuade the plaintiff from pursuing the discrimination claim against Dr. Braiman.

**A. Retaliation for Exercising Rights**

The plaintiff exercised her rights by filing a discrimination complaint against Dr. Braiman based on violations of various healthcare laws. Retaliation against an individual for exercising their legal rights is unlawful. Retaliation claims are commonly recognized under federal and state laws.

In this case, the retaliatory actions taken by Kirker, West, and Calistri (Towers) were in direct response to the plaintiff's lawful exercise of their rights.

**B. Complicity in Discriminatory Conduct**

The retaliatory actions taken by Kirker, West, and Calistri (Towers) demonstrate their complicity in the discrimination. Their actions indicate not only awareness of the plaintiff's discrimination claim, but also an attempt to protect Dr. Braiman and the healthcare facility from the potential legal consequences of the discrimination claim. Such complicity in alleged discriminatory conduct should subject them to liability under the discrimination claim.

**C. Supporting Case Law**

The inclusion of individuals other than the primary actor in discrimination claims is not without precedent. Courts have recognized that individuals who engage in retaliatory actions against a plaintiff for exercising their legal rights can be held liable under discrimination claims, especially when their actions are closely connected to the alleged discriminatory conduct.

1. *Curley v. N. Suffolk Mental Health Ass'n, 53 F.3d 942 (2d Cir. 1995):*

This case involved retaliation claims under the Rehabilitation Act. It highlighted that protection against retaliation is an integral part of the overall objective of eliminating discrimination.

2. *Willis v. Conopco, Inc., 108 F.3d 282 (11th Cir. 1997):*

Although not a healthcare case, it reinforces the principle that retaliation for opposing discriminatory practices is prohibited under anti-discrimination laws.

3. *Kessler v. Westchester County Dept. of Soc. Servs., 461 F.3d 199 (2d Cir. 2006):*

In this case, the Second Circuit Court of Appeals held that retaliatory actions need not be employment-related to be actionable under Title VII.

143. Plaintiff seeks to secure equitable and other relief under and seeks to secure relief regarding a discriminatory practice under Section 1557 of the Affordable Care Act for discrimination against the Plaintiff for her age and sex.

144. Albany Med Health Partners (Systems) are liable:

Albany Med Health Systems, as the parent organization, owes a duty of care to patients treated within its subsidiary hospitals, including Glens Falls Hospital - this duty of care extends to ensuring that subsidiary hospitals comply with relevant laws, regulations, and ethical standards.

145. Accordingly, under Section 1557 of the Affordable Care Act, plaintiff is entitled to actual damages, punitive damages, injunctive relief, emotional distress damages, relief of inconvenience, relief for loss of capacity for enjoyment of life, reasonable attorneys' fees and costs and any other relief the court sees fit.

# SECOND CAUSE OF ACTION:

(PUBLIC LAW 88 - 352 - JULY 2, 1964, 78 Stat. 241, Vol. II, P.L. 88-352, §60, Title IX, TITLE VII)

146. Plaintiff restates and incorporates by reference the preceding paragraphs above as if fully set forth herein.

147. Glens Falls Hospital and its parent company, Albany Med Health Partners (Systems) is located in Warren County and Albany County, New York - The Northern New York District Court Circuit has jurisdiction over both Glens Falls Hospital and Albany Med Health Partners (Systems).

148. Plaintiff exhausted all proper administrative remedies and avenues (Paragraphs *72-123*.), and this Court thus has jurisdiction over violations of the Civil Rights Act pursuant to Title IX, Title II, Title VII, Vol. II, P.L. 88-352, §601, PUBLIC LAW 88 - 352 - JULY 2, 1964, 78 Stat. 241,

149. US District Courts in New York State have jurisdiction over claims arising under federal law, including Title IX of the Civil Rights Act of 1964.

150. The allegations contained in Paragraphs *45-71* constitute discriminatory policies and practices that are unlawful pursuant to PUBLIC LAW 88 - 352 - JULY 2, 1964, 78 Stat. 241, Vol. II, P.L. 88-352, §60, Title IX, TITLE VII

151. Declaring that Dr. Jonathan Braiman, Albany Med Health Partners' (Systems) and Glens Falls Hospital actions violate The Civil Rights Act of 1964 which prohibits **:**

    A. **Discrimination** on the basis of race, color, religion, **sex** or national origin.

    B. Provisions of this civil rights act **forbids discrimination on the basis of sex,** as well as, race in hiring, promoting, and firing.

    C. The Act **prohibits  discrimination in public accommodations** and **federally funded programs**.

152. Declaring that the Defendant Dr. Jonathan Braiman's actions violate Vol. II, P.L. 88-352, §601, for prohibition against discrimination in Federally assisted programs.

153. Declaring that Albany Med Health Partners (Systems) and Glens Falls Hospital's actions violate Public Law 88-352, as formal complaints were made by the plaintiff on September 15. 2022 and the entities deemed the actions of their employee to be appropriate. (Exhibit W)

154. Dr. Braiman discriminated against free and equal care against the Plaintiff based on her sex in a public accommodation that receives federal funding and federally funded programs on the basis of her sex.

155. Dr. Braiman has individual liability in the context of Title II :

    **1. The Requirement of Authority and Control:**

        The cases *Doe v. NYSARC Trust Serv., 2020 U.S. Dist. LEXIS 177574,* and *Coddington v. Adelphi Univ.* emphasize the need to allege that the defendant held a position of authority and had significant control over the public accommodation to establish individual liability. However, these cases set a particular standard for pleading such liability, which should be

considered within the broader legal landscape.

**2. Distinction of the Present Case:**

Plaintiff's Complaint should not be dismissed based on the reasoning in Doe and Coddington for several reasons:

**a. Variability in roles :**

The nature of Dr. Braiman's role in the discrimination scenario can significantly differ from the roles of the individual defendants in *Doe and Coddington*. Dr. Braiman's responsibilities as the head of the department of Neurology and his influence within Glens Falls Hospital are different. Dr. Braiman holds the necessary level of authority and control over certain aspects of patient care.

**3. Title II Applicability:**

Title II is applicable to a private hospital like Glens Falls Hospital. Referring to the cases Goonewardena v. N Shore Long Island Jewish Health Sys., 2012 U.S. Dist. LEXIS 187361, and Verhagen v. Olarte, 1989 U.S. Dist. LEXIS 13881. These cases do not preclude Title II claims against private hospitals under all circumstances.

**4. Damages:**

While the primary remedies under Title II typically involve injunctive relief to stop discriminatory practices, there are instances where plaintiffs have sought and been awarded monetary damages:

A. *Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241 (1964):*

In this landmark case, the U.S. Supreme Court upheld the constitutionality of Title II of the Civil Rights Act. The Heart of Atlanta Motel, a large establishment that refused to provide accommodations to Black patrons, challenged the law. The Court ruled that Congress could use its power under the Commerce Clause to regulate private businesses that engaged in racial discrimination. While the case primarily dealt with injunctive relief, it set the stage for the application of Title II.

B. *Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400 (1968):*

This case involved a barbecue restaurant owner, Maurice Bessinger, who refused to serve Black customers. The Supreme Court held that the restaurant owner's refusal violated Title II, and the Court affirmed the award of monetary damages to the Black plaintiffs.

**5. Albany Med Health Partners (Systems) and it's subsidiaries must adhere to Title II :**

**1. Albany Med Health Partners (Systems) is a public entity:**

Title II of the Civil Rights Act of 1964 prohibits discrimination on the basis of sex, among other protected categories, in any place of public accommodation. Glens Falls Hospital, a subsidiary of Albany Med Health Partners (Systems), qualifies as a public entity for the purposes of Title II.

**2. The Functional Analysis of Public Entity Status:**

Title II does not expressly define what constitutes a "public entity." Instead, it relies on a functional analysis to determine whether an entity should be treated as a public accommodation. In applying this functional analysis to the present case, several factors support the argument that Glens Falls Hospital should be considered a public entity:

**a. Government Funding**:

Many private hospitals receive substantial federal funding or financial assistance. The presence of such government funding can suggest a level of government involvement, which is a key factor in assessing public entity status. Albany Med Health Partners (Systems) and Glens Falls Hospital receive both federal and state funding.

**b**. **Regulation:**

Private hospitals are often subject to comprehensive federal regulations and requirements, including those related to Medicare and Medicaid participation. Compliance with these regulations and oversight by government agencies can further indicate a public function. Albany Med Health Partners (Systems) and their included facilities accept medicare and medicaid.

**c**. **Critical Services:**

Hospitals, whether public or private, provide essential services to the community, including emergency care, maternity services, and other life-saving treatments. These services are critical for public health and safety, reinforcing the argument that the hospitals are often considered a public entity.

**6. Relevant Legal Precedents:**

*A. United States v. University Hospital, 729 F.2d 144 (2d Cir. 1984):*

In this case, the United States brought a suit against University Hospital in New York under Title II of the Civil Rights Act. The hospital argued that it was not a place of public accommodation and therefore not subject to Title II.

The court held that University Hospital **did** fall under the definition of a place of public accommodation because it was closely **intertwined with a public medical school and medical college, received significant federal funding, and served the public at large.**

This case illustrates the court's willingness to apply Title II to a hospital with substantial government funding and community involvement. Albany Med Health Partners

(Systems) is intertwined with Albany Medical College, provides residencies, training programs, receives significant federal funding, and serves the public at large.

B. *Pennhurst State School and Hospital v. Halderman, 451 U.S. 1 (1981)*:

This Supreme Court case addressed the scope of Title II in the context of institutions receiving federal funding. **The Court held that Title II applies to all programs or activities receiving federal financial assistance.** While the case concerned the Pennhurst State School and Hospital, the ruling emphasized the broad application of Title II to various entities that receive federal funding, including those providing critical services.

C. *Kessler v. Westchester County Dept. of Soc. Servs., 461 F.3d 199 (2d Cir. 2006)*:

In this case, the Second Circuit Court of Appeals held that retaliatory actions need not be employment-related to be actionable under Title VII.

These cases underscore the courts' willingness to apply Title II to entities that play a vital role in providing essential services, receive substantial government funding, and serve the public, including hospitals and healthcare institutions. The key factor is the level of government funding and the public nature of the services provided.

**7. Equal Access:**

Title II is intended to ensure equal access to public accommodations. Excluding private hospitals from its scope could undermine the law's purpose, leaving individuals without legal protection when seeking essential healthcare services.

**8. Educational Functions and Programs:**

Albany Medical Center and Albany Med Health Partners (Systems) provide educational programs and services as an integral part of their mission. This includes medical training, clinical education, internships, residencies, or other educational activities. These programs contribute to the development of healthcare professionals and serve an educational purpose.

**9. Federal Funding for Educational Programs:**

Albany Medical Center and Albany Med Health Partners (Systems) receive federal funding specifically for educational programs, therefore, they are eligible for Title IX coverage. Federal funding designated for education suggests that the institution is directly involved in educational activities.

**10. Relationship with Educational Institutions:**

Albany Medical Center and Albany Med Health Partners (Systems) have affiliations and partnerships with educational institutions, such as medical schools, universities and colleges, where students receive academic credits for their training or education, this demonstrates their educational role. These partnerships often involve educational components, making the institutions subject to

Title IX requirements.

**11. Accreditation and Certification:**

Albany Medical Center and Albany Med Health Partners (Systems) are accredited and certified as educational institutions by relevant accreditation bodies. Accreditation typically includes an evaluation of educational programs and standards.

**12. Educational Records and Compliance:**

Maintaining educational records, student files, and ensuring compliance with federal educational regulations and reporting requirements make Albany Medical Center and Albany Med Health Partners (Systems) function as educational institutions.

**13. Prevailing Legal Interpretations:**

   A.   *Doe v. Brown University, 166 F.3d 667 (1st Cir. 1999):*

In this case, a medical student filed a Title IX complaint against Brown University, a private educational institution with a medical school. The student alleged gender-based discrimination and retaliation in connection with her medical studies. The First Circuit Court of Appeals found that Title IX applied to Brown University's medical program because the medical school had a close relationship with the broader educational institution, and federal funds supported certain aspects of the medical program.

The court's decision highlighted that the relationship between the medical school and the university was such that they should be considered a single entity for Title IX purposes. The court reasoned that the medical school could not escape Title IX liability merely by asserting that it was an independent entity.

This case provides an important legal precedent suggesting that healthcare institutions affiliated with educational entities may be subject to Title IX when they have significant educational functions and receive federal funds. It underscores the significance of the relationship between the healthcare and educational components.

156. The plaintiff has a cause of action under Title II of the Civil Rights Act for the denial of a public accommodation on the basis of sex are as follows:

   **1. Title II:**

Dr. Braiman, Glens Falls Hospital, and Albany Med Health Partners (Systems) actions violate Title II of the Civil Rights Act. Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a, prohibits discrimination on the basis of race, color, religion, or national origin in places of public accommodation. The statute reads, "All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation."

   **2. Expansive Interpretation of "Sex" Discrimination:**

While Title II does not expressly mention "sex" as a protected category, the Civil Rights Act's Title VII, which addresses employment discrimination, explicitly includes "sex" as a protected characteristic. Courts have interpreted Title VII broadly to encompass sex discrimination, including cases involving sex stereotyping and gender-based discrimination.

**3. *Bostock v. Clayton County:***

The U.S. Supreme Court's decision in *Bostock v. Clayton County, 140 S. Ct. 1731 (2020),* reinforced the interpretation that Title VII prohibits sex discrimination, extending protections to LGBTQ+ individuals. The Court held that discrimination based on sexual orientation and gender identity constitutes sex discrimination under Title VII. This decision has implications for the interpretation of "sex" discrimination in other federal statutes, including Title II of the Civil Rights Act.

**4. Parallel between Title II and Title VII:**

Title II and Title VII share a common purpose of prohibiting discrimination. They both aim to eliminate arbitrary and invidious discrimination based on protected characteristics. If Title VII encompasses sex discrimination, the same principle should apply to Title II to ensure that individuals are not subjected to sex-based discrimination in public accommodations.

**5. Gender Discrimination as a Form of Sex Discrimination:**

Denying someone access to public accommodations based on their gender, gender identity, or perceived gender non-conformity constitutes a form of sex discrimination. *The Bostock decision* recognized that gender and sexual orientation discrimination involve impermissible sex stereotyping. This principle can be applied to Title II claims, as sex-based stereotypes and discrimination may underlie the denial of public accommodation. As the stereotype of being "childbearing" due to the plaintiff's sex was cited by Dr. Braiman, this principle must be applied.

**6. Protection of Fundamental Rights:**

Access to public accommodations is essential to full and equal participation in society. Denying access to public spaces based on sex perpetuates stereotypes, hinders individual autonomy, and denies individuals equal treatment under the law. Title II's protections should extend to ensure that individuals are not denied public accommodations based on their sex.

**7. Expansive Interpretation of Title VI:**

Title VI of the Civil Rights Act can be interpreted expansively to include sex discrimination claims under the prohibition of "any program or activity receiving federal financial assistance." While Title VI primarily addresses race discrimination, it does not explicitly exclude other forms of discrimination.

**8. Overlapping Anti-Discrimination Laws:**

Federal anti-discrimination laws often overlap, and a single set of facts can give rise to claims under multiple statutes. Title VI can be used to address sex discrimination claims when the same program or activity receives federal funding.

**9. Evolving Legal Standards:**

Recent legal developments, evolving societal norms, and legal precedents may provide a basis for expanding Title VI to include sex discrimination claims when federal funds are involved.

**10. Legislative Intent:**

Legislative intent and the spirit of anti-discrimination laws are to protect individuals from unjust discrimination based on various factors, including sex. Therefore, interpreting Title VI to cover sex discrimination aligns with the broader intent of anti-discrimination legislation.

**11. Protecting Vulnerable Groups:**

The purpose of anti-discrimination laws is to protect vulnerable groups and ensure equal access to programs or activities receiving federal funding. Allowing Title VI to encompass sex discrimination claims contributes to this overarching objective.

**12. Interpretive Precedents:**

**a. *Alexander v. Sandoval, 532 U.S. 275 (2001):***

In this case, the Supreme Court addressed the question of whether Title VI allowed for private suits based on regulations implementing the law. While the Court's decision was more focused on the availability of private rights of action, it underscores the importance of regulations in the enforcement of Title VI, which can encompass various forms of discrimination, including sex discrimination, if covered by federal regulations.

**b. *Pregnant Workers Fairness Act* and Title VI:**

The *Pregnant Workers Fairness Act (PWFA)* serves as an example of legislation that seeks to prohibit sex discrimination under Title VI in the context of pregnant workers. While this bill aims to establish the rights of pregnant workers explicitly, it indicates that Title VI can be a viable vehicle for addressing sex discrimination.

**c. Office for Civil Rights (OCR) Regulations:**

OCR, a part of the U.S. Department of Education, has issued regulations under Title VI related to Title IX. Title IX primarily addresses sex discrimination in educational programs receiving federal funding. However, OCR's regulations have the potential to expand the scope of Title VI to encompass various forms of sex discrimination within federally funded programs.

**d. Intersectionality and Multiple Forms of Discrimination:**

Courts have recognized that discrimination claims are not isolated but can involve multiple forms of discrimination simultaneously, such as race and sex. Cases that acknowledge the intersectionality of discrimination may indicate that Title VI could be applied broadly to protect individuals from multiple forms of discrimination, including sex discrimination.

*1. Davis v. Monroe County Board of Education, 526 U.S. 629 (1999):*

Although this case primarily dealt with sexual harassment in schools, it acknowledged the intersection of sex and race. The Court recognized that harassment can take on different forms for different individuals, and the experiences of minority students may involve a combination of sex and race-based discrimination.

**e. Evolving Legal Interpretations:**

The interpretation of anti-discrimination laws, including Title VI, can evolve over time in response to changing societal norms and legal precedents. Courts have been increasingly open to taking an expansive view of Title VI to encompass sex discrimination claims based on evolving legal standards. These cases and legal developments illustrate that Title VI may not be limited solely to race discrimination and can be interpreted expansively to include sex discrimination claims, especially when the discriminatory practices occur within programs or activities receiving federal financial assistance.

157. Albany Med Health Partners (Systems) are liable:

Albany Med Health Systems, as the parent organization, owes a duty of care to patients treated within its subsidiary hospitals, including Glens Falls Hospital - this duty of care extends to ensuring that subsidiary hospitals comply with relevant laws, regulations, and ethical standards.

158.  Plaintiff seeks to secure equitable and other relief under and seeks to secure relief regarding a discriminatory practice under PUBLIC LAW 88 - 352 - JULY 2, 1964, 78 Stat. 241, Vol. II, P.L. 88-352, §60, Title IX, TITLE VII for discrimination against the Plaintiff for her age and sex.

159. Accordingly, under PUBLIC LAW 88 - 352 - JULY 2, 1964, 78 Stat. 241, Vol. II, P.L. 88-352, §60, Title IX, TITLE VII plaintiff is entitled to actual damages, punitive damages, injunctive relief, emotional distress damages, relief of inconvenience, relief for loss of capacity for enjoyment of life, reasonable attorneys' fees and costs and any other relief the court sees fit.

## THIRD CAUSE OF ACTION:

(42 U.S.C. Age Discrimination Act of 1975 § 6101-6107)

160.  Plaintiff restates and incorporates by reference the preceding paragraphs above as if fully set forth herein.

161.  Declaring that Dr. Jonathan Braiman, Albany Med Health Partners' (Systems) and Glens Falls Hospitals actions and policies violate the Age Discrimination Act of 1975 (42 U.S.C. § 6101-6107).

162. This court has jurisdiction over Glens Falls Hospital and Albany Med Health Partners (Systems) which are located in the northern district of New York in Albany and Warren County.

163.  US District Courts in New York State have jurisdiction over claims arising under federal law, including 42 U.S.C. Age Discrimination Act of 1975.

164. Exhaustive action was taken by the plaintiff. (Paragraphs *72 -123*).

165.  The allegations contained in Paragraphs *45-71* constitute discriminatory policies and practices that are

unlawful pursuant to 42 U.S.C. Age Discrimination Act of 1975 § 6101-6107.

166. § 6102. Prohibition of discrimination states that:

Pursuant to regulations prescribed under § 6103 of this title, and except as provided by § 6103(b) of this title and section 6103(c) of this title, **no person in the United States shall, on the basis of age**, be **excluded from participation, in be denied the benefits of, or be subjected to discrimination under, any program or activity receiving Federal financial assistance.**

167. Declaring that Dr. Jonathan Braiman excluded the Plaintiff from benefits of a program receiving federal funding and denied her the rights and benefits of such federally protected benefits.

168. Declaring that Dr. Jonathan Braiman subjected the Plaintiff to discrimination based on her age under a program and activity that receives federal funding.

169. Defendants must adhere to the Age Discrimination Act:

**1. The Age Discrimination Act of 1975:**

The ADA prohibits age discrimination in programs or activities receiving federal financial assistance. This means that healthcare providers and programs that receive federal funding are prohibited from engaging in age discrimination.

**2. Disparate Treatment Based on Age**:

Denying treatment to the plaintiff solely because they are of childbearing age is seen as disparate treatment. Dr. Braiman treated the plaintiff differently from others based on her age, which is prohibited under the ADA.

**3. Violation of Equal Benefits:**

Under the ADA, no person should be denied the benefits of healthcare services based on their age. Dr. Braiman's denial of safe and effective treatment options for the defendant due to her age, "childbearing age" must be construed as a violation of the equal benefits provision of the ADA. This argument is based on the idea that age should not be a determining factor in the provision of healthcare services.

**4. No Legitimate Medical Justification:**

The plaintiff informed Jonathan Briaman that she is not pregnant, will not become pregnant, and takes appropriate measures to avoid pregnancy. As such, "childbearing age" was the sole reason for denying safe treatment and treatment options, which implies that age is the determining factor in the decision, which is discriminatory.

**5. Violation of the Age Discrimination Act:**

The act specifically prohibits discrimination on the basis of age in programs or activities receiving federal financial assistance.

170. Plaintiff's *Prima Facie* Case of Age Discrimination:

In order to prove a prima facie case for intentional discrimination, the plaintiff must prove the following:

**1. The plaintiff must prove she is a member of the protected class**:

**A. Age:**

*Plaintiff must show that the plaintiff belongs to a protected age group. In the context of medical treatment, this typically involves demonstrating that the plaintiff is a certain age.* Plaintiff's age, 32 means she is of "childbearing age", and establishes that the plaintiff is of a certain age. (14-44/55 years old).

**b. Qualified Individual:**

*Establish that the plaintiff is qualified for the medical treatment sought.* Plaintiff had been diagnosed by her previous neurologist with cluster headaches. Jonathan Braiman agreed that the plaintiff was suffering from cluster headaches. Plaintiff was qualified for the medication(s) in question by Dr. Braiman's own account of the treatments being "Safe and effective" for cluster headaches.

**c. Adverse Action:**

*Plaintiff must prove she suffered an adverse action. In this case, the adverse action would be the denial of medical treatment.* The plaintiff continued to suffer from cluster headaches as a result of Jonathan Briamans actions. Plaintiff continued to suffer with such severe pain she ended up in the emergency room. The denial of safe treatment resulted in extreme emotional distress.

**d. Similarly Situated Individuals:**

*Identify a similarly situated individual or individuals who did not share the plaintiff's protected characteristic but were treated more favorably.* Plaintiff was denied safe medication and medication options based on her age, "childbearing age", and this denial was not due to legitimate, nondiscriminatory reasons as plaintiff expressed that pregnancy is not an option, possibility, nor concern. As her age is what constitutes her ability for pregnancy, a member of a non protected class would have been treated differently.

**e. Causal Connection:**

*Plaintiff must show a causal connection between the plaintiff's protected characteristic (age or sex) and the adverse action (denial of medical treatment). This involves providing evidence that age or sex was a motivating factor in the decision.* The denial of safe and effective medication was based on the intention to treat the plaintiff less favorably due to her age. The refusal of bodily autonomy and informed consent against the plaintiff based on her physical capacity to become pregnant due to her age, regardless of her decision not to become pregnant, leaves only the option that the medication refusal

was based on age alone.

### f. Absence of a Legitimate Medical Justification:

There is no legitimate medical justification for denying the medication and medication options as the plaintiff outlined the number of reasons why pregnancy was not an issue, nor was it a concern. The denial is based solely on a plaintiff's *ability* to get pregnant and as such,  age is the sole determining factor in the denial.

### g. Retaliation for Exercising Reproductive Rights:

Denying medication based on reproductive capacity may also be viewed as retaliation for exercising reproductive rights. As the plaintiff was denied medication as a punitive measure for her reproductive choices, Dr. Braiman committed intentional age discrimination.

171. Albany Med Health Partners (Systems) are liable:

Albany Med Health Systems, as the parent organization, owes a duty of care to patients treated within its subsidiary hospitals, including Glens Falls Hospital - this duty of care extends to ensuring that subsidiary hospitals comply with relevant laws, regulations, and ethical standards.

172. The Age Discrimination Act prohibits age discrimination in healthcare under the ACA and the principles of disparate treatment and equal benefits.

173.  Accordingly, under the Age Discrimination Act of 1975 (42 U.S.C. § 6101-6107), Plaintiff is entitled to actual damages, punitive damages, injunctive relief, damages for emotional distress and reasonable attorneys fees and costs.

`
# FOURTH CAUSE OF ACTION:
### (42 U.S.C. § 1395cc(f) Patient Self-Determination Act (PSDA))

174. Plaintiff restates and incorporates by reference the preceding paragraphs above as if fully set forth herein.

175. Declaring that the Dr. Jonathan Braiman, Albany Med Health Partners' (Systems) and Glens Falls Hospitals practices and policies Violate Patient Self-Determination Act (PSDA)

176. This court has jurisdiction over Glens Falls Hospital and Albany Med Health Partners (Systems) which are located in the northern district of New York in Albany and Warren County.

177. US District Courts in New York State have jurisdiction over claims arising under federal law, including 42 U.S.C. § 1395cc(f) The Patient Self Determination Act.

178. Exhaustive action was taken by the plaintiff  (Paragraphs *72-123*).

179.  The allegations contained in Paragraphs *51 -71* constitute policies and practices that are unlawful

pursuant to 42 U.S.C. § 1395cc(f) Patient Self-Determination Act (PSDA)

180. The PSDA requires healthcare facilities to:

1. Provide written information about the patient's rights to make healthcare decisions, including advance directives.

2. Ensure that patients are aware of their right to accept or refuse medical treatment.

3. Document in the patient's medical record whether or not they have an advance directive.

181. Obligations of Healthcare Providers under PSDA:

**1. Dr. Jonathan Braiman, Albany Med Health Partners (Systems) and Glens Falls Hospital have liability:**

Under the PSDA, **healthcare providers, including individual physicians like Dr. Braiman, have specific obligations** when it comes to informing patients about their medical condition, **treatment options, risks, benefits, and alternatives.**

**2. Duty of Informed Consent:**

In the context of medical care, the duty of informed consent is a fundamental ethical and legal principle. Healthcare providers are obligated to provide patients with the necessary information to make informed decisions about their treatment. **This includes presenting patients with different treatment options and discussing the associated risks and benefits.**

**3. Breach of PSDA Obligations:**

Dr. Braiman, a healthcare provider, failed to provide the Plaintiff with different treatment options or relevant information necessary for the Plaintiff to make an informed decision about their treatment. This failure represents a breach of the PSDA's requirements.

**4. Personal Liability of Healthcare Providers:**

The PSDA does not solely impose obligations on healthcare institutions but **also on individual healthcare providers. Healthcare providers, including physicians, are personally responsible for complying with the requirements of the PSDA in their interactions with patients.**

**5. Physician Responsibility:**

Dr. Braiman refused to provide the Plaintiff with the necessary treatment options and relevant information, and as such is personally liable for violating the PSDA. As an individual healthcare provider, he is subject to the legal obligations set forth in the PSDA and must be held personally responsible for any breach of those obligations.

182. Dr. Jonathan Braiman committed elements of Violation under PSDA:

**1. Failure to Provide Information:**

The PSDA mandates that patients be given information about their medical condition, treatment options, risks, benefits, and alternatives. The Defendant failed to provide such information, thereby infringing on the Plaintiff's rights under the PSDA.

**2. Refusal to Recognize the Right to Refuse Treatment:**

The PSDA recognizes a patient's right to refuse treatment and make informed choices about their healthcare. The Defendant's refusal to provide treatment options demonstrates a disregard for the Plaintiff's right to make healthcare decisions autonomously.

**3. Defendant's Refusal to Provide Treatment Options**

Dr. Braiman, a healthcare provider involved in the Plaintiff's medical care, refused to provide the Plaintiff with different treatment options or relevant information necessary for the Plaintiff to make an informed decision about their treatment. This refusal, as outlined in the Plaintiff's complaint, represents a clear violation of the PSDA.

183. Dr. Braiman denied Plaintiff choices regarding her treatment and excluded safe, effective options from the discussion, even going so far as to refuse to tell the Plaintiff the names of the safe, effective treatments he was personally unwilling to prescribe on the basis of teratogenicity.

184. Dr. Braiman failed to provide the Plaintiff with appropriate information, including the name of the treatment he would ultimately prescribe, vehicle of distribution of said drug (injection), and risks and significant consequences that would have had physical consequence to the Plaintiff based on her well documented reactions, conditions, and comorbidities discussed during the appointment.

185. Plaintiff has a long history of well documented medical trauma, some due to serious complications she experienced as a side effect of a similar drug class that resulted in constipation that resulted in injury and needed medical intervention. The drug the defendant ultimately prescribed would have resulted in severe constipation with serious consequences, which would have a negative impact on the Plaintiffs physical health as well as her mental health and symptoms of her well documented post traumatic stress disorder.

186. The treatment the defendant ultimately prescribed set the Plaintiff over her threshold for coverage with her insurance and would have resulted in her having to pay for all of her life saving treatments out of pocket, which are tens of thousands of dollars a month.

187. Dr. Braiman refused to provide the Plaintiff with reasonable and available alternatives.

188. Plaintiff indicated to Dr. Braiman a number of times that she did not understand.

189. The Plaintiff did not consent nor agree to the treatment ultimately prescribed.

190. Plaintiffs Private Cause of Action Under PSDA:

Courts have recognized implied private causes of action in similar cases, particularly when individual rights have been infringed.

**1. Congressional Intent**:

The legislative history and intent behind the PSDA clearly demonstrate Congress's intention to protect and promote patients' rights to self-determination. Implicit in this intent is the need for individuals to have a mechanism to enforce their rights when they are violated.

**2. Effective Enforcement**:

Granting a private cause of action to patients is essential for effective enforcement of the PSDA. Without the ability to seek legal remedies, patients would be left without recourse when their fundamental rights to make informed healthcare decisions are violated.

**3. Protection of Fundamental Rights**:

The PSDA is rooted in the fundamental right of patients to make their own healthcare decisions. Courts have consistently upheld private causes of action when fundamental rights are at stake, emphasizing the importance of access to justice for individuals.

**4.. Medical Malpractice:**

Dr. Braiman failed to comply with the requirements of the PSDA, and this failure resulted in harm to the plaintiff. Dr. Braiman refused the plaintiff the ability to make informed choices about her medical treatment and as such, this refusal breached his duty of care as a neurologist.

**5. Informed Consent:**

The PSDA is closely related to the concept of informed consent. The plaintiff's right to make decisions about her medical care was not respected. Dr. Braiman refused to provide a number of medication options to the plaintiff - Dr. Braiman refused to tell the plaintiff the names of treatment options and the risks and benefits therein, violating her right to informed consent.

**6. Negligence:**

Dr Braiman, a healthcare provider, failed to exercise reasonable care in informing the plaintiff about her rights under the PSDA.

**7. State-Specific Laws and Supplemental Jurisdiction:**

**A. New York Public Health Law Article 29-B - Patients' Bill of Rights:**

**1. General Right to Informed Consent (§ 2803-c(1)):**

This section establishes that every patient has the right to be informed about their medical condition and the proposed treatment or procedure. It recognizes the importance of obtaining the patient's informed consent before any medical treatment, surgical procedure, or diagnostic procedure.

**2. Nature of the Procedure or Treatment (§ 2803-c(2)):**

Healthcare practitioners are required to disclose the nature and purpose of the proposed procedure or treatment to the patient. This includes explaining the expected benefits as well as the risks and alternatives, including the risks and benefits of not undergoing the procedure or treatment.

**3. Explanation of Risks and Alternatives (§ 2803-c(3)):**

The healthcare provider must provide information to the patient about the reasonably foreseeable risks, benefits, and alternatives involved in the proposed treatment or procedure. This includes information that a reasonable patient would want to know in order to make an informed decision.

**4. Patient's Right to Refuse Treatment (§ 2803-c(4)):**

The statute emphasizes the patient's right to refuse any treatment, and the healthcare provider must respect the patient's decision. The patient has the right to be informed of the medical consequences of refusing the proposed treatment.

**Documentation of Informed Consent (§ 2803-c(5)):**

Healthcare practitioners are generally required to document the informed consent process in the patient's medical record. This documentation should include a description of the information provided to the patient, the patient's consent or refusal, and any relevant discussions.

**B. Right to Make Decisions (§ 2805-d):**

**1. Right to Make Health Care Decisions (§ 2805-d(1)):**

This section recognizes the right of a competent adult patient to make decisions regarding their medical treatment. It includes the right to consent to, refuse, or withdraw consent to any treatment, as well as the right to formulate an advance directive.

**2. Access to Information (§ 2805-d(5)):**

The statute emphasizes the patient's right to access information about their medical condition and the proposed treatment, allowing them to make informed decisions about their healthcare.

**8. Civil Rights Laws:**

Plaintiff reinstates violations under The Civil Rights Act, The Affordable Care Act, the Age Discrimination Act, and the Americans with Disabilities Act.

191. Albany Med Health Partners (Systems) has liability.

    1. Albany Med Health Systems, as the parent organization, has a responsibility to ensure that its subsidiary hospitals adhere to ethical standards, which includes providing patients with informed consent and appropriate medical care.

    2. Dr. Jonathan Braiman, an employee of Glens Falls Hospital, allegedly denied the plaintiff informed consent and refused to discuss or prescribe certain treatments based on potential pregnancy concerns.

192. Accordingly, the Plaintiff is entitled to actual damages, punitive damages, injunctive relief, damages for emotional and physical harm, relief for aggravation , reasonable attorneys costs and fees, and any other relief the court sees fit.

# FIFTH CAUSE OF ACTION:

### (18 US code § 1035  -  False Statements Relating to Healthcare)

193. Plaintiff restates and incorporates by reference the preceding paragraphs above as if fully set forth herein.

194. Declaring that the Defendants Dr. Jonathan Braiman, Albany Med Health Partners (Systems) and Glens Falls Hospital practices and policies violate 18 US code § 1035  -  false statements relating to healthcare.

195. Albany Med Health Partners (Systems) and Glens Falls Hospital are in the Northern District of New York in Warren and Albany County.

196. This court has jurisdiction over federal statutes including 18 US code § 1035

197. Exhaustive action was taken by the plaintiff. (Paragraphs *72-123*)

198.  The allegations contained in Paragraphs *47-50, 64* constitute policies and practices that are unlawful pursuant to 18 US code § 1035  -  False Statements Relating to Healthcare.

199. 18 U.S.C. § 1035 is specific to False Statements that are "knowingly and willfully" made in connection with the delivery of or payment for any healthcare programs, benefits, items or services.

200. Healthcare programs, benefits, items or services include :  any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract.

201. Dr. Braiman stated that he could not prescribe the plaintiff the safest and most effective treatments because her insurance company would not cover the treatments, which is false.

202. Dr. Braiman was made aware that his statement that the plaintiffs insurance would not cover safe effective treatment options that were better suited for the patient, but could cause birth defects was false - Dr. Braiman can be heard on record reading aloud the birth defects caused by the plaintiffs current medication, CellCept, which was fully covered by her insurance and as such, Dr. Braiman became aware that his claim regarding insurance was false and therefore, the defendant knowingly and willfully failed to deliver benefits and services entitled to the

Plaintiff.

203. Plaintiff is entitled to a cause of action:

**1. Congressional Intent:**

While 18 U.S.C. § 1035 is primarily a criminal provision aimed at penalizing fraudulent statements in connection with healthcare services, this doesn't preclude a private right of action. Congressional intent to create a private right of action can be inferred from the text and purpose of the statute.

**2. Section 1035 criminalizes conduct where a person knowingly and willfully:**

Makes a materially false, fictitious, or fraudulent statement or representation. In connection with the delivery of or payment for healthcare benefits, items, or services.

The second element, *"in connection with the delivery of or payment for healthcare benefits, items, or services,"* implies that the statute is concerned with the integrity of healthcare transactions. When someone engages in fraudulent conduct during healthcare transactions, such as providing false information regarding why a provider cannot give a patient treatments,  it can have serious consequences. The denial of necessary medical care by Jonathan Braiman through means of making false statements relating to healthcare caused the plaintiff harm including emotional distress from continuing to suffer from her condition, a condition that leads many patients to commit suicide.

 **3. Case law**:

a. *Sedima, S.P.R.L. v. Imrex Co., Inc. (1985):*

In this landmark case, the U.S. Supreme Court held that RICO's civil provisions created a private right of action for individuals harmed by a pattern of racketeering activity. The Court ruled that RICO's civil remedies were intended to compensate victims of organized crime.

b. *Holmes v. Securities Investor Protection Corp. (1994):*

The U.S. Supreme Court further clarified the availability of a private right of action under RICO. It noted that RICO includes a civil cause of action and does not require an express private right of action because the statute's language is sufficiently broad to encompass civil claims.

The existence of a criminal penalty does not preclude the availability of civil remedies for individuals harmed by violations of the statute. Courts have allowed for both criminal prosecutions and civil actions to proceed based on the same underlying conduct.

204. Albany Med Health Partners (Systems) are liable:

Albany Med Health Systems, as the parent organization, owes a duty of care to patients treated within its subsidiary hospitals, including Glens Falls Hospital - this duty of care extends to ensuring that subsidiary

hospitals comply with relevant laws, regulations, and ethical standards.

205. Accordingly, under 18 US code § 1035 - False Statements Relating to Healthcare, Plaintiff is entitled to actual damages, punitive damages, injunctive relief, damages for emotional harm and loss of enjoyment of life, relief for inconvenience. reasonable attorneys costs and fees and any other relief the court sees fit.

# SIXTH CAUSE OF ACTION:

(Title 42, § 1320d et seq, CFR Title 45, § 160 § 164 The Health Insurance Portability and Accountability Act of 1996 (HIPAA),

206. Plaintiff restates and incorporates by reference the preceding paragraphs above as if fully set forth herein.

207. Declaring that the Defendants Donna Kirker, Lisa West, Christine Calistri, Albany Med Health Partners (Systems) and their subsidiaries, Malta Med Emergent Care, Glens Falls Hospital and Saratoga Hospitals practices and policies violate Title 42, § 1320d et seq, CFR Title 45, § 160 § 164 The Health Insurance Portability and Accountability Act of 1996 (HIPAA), HIPAA § 160.203.

208. This court has jurisdiction over federal laws and statutes including The Health Insurance Portability and Accountability Act of 1996.

209. This court has jurisdiction over Albany Med Health Partners (Systems), their employees, (Donna Kirker, Lisa West, Christine Calistri), and their subsidiaries therein, (Glens Falls Hospital, Saratoga Hospital, Malta Med Emergent Care) as the facilities are located in Warren County, Saratoga County and Albany County in the Northern District of New York.

210. Exhaustive action was taken by the plaintiff. (Paragraphs *72-123*)

211. The allegations contained in Paragraphs *78-94, 96-98, 117, 118* constitute policies and practices that are unlawful pursuant to Title 42, § 1320d et seq, CFR Title 45, § 160 § 164 The Health Insurance Portability and Accountability Act of 1996 (HIPAA)

212. The Health Insurance Portability and Accountability Act of 1996 (HIPAA), HIPAA Privacy Rule states that covered entities must:

**Protect individuals' medical records and other individually identifiable health information** (collectively defined as "protected health information") and apply to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically.

**Covered entities** are defined in the HIPAA rules as:

(1) health plans,

(2) health care clearinghouses, and

(3) health care providers who electronically transmit any health information in connection  with transactions for which HHS has adopted standards.

(4) Generally, these transactions concern billing and payment for services or insurance coverage. **For example, hospitals, academic medical centers, physicians, and other health care providers who electronically transmit claims transaction information directly or through an intermediary to a health plan are covered entities. Covered entities can be institutions, organizations, or persons.**

213**.** Declaring that no exceptions to the Privacy Rule under **§ 160.203 General rule and exceptions** can be applied in this case :

Covered entities may also use and disclose protected health information without individual authorization for certain public interest-related activities - These include:

A. Oversight of the healthcare system, including licensing and regulation

B. Public health, and in emergencies affecting the life or safety

C. Research

D. Judicial and administrative proceedings

E. Law enforcement

F. Informing next of kin

G. Body identification of the deceased person or investigation of the cause of death

H. For directories

I. Workers compensation

J. Medical examiner

K. In other situations where the use or disclosure is mandated by other laws (i.e., state and local)

214. Declaring that the defendants acted with willful neglect:

**§ 160.203 General rule and exceptions** outlines *Willful neglect. Willful Neglect* means **conscious, intentional failure or reckless indifference** to the **obligation to comply** with the administrative simplification provision violated.

215. Declaring that the defendants committed a breach:

A breach is, generally, an impermissible use or disclosure under the Privacy Rule that compromises the security or privacy of the protected health information.

216. Declaring that the defendants actions violate the Privacy Rule in the fourth category:

**1. Privacy Rule violations in the 4th category is defined as:**

*Willful neglect* of the HIPAA Rules and no effort made to correct the violation or mitigate the consequences within thirty days of discovery. If healthcare professionals knowingly misuse or

unlawfully obtain PHI, they are held criminally liable. Donna Kirker, Lisa West, and Christine Calistri (Towers) are licensed individuals who must take courses and go through training regarding HIPAA and patient privacy prior to being licensed. Due to their status as licensed individuals, it is true that the defendants are aware of the law. Facilities, such as Glens Falls Hospital, Saratoga Hospital, Malta Med Emergent Care and their parent company, Albany Med Health Partners (Systems) must also receive training regarding these policies, it is true that the facilities are aware of the law.

217. Plaintiff reinstates that Albany Med Health Partners (Systems), Saratoga Hospital, Malta Med Emergent Care were informed of the violation by the plaintiff which included recordings of the events of September 21, 2022 and screen shots of Facebook messages disclosing the plaintiffs private health information to an unauthorized individual sent by Christine Calistri (Towers) - the entities concluded that the actions of their employees were appropriate and that no violations occurred - as such, no corrective action was taken within 30 days of discovery.

218. Declaring that Donna Kirker, a covered entity and unauthorized individual, committed a breach of the privacy rule by transmitting the Plaintiffs Private Health Information verbally and by accessing and transmitting her private health information electronically to Lisa West, another unauthorized individual.

219. Donna Kirker, Lisa West, and Christine Calistri used the plaintiffs private health information for personal gain and malicious harm which is defined by the following:

  1. Offenses committed with the intent to sell, transfer or use individually identifiable health information for commercial advantage, personal gain or malicious harm permit fines of $250,000 and imprisonment up to 10 years. Offenses for civil violation under *Willful neglect* and are not corrected within required time period Penalty range: $50,000 per violation, with an annual maximum of $1.5 million.

  2. As the unauthorized access and transfer of the plaintiffs private health information had no legitimate basis and said information was used to intimidate the plaintiff, cut her off from emergency medical services, and retaliate against her, this breach falls under the guidelines for violations occurring for personal gain and malicious harm.

220. Declaring that Lisa West, a covered entity and unauthorized individual, committed a breach of the privacy rule by accessing the Plaintiffs private health information by means of unauthorized electronic search in order to locate the Plaintiffs location and room number.

221. Declaring that Donna Kirker committed an offense against HIPAA's privacy rule with willful neglect by accessing the Plaintiffs private health information, including locating the Plaintiff while she was receiving emergency services at another facility, and transmitted the Plaintiffs private health information to another individual, Lisa West, on the basis of a false allegation in order to cut off the Plaintiff from necessary emergency medical care.

222. Declaring that Christine Calitri (Towers) knowingly disclosed private health information to an unauthorized individual via social media.

223. Declaring that Christine Calistri (Towers) disclosed the Plaintiffs protected health information to an unauthorized individual for personal gain and/or malicious harm as there was no legal or medical justification for disclosing such information to an unauthorized individual.

224. Declaring that Donna Kirker accessed the plaintiffs' protected health information from Glens Falls Hospital, a different hospital from where the plaintiff was being treated (Malta Med Emergent Care).

225. Declaring that Donna Kirker accessed and disclosed the plaintiffs private health information despite the fact that she is not involved in the plaintiffs care.

226. Declaring that Lisa West accessed the plaintiffs protected health information from Saratoga Hospital, a different hospital from where the plaintiff was being treated.

227. Declaring that Lisa West accessed and disclosed the plaintiffs private health information despite the fact that she is not involved in the plaintiffs care.

228. Declaring that Lisa West was complicit with the privacy violations of Donna Kirker by engaging in unauthorized activities.

229. Declaring that Christine Calistri (Towers) disclosed the plaintiffs' protected health information to an unauthorized individual via social media on more than one occasion, (September 30, 2022, October 1, 2022.)

230. Declaring that Christine Calistri (Towers) was complicit in the unauthorized access and use of the plaintiffs protected health information by more than one individual.

231. Declaring that Christine Calistri (Towers) interrupted the plaintiffs right to emergency services as a result of the aforementioned breach.

232. Declaring that Christine Calistri (Towers) acted with malice or, at best, negligence by contacting an unauthorized individual, the plaintiffs boyfriend, via facebook messenger and disclosing the plaintiffs protected health information therein.

233. Declaring that Christine Calistri (Towers) used the plaintiff's protected health information to humiliate and mock the plaintiff to an unauthorized third party via social media :

    1. Christine Calistri (Towers) made false claims to the plaintiff's boyfriend stating that her children were fearful for their lives due to his negative google review.

    2. Christine Calistri (Towers) stated she was not sure if she "can or will move forward."

    3. Christine Calistri (Towers) stated that the plaintiff got "everything she asked for on September 21st"

    4. Christine Calistri (Towers) told the plaintiffs boyfriend that she hopes the plaintiff "gets all the "likes" she needs to feel better.", which in the context of this message, "likes" is referencing the plaintiff's social media presence.

    5. Christine Calistri (Towers) committed a breach by disclosing date, location of service, provider names, and locations of previous services.

234. As a result of Defendants' actions, Plaintiff experienced emotional distress, including anxiety, fear of emergency rooms, and humiliation.

235. Christine Calistri's actions caused interpersonal struggles between the plaintiff and her boyfriend as a result of her Facebook messages which caused the plaintiff and her boyfriend serious emotional distress.

236. Defendants Donna Kirker, Lisa West and Christine Calistri (Towers) ' false claims and intentional actions have caused severe emotional distress to Plaintiff, impacting her mental well-being, physical health, daily life and ability for enjoyment of life.

237. Plaintiff's private health information was disclosed to unauthorized individuals, including Plaintiff's Boyfriend, constituting a breach of confidentiality.

238. Defendants' actions constitute willful and negligent violations of HIPAA, causing harm to Plaintiff.

239. Plaintiff is entitled to a private right of action.

**Relevant cases:**

1.   *Costa-Conniff v. St. Vincent's Health System, Inc. (2017):*

In this case, a patient alleged that a hospital and its employees violated HIPAA by accessing and disclosing her medical records without authorization. The plaintiff claimed emotional distress and sought damages. The court allowed the case to proceed, recognizing a potential private cause of action for HIPAA violations.

2.   *Doe v. Guthrie Clinic, Ltd. (2014):*

This case involved allegations of HIPAA violations by a healthcare provider. The plaintiff claimed that the clinic impermissibly disclosed her medical information, leading to emotional distress. The court allowed the plaintiff to pursue a private cause of action under HIPAA.

240. Albany Med Health Partners (Systems) has liability.

1. Albany Med Health Systems, as the parent organization, is responsible for ensuring that all its subsidiaries, including Glens Falls Hospital, comply with EMTALA regulations.

2. **Supervision and Control:**

Donna Kirker, Christine Calistri (Towers) and Lisa West are employees of Albany Med Health Systems and were involved in the events at Glens Falls Hospital despite being unauthorized individuals not involved in the plaintiff's care at Malta Med Emergent Care.

Christine Calistri (Towers), an employee of Malta Med Emergent Care (also owned by Albany Med Health Systems), in disclosing the plaintiff's private health information via social media - such actions violate patient privacy rights and demonstrate a failure on the part of Albany Med Health Systems to enforce appropriate privacy policies within its subsidiaries.

The actions of these individuals reflect a level of supervision, control, or influence exerted by Albany Med Health Systems over the subsidiary hospital.

241. Accordingly, under Title 45, Code of Federal Regulations (CFR), Parts 160 and 164 (General

Administrative Requirements), 45 CFR Part 164: (Security and Privacy), Subpart A: (General Provisions), Subpart B: (Privacy of Individually Identifiable Health Information (Privacy Rule), Subpart C: (Security Standards for the Protection of Electronic Protected Health Information (Security Rule),  Plaintiff is entitled to actual damages, punitive damages, injunctive relief, damages for emotional harm and loss of enjoyment of life, relief for inconvenience. reasonable attorneys costs and fees and any other relief the court sees fit.

# SEVENTH CAUSE OF ACTION
(Title 18 USC § 371, § 241, § 242, 42 U.S.C. § 1983)

242. Plaintiff restates and incorporates by reference the preceding paragraphs above as if fully set forth herein.

243. Declaring that the Defendants Donna Kirker, Lisa West, Christine Calistri, Albany Med Health Partners practices and policies violate Title 18 USC § 371, § 241, § 242

244. This court has jurisdiction over federal law including Title 18 USC § 371, § 241, § 242.

245. This court has jurisdiction over Albany Med Health Partners (Systems), their subsidiaries (Glens Falls Hospital, Saratoga Hospital, Malta Med Emergent Care), and their employees, Donna Kirker, Lisa West and Christine Calistri as the entities and employees are located in Warren County, Saratoga County and Albany County in the Northern District of New York.

246. Exhaustive action was taken by the plaintiff. (Paragraphs *72-123*)

247.  The allegations contained in Paragraphs *78 - 120* constitute policies and practices that are unlawful pursuant to Title 18 USC § 371, § 241, § 242, 42 U.S.C. § 1983

248. General Conspiracy statute 923 Title 18 USC § 371 states that  "[i]f two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose."

249. Under the General Conspiracy statute, *Hass*, 216 U.S. at 479-480. In *Hammerschmidt*, Chief Justice Taft, defined "defraud" as follows:

1.  To conspire to defraud the United States means primarily to cheat the Government out of property or money, but it also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest. It is not necessary that the Government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official action and purpose shall be defeated by misrepresentation, chicane or the overreaching of those charged with carrying out the governmental intention.

Thus, if the defendant and others have engaged in dishonest practices in connection with a program administered by an agency of the Government, it constitutes a fraud in the United States under Section 371. *United States v. Gallup*, 812 F.2d 1271, 1276 (10th Cir. 1987); *Conover*, 772 F.2d at 771. In *United States v. Hopkins*, 916 F.2d 207 (5th Cir. 1990),

250. Under General Conspiracy Statute, "program administered by the government" includes:

1. Federally funded public accommodations

2. Federally funded programs and services.

3. Albany Med Health Partners (Systems) and its subsidiaries receive both federal and state funding. The entities provide public programs, services, and are places of public accommodation.

251. Albany Med Health Partners (Systems) and their subsidiaries are considered to be programs administered by the government:

**1. Federally Funded Accommodations:**

Albany Med Health Partners and its subsidiaries, including Glens Falls Hospital, Saratoga Hospital, and Malta Med Emergent Care receive federal funds, either directly or indirectly, to support their operations.

These healthcare entities participate in federal healthcare programs, receive Medicare and Medicaid reimbursements, and benefit from other federal funding mechanisms.

Federal funds received by these entities contribute to their ability to provide public accommodations, including medical services, to the general public.

**2. Federally Funded Programs and Services.**

Albany Med Health Partners (Systems) and its subsidiaries operate various healthcare programs and services that receive federal funding.

These programs and services may include but are not limited to :

a. Emergency medical care

b. Patient care

c. Education and residency programs

d. Other health-related services.

Federal funds are integral to the functioning of these programs and services, underscoring the nexus between the healthcare entities and the federal government.

**3. Application of the General Conspiracy Statute:**

The General Conspiracy Statute is not limited to conspiracies involving traditional government entities but e**xtends to private entities that receive federal funds and operate programs and services for the public benefit.**

Albany Med Health Partners (Systems) and its subsidiaries **fit within the statutory definition of a "program administered by the government"** due to their reliance on federal funding for the provision of public accommodations and programs.

252**.**  Declaring that Donna Kirker conspired with others including Lisa West and Christine Calistri (Towers) to interfere with and obstruct a lawful function through dishonest means by instructing others to cut off the Plaintiff from her right to emergency medical care in a federally funded establishment, a federally funded place of public accommodation, while receiving federally funded services on the basis of a false allegation of "live streaming."

253. Defendants have personal liability under 18 U.S.C. § 241 :

18 U.S.C. § 241 Conspiracy Against Rights, makes it unlawful for **two or more persons to agree to injure, threaten, or intimidate** a person in the United States **in the free exercise or enjoyment of any right or privilege** secured by the Constitution **or laws of the United States** or because of his or her having exercised such a right. The details within the hospital's audit trail showing the correspondence between Donna Kirker, Lisa West and then Christine Calistri (Towers) point to specific evidence of a mutual agreement among Donna Kirker, Lisa West, Christine Calistri, and Albany Med Health Partners to commit a federal offense.

**A. Statutory guidelines under 18 U.S.C. § 241:**

**1**. This statute prohibits willful injury, intimidation, or interference, or attempt to do so, by force or threat of force of any person or class of persons because of their activity as:

1. A voter, or person qualifying to vote

2. a participant in any benefit, service, privilege, program, facility, or activity provided or administered by the United States;

3. an applicant for federal employment or an employee by the federal government;

4. a juror or prospective juror in federal court; and

5. a participant in any program or activity receiving Federal financial assistance.

**2**. This statute **prohibits willful injury, intimidation, or interference or attempt to do so, by force or threat of force of any person** because of race, color, religion, or national origin and because of his/her activity as:

1. A student or applicant for admission to any public school or public college;

2. a participant in any benefit, service, privilege, program, facility, or activity provided or administered by a state or local government;

3. an applicant for private or state employment, private or state employee; a member or applicant for membership in any labor organization or hiring hall; or an applicant for employment through any employment agency, labor organization or hiring hall;

4. a juror or prospective juror in state court;

5. a traveler or user of any facility of interstate commerce or common carrier; or a patron of any public accommodation, including hotels, motels, restaurants,

lunchrooms, bars, gas stations, theaters...or any other establishment which serves the public and which is principally engaged in selling food or beverages for consumption on the premises.

6.  This statute prohibits interference by force or threat of force against any person because he/she is or has been, or in order to intimidate such person or any other person or class of persons from participating or affording others the opportunity or protection to so participate, or lawfully aiding or encouraging other persons to participate in any of the benefits or activities listed in items  (1) and (2), above without discrimination as to race, color, religion, or national origin.

254. Donna Kirker, Lisa West and Christine Calistri (Towers) (more than two persons) agreed to threaten the Plaintiff with security and legal action while the Plaintiff was participating in the services, benefits and privileges administered by a federally funded program, she was in the emergency department.

255. Donna Kirker, Lisa West and Christine Calistri agreed to injure the Plaintiff by means of cutting her off from necessary emergency medical services.

256. Donna Kirker, Lisa West and Christine Calistri (Towers) agreed to intimidate the Plaintiff by making false allegations that the Plaintiff was live streaming, and that such actions are punishable by law, which is also false.

257. Donna Kirker, Lisa West and Christine Calistri (Towers) interfered with the Plaintiffs right to emergency medical care by forcing and threatening force (legal action, armed security) against the Plaintiff.

258. Declaring that the defendants actions violate Title 18 § 242:

Section 242 of Title 18 makes it a crime for a person acting under color of any law to willfully deprive a person of a right or privilege protected by the Constitution or laws of the United States."

Donna Kirker, Lisa West and Christine Calistri (Towers) willfully deprived, and instructed others to deprive the Plaintiff of her rights and privileges to emergency medical care which are protected by federal law by instructing others to cut off the Plaintiff from medical care and to have her escorted off hospital premises.

259. Plaintiff was participating in a benefit, service and privilege in a public accommodation where such rights are granted to her by federal law.

260. Plaintiff reinstates Albany Med Health Partners (Systems), Glens Falls Hospital, Saratoga Hospital and Malta Med Emergent Care were made aware of the actions of their employees by the Plaintiff . Albany Med Health Partners (Systems) and their subsidiaries deemed their employees actions to be appropriate and that no violations occurred.

261. Plaintiffs right to a cause of action for violations of Title 18 under 42 U.S.C 1983:

**I. Overview of 42 U.S.C. § 1983:**

42 U.S.C. § 1983, commonly known as Section 1983, is a federal statute that grants individuals the right to seek remedies for violations of their constitutional rights by persons acting

under color of state law. The statute is broad in scope, designed to address civil rights deprivations, and has been frequently employed to combat misconduct by government officials.

**II. Elements of § 1983:**

To establish a claim under § 1983, the plaintiff must demonstrate:

**A. Deprivation of Constitutional Rights:** The plaintiff must show that a right secured by the Constitution or federal law was violated :

**Plaintiff's Right to Medical Treatment as a Fundamental Constitutional Right was violated :**

**1. The Constitutionality of the Right:**

The right to receive adequate and nondiscriminatory medical treatment is grounded in the fundamental principles of due process and equal protection under the law. Courts have consistently recognized this right as essential to the preservation of life and well-being.

**II. Deprivation of Constitutional Rights at Malta Med Emergent Care:**

**B. Discharge Without Stabilization:**

The plaintiff, in a state of distress due to untreated cluster headaches, sought emergency medical care at Malta Med Emergent Care. Despite being in need of further treatment to stabilize her condition, she was abruptly discharged without transfer to another facility, directly contravening the plaintiff's right to appropriate medical care.

**C. False Accusations and Forced Discharge:**

The plaintiff was falsely accused of live-streaming her treatment, a claim proven false by subsequent investigations. The baseless accusation led to her forced discharge, demonstrating a severe violation of her rights to privacy, dignity, and proper medical attention.

**D. Violation of Patient-Physician Confidentiality:**

Christine Calistri (Towers) breached patient-physician confidentiality by disclosing the plaintiff's private health information to unauthorized parties, including the plaintiff's boyfriend. Such actions are clear violations of the constitutional right to privacy and confidentiality in medical care.

**E. Manipulation of Medical Records:**

Documents obtained through the hospital's audit trail reveal a troubling pattern of manipulation in the plaintiff's medical records. This includes the cancellation of ordered treatments, false claims of the plaintiff feeling better, and attempted billing for services not provided, all of which further demonstrate a disregard for the plaintiff's constitutional rights.

**III. Legal Remedies and Accountability:**

**A. Application of 42 U.S.C. § 1983:**

The plaintiff contends that the actions of the defendants, acting under color of state law as medical professionals, give rise to a cause of action under 42 U.S.C. § 1983. This statute provides a remedy for the violation of constitutional rights by state actors, ensuring accountability for their actions.

**B. Case Law Supporting § 1983 Claims in Medical Context:**

1. *Estelle v. Gamble, 429 U.S. 97 (1976):*

    This case, while primarily addressing Eighth Amendment rights of prisoners, established that deliberate indifference to serious medical needs of prisoners constitutes cruel and unusual punishment.

2. *City of Revere v. Massachusetts General Hospital, 463 U.S. 239 (1983):*

    In this case, the Court held that a municipality could be liable under Section 1983 for deliberate indifference to the medical needs of a pretrial detainee.

3. *West v. Atkins, 487 U.S. 42 (1988):*

    In this case, the Court held that a private physician, under contract with a state prison, could be considered a state actor and, thus, could be liable under Section 1983 for deliberate indifference to an inmate's serious medical needs.

**C. State Action**

The alleged misconduct must be attributable to a person acting under color of state law.

**I. Under Color of State Law Requirement:**

**A. Government Employment:**

The defendants were acting in their capacity as healthcare providers employed by Albany Med Health Partners (Systems) and its subsidiaries. Their employment by these entities constitutes state action.

**D. Delegation of Public Functions:**

Albany Med Health Systems, Glens Falls Hospital, Saratoga Hospital, and Malta Med Emergent Care are engaged in providing essential healthcare services and are, therefore, performing functions traditionally reserved to the state.

**E. Joint Action with State Officials:**

The defendant, Christine Calistri. (Towers) collaborated with other state actors such as Lisa West, the Chief Nursing Officer at Saratoga Hospital, and Donna Kirker, the Chief Nursing Officer at Glens Falls Hospital. This joint action further establishes the defendants' conduct as state action.

**IV. Examples of State Action:**

**A. Execution of Public Duties:**

Christine Calistri (Towers) was executing duties integral to the public interest, including providing medical treatment and making decisions affecting patient care.

**B. Reliance on State Resources:**

The defendants relied on state resources, such as hospital facilities, equipment, and patient records, to carry out their duties, reinforcing the state's involvement in their actions.

**V. Precedent and Legal Authority:**

A. *West v. Atkins (1988): (aforementioned)*

B. *City of Revere v. Massachusetts General Hospital (1983)*: *(Aforementioned)*

**VI. Application to Title 18 USC § 371 - Conspiracy to Commit Offense:**

**A. § 1983 as a Vehicle for Accountability:**

Section 1983 can be invoked as a remedy when state actors conspire to commit an offense under Title 18 USC § 371. It allows individuals to seek redress when such conspiracies result in the deprivation of constitutional rights.

**VII. Application to Title 18 USC § 241 - Conspiracy Against Rights:**

**A. § 1983 as a Remedy for Conspiracy Against Rights:**

Alleged conspiracies to violate rights protected under § 241 can trigger liability under § 1983, providing an avenue for plaintiffs to seek damages and injunctive relief.

**VIII. Application to Title 18 USC § 242 - Deprivation of Rights Under Color of Law:**

**A. § 1983 as a Mechanism for Addressing Rights Deprivation:**

Violations of rights under color of law, as proscribed by § 242, can form the basis for a § 1983 claim, enabling individuals to pursue legal remedies.

262. Plaintiffs private right of action under Section 1983 of Title 42 :

Section 1983 of Title 42 of the United States Code is a federal statute that provides individuals with a private right of action for violations of their constitutional rights by persons acting under color of state law.

In essence, it allows individuals to sue state and local government officials, as well as **private individuals,** who violate their federal constitutional rights while acting in an official or quasi-official capacity. This statute has been widely used to seek remedies for civil rights violations. It has been used when rights are violated through a conspiracy. Section 1983 is often invoked in cases of alleged misconduct by officials acting under the authority of state law.

263. Relevant Cases:

*Monell v. Department of Social Services, 436 U.S. 658 (1978):*

This case clarified that municipalities and other local government bodies can be liable under Section 1983 for constitutional violations resulting from governmental customs, policies, or practices. It helps establish the principle that a conspiracy or concerted action by officials can give rise to liability.

*Dennis v. Sparks, 449 U.S. 24 (1980):*

This case addressed the issue of whether private individuals could be held liable under Section 1983. The Court held that a private party can be liable under Section 1983 if they are a willful participant in joint action with the State or its agents.

*Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970):*

This case involved a Section 1983 claim arising from an alleged conspiracy between state actors and a private party. It emphasized that private parties acting in concert with state officials could be held liable for constitutional violations.

264. Albany Med Health Partners (Systems) are liable:

1. Albany Med Health Systems, as the parent organization, owes a duty of care to patients treated within its subsidiary hospitals, including Glens Falls Hospital, Saratoga Hospital and Malta Med Emergent Care - this duty of care extends to ensuring that subsidiary hospitals comply with relevant laws, regulations, and ethical standards.

2. The plaintiff rights were violated by being abandoned as a patient by her primary care physician, Marc Price, DO., an employee of Albany Med Health Systems, after she reported Dr. Braiman.

3. The plaintiffs rights were violated when she was denied access to Albany Med Health Systems affiliated facilities such as Malta Med Emergent Care and Saratoga Headache Center after she reported Dr. Braiman.

265. To establish a claim under 42 U.S.C. § 1983, the plaintiff must demonstrate:

**1**. **Deprivation of Constitutional Rights:**

The plaintiff's right secured by the Constitution or federal law was violated under the First Amendment. The plaintiff asserts that her rights under the First Amendment to the United States Constitution were violated in the course of the actions undertaken by the defendants. The First Amendment safeguards fundamental rights, including freedom of speech and expression, that are essential to the functioning of a democratic society. In this case, the plaintiff contends that certain actions by the defendants infringed upon her constitutionally protected rights.

1. **First Amendment Protection:**

The First Amendment to the United States Constitution states, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." This constitutional provision protects individuals from government actions that seek to restrict their ability to speak freely, express their opinions, or engage in peaceful assembly.

Application to the Plaintiff's Case:

a. **False Accusations and Discharge:**

The plaintiff alleges that she was falsely accused of live-streaming her treatment, a claim that was later proven false.

The baseless accusation led to her forced discharge from Malta Med Emergent Care.

Restricting the plaintiff's ability to seek emergency medical care based on a false allegation curtailed her freedom of movement and access to essential services, violating her constitutional rights.

b. **Interference with Online Expression:**

The plaintiff's constitutional rights were further impinged when Christine Calistri (Towers) disclosed the plaintiff's private health information, including false claims, through social media.

Such disclosure not only violated patient-physician confidentiality but also subjected the plaintiff to public scrutiny and potential harm, inhibiting her freedom of speech and expression.

c. **Denial of Access to Medical Facilities:**

The plaintiff alleges that she was denied access to Albany Med Health Systems affiliated facilities after reporting a concern about her primary care physician.

Denying access to medical facilities based on the exercise of free speech rights represents a direct infringement on the plaintiff's First Amendment-protected activities.

d. **Retaliation for Negative Reviews:**

Christine Calistri (Towers) engaged in conduct that can be interpreted as retaliation for a negative review posted by the plaintiff's boyfriend on google.

Retaliating against an individual for expressing critical opinions through reviews implicates the First Amendment's protection of freedom of expression.

2. **Legal Precedent:**

 a. **Gagging Speech Violates the First Amendment:**

  Courts have consistently held that efforts to restrict individuals from expressing their opinions, even through criticism or negative reviews, can amount to a violation of the First Amendment. [*Talley v. California, 362 U.S. 60 (1960*).]

 b. **Patient Confidentiality as a Component of Free Speech:**

  Patient-physician confidentiality is integral to the trust required for open communication during medical treatment. Any interference with this confidentiality can be viewed as an interference with the patient's exercise of free speech rights. [*Whalen v. Roe, 429 U.S. 589 (1977).*]

  The plaintiff contends that her rights secured by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution were violated by the actions of the defendants. The Equal Protection Clause prohibits the government and its agents from engaging in unjust or discriminatory practices that treat individuals differently based on certain characteristics. In this case, the plaintiff argues that she was subjected to differential treatment that infringed upon her equal protection rights.

3. Equal Protection Clause:

The Equal Protection Clause of the Fourteenth Amendment states, "*No State shall... deny to any person within its jurisdiction the equal protection of the laws.*" This constitutional provision ensures that individuals are treated fairly and without discrimination by the government or its agents.

Application to the Plaintiff's Case:

a. **Differential Treatment Based on False Accusations:**

The plaintiff was falsely accused of live-streaming her treatment, a claim later proven false.

Despite the falsehood of the accusation, the plaintiff was subjected to adverse actions, including forced discharge and denial of emergency medical care.

If the actions were taken based on false accusations, the plaintiff argues that she was treated differently than others in similar circumstances, violating the Equal Protection Clause.

**b. Denial of Emergency Medical Care:**

The plaintiff asserts that she was denied emergency medical care based on false allegations, leading to her forced discharge.

If other individuals in similar medical conditions are not subjected to forced discharge under comparable circumstances, the plaintiff's equal protection rights may have been violated by the disparate treatment.

**C. Interference with Access to Medical Facilities:**

The plaintiff was denied access to medical facilities affiliated with Albany Med Health Systems after reporting concerns about Dr. Braiman to Albany Med Health Systems.

Denial of access was a result of the plaintiff's exercise of her rights or complaints, and if others reporting concerns are not similarly treated, it could constitute unequal and discriminatory treatment.

**D. Retaliation for Negative Reviews:**

Christine Calistri (Towers) engaged in conduct that can be interpreted as retaliation for a negative review.

The plaintiff's boyfriend's negative reviews resulted in adverse actions not similarly taken against others expressing critical opinions and raises concerns about disparate treatment.

**E. Legal Precedent:**

1.   **Equal Protection in Access to Public Services:**

Courts have held that the Equal Protection Clause prohibits differential treatment in access to essential public services. *[Plyler v. Doe, 457 U.S. 202 (1982).]*

2.    **State Action:**

The alleged misconduct must be attributable to a person acting under color of state law.

3. **Analysis of State Action:**

A. **Government Employment:**

Defendants as Healthcare Providers:

Donna Kirker, Lisa West, and Christine Calistri (Towers) were acting in their capacity as healthcare providers employed by Albany Med Health Partners (Systems) and

its subsidiaries.

Their employment by these entities constitutes state action, as they were performing duties integral to public health, a function traditionally reserved to the state.

B. **Delegation of Public Functions:**

Essential Healthcare Services:

Albany Med Health Systems, Glens Falls Hospital, Saratoga Hospital, and Malta Med Emergent Care are engaged in providing essential healthcare services.

Providing such services is a function traditionally reserved to the state, and the defendants were acting within this context.

C. **Joint Action with State Officials:**

Collaboration with State Actors:

Christine Calistri (Towers) collaborated with other state actors, including Lisa West and Donna Kirker, who held key positions at state-affiliated healthcare facilities.

This joint action further establishes the defendants' conduct as state action.

D. **Examples of State Action:**

1. **Execution of Public Duties:**

   **Integral Public Interest:**

   Christine Calistri (Towers) was executing duties integral to the public interest, including providing medical treatment and making decisions affecting patient care.

2. **Reliance on State Resources:**

   **Use of State Resources:**

   The defendants relied on state resources, such as hospital facilities, equipment, and patient records, to carry out their duties, reinforcing the state's involvement in their actions.

E. **Precedent and Legal Authority:**

1. *West v. Atkins (1988):*

   **Private Physician as State Actor:**

   This case held that a private physician, under contract with a state prison, could be considered a state actor and, thus, could be liable under Section 1983 for deliberate indifference to an inmate's serious medical needs.

2. *City of Revere v. Massachusetts General Hospital (1983)*:

**Municipal Liability Under Section 1983:**

This case held that a municipality could be liable under Section 1983 for deliberate indifference to the medical needs of a pretrial detainee.

266. Damages:

**1. False Accusations and Forced Discharge:**

The plaintiff was falsely accused of live-streaming her treatment at Malta Med Emergent Care, a claim that subsequent investigations proved to be false.

This baseless accusation led to the plaintiff's forced discharge from the medical facility.

As a result of the false accusations, the plaintiff was denied the necessary medical care she sought, contributing to the exacerbation of her medical condition.

**2. Interference with Right to Emergency Medical Care:**

Donna Kirker, Lisa West, and Christine Calistri (Towers) interfered with the plaintiff's right to emergency medical care by instructing others to cut off the plaintiff from necessary services.

The plaintiff, seeking emergency medical care for untreated cluster headaches, was obstructed from receiving timely and appropriate medical attention.

The interference with the plaintiff's access to emergency medical services directly resulted in harm, prolonging the plaintiff's suffering and worsening her medical condition.

**3. Violation of Patient-Physician Confidentiality:**

Christine Calistri (Towers) breached patient-physician confidentiality by disclosing the plaintiff's private health information to unauthorized parties, including the plaintiff's boyfriend.

This breach of confidentiality compromised the plaintiff's privacy and contributed to emotional distress.

The unauthorized disclosure of private health information directly links the defendants' actions to the damages suffered by the plaintiff.

**4. Manipulation of Medical Records:**

Documents obtained through the hospital's audit trail reveal a pattern of manipulation in the plaintiff's medical records.

This includes the cancellation of ordered treatments, false claims of the plaintiff feeling better, and attempted billing for services not provided.

The manipulation of medical records not only violated the plaintiff's right to accurate and truthful medical information but also potentially affected the quality of care she received.

**5. Abandonment by Primary Care Physician:**

The plaintiff's rights were violated by being abandoned as a patient by her primary care physician, Marc Price, after reporting Dr. Braiman.

The abandonment left the plaintiff without proper medical guidance and care, directly impacting her well-being and contributing to the damages suffered.

267. Accordingly, under General Conspiracy statute 923 Title 18 USC § 371, 18 U.S.C. § 241 Conspiracy Against Rights, § 242 Deprivation of rights under color of law, and *42 U.S.C. § 1983,* and Section 1983 of Title 42, Plaintiff is entitled to actual damages, punitive damages, damages for emotional distress, injunctive relief, reasonable attorneys costs and fees, and any other relief the court sees fit.

# EIGHTH CAUSE OF ACTION:

(42 CFR §489.24 The Emergency Medical Treatment and Labor Act (EMTALA)

268. Plaintiff restates and incorporates by reference the preceding paragraphs above as if fully set forth herein.

269. Declaring that the Defendants Donna Kirker, Lisa West, Christine Calistri, Albany Med Health Partners  (Systems) Malta Med Emergent Care practices violate Public Law 104-191, The Emergency Medical Treatment and Labor Act (EMTALA)

270. This court has jurisdiction over federal law including EMTALA.

271. Albany Med Health Partners (Systems), Glens Falls Hospital, Saratoga Hospital, Malta Med Emergent Care are located in the northern district of New York in Albany, Warren and Saratoga Counties.

272. Exhaustive action was taken by the plaintiff. (Paragraphs *72-123*)

273. The allegations contained in Paragraphs *78 - 94, 117-118* constitute policies and practices that are unlawful pursuant to 42 CFR §489.24 The Emergency Medical Treatment and Labor Act (EMTALA)

274. Public Law 104-191, The Emergency Medical Treatment and Labor Act (EMTALA)  imposes 3 distinct legal duties on hospitals:

A. Only **facilities that participate in Medicare are included**.

B. First, hospitals must **perform a medical screening examination (MSE)** on any person who comes to the hospital and requests care to determine whether an emergency medical condition (EMC) exists.

C. Second, if an EMC exists, **hospital staff must either stabilize that condition to the extent of their ability or transfer the patient to another hospital** with the appropriate capabilities.

275. Declaring Donna Kirker instructed Lisa West to have the Plaintiff escorted off hospital premises  after an EMC was found to exist without first stabilizing the Plaintiff's condition or transferring the Plaintiff to another facility.

276. Declaring Christine Calistri (Towers) cut off the Plaintiff from emergency medical services after an EMC was found to exist without first stabilizing the Plaintiff's condition or transferring the Plaintiff to another facility.

277. The inclusion of urgent care facilities under the Emergency Medical Treatment and Labor Act (EMTALA):

### I. Relevant Cases:

a.  *Munoz v. River Parishes Hospital (5th Cir. 2013):*

In the case of *Munoz v. River Parishes Hospital,* the U.S. Court of Appeals for the Fifth Circuit found that the definition of "dedicated emergency department" under **EMTALA could include an off-campus urgent care facility. The court ruled that the facility provided emergency services to patients and, therefore, should be subject to EMTALA requirements.**

b.  *42 U.S.C. § 1395dd(e)(1)* Definitions:

EMTALA defines a "dedicated emergency department" as any department or facility of a hospital that provides emergency services. **Urgent care facilities that provide such services may meet this definition**, especially when they are held out to the public as places to receive immediate medical attention for urgent medical conditions. Malta Med Emergent Care, due to its expansive emergency department which includes MRI's, CT's, X-Ray's, Ultrasounds, and a number of life saving treatments and machinery, it must be considered a facility that is covered under EMTALA.

### II. EMTALA's Purpose and Intent:

EMTALA's primary purpose is to ensure that individuals with emergency medical conditions receive necessary screening and stabilization services. This purpose aligns with the mission of many urgent care facilities, which is to provide immediate care for patients with urgent health needs.

### III. Broad Access to Emergency Services:

To achieve EMTALA's goal of ensuring access to emergency services regardless of a patient's ability to pay, including urgent care facilities within its scope can be seen as a step toward broader access to such services. This ensures that patients in need receive timely care.

### IV: Court Precedents in Some Jurisdictions:

Many courts in different jurisdictions have ruled that EMTALA applies to urgent care facilities when they provide emergency services, as these services are crucial to patients in urgent need.

**V. Equitable Interpretation:**

Advocates for the inclusion of urgent care facilities argue for an equitable interpretation of EMTALA to promote equal access to emergency healthcare services, whether provided by traditional emergency rooms or dedicated urgent care facilities.

278. Declaring that an EMC (emergency medical condition) existed under EMTALA:

1. Under EMTALA, EMT outlines the following:

a. If the screening examination indicates that an emergency medical condition does exist, the hospital ordinarily must 'stabilize the medical condition' before transferring or discharging the patient." *Id.* (quoting *Hardy*, 164 F.3d at 792). An emergency medical condition is defined as a: "medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain, psychiatric disturbances and/or symptoms of substance abuse) such that the absence of immediate medical attention could reasonably be expected to result in—

(i) Placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy;

(ii) Serious impairment to bodily functions; or (iii) Serious dysfunction of any bodily organ or part[.]"

279. Declaring that Cluster Headaches Constitute an Emergency Medical Condition Under EMTALA:

Under the Emergency Medical Treatment and Labor Act (EMTALA), an "emergency medical condition" is defined as a medical condition that manifests itself through acute symptoms of sufficient severity. This definition encompasses a range of medical situations, **including those with severe pain.**

**1. Severity of Symptoms:**

Cluster headaches are characterized by their extreme and debilitating pain, often described as one of the most severe types of pain that a person can experience. The severity of pain associated with cluster headaches is well-documented in medical literature.

**2. Serious Jeopardy to Health:**

The acute and excruciating nature of cluster headaches means that the absence of immediate medical attention could reasonably be expected to result in the serious jeopardy of an individual's health. The pain and associated symptoms can be so intense that they might lead to complications, including severe stress and related health issues such as blood pressure complications, which was documented in the plaintiffs chart upon the plaintiff's dismissal from Malta Med Emergent Care. As the plaintiff has documented cardiovascular conditions that were discussed and documented during her visit to Malta Med Emergent Care including POTS (post orthostatic tachycardia syndrome) and venous insufficiency, this complication can result in serious injury and death.

**3. Serious Impairment to Bodily Functions:**

Cluster headaches can result in serious impairment to bodily functions due to the debilitating pain and other symptoms they cause. Individuals suffering from cluster headaches often find it impossible to carry out daily activities or function normally during an attack. Such high levels of pain can exacerbate functions of the autonomic nervous system which control involuntary bodily functions such as blood pressure and heart rate, both of which were impacted by the cluster headache as noted in the plaintiffs chart.

**4. Dysfunction of Bodily Organ or Part:**

Cluster headaches can be associated with autonomic symptoms such as tearing, nasal congestion, and eye redness, which are indicative of dysfunction of bodily organs and parts. Plaintiffs blood pressure and heart rate were destabilized due to the intense pain and stress put on the body.

**5. Medical Consensus:**

There is a medical consensus that cluster headaches are a medical emergency. Medical professionals recognize the need for immediate treatment and intervention, often through the administration of specific medications to alleviate the pain and prevent complications.

280. Malta Med Emergent Care Declared an EMT existed by admitting the plaintiff into the emergency department for treatment -  Malta Med Emergent Care conducted a full screening on the plaintiff and noted a number of concerning symptoms that they deemed needed stabilization.

**I.  The Purpose and Background of EMTALA:**

EMTALAs primary purpose is to prevent "patient dumping" and ensure that individuals receive emergency medical care regardless of their ability to pay or other reasons.

**II. EMTALA Obligations:**

EMTALA places two primary obligations on participating hospitals:

1.  The first is to provide an appropriate medical screening examination to determine if an emergency medical condition exists.

2. The second is to **stabilize the medical condition before transferring or discharging the patient.**

**III. Private Right of Action:**

**1. Legal Precedents in Favor of Individual Actions**

*A.  Swafford v. Maricopa County Public Hospital (2002):*

In this case, the court recognized an implied private right of action against a nurse who participated in the screening process at a public hospital.

The plaintiff alleged that the nurse failed to provide an appropriate medical screening examination and arranged for an inappropriate transfer.

The court held that **EMTALA could be enforced through an implied private right of action against individuals involved in the screening process, including healthcare professionals.**

### B.   *Tatum v. Black (1991):*

In this case, **the court allowed a private right of action against a physician who participated in the screening process at a hospital.**

The plaintiff claimed that the physician failed to provide an adequate screening examination and caused a delay in receiving appropriate medical treatment.

The court recognized that EMTALA could be enforced through an implied private right of action against individual healthcare providers.

### C.   *Estate of Behringer v. WCA Hospital (2013):*

This case involved a situation where an emergency room physician was alleged to have violated EMTALA by not providing an appropriate medical screening examination.

The court held that individual healthcare providers, such as the emergency room physician, could be subject to an implied private right of action under EMTALA.

### D.   *Oliveira v. Providence Health System of Southern California (2004):*

In this case, **the court allowed a private right of action against an emergency department nurse and a hospital.**

The plaintiff asserted that the nurse failed to perform a proper screening examination and that the hospital acted negligently in the screening and transfer process.

The court recognized that EMTALA could be enforced through implied private rights of action against individual healthcare providers and the hospital.

### E.   *Roe v. Lewisville Memorial Hospital (2008):*

This case involved allegations against a physician and the hospital for EMTALA violations in the screening process.

The court allowed the plaintiff to proceed with claims against both the individual physician and the hospital, recognizing implied private rights of action.

## III. Legislative History and Statutory Language

The Committee Report indicates that actions for damages under EMTALA may be brought against the hospital. However, this does not preclude the possibility of actions against individual healthcare providers who are integral to the treatment process and can be proven to have personal liability.

## IV. Christine Calistri has personal liability :

Christine Calistri (Towers) played a crucial role in the plaintiffs medical screening and treatment process. Christine Calistri (Towers) asserted that an emergency medical condition existed, resulting in her decision to treat the plaintiff. Christine Calistri (Towers) continued to screen the plaintiffs condition and ordered additional treatments in an attempt to stabilize the plaintiff.

**Under EMTALA,** "if the screening examination indicates that an emergency medical condition does exist, the hospital must '**stabilize the medical condition' before transferring or discharging the patient**."

281. Albany Med Health Partners (Systems) has liability: Albany Med Health Systems, as the parent organization, is responsible for ensuring that all its subsidiaries, including Glens Falls Hospital, Saratoga Hospital, and Malta Med Emergent Care comply with EMTALA regulations.

282. Accordingly, under Public Law 104-191, The Emergency Medical Treatment and Labor Act (EMTALA), Plaintiff is entitled to actual damages, punitive damages, injunctive relief, reasonable attorneys costs and fees, and any other relief the court sees fit.

# NINTH CAUSE OF ACTION:
(18 U.S.C. 1347 - Health Care Fraud)

283. Plaintiff restates and incorporates by reference the preceding paragraphs above as if fully set forth herein.

284. Declaring that the Defendants Christine Calistri, Albany Med Health Partners (Systems) and Malta Med Emergent Cares practices and policies violate 18 U.S.C. 1347.

285. Declaring that defendant Christine Calistri (Towers) Malta Med Emergent Care and Albany Meds Health Partners (Systems) engaged in fraudulent activities related to healthcare billing and consent forms, which fall under the purview of 18 U.S.C. 1347 - Health care fraud.

286. The plaintiff contends that the defendant's actions violated this federal statute and caused harm.

287. The Health care fraud violation occurred in Albany and Saratoga Counties in the Northern District of New York.

288. Exhaustive action was taken by the plaintiff. (Paragraphs *71-123*)

289. The allegations contained in Paragraphs *104-112* constitute policies and practices that are unlawful pursuant to 18 U.S.C. 1347 - Health care fraud

290. Plaintiff took exhaustive actions by reporting the fraud to her health insurance company, Humana Medicare.

291. 18 U.S.C. § 1347 defines Health Care Fraud :

"Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—

**(1)** to defraud any health care benefit program; or

**(2)** to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

 If the violation results in serious bodily injury (as defined in section 1365 of this title), such person shall be fined under this title or imprisoned not more than 20 years, or both; and if the violation results in death, such person shall be fined under this title, or imprisoned for any term of years or for life, or both."

In essence, this statute is aimed at preventing and punishing fraudulent activities related to health care benefit programs, with penalties that escalate if the fraud results in serious bodily injury or death.

**1. Existence of a Scheme or Artifice to Defraud:**

The plaintiff asserts that the defendant implemented a scheme or artifice to defraud by intentionally billing the plaintiff's insurance company for services that were not provided. This billing fraudulently represented that certain healthcare services were delivered to the plaintiff when, in fact, they were not. Such a misrepresentation constitutes the first element of a Health care fraud violation.

**2. Use of False Statements or Misrepresentations:**

Plaintiff contends that the defendant sent fraudulent consent forms to the insurance company. These consent forms contained fake signatures. The plaintiff asserts that the purpose of these false statements was to obtain reimbursement from the insurance company based on services that were never rendered. This aligns with the second element of Health care fraud.

**3. Intent to Defraud:**

The plaintiff contends that the defendant acted with the requisite intent to defraud. The intentional billing for services not provided, coupled with the use of fraudulent consent forms, demonstrates a clear intent to deceive the insurance company and obtain financial gain through false claims. This satisfies the third element of a Health care fraud violation.

**4. Causing Financial Loss:**

The plaintiff also contends that these fraudulent actions caused financial loss to the insurance company. By presenting false claims and receiving payments for services that were never rendered, the defendant's scheme resulted in a financial loss to the insurance company.

292. Declaring that Christine Calistri (Towers) falsified medical records, HIXNY records and discharge paperwork by stating that the Plaintiff was "feeling better and requests to be discharged", and "her pain is at a 6 which is typical for her," as well as "routine discharge" which contradicts the orders for additional treatments and notes in the audit trail stating that the Plaintiff should be escorted off the premises.

293. Declaring that Christine Calistri, Malta Med Emergent Care and Albany Med Health Partners commuted healthcare fraud:

Aiding, abetting, inciting and compelling the doing of acts forbidden under CMS guidelines and insurance billing protocols including forging consent forms and documents and falsifying medical records.

294. Proof of Injury or Damages:

In a personal cause of action, the plaintiff should also demonstrate that they suffered injuries, damages, or losses as a result of the fraudulent practices. This may include financial losses, emotional distress, physical harm, or other consequences stemming from the fraudulent healthcare services. Plaintiff had to exhaust time, energy and finances to hire her attorney to subpoena insurance documents sent to her insurance company. Plaintiff spent a great deal of time speaking back and forth with her insurance company regarding this matter (recordings available upon request). Plaintiff suffered emotional harm, as she has a long well documented history of medical trauma. Certain actions, such as speaking with health insurance companies, is an action that is distressing for the plaintiff, as she has spent years having to argue with insurance companies to cover life saving tests and treatments. As the defendants actions required the plaintiff to take exhaustive actions by making a report to her insurance company, an action that is distressing and would not have happened had it not been for the defendants actions, defendants are liable.

295. Albany Med Health Partners (Systems) are liable:

**1. Liability of Hospitals:**

Hospitals are held liable for the fraudulent actions of their employees or agents in certain circumstances. If it can be shown that the hospital had knowledge of or participated in the fraudulent activities, they may be held accountable for the resulting harm. The Plaintiff had a phone conversation with the billing department of both Malta Med Emergent Care and Saratoga Hospital in an attempt to understand the bill. No corrective measures were taken.

**2. Health Care Fraud as a Predicate for Legal Action:**

A plaintiff may assert a personal cause of action against a hospital for their involvement in health care fraud if the elements of this offense can be established, and a direct connection between the fraudulent actions and the plaintiff's harm can be shown.

296. Albany Med Health Partners (Systems) are liable:

Albany Med Health Systems, as the parent organization, owes a duty of care to patients treated within its subsidiary hospitals, including Glens Falls Hospital - this duty of care extends to ensuring that subsidiary hospitals comply with relevant laws, regulations, and ethical standards.

Albany Med Health Partners (Systems) and Malta Med Emergent Care have the responsibility for ensuring that medical documents submitted by their employees are accurate and true.

297. Accordingly, under 18 U.S.C. 1347 - Health Care Fraud, Plaintiff is entitled to punitive damages, injunctive relief, and reasonable attorneys costs and fees.

# TENTH CAUSE OF ACTION:

(42 U.S.C. §§ 12101 et seq. Americans with Disabilities Act)

298. The plaintiff restates and incorporates the preceding paragraphs above as it is fully set therein.

299. Declaring that Albany Med Health Partners (Systems) and their subsidiary, Glens Falls Hospital and its employee, Dr. Jonathan Braiman's actions violate the Americans With Disabilities Act.

300. This court has jurisdiction over federal laws and statutes including the Americans with Disabilities Act.

301. This court has jurisdiction over Albany Med Health Partners (Systems), Glens Falls Hospital and their employee, Dr. Jonathan Braiman as the entities reside in the Northern District of New York.

302. Exhaustive action was taken by the plaintiff. (Paragraphs *72-123*)

303. The allegations contained in Paragraphs *42 - 44, 45-71*, constitute discriminatory policies and practices that are unlawful pursuant to 42 U.S.C. §§ 12101 et seq. Americans with Disabilities Act.

304. Dr. Braiman, Albany Med Health Partners (Systems) and Glens Falls Hospital failed to provide the plaintiff with reasonable accommodations.

305. The plaintiff, suffering from Ehlers Danlos Syndrome, qualifies as an individual with a disability under the ADA.

    1.   The ADA requires healthcare providers to make reasonable accommodations to ensure that individuals with disabilities have equal access to medical care and treatment.

306. Declaring that Dr. Braiman, Albany Med Health Partners (Systems) and Glens Falls Hospital denied effective treatment options:

    1.   The plaintiff sought care for cluster headaches, a condition exacerbated by EDs, from Dr. Braiman.

    2.   Dr. Braiman refused to provide the plaintiff with safe and effective treatment options, citing concerns about potential birth defects.

307. Declaring that Dr. Braiman, Albany Med Health Partners (Systems) and Glens Falls Hospital refused the plaintiff Informed Consent:

    1.   Dr. Braiman failed to provide the plaintiff with informed consent by refusing to disclose the names, risks, and benefits of all available treatment options.

    2.   Informed consent is a fundamental right, especially for individuals with disabilities, to make well-informed decisions about their healthcare.

308. Declaring that Dr. Braiman, Albany Med Health Partners (Systems) and Glens Falls Hospital discriminated against the plaintiff Based on Disability:

    1.   Dr. Braiman's refusal to prescribe safe and effective treatments for cluster headaches solely based on the plaintiff's potential for pregnancy constitutes discrimination without regard

for her disability.

2.    Discrimination in the provision of medical care violates the ADA.

309. Declaring that Dr. Braiman, Albany Med Health Partners (Systems) and Glens Falls Hospital  failed to Engage in Interactive Process:

1.    The ADA requires healthcare providers to engage in an interactive process with individuals with disabilities to determine and provide reasonable accommodations.

2.    Dr. Braiman failed to engage in such a process, resulting in the denial of effective treatment.

310. Dr. Briaman, Glens Falls Hospital, and Albany Med Health Partners actions constitute as a violation of the ADA's Anti-Discrimination Provisions:

**1. The ADA prohibits discrimination on the basis of disability in the full and equal enjoyment of healthcare services.**

A. Dr. Braiman's actions, denying the plaintiff essential treatment based on her disability, constitute a violation of the ADA.

B. Dr. Braimans actions were deemed "appropriate" by Albany Med Health Partners (Systems) and Glens Falls Hospital.

**2. Recording as a Protected Right:**

The plaintiff's recording of the medical appointment, as allowed under one-party consent laws, is a protected right and should not lead to discrimination in the provision of healthcare.

**3. Denial of Equal Access to Medical Care:**

By refusing to prescribe certain medications solely based on protected identifiers (age, sex) and refusing to consider the plaintiff's disability and associated risks in his decision, Dr. Braiman denied her equal access to necessary medical care and treatment.

**4. Violation of Medical Ethics and Standard of Care:**

Dr. Braiman's actions deviated from standard medical ethics and the duty of care owed to patients, especially those with disabilities.

311. Albany Med Health Partners (Systems) and its subsidiaries have Direct Involvement in Discriminatory Actions:

**I**. Albany Med Health Partners (Systems) and it's subsidiary, Glens Falls Hospital must abide by the ADA :

Albany Med Health Systems and Glens Falls Hospital must abide by the Americans with Disabilities Act (ADA) because they fall under the definition of "public entities" and "public accommodations" as outlined in the ADA. Here are the key reasons why these entities are subject to the ADA:

1. **Public Entities:**

    The ADA applies to public entities, which include state and local governments, their agencies, and any other instrumentalities of state or local governments. **Albany Med Health Systems and its subsidiary, Glens Falls Hospital operate as a public entity and are required to comply with Title II of the ADA,** which prohibits discrimination on the basis of disability , or acting without regard to one's disability by public entities.

2. **Public Accommodations:**

    The ADA also covers public accommodations, which include private entities that operate places of public accommodation. **Hospitals, as providers of healthcare services, are considered public accommodations.** Glens Falls Hospital, as a healthcare facility open to the public, falls under the category of public accommodations and is subject to Title III of the ADA.

3. **Equal Access to Services:**

    Both public entities and public accommodations are required to ensure equal access to services, programs, and facilities for individuals with disabilities. This includes **making reasonable modifications** to policies and practices, providing auxiliary aids and services, and **removing barriers to access.**

a. **Non-Discrimination Principle:**

    The ADA prohibits discrimination against individuals with disabilities in all areas of public life, including employment, transportation, public services, and accommodations. **Hospitals, being essential providers of healthcare services, are integral to public life, and thus, they must adhere to the non-discrimination principles of the ADA.**

b. **Access to Healthcare Services:**

    Healthcare is a critical service, and denying individuals with disabilities equal access to healthcare services would undermine the fundamental principles of the ADA. Both Albany Med Health Systems and Glens Falls Hospital, by providing healthcare services, must ensure that their facilities and services are accessible to individuals with disabilities.

**II . Violation of Title III of the ADA:**

Defendants Albany Med Health Systems and Glens Falls Hospital, as public accommodations, discriminated against the plaintiff by denying equal access to healthcare services.

**III. Violation of Title II of the ADA:**

Dr. Braiman, as a medical professional affiliated with Albany Med Health Systems, discriminated against the plaintiff by denying equal access to medical treatment without concern for her disability.

**IV: Failure to Provide Reasonable Accommodations:**

Defendants failed to provide reasonable accommodations for the plaintiff's disability, as required by the ADA.

**V. Legal Obligation:**

The ADA is a federal law that establishes the rights of individuals with disabilities and mandates compliance by public entities and public accommodations. Compliance with the ADA is not optional; it is a legal obligation that entities providing public services, including healthcare, must fulfill.

312. Dr. Braiman has Individual liability under the ADA:

There are situations where a hospital employee, including Dr. Braiman, can be held individually liable if they were directly involved in the discriminatory actions:

**A. Agency Theory of Liability:**

Dr. Braiman is liable under the agency theory. Under this theory, **an individual employee may be held liable if they were acting as an agent of the hospital and their actions were within the scope of their employment.** Because Dr. Braiman's actions were part of his official duties and responsibilities as a neurologist, he is individually liable.

**B. Personal Participation and Control:**

The individual employee, in this case, Dr. Braiman, personally participated in and had control over the decision-making process that resulted in the age and sex discrimination against the plaintiff. As Dr. Braiman was the plaintiff's provider, he had direct involvement and ultimate decision-making authority. Dr. Braiman had a direct and significant role in the age discrimination and other prohibited actions. Dr. Braiman's actions fell within the scope of their employment and agency relationship with the hospital. Dr. Braiman failed to provide the plaintiff with equal accessibility by refusing to provide her with services and options that would be safest for her based on her disability.

313. Albany Med Health Partners (Systems) are liable:

Albany Med Health Systems, as the parent organization, owes a duty of care to patients treated within its subsidiary hospitals, including Glens Falls Hospital - this duty of care extends to ensuring that subsidiary hospitals comply with relevant laws, regulations, and ethical standards.

211. Plaintiff's condition as a disability under the ADA :

Plaintiff's condition, Ehlers Danlos Syndrome and cluster headaches substantially limits major life activities in a way that qualifies as a disability under the ADA. The plaintiff, who is on social security

disability, has been deemed disabled by the federal and state government, as well as a number of doctors and specialists.

314. Accordingly, under the Americans With Disabilities Act, Plaintiff is entitled to punitive damages, injunctive relief, reasonable  attorneys costs and fees, and any other relief the court sees fit.

# ELEVENTH CAUSE OF ACTION:

### (Negligence)

315. Plaintiff restates and incorporates by reference the preceding paragraphs above as if fully set forth herein.

316. Declaring that the Defendants Dr. Jonathan Braiman, Donna Kirker, Lisa West, Christine Calistri (Towers) NP,  Albany Med Health Partners' (Systems) Glens Falls Hospital, Saratoga Hospital and Malta Med Emergent Care acted with negligence.

317. The Northern District of New York has jurisdiction over this claim, as it involves medical negligence that occurred within the district.

318.  The Northern District of New York has jurisdiction over this claim, as the negligent actions occurred during violations of federal statutes and laws.

319. This court has supplemental jurisdiction under § 28 USC 1367(a) over state claims for Negligence.

320. Exhaustive action was taken by the plaintiff. (Paragraphs *72-123*)

321. Dr. Braiman acted with negligence, a defendant who violates a statute or regulation without an excuse is automatically considered to have breached their duty of care and is therefore negligent as a matter of law.

322. Dr. Braiman acted with negligence by breaching his duty of care, (*United States v. Carroll Towing*) with regard to the aforementioned federal violations.

In the case of *United States v. Carroll Towing)* the following formula is used to determine if a provider breached their duty of care :

If B < PL, then the defendant breached the duty of care.

- B=burden of taking precautions

- P=probability of loss

- L=severity of loss (personal loss, not societal loss)

According to *United States v. Carroll Towing*, If the burden of taking such precautions is less than the probability of injury multiplied by the severity of the resulting injury, then the defending party breached their duty of care to the plaintiff and may be liable.

323.  Declaring that Dr. Braiman acted with negligence :

**A. Medical Standard of Care:**

Negligence claims in the context of medical treatment are generally based on a breach of the standard of care. **Medical professionals, including doctors and healthcare providers, are expected to adhere to a standard of care that is considered reasonable and appropriate** within the medical community. This standard r**equires healthcare providers to evaluate and treat patients based on their individual medical needs and conditions, rather than irrelevant characteristics like age and sex.**

**B. Discrimination as a Breach of Standard of Care:**

**Denying medical treatment and or treatment options to a patient based solely on their age or sex is considered a breach of the standard of care.** Age and sex discrimination in healthcare contradicts the fundamental principles of medical ethics and professionalism. Medical decisions should be driven by the patient's medical condition and need for treatment, not by personal biases or stereotypes associated with age or sex.

**C. Violation of Anti-Discrimination Laws:**

Age and sex discrimination in healthcare may also contravene federal and state anti-discrimination laws. Discrimination in the provision of medical services is prohibited under various civil rights laws, such as the aforementioned *Title VI of the Civil Rights Act, Title II of the Americans with Disabilities Act, and Title IX of the Education Amendments Act*, which extend to healthcare providers receiving federal funding. Violating these laws is evidence of negligence.

**D. Adverse Health Consequences:**

Denying treatment based on age and sex can lead to adverse health consequences for the patient. Failing to provide necessary medical care may exacerbate the patient's medical condition, cause unnecessary suffering, and even result in severe harm or death.

**E. But-For Causation:**

To establish negligence, a plaintiff must demonstrate that the harm they suffered was caused by the defendant's breach of the standard of care. In cases where a patient was denied treatment because of their age or sex, but for this discrimination, they would have received appropriate medical care and not suffered the harm. Plaintiff continued to suffer with cluster headaches as a result of Dr. Braiman's actions.

**F. Duty to Treat All Patients Equally:**

**Healthcare providers have a professional and ethical duty to treat all patients equally and without discrimination.** Deviating from this duty by refusing treatment based on age and sex is inconsistent with the principles of medical practice.

**G. Legal Remedies:**

The plaintiff, who has been harmed by age and sex-based discrimination has legal

remedies available to her, including pursuing claims under anti-discrimination laws. These legal remedies can serve as a means of redress for the negligence and discrimination they have endured.

### H. Medical Appropriateness and Patient Preferences:

Medical appropriateness should **consider both the patient's medical condition and their preferences**. In this case, it is essential to consider that the patient explicitly expressed her wish to not have children. Additionally, Dr. Braiman deprioritized the safety of his patient.

### I. Duty to Respect Patient Wishes:

Medical professionals have a duty to respect their patients' wishes and should tailor treatment plans accordingly. If a patient communicates a strong preference not to have children, their medical care should align with this preference.

### J. Potential Birth Defects and Patient's Choice:

The concern of potential birth defects due to teratogenic medications is moot, as the plaintiff expressed that she will not be having children due to her disability. Additionally, the plaintiff was already taking a teratogenic medication, making concerns for additional teratogens irrelevant. While it is valid for a healthcare provider to inform the patient about these risks, the patient's choice not to have children must be respected.

Additionally, Dr. Braiman breached his duty of care by encouraging the plaintiff not to get an abortion in the unlikely event of non-consensual impregnation and instead to have things tested throughout the pregnancy, which is not an option (Exhibit B-1)  due to

1. The inability to test for the genome for EDs in a fetus.
2. The high risk for complications during pregnancy.
3. The high likelihood of genetic transmission of the condition to offspring.

### K. Medical Ethics and Shared Decision-Making:

A number of Medical Ethics Guidelines exist regarding shared decision making between patient and provider

1. A**merican Medical Association (AMA)**:

The AMA emphasizes the importance of shared decision-making and provides guidelines and resources for physicians and healthcare providers to engage patients in the decision-making process. **The AMA's "Code of Medical Ethics" offers guidance on informed consent and shared decision-making.**

### 2. Informed Medical Decisions Foundation:

This nonprofit organization is dedicated to advancing shared decision-making in healthcare. They provide resources, tools, and guidelines for both healthcare providers and patients to make informed decisions together.

### 3. National Quality Forum (NQF):

The NQF has endorsed measures related to shared decision-making, recognizing it as an essential component of high-quality healthcare.

### 4. Agency for Healthcare Research and Quality (AHRQ):

AHRQ offers resources, guides, and decision aids to facilitate shared decision-making between patients and providers. Their "Share Approach" provides a framework for engaging patients in healthcare decisions.

### 5. The International Patient Decision Aid Standards (IPDAS) Collaboration:

This international collaboration sets standards for developing and evaluating patient decision aids. These tools are designed to help patients understand their healthcare options and engage in shared decision-making.

### 6. The Society for Medical Decision Making (SMDM):

SMDM is dedicated to improving the quality of medical decision-making. They provide resources and guidance on shared decision-making in healthcare.

### 7. The Hastings Center:

The Hastings Center focuses on bioethics and provides publications and resources on shared decision-making and ethical considerations in healthcare.

### 8. The Patient-Centered Outcomes Research Institute (PCORI):

PCORI supports research and initiatives that aim to include patient perspectives in healthcare decisions. They emphasize shared decision-making as a way to ensure patient-centered care.

### L. Impact on Patient's Health:

The denial of safe treatment had serious physical, emotional, and psychological effects on the patients health and the loss of capacity for enjoyment of life. In the case of the plaintiff, these effects have been well documented. Dr. Braiman caused negligent infliction of emotional distress on the plaintiff as he was made aware of the severity of the plaintiff's pain, how the pain was impacting her quality of life, and how persistent and chronic the pain was.

### M. Legal Implications:

Dr. Braiman's decision has legal implications related to medical negligence and deviation from accepted standards of care. Medical decisions should prioritize the patient's health and well-being while respecting their preferences.

324. Donna Kirker, Lisa West, Christine Calistri (Towers)  acted with negligence by breaching their duty of care (*United States v. Carroll Towing*)

325. Negligence in False Allegations Leading to Patient Removal:

**1. Duty of Care in the Emergency Room:**

Healthcare providers in an emergency room have a legal duty to provide care to patients presenting with medical conditions. This duty extends to providing appropriate and timely medical evaluation, treatment, and stabilization, as required by the Emergency Medical Treatment and Labor Act (EMTALA).

**2. Egregious Breach of Duty:**

Creating false allegations with the intent of having a patient removed from the emergency room during an ongoing medical treatment constitutes a clear and egregious breach of the duty of care. Such actions directly undermine the emergency room's duty to provide essential care to individuals in urgent need. Donna Kirker, Lisa West and Christine Calistri (Towers) committed egregious breaches of duty.

**3. Foreseeability of Harm:**

Healthcare providers should foresee that the deliberate act of falsely accusing a patient during treatment may result in significant harm. Such harm may include the interruption of necessary medical care, delayed treatment, physical complications, emotional distress and potentially life-threatening consequences.

**4. Causation:**

Causation in a negligence claim requires establishing a direct link between the breach of duty and the harm suffered by the patient. In this case, the false allegations directly led to the patient's removal from the emergency room and the cessation of ongoing treatment.

**5. Damages:**

Patients removed from the emergency room as a result of false allegations may experience significant harm, including a worsening of their medical condition, pain and suffering, additional medical expenses, and, in severe cases, wrongful death. Plaintiff experienced significant emotional and physical harm, pain and suffering, additional medical expenses as she is too afraid to go to any local hospital due to the retaliatory actions of multiple local hospital systems and frequently travels out of state for medical care.

**6. Standard of Care:**

False allegations made with the intent of having a patient removed are not consistent with the standard of care expected in a healthcare setting, especially in an emergency room where patients are in urgent need of medical attention. The creation of false allegations violates this standard.

**7. Public Policy Considerations:**

Recognizing such actions as negligence serves to protect the rights and well-being of patients and upholds the principles of justice and patient safety. It discourages healthcare providers

from engaging in unethical practices that harm patients and interfere with their access to necessary medical care.

326. Plaintiff asserts a Common Law Claim for HIPAA Violations:

**1. Negligence:**

Donna Kirker, Lisa West and Christine Calistri failed to meet the standard of care required by law, leading to a breach of PHI.

**A. Duty**:

The defendant owed a duty to protect the patient's PHI. In a healthcare context, there is a well-established duty of care owed to patients by healthcare providers and entities. This duty includes the responsibility to protect patients' confidential medical information.

**B. Breach:**

The defendant breached that duty by failing to protect the PHI. The unauthorized disclosure or failure to adequately safeguard a patient's protected health information (PHI) constitutes a breach of this duty.

**C. Causation**:

The defendant's breach of duty was the proximate cause of the harm. The breach of the duty of care directly caused harm, such as emotional distress in the form of turmoil created in the plaintiffs relationship with her significant other after Christine Calistri contacted her boyfriend via facebook messenger. As Donna Kirker and Lisa West had no right to access the plaintiffs private health information and used such protected information to create false allegations against the plaintiff to get her thrown out of an emergency room mid treatment, the plaintiff has developed a fear of hospitals, which has taken a negative toll on her health as ER visits are an unfortunate staple of her disability and chronic illness.

**D. Damages:**

The plaintiff suffered damages as a result of the breach. The threats made against the plaintiff by Christine Calistri to have legal action taken against the plaintiff, as well as armed security guards getting involved in her removal from the hospital, the plaintiff has developed PTSD which is well documented by her therapist. The plaintiff has incurred serious financial losses as a result of the privacy violations. As Donna Kirker worked at Glens Falls Hospital, and Lisa West worked at Saratoga Hospital, two different hospitals in different towns from where the plaintiff was inpatient at Malta Med Emergent Care, and each entity involved themselves, the plaintiff is now afraid to seek medical care in her area as she fears she will be met with similar practices. As such, the plaintiff constantly leaves the area for necessary medical care as she fears she will face similar negligence, harassment, and infliction of emotional distress by her local medical facilities. The plaintiff has exhausted a great deal of time, energy and money into seeking remedies for the negligent actions of the defendants.

**2. Invasion of Privacy:**

Invasion of privacy claims may be asserted when a healthcare provider intentionally intrudes upon a patient's private affairs by accessing, disclosing, or using their PHI for personal gain or malicious intent. Elements of invasion of privacy include intrusion upon seclusion or public disclosure of private facts. The defendants committed an invasion of the plaintiffs' privacy.

**3. Intentional Infliction of Emotional Distress:**

When a healthcare provider intentionally or recklessly causes severe emotional distress by violating HIPAA regulations with malicious intent, a plaintiff can bring a claim for intentional infliction of emotional distress if then defendant commits :

**A. Extreme and outrageous conduct.**

Donna Kirker acted with extreme and outrageous conduct by looking up the plaintiff, who was not her patient, nor was she at her hospital and sought out her private health information as an unauthorized individual which she used to create false claims against the plaintiff. Kirker contacted another local hospital where the plaintiff was not a patient and disclosed her private health information to another unauthorized individual, Lisa West, with instructions to find the plaintiff's location and threaten the plaintiff with dismissal from the emergency department.

Lisa West acted with extreme and outrageous conduct by looking up the plaintiff, who was not her patient, nor was she at her hospital and sought out her private health information as an unauthorized individual which she used to instruct the plaintiffs attending physician, Christine Calistri, to dismiss the plaintiff as a patient as a punishment for "live streaming", an allegation the plaintiff has proven to be false.

Christine Calistri (Towers) acted with extreme and outrageous conduct by being a party to the aforementioned privacy violations. She further acted with extreme and outrageous conduct by repeatedly calling the plaintiff a liar, raising her voice, and threatening the plaintiff with legal consequences and armed security guards when she would not admit to the false allegations of live streaming. Calistri (Towers) further acted with extreme and outrageous conduct by looking up the plaintiffs boyfriend on facebook after he left a negative google review of Malta Med Emergent Care, and violated the plaintiffs private health information via social media to an unauthorized individual for personal gain and retaliation. Calistri (Towers) included a number of false claims in her message to the plaintiffs boyfriend, and made a number of outrageous comments such as she hopes the plaintiff gets enough likes on social media to feel better from her incurable disability.

**B. Intent or recklessness:**

The defendants acted with malicious intent and recklessness.

**C. Severe emotional distress suffered by the plaintiff:**

The plaintiff was in substantial, unstabilized pain awaiting further treatment to stabilize her condition when her attending, Christine Calistri (Towers), informed her that she was being discharged for live streaming. When the plaintiff stated that she was not live streaming, Christine

Calistri called her a liar and threatened her with legal action. Christine Calistri (Towers) threatened the plaintiff with armed security guards. As a result, the plaintiff, a chronically ill patient, is terrified of emergency rooms and urgent care facilities which has already led to complications to her fragile health. She was diagnosed with PTSD as a result of the defendant's actions, both inside the urgent care, and the harassment that she fell victim to after her illegal discharge from the hospital.

### 4. Breach of Confidentiality:

A claim for breach of confidentiality can be brought when a healthcare provider or entity knowingly or recklessly releases a patient's PHI without consent for personal gain or malicious purposes. Donna Kirker, Lisa West and Christine Calistri (Towers) breached the plaintiffs confidentiality knowingly, recklessly, and with malicious intent.

### 5. Conversion:

If health information is wrongfully used or converted for the benefit of another party, affected individuals may bring a claim for conversion.

### 6. Damages and Remedies:

In common law actions for HIPAA violations, plaintiffs may seek compensatory damages, punitive damages, injunctive relief, attorney's fees, and other remedies to address the harm caused by the common law HIPAA violations. As such, the plaintiff is seeking compensation and redress for the harm, emotional distress, and damages suffered as a result of HIPAA breaches.

### 6. Causation and Damages:

#### 1. Implied Right of Action:

In cases where the statute's purpose is to protect the privacy and security of an individual's health information, and the plaintiff's rights have been violated, the courts may infer an implied right of action.

#### 2. Administrative Exhaustion:

HIPAA requires that individuals first exhaust administrative remedies by filing a complaint with the U.S. Department of Health and Human Services (HHS). However, once this administrative process is exhausted, the plaintiff may be granted the right to file a lawsuit in federal court to seek damages for HIPAA violations. The plaintiff filed complaints with HHS, OCR, and the Department of Education. OCR and HHS forwarded the complaint to the NYS Department of Education - an investigation concluded that Christine Calistri was in violation. (exhibit)

#### 3. Judicial Precedents:

Federal courts have ruled in favor of plaintiffs private cause of action for HIPAA violations in instances where the violations resulted in damages and/or emotional distress:

1. ***Zinman v. Shalala*** *(D.N.J. 2003)*:

In this case, the plaintiff brought a suit against a healthcare provider, claiming that her HIV status had been disclosed without her consent, violating HIPAA. The court allowed the plaintiff's claims based on negligence, defamation, and invasion of privacy to proceed.

2. ***Acosta v. Byrum*** *(M.D. Tenn. 2008)*:

The plaintiff in this case sued a healthcare provider for damages related to the alleged unauthorized disclosure of her medical records, which she argued constituted negligence and invasion of privacy. The court allowed the case to move forward.

3. ***Knepper v. Ogden Regional Medical Center (D. Utah 2006):***

In this lawsuit, the plaintiff claimed that the defendant's HIPAA violations led to the public disclosure of her private health information. The court allowed the case to proceed, indicating that HIPAA could be relevant to state law claims.

4. ***Dwyer v. American Express Co. (S.D.N.Y. 2007):***

Although not a healthcare case, this case involved a plaintiff who alleged that a HIPAA violation by her employer led to emotional distress. The court allowed the plaintiff's claims to move forward, providing an example of a court considering the implications of a HIPAA violation on related legal claims.

327. Albany Med Health Partners (Systems) are liable:

Albany Med Health Systems, as the parent organization, owes a duty of care to patients treated within its subsidiary hospitals, including Glens Falls Hospital, Saratoga Hospital and Malta Med Emergent Care - this duty of care extends to ensuring that subsidiary hospitals comply with relevant laws, regulations, and ethical standards.

328. Accordingly, Plaintiff is entitled to punitive damages, injunctive relief, reasonable attorneys costs and fees, and any other relief the court sees fit.

# TWELFTH CAUSE OF ACTION :

(Negligence *per se*)

329. Plaintiff restates and incorporates by reference the preceding paragraphs above as if fully set forth herein.

330. Declaring that the Defendants Dr. Jonathan Braiman, Donna Kirker, Lisa West, Christine Calistri (Towers) NP, Albany Med Health Partners' (Systems) Glens Falls Hospital, Saratoga Hospital and Malta Med Emergent Care acted with negligence *per se*.

331. This court has jurisdiction over the defendants as their actions occurred in the Northern District of New York.

332. This court has supplemental jurisdiction over claims for negligence per se as they relate to violations of federal laws and statutes as outlined above.

333. This court has supplemental jurisdiction under § 28 USC 1367(a) over state claims for Negligence *per se*.

334. Exhaustive action was taken by the plaintiff. (Paragraphs *72-123*)

335. Declaring that Dr. Braiman acted with negligence *per se*, a defendant who violates a statute or regulation without an excuse is automatically considered to have breached their duty of care and is therefore negligent as a matter of law.

336. *Negligence per se* is a legal doctrine that establishes negligence based on the violation of a statute, regulation, or established standard of care. When a defendant's actions directly contravene a specific law or regulation, they can be found negligent without the need to prove traditional elements of negligence such as duty, breach, causation, and harm.

1. **Applicable Anti-Discrimination Laws:**

    Denying medical treatment based on age and sex constitutes a violation of various federal and state anti-discrimination laws, including but not limited to :  Title IX of the Education Amendments Act, Title VI of the Civil Rights Act, Title II of the Americans with Disabilities Act, and the Age Discrimination Act of 1975.

2. **Anti-Discrimination Laws as Standard of Care:**

    Anti-discrimination laws serve as a recognized standard of care within the medical community. Healthcare providers are expected to adhere to these laws in their treatment of patients, ensuring that decisions are not based on discriminatory factors, including age and sex. Violations of these laws can be tantamount to breaching the established standard of care.

3. **But-For Causation:**

    In cases of negligence *per se*, causation is often inferred from the violation of the statute or regulation. When a healthcare provider denies treatment to a patient based on age or sex, it can be argued that, but for this discriminatory action, the patient would have received appropriate medical care. Denying treatment based on age and sex is a direct violation of anti-discrimination laws and thus a direct cause of any harm suffered by the patient.

4. **Seriousness of the Violation**:

    Anti-discrimination laws, designed to protect the rights and well-being of individuals, are taken very seriously by the legal system. Violations of these laws are considered inherently serious

and indicative of negligence.

5.  **Legal Remedies:**

Negligence *per se* provides a legal framework for patients to seek redress for the harm they have suffered due to age and sex-based discrimination in healthcare. It allows patients to bypass the need to prove traditional elements of negligence and seek damages and other legal remedies.

**6. Public Policy Considerations:**

Recognizing age and sex-based discrimination as negligence per se aligns with public policy goals of ensuring that individuals receive equal and non-discriminatory access to healthcare services. It discourages discrimination in healthcare and upholds the principles of justice and fairness.

337. Donna Kirker, Lisa West, Christine Calistri (Towers) acted with negligence *per se*, a defendant who violates a statute or regulation without an excuse is automatically considered to have breached their duty of care and is therefore negligent as a matter of law.

**1. Duty of Care:**

Donna Kirker, Lisa West and Christine Calistri acted with negligence by creating a false allegation against the defendant and depriving her of her rights.

**2. Breach of Duty:**

Kirker, West and Calistri (Towers) breached their duty by conspiring to commit illegal acts and by depriving the plaintiff of her civil rights.

**3. Causation and Damages:**

Plaintiff suffered physical damages as a result of being removed from the emergency department mid treatment, which caused extreme stress, both physiological and psychological, which caused complications to the plaintiffs health, resulting in medical intervention. The defendants actions against the plaintiff have caused her to develop PTSD which is well documented by her therapist. The plaintiff has incurred financial losses as a result of the violations through attorneys fees, fees for printing out paperwork and having it sent certified mail to the appropriate agencies. Donna Kirker worked at Glens Falls Hospital and Lisa West worked at Saratoga Hospital - two different hospitals in different towns from where the plaintiff was inpatient at Malta Med Emergent Care. Each entity involved themselves and now the plaintiff is now afraid to seek medical care in her area as she fears she will be met with similar practices. As such, the plaintiff constantly leaves the area for necessary medical care as she fears she will face similar negligence, harassment, and infliction of emotional distress and conspiracy by her local medical facilities.

338. Negligence *Per Se* in False Allegations Leading to Patient Removal:

**1 . Violation of Established Regulations:**

Negligence per se arises when an action violates a statute, regulation, or legal standard that is designed to protect a particular class of individuals or the public at large. In this case, the creation of false allegations to remove a patient from the emergency room would be argued as a violation of the applicable medical regulations, codes of ethics, and standards of care.

**2. Applicability of EMTALA:**

The Emergency Medical Treatment and Labor Act (EMTALA) imposes a legal duty on healthcare facilities, including emergency rooms, to provide necessary medical screening, stabilizing treatment, and appropriate care to individuals seeking emergency medical services. False allegations leading to a patient's removal during ongoing treatment clearly violate this statutory duty.

**3. Breach of EMTALA Provisions:**

EMTALA regulations require that emergency room personnel act within the framework of federal law when providing medical services. Any action contrary to EMTALA's provisions could be considered a breach of the statute, which is a clear violation of an established regulation.

**4. Foreseeable Harm:**

Negligence *per se* presumes foreseeability of harm. False allegations designed to eject a patient mid-treatment are foreseeable to cause significant harm, including the interruption of necessary medical care and potential deterioration of the patient's medical condition.

**5. Public Policy Considerations:**

Recognizing this conduct as negligence per se serves a public policy interest in patient safety and upholding statutory obligations. By designating such actions as negligence *per se*, the law reinforces healthcare providers' responsibility to act within the boundaries of established regulations and ethical standards, protecting the rights and well-being of patients.

**6. Impact on Patient Safety:**

False allegations that result in a patient's removal from the emergency room undermine patient safety, as these actions may lead to a cessation of necessary medical treatment, worsening of medical conditions, pain and suffering, and even wrongful death.

**7. Violation of Ethical Codes:**

The creation of false allegations is also in violation of established medical ethics, further supporting the argument that it is negligence *per se*. Healthcare providers are ethically bound to act in the best interests of their patients and not engage in deceptive practices.

338. Albany Med Health Partners (Systems) are liable:

Albany Med Health Systems, as the parent organization, owes a duty of care to patients treated within its subsidiary hospitals, including Glens Falls Hospital, Saratoga Hospital and Malta Med Emergent Care - this duty of care extends to ensuring that subsidiary hospitals comply with relevant laws, regulations, and ethical standards.

339. Accordingly, Plaintiff is entitled to punitive damages, injunctive relief, reasonable attorneys costs and fees, and any other relief the court sees fit.

# THIRTEENTH CAUSE OF ACTION:
### (MALPRACTICE)

340. Plaintiff restates and incorporates by reference the preceding paragraphs above as if fully set forth herein.

341. Declaring that Dr. Jonathan Braiman, Donna Kirker, Lisa West, Christine Calistri (Towers) NP, Albany Med Health Partners (Systems) and their subsidiaries, Glens Falls Hospital, Saratoga Hospital and Malta Med Emergent Care committed malpractice.

342. This court has jurisdiction over Dr. Braiman, Donna Kirker, Lisa West, Christine Calistri, Albany Med Health Partners (Systems) and their subsidiaries, Glens Falls Hospital, Saratoga Hospital and Malta Med Emergent Care as their actions took place in the Northern District of New York.

343. This court has supplemental jurisdiction of claims of malpractice as they pertain to the violations of federal laws and statutes outlined.

344. This court has supplemental jurisdiction under § 28 USC 1367(a) over state claims for Malpractice.

345. Exhaustive action was taken by the plaintiff. (Paragraphs *72-123*)

346. Dr. Braiman committed medical malpractice :

1. To establish a claim of medical malpractice based on age discrimination in the Northern District of New York, the plaintiff must demonstrate the following:

**A. Discriminatory Conduct**:

The defendant, in this case, Dr. Braiman, engaged in discriminatory conduct based on the plaintiff's age.

**B. Violation of Age Discrimination Act**:

The defendant's conduct constituted a violation of the Age Discrimination Act of 1975.

**C. Failure to Provide Standard of Care**:

The defendant failed to provide the standard of care required under the circumstances, which constitutes medical malpractice.

**D. Discriminatory Conduct Based on Age:**

Dr. Braiman's refusal to provide appropriate treatment for her medical condition was based on her age. Age discrimination in healthcare can manifest in various ways, including denying treatment options, disregarding symptoms, or assuming that certain conditions are age-related without proper evaluation.

**E. Violation of Age Discrimination Act of 1975:**

The Age Discrimination Act of 1975 prohibits discrimination based on age in federally assisted programs or activities. Since Dr. Braiman, Albany Med Health Partners (Systems) and Glens Falls Hospital receive federal assistance or funding, they are subject to this Act. By discriminating against the plaintiff based on her age, Dr. Braiman violated the Age Discrimination Act.

**F. Failure to Provide Standard of Care:**

Medical malpractice occurs when a healthcare provider deviates from the standard of care expected within the medical community. The plaintiff contends that Dr. Braiman's refusal to provide appropriate treatment for her condition, irrespective of her age, constituted a failure to provide the standard of care expected from a healthcare professional.

**G. Northern District of New York Jurisdiction:**

The Northern District of New York has jurisdiction over this claim, as it involves allegations of medical malpractice and discrimination under the Age Discrimination Act of 1975.

347. Tort Law and Malpractice Claims:

1. **Duty of Care**:

Healthcare professionals owe a duty of care to their patients. They must provide treatment consistent with established medical standards and guidelines, and ensure that patients receive information necessary for informed consent. Additionally, Dr. Braiman breached his duty of care by encouraging the plaintiff not to get an abortion in the unlikely event of non-consensual impregnation and instead to have things tested throughout the pregnancy, which is not an option (Exhibit B-1) due to

1. The inability to test for the genome for EDs in a fetus.
2. The high risk for complications during pregnancy.
3. The high likelihood of genetic transmission of the condition to offspring.

2. **Breach of Standard of Care**:

Medical malpractice occurs when a healthcare provider breaches the standard of care expected within their profession. A breach can result from, among other things, failing to consider a patient's individual needs, including factors such as age and sex.

Additionally, Dr. Braiman breached his duty of care by encouraging the plaintiff not to get an abortion in the unlikely event of non-consensual impregnation and instead to have things tested throughout the pregnancy, which is not an option (Exhibit B-1)  due to

1.The inability to test for the genome for EDs in a fetus.
2. The high risk for complications during pregnancy.
3. The high likelihood of genetic transmission of the condition to offspring.

3. **Informed Consent**:

Patients have a common law right to be informed about their medical conditions, proposed treatments, associated risks, and alternatives. A failure to provide this information can lead to a breach of the duty of care.

4. **Federal Jurisdiction**:

Medical malpractice claims, which involve federal law considerations, such as the Health Insurance Portability and Accountability Act (HIPAA) and the Affordable Care Act (ACA), can establish federal jurisdiction.

348. Jurisdiction in the Northern District of New York:

The Northern District of New York has jurisdiction over the plaintiff's claims for the following reasons:

**A. Federal Question Jurisdiction**:

The plaintiff's claims are based on federal laws, such as the ACA and HIPAA, and they are properly pleaded, the court can exercise federal question jurisdiction.

**B. Venue**:

The Northern District of New York is a proper venue if a substantial part of the events or omissions giving rise to the claims occurred within the district.

**C. Application to the Present Case:**

In this case, Dr. Braiman's actions were medically inappropriate and discriminatory, constituting a breach of the standard of care and common law principles. Furthermore, federal laws, such as HIPAA and the ACA, are implicated in the plaintiff's claims, supporting federal jurisdiction. The plaintiff's claims center on events that took place within the Northern District of New York. The plaintiff was a patient receiving treatment within this jurisdiction, and her claims arise from the medical care received here. Therefore, the Northern District of New York is a proper venue for the present action.

349. Donna Kirker, Lisa West, and Christine Calistri (Towers) engaged in tortious conduct:

By violating the plaintiffs privacy rights, threatening her, and retaliating against her, leading to the interruption of her emergency medical care these actions are indicative of professional malpractice, and the Northern District of New York has jurisdiction to adjudicate these claims.

350. Tort Law and Professional Malpractice Claims:

**A. Duty of Care:**

Healthcare professionals, including hospital personnel, owe a duty of care to patients. This duty includes safeguarding patients' confidential health information and ensuring they receive appropriate and uninterrupted medical care.

**B. Privacy Violations:**

Unauthorized disclosure of a patient's private health information is a violation of the common law right to privacy and can be a form of professional malpractice.

**C. Retaliation**:

Retaliation against a patient for asserting their rights or making a complaint can constitute professional malpractice, including harassment, threats, and the disruption of emergency medical care.

351 . Jurisdiction in the Northern District of New York :

The Northern District of New York has jurisdiction over these claims for the following reasons:

**A. Federal Question Jurisdiction:**

Because claims involve federal laws, such as the Health Insurance Portability and Accountability Act (HIPAA) or other relevant federal regulations, the court can exercise federal question jurisdiction.

**B. Venue:**

The Northern District of New York is a proper venue if a substantial part of the events or omissions leading to the claims occurred within the district, such as the alleged actions by Kirker, West, and Calistri. (Towers)

**C. Application to the Present Case :**

Kirker, West, and Calistri engaged in actions that breached their duty of care, including unauthorized disclosure of the plaintiff's private health information, threats, harassment, and disruption of medical care, as retaliation for Dr. Braiman's actions and reports made by the plaintiff regarding his actions. These actions occurred within the Northern District of New York.
The plaintiff's claims involve violations of federal laws, such as HIPAA, and are indicative of tortious conduct. As such, they fall under the jurisdiction of the Northern District of New York.

352. Albany Med Health Partners (Systems) are liable:

Albany Med Health Systems, as the parent organization, owes a duty of care to patients treated within its subsidiary hospitals, including Glens Falls Hospital, Saratoga Hospital and Malta Med Emergent Care - this duty of care extends to ensuring that subsidiary hospitals comply with relevant laws, regulations, and ethical standards.

353. Accordingly, Plaintiff is entitled to punitive damages, injunctive relief, reasonable attorneys costs and fees, and any other relief the court sees fit.

# FOURTEENTH CAUSE OF ACTION:

(Intentional Infliction of Emotional Distress)

354. Plaintiff restates and incorporates by reference the preceding paragraphs above as if fully set forth herein.

355. Declaring that the Defendants Dr. Jonathan Braiman, Donna Kirker, Lisa West, Christine Calistri (Towers) NP,  Albany Med Health Partners' (Systems) Glens Falls Hospital, Saratoga Hospital and Malta Med Emergent Care acted with intentional infliction of emotional distress.

356. This court has jurisdiction over the defendants as their actions occurred in the Northern District of New York.

357. This court has supplemental jurisdiction over claims for intentional infliction of emotional distress as they relate to violations of federal laws and statutes as outlined above.

358. This court has supplemental jurisdiction under § 28 USC 1367(a) over state claims for Intentional Infliction of Emotional Distress.

359. Exhaustive action was taken by the plaintiff. (Paragraphs *72-123*)

360. Dr. Braiman inflicted emotional distress on the plaintiff as he was made aware of the severity of the plaintiff's pain, how the pain was impacting her quality of life, and how persistent and chronic the pain was.

361. To establish a claim of intentional infliction of emotional distress in the Northern District of New York, the plaintiff must demonstrate:

**A. Extreme and Outrageous Conduct**:

*The defendant's actions must be extreme and outrageous, exceeding the bounds of socially acceptable behavior.*

Dr. Braiman refused to provide safe and effective treatment for her cluster headaches despite the well-documented and widely recognized severity of the condition. Cluster headaches are known for causing excruciating, debilitating pain, often referred to as "suicide headaches." When a healthcare provider, aware of the intense pain cluster headaches cause, intentionally denies treatment options for a potentially severe condition, it constitutes extreme and outrageous conduct.

**B. Intent or Recklessness**:

*The defendant must have intended to cause severe emotional distress or acted recklessly in disregard of the high probability that such distress would occur.*

Dr. Braiman intentionally refused treatment for her cluster headaches by refusing to discuss treatments that the plaintiff could safely take. By denying care for a condition causing severe pain, Dr. Braiman either intended to cause emotional distress or acted recklessly in complete disregard for the foreseeable consequences of his actions.

Additionally, Dr. Braiman acted recklessly by encouraging the plaintiff not to get an abortion in the unlikely event of non-consensual impregnation and instead to have things tested throughout the pregnancy, which is not an option (Exhibit B-1)  due to

1. The inability to test for the genome for EDs in a fetus.
2. The high risk for complications during pregnancy.
3. The high likelihood of genetic transmission of the condition to offspring.

**C. Severe Emotional Distress**:

*The plaintiff must have suffered severe emotional distress as a result of the defendant's conduct.*

Cluster headaches are recognized for their potential to cause extreme emotional distress due to the relentless, agonizing pain they inflict. Dr. Braiman's actions resulted in severe emotional distress, impacting her mental and emotional well-being which has been well documented by the plaintiffs therapist.

Dr. Braiman understands the severity of cluster headaches and how they affected the plaintiff, both due to his training as a neurologist and the complaints made by the plaintiff. The plaintiff's severe emotional distress was a direct result of her being unable to find relief from the disabling pain due to Dr. Braiman's decision.

362. Northern District of New York Jurisdiction:

The Northern District of New York has jurisdiction over this claim, as it involves allegations of intentional infliction of emotional distress that occurred within the district.

363. Declaring that Kirker, West and Calistri intentionally inflicted emotional distress onto the plaintiff through their breach of HIPAA

364. **Intentional Infliction of Emotional Distress (IIED):**

Plaintiff asserts a claim for IIED as a result of the HIPAA violations as they were particularly egregious and malicious. The intentional infliction of emotional distress occurred due to the defendant's extreme and outrageous conduct.

365. Donna Kirker, Lisa West, Christine Calistri (Towers) caused negligent infliction of emotional distress on the plaintiff as he was made aware of the severity of the plaintiff's pain, how the pain was impacting her quality of

life, and how persistent and chronic the pain was.

366. Donna Kirker, Lisa West, Christine Calistri (Towers) caused intentional infliction of emotional distress on the plaintiff by creating false allegations, threatening the plaintiff with security and legal action, cutting off plaintiff from emergency services while her condition was unstable and she was in immense pain, and harassing the plaintiff via social media.

367. Christine Calistri (Towers) harassed the plaintiff via social media for weeks after she improperly discharged the plaintiff mid treatment.

368. Intentional Infliction of Emotional Harm in False Allegations Leading to Patient Removal:

**1. Intent to Cause Emotional Distress:**

The tort of intentional infliction of emotional distress requires the presence of intent. In the context of false allegations leading to a patient's removal from the emergency room, it can be argued that those making or perpetuating the false allegations intended to cause emotional distress to the patient. This intent to inflict emotional harm can be inferred from their actions.

**2. Extreme and Outrageous Conduct:**

The conduct of creating false allegations to disrupt a patient's ongoing medical treatment is extreme and outrageous by ordinary standards of decency. False allegations, if proven, represent a severe departure from the expected standard of care and professionalism within a healthcare setting.

**3. Foreseeability of Severe Emotional Distress:**

It is foreseeable that the patient will experience severe emotional distress as a result of such false allegations, especially when it results in their removal from a medical facility in the midst of necessary treatment. This harm is foreseeable, and the wrongdoers should reasonably anticipate the patient's emotional suffering.

**4. Causation:**

The false allegations directly caused the patient's emotional distress. The patient can demonstrate that, but for these false allegations, they would not have been removed from the emergency room or subjected to the emotional distress they experienced.

**5. Severe Emotional Distress:**

The patient can provide evidence that they suffered severe emotional distress as a direct result of the false allegations and their subsequent removal from ongoing medical treatment. This may include psychological evidence, expert testimonies, or medical records documenting the patient's emotional state.

**6. Public Policy and Ethical Considerations:**

Recognizing false allegations leading to patient removal as intentional infliction of emotional harm serves important public policy and ethical considerations. It discourages deceptive

and harmful practices within the healthcare sector, reinforces patient rights, and ensures that healthcare providers act ethically and within the bounds of their professional obligations.

**7. Duty of Care:**

Healthcare providers owe a duty of care to their patients, which includes not engaging in conduct that intentionally causes harm or emotional distress. Creating false allegations to remove a patient mid-treatment is a clear breach of this duty.

369. Albany Med Health Partners (Systems) are liable:

Albany Med Health Systems, as the parent organization, owes a duty of care to patients treated within its subsidiary hospitals, including Glens Falls Hospital, Saratoga Hospital and Malta Med Emergent Care - this duty of care extends to ensuring that subsidiary hospitals comply with relevant laws, regulations, and ethical standards.

370. Accordingly,  Plaintiff is entitled to punitive damages, injunctive relief, reasonable attorneys costs and fees, and any other relief the court sees fit.

# FIFTEENTH CAUSE OF ACTION:
### (INVASION OF PRIVACY)

371.  Plaintiff restates and incorporates by reference the preceding paragraphs above as if fully set forth herein.

372.  Declaring that Donna Kirker, Lisa West, Christine Calistri (Towers),  Albany Med Health Partners' (Systems) Glens Falls Hospital, Saratoga Hospital and Malta Med Emergent Care's committed invasion of privacy.

373. This court has jurisdiction over the defendants as their actions occurred in the Northern District of New York.

374. This court has supplemental jurisdiction over claims for intentional infliction of emotional distress as they relate to violations of federal laws and statutes as outlined above.

375. This court has supplemental jurisdiction under § 28 USC 1367(a) over state claims for Invasion of Privacy.

376. Exhaustive action was taken by the plaintiff. (Paragraphs *72-123*)

377. Defendants committed Invasion of Privacy:

**1**. **Intrusion upon Seclusion**:

Plaintiff asserts a claim for intrusion upon seclusion, a recognized common law privacy tort. Unauthorized access to an individual's medical records or unauthorized disclosure of PHI could constitute an intrusion upon their private affairs. The actions of Donna Kirker and Lisa West include intrusive and invasive conduct that invades individuals' privacy, as the defendants had no right to access her protected health information, the plaintiff can assert a claim for intrusion upon seclusion.

**2. Public Disclosure of Private Facts**:

HIPAA violations by Christine Calistri via an unauthorized individual via social media constitutes a claim for  public disclosure of private facts, resulting in harm and embarrassment to the plaintiff.

378. Albany Med Health Partners (Systems) are liable:

Albany Med Health Systems, as the parent organization, owes a duty of care to patients treated within its subsidiary hospitals, including Glens Falls Hospital, Saratoga Hospital and Malta Med Emergent Care - this duty of care extends to ensuring that subsidiary hospitals comply with relevant laws, regulations, and ethical standards.

379. Accordingly, Plaintiff is entitled to punitive damages, injunctive relief, reasonable attorneys costs and fees, and any other relief the court sees fit.

# SIXTEENTH CAUSE OF ACTION:
### (Harassment)

380. Plaintiff restates and incorporates by reference the preceding paragraphs above as if fully set forth herein.

381. Declaring that the Albany Med Health Partners' (Systems), Glens Falls Hospital, Saratoga Hospital, Malta Med Emergent Care, Donna Kirker, Lisa West, and Christine Calistri committed harassment against the plaintiff.

382. This court has jurisdiction over the actions of the defendants as their actions took place in the Northern District of New York.

383. This court is a proper venue for claims for harassment as the actions of the defendants violated the standard for federal laws and statutes.

384. This court has supplemental jurisdiction under § 28 USC 1367(a) over state claims for Harassment.

385. Exhaustive action was taken by the plaintiff. (Paragraphs *72-123*)

386. The defendants committed Harassment Through Unauthorized Disclosure of Private Health Information:

To prove a cause of action, a plaintiff must prove the following:

**1. Unauthorized Disclosure of Private Health Information:**

Christine Calistri intentionally disclosed a patient's private health information on social media platforms. This information was protected by laws and regulations, such as the Health Insurance Portability and Accountability Act (HIPAA) in the United States, which prohibit the unauthorized disclosure of a patient's medical information.

**2. Intent to Harass:**

The act of sharing private health information on social media is an intentional act with the purpose of causing harm, embarrassment, or distress to the patient. By disclosing this sensitive information without authorization, the doctor exhibited an intent to harass or distress the patient. The fact that Calistri acknowledged she saw the plaintiffs posts on social media where she was sobbing and expressing extreme emotional distress regarding Calistri reaching out to her boyfriend on social media, her second time reaching out to the plaintiffs boyfriend on October 1st is an even more glaring example of her intent to harass the plaintiff.

### 3. Recklessness or Negligence:

Even if Calistri argues that the disclosure was not intentional, the act may still be classified as harassment due to recklessness or negligence. The doctor, as a medical professional, has a duty to protect patient confidentiality, and their failure to do so may amount to negligence.

### 4. Emotional Distress and Harm:

Unauthorized disclosure of private health information is reasonably expected to cause emotional distress and harm to the patient. Patients have a reasonable expectation of privacy regarding their medical history, and breaching this privacy can lead to significant emotional distress, and did lead to such distress in this case. Now the plaintiff is fearful of healthcare workers and fears that her privacy will be violated. This fear has led to the plaintiff not receiving medical care in a timely manner which has caused physical harm to the plaintiff. The breach of privacy caused turmoil between the plaintiff and her boyfriend, which resulted in serious emotional distress as the false claims put forth by Calistri were initially believed by the plaintiff's boyfriend.

### 5. Causation:

Calistri's unauthorized disclosure directly caused the patient emotional distress and harm. It is the doctor's action that led to the patient's suffering.

### 6. Cyberbullying and Harassment:

Posting a patient's private health information on social media can be seen as a form of cyberbullying or online harassment, which is recognized as harmful and illegal behavior in many jurisdictions.

### 7. Professional and Ethical Violation:

Calistri's actions not only violated legal regulations like HIPAA, but also breached their professional and ethical obligations to maintain patient confidentiality. This further supports the argument that the doctor's conduct should be classified as harassment.

### 8 . Potential Legal Precedents:

While specific cases of doctors disclosing private health information on social media may be relatively new, courts have recognized the significance of privacy rights and the harm caused by

unauthorized disclosures. Precedents involving other forms of harassment or privacy breaches can be relevant in establishing this argument.

387.  Harassment Resulting from Disrupting Medical Treatment Based on Social Media Activity:

**1. Interference with Medical Treatment:**

The primary duty of a medical professional, especially in an emergency room, is to provide appropriate medical care to patients. Refusing to provide or prematurely discontinuing treatment for a patient without medical justification is a breach of this duty.

**2. Patient's Right to Medical Care:**

Patients have a fundamental right to receive appropriate medical care, and doctors have an ethical and legal obligation to ensure that this right is upheld. Denying a patient necessary medical care without valid medical reasons constitutes a violation of this right.

**3. Social Media Activity as the Trigger:**

The patient's use of social media is not relevant to their medical condition or the urgency of the care they require. Therefore, the actions of Kirker, West, and Calistri were, according to their own account, a direct response to the patient's social media presence as an influencer.

**4. Intent to Harass:**

Calistri's decision to remove the patient from the emergency room was an attempt to harass or intimidate the patient in response to their social media presence. If the nurse's actions were not based on valid medical reasons but were instead intended to inflict harm or distress on the patient, it can be categorized as harassment.

**5. Violation of Professional Standards:**

Medical professionals are expected to adhere to high ethical standards, which include providing medical care without discrimination or retaliation based on non-medical factors, such as social media activity. Violating these professional standards further supports the nurses actions as intended to harass the patient.

**6. Emotional Distress and Harm:**

Denying a patient necessary medical care caused emotional distress and physical harm. By linking the denial of treatment to the patient's social media presence, the doctor's actions are directly responsible for the distress and potential harm suffered by the patient.

**7. Causation:**

The nurse's actions led to the patient's removal from the emergency room, directly causing emotional distress and potentially harm to the patient.

**8. Recognition of the Patient-Doctor Relationship:**

The patient-doctor relationship is built on trust, and any actions by the doctor that betray this trust may be seen as harassment in a professional context.

**9. Importance of Medical Neutrality:**

Medical neutrality is a fundamental principle in healthcare, which dictates that medical care should be provided based on medical necessity and without bias. Any actions by medical professionals that disrupt this neutrality can be legally problematic.

**10: Established Legal Precedents:**

While this specific scenario may be relatively novel, the legal system has recognized that medical professionals must provide care based on medical appropriateness and without discrimination.

388. Albany Med Health Partners (Systems) are liable:

Albany Med Health Systems, as the parent organization, owes a duty of care to patients treated within its subsidiary hospitals, including Glens Falls Hospital, Saratoga Hospital and Malta Med Emergent Care - this duty of care extends to ensuring that subsidiary hospitals comply with relevant laws, regulations, and ethical standards.

389. Accordingly, Plaintiff is entitled to punitive damages, injunctive relief, reasonable attorneys costs and fees, and any other relief the court sees fit.

# SEVENTEENTH CAUSE OF ACTION:
(Negligent Infliction of Emotional Distress)

390. Plaintiff restates and incorporates by reference the preceding paragraphs above as if fully set forth herein.

391. Declaring that the Albany Med Health Partners' (Systems), Glens Falls Hospital, Saratoga Hospital, Malta Med Emergent Care, Dr. Jonathan Braiman, Donna Kirker, Lisa West, and Christine Calistri (Towers) NP, committed negligent infliction of emotional distress against the plaintiff.

392. This court has jurisdiction over the actions of the defendants as their actions took place in the Northern District of New York.

393. This court is a proper venue for claims for harassment as the actions of the defendants violated the standard for federal laws and statutes.

394. This court has supplemental jurisdiction under § 28 USC 1367(a) over state claims for Negligent Infliction of Emotional Distress.

395. Exhaustive action was taken by the plaintiff. (Paragraphs *72-123*)

396. Dr. Braiman, Albany Med Health Partners (Systems) and Glens Falls Hospital committed Negligent Infliction of Emotional Distress

**I. Introduction:**

The plaintiff, suffering from Ehlers Danlos Syndrome and seeking treatment for cluster headaches, was subjected to negligent and discriminatory conduct by the defendants, leading to severe emotional distress. This legal argument outlines the elements supporting a claim for negligent infliction of emotional distress.

**II. Duty of Care:**

The defendants, including Dr. Braiman and his employers, had a duty of care towards the plaintiff as healthcare professionals. This duty includes providing accurate medical information, obtaining informed consent, and ensuring the well-being of the patient.

**III. Breach of Duty:**

Dr. Braiman breached his duty of care by:

1. Providing false information about the teratogenic effects of the plaintiff's current medication (Cellcept).

2. Refusing to provide informed consent for available treatment options.

3. Prescribing medication without the plaintiff's consent, potentially endangering her health.

4. Denying the plaintiff treatment options based on her age and sex, leading to discriminatory practices.

**IV. Severe Emotional Distress:**

The negligent actions of Dr. Braiman directly caused the plaintiff severe emotional distress. His refusal to provide necessary treatment, discriminatory practices, and lack of informed consent created a situation causing significant emotional harm to the plaintiff. The plaintiff experienced severe emotional distress manifested by:

1. Anxiety and distress due to the denial of necessary medical treatment.

2. Emotional anguish resulting from discriminatory practices and refusal of informed consent.

**V. Foreseeability:**

Given the defendants' roles as healthcare professionals, it was foreseeable that their negligent actions would cause severe emotional distress to the plaintiff.

397. Albany Med Health Partners (Systems), Glens Falls Hospital, Saratoga Hospital, Malta Med Emergent Care, Donna Kirker, Lisa West and Christine Calistri (Towers) committed negligent Infliction of Emotional Distress.

**I. Introduction:**

The plaintiff, having suffered from untreated cluster headaches and subjected to false accusations and actions by Donna Kirker, Lisa West, and Christine Calistri, seeks to establish a claim of negligent infliction of emotional distress based on their negligent conduct.

**II. Duty of Care:**

Donna Kirker, Lisa West, and Christine Calistri, in their roles as healthcare professionals and administrators, owed a duty of care to the plaintiff. This duty includes ensuring the well-being of the patient, providing accurate information, and handling patient complaints responsibly.

**III. Breach of Duty:**

The defendants breached their duty of care by:

1. Falsely accusing the plaintiff of live streaming, leading to unwarranted distress.

2. Instructing Malta Med Emergent Care to discharge the plaintiff based on false information.

3. Failure to provide accurate information about the plaintiff's status, leading to an unjust discharge.

4. Sending false and forged documents to the plaintiff's insurance company.

**IV. Causation:**

The defendants' negligent actions directly caused the plaintiff severe emotional distress, evident from:

1. Unjust discharge from Malta Med Emergent Care.

2. False accusations leading to heightened emotional distress.

3. Forged documents affecting the plaintiff's insurance claim and causing additional stress.

**V. Severe Emotional Distress:**

The plaintiff experienced severe emotional distress, as demonstrated by:

1. Physical manifestations like crying, sweating, shaking, heightened blood pressure, and pulse.

2. Mental anguish resulting from false accusations and the unjust discharge.

3. Emotional harm caused by the defendants' failure to handle the situation responsibly.

**VI. Foreseeability:**

Given their positions in the healthcare system, it was foreseeable that the defendants' actions, including false accusations and unjust discharge, would cause severe emotional distress to the plaintiff.

**VII. Conclusion:**

Donna Kirker, Lisa West, and Christine Calistri, through their negligent actions and false accusations, directly caused the plaintiff severe emotional distress. The breach of duty, resulting in unwarranted distress, unjust discharge, and forged documents, establishes a compelling case for negligent infliction of emotional distress.

398. Albany Med Health Partners (Systems) are liable:

Albany Med Health Systems, as the parent organization, owes a duty of care to patients treated within its subsidiary hospitals, including Glens Falls Hospital, Saratoga Hospital and Malta Med Emergent Care - this duty of care extends to ensuring that subsidiary hospitals comply with relevant laws, regulations, and ethical standards.

399. Accordingly, Plaintiff is entitled to punitive damages, injunctive relief, reasonable attorneys costs and fees, and any other relief the court sees fit.

# ADDITIONAL CONSIDERATIONS:

Plaintiffs Rights as a *Pro Se* Litigant

400. Plaintiffs Rights as a *Pro Se* Litigant:

A *pro se* litigant may be granted an exception to the exhaustion of administrative remedies requirement under certain circumstances. *Pro se* litigants, who are individuals representing themselves in legal proceedings, often face unique challenges and may not be fully aware of all legal requirements and procedures. The exhaustion of administrative remedies requirement, while an important procedural safeguard, should be interpreted in a manner that accommodates the particular circumstances of pro se litigants to ensure access to justice.

401. Several reasons support the notion that *pro se* litigants should be granted an exception to the exhaustion requirement:

**1. Due Process and Equal Access:**

*Pro se* litigants, often untrained in the law, may not fully comprehend the complexities of administrative exhaustion. To enforce the exhaustion requirement strictly against *pro se* litigants may infringe on their right to due process and equal access to the courts.

**2. Equitable Considerations:**

Courts should consider the principle of equity when dealing with *pro se* litigants. Denying them access to the court for failing to adhere strictly to procedural requirements may lead to inequitable results.

### 3. Intent of the Statute:

The intent of statutes requiring exhaustion of administrative remedies is to encourage resolution of disputes at an administrative level, promote efficiency, and reduce the burden on the judicial system. *Pro se* litigants may not hinder these purposes, as they are often seeking a forum to address their grievances, not trying to bypass administrative procedures.

### 4. Case-Specific Evaluation:

Each case should be evaluated on its specific facts and circumstances. The court should determine whether exhaustion would serve a meaningful purpose, recognizing that the primary goal is to ensure justice.

### 5. Preserving the Right to Redress:

Denying pro se litigants the opportunity to have their cases heard in court, based solely on a failure to exhaust administrative remedies, could deprive them of their right to seek redress for grievances. This would undermine the principle that justice delayed is justice denied.

### 6. Significant Effort by the Plaintiff:

The plaintiff has spent a great deal of time studying law, as well as appropriate District Court guidelines and protocols in an attempt to ensure to the best of her ability that the court's time is not wasted. Plaintiff has done as much as within her abilities to ensure that all exhaustive measures have been taken prior to filing a federal question. Due to her fragile health and the amount of time, energy and resources the plaintiff has put into exhausting these avenues for correction through the entities involved, as well as state and federal agencies, the plaintiff requests that any oversight on her end regarding exhaustive actions are forgiven by the court.

In light of these considerations, the plaintiff, a *pro se* litigant, should be afforded a certain degree of leniency when it comes to exhaustion of administrative remedies requirements. Courts have the discretion to grant exceptions to *pro se* litigants, allowing them to proceed with their claims even if they have not fully exhausted administrative remedies, so as not to impede access to justice for those who may not fully grasp the intricacies of the legal process.

402. Plaintiff exhausted administrative remedies to the best of her abilities:

1. Plaintiff reinstates her exhaustive actions for administrative remedy with the hospital systems involved, as well as the appropriate state and federal government. (Paragraphs *72-123*)

403. Plaintiff's concerns regarding medical care with Albany Med Health Systems and their affiliates

Exhaustive actions and remedies sought by the plaintiff regarding the actions of Dr.

Braiman have resulted in retaliation in the following ways:

        1. Removal from the emergency department on September 21, 2022

        2. False allegations made against the plaintiff and subsequent threats of legal recourse and armed security guards.

        3. Private health information disclosures and harassment via social media by Christine Calistri (Towers) on September 30th and October 1, 2022.

        4. Fraudulent information submitted to the plaintiffs insurance and submitted to HIXNY regarding patient discharge from Malta Med on September 21, 2022.

        5. Refusal of service from Saratoga Headache Center

        6. Patient abandonment committed against the plaintiff and her family member from Dr. Marc Price.

        7. As a result of these retaliatory actions committed by a number of Albany Med Health Systems employees and facilities, the plaintiff does not feel safe receiving service from any Albany Med Health Systems affiliated facility and as such, she must travel outside of her area for health care, which is not sustainable for the plaintiff as she has a number of serious, life threatening conditions including EDs. It is not a financially sustainable solution, as the plaintiff is on a fixed income through social security disability.

# PRAYER FOR RELIEF

    **WHEREFORE,** Plaintiff respectfully requests judgment against Defendant Dr. **Jonathan Braiman** as follows:

        a.  Train all Defendant's current and future employees and agents with responsibilities related to the design, implementation, and operation of Defendants' discrimination laws.

        b. Train all Defendant's current and future employees and agents with responsibilities related to the design, implementation, and operation of Informed consent laws; both state and federal.

        c. Awarding such damages to Plaintiff as will fully compensate it for the diversion of rights and privileges, frustration, physical and emotional distress caused by Defendant's unlawful practices;

        d. Awarding punitive damages to the Plaintiff;

        e. Awarding the plaintiff damages for malpractice, negligence, and negligence per se committed by the defendant with regard to federal statutes and laws.

        f. Awarding the Plaintiff reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action;

        g. Awarding compensation for travel expenses and medical care outside of Plaintiffs local area.

h. Awarding punitive damages for psychological distress and post traumatic stress disorder.

i. Implement common law practices where the court sees fit for violations herein.

j. Granting the Plaintiff such other and further relief as may be just and proper.

**WHEREFORE,** Plaintiff respectfully requests judgment against Defendant **Donna Kirker** as follows:

a. Train all Defendant's current and future employees and agents with responsibilities related to the design, implementation, and operation of Defendants' Patients Rights Laws, both State and Federal,

b. Train all Defendant's current and future employees and agents with responsibilities related to the design, implementation, and operation of HIPAA's privacy rule.

c. Train all Defendant's current and future employees and agents with responsibilities related to the design, implementation, and operation of EMTALA.

d. Awarding such damages to Plaintiff as will fully compensate it for the diversion of rights and privileges, frustration, physical distress caused by Defendant's unlawful practices;

e. Awarding punitive damages to the Plaintiff for infliction of emotional distress, harassment, violation of privacy, denial of constitutional rights;

f. Awarding the Plaintiff reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action;

g. Awarding compensation for travel expenses and medical care outside of Plaintiffs local area

h. Awarding damages to the Plaintiff for psychological distress and post traumatic stress disorder.

i. implement common law practices where the court sees fit for violations herein.

j. Granting the Plaintiff such other and further relief as may be just and proper.

**WHEREFORE,** Plaintiff respectfully requests judgment against Defendant **Lisa West** as follows:

a. Train all Defendant's current and future employees and agents with responsibilities related to the design, implementation, and operation of Defendants' Patients Rights Laws, both State and Federal,

b.Train all Defendant's current and future employees and agents with responsibilities related to the design, implementation, and operation of HIPAA's privacy rule.

c. Train all Defendant's current and future employees and agents with responsibilities related to the design, implementation, and operation of EMTALA.

d. Awarding such damages to Plaintiff as will fully compensate it for the diversion of rights and privileges, frustration, physical distress caused by Defendant's unlawful practices;

e. Awarding punitive damages to the Plaintiff for infliction of emotional distress, harassment, violation of privacy, denial of constitutional rights;

f. Awarding the Plaintiff reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action;

g. Awarding compensation for travel expenses and medical care outside of Plaintiffs local area

h. Awarding damages to the Plaintiff for psychological distress and post traumatic stress disorder.

i. implement common law practices where the court sees fit for violations herein.

j. Granting the Plaintiff such other and further relief as may be just and proper.

**WHEREFORE,** Plaintiff respectfully requests judgment against Defendant **Christine Calistri (Towers)** as follows:

a. Train all Defendant's current and future employees and agents with responsibilities related to the design, implementation, and operation of Defendants' Patients Rights Laws, both State and Federal,

b.Train all Defendant's current and future employees and agents with responsibilities related to the design, implementation, and operation of HIPAA's privacy rule.

c. Train all Defendant's current and future employees and agents with responsibilities related to the design, implementation, and operation of EMTALA.

d. Awarding such damages to Plaintiff as will fully compensate it for the diversion of rights and privileges, frustration, physical distress caused by Defendant's unlawful practices;

e. Awarding punitive damages to the Plaintiff for infliction of emotional distress, harassment, violation of privacy, denial of constitutional rights;

f. Awarding the Plaintiff reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action;

g. Awarding compensation for travel expenses and medical care outside of Plaintiffs local area

h. Awarding damages to the Plaintiff for psychological distress and post traumatic stress disorder.

i. implement common law practices where the court sees fit for violations herein.

j. Granting the Plaintiff such other and further relief as may be just and proper.

**WHEREFORE,** Plaintiff respectfully requests judgment against Defendant **Albany Med Health Partners**

**(Systems)** as follows:

      a. Train all Defendant's current and future employees and agents with responsibilities related to the design, implementation, and operation of Defendants' Patients Rights Laws, both State and Federal,

      b. Train all Defendant's current and future employees and agents with responsibilities related to the design, implementation, and operation of HIPAA's privacy rule.

      c. Train all Defendant's current and future employees and agents with responsibilities related to the design, implementation, and operation of EMTALA.

      d. Implementing and allowing a full audit of claims made to medicare and medicaid as found to be appropriate by CMS as the court sees appropriate.

      e .Awarding such damages to Plaintiff as will fully compensate it for the diversion of rights and privileges, frustration, physical distress caused by Defendant's unlawful practices;

      f.  Awarding punitive damages to the Plaintiff for complacency in the actions of their employees and the damages caused as a result.

      g  Awarding the Plaintiff reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action;

      h. Awarding compensation for travel expenses and medical care outside of Plaintiffs local area

      i. Awarding damages to the Plaintiff for psychological distress and post traumatic stress disorder.

      j. Awarding compensation for aiding, abetting, and complacency with the violations and harassment  that occurred.

      k. Awarding compensation for frustration, time and effort put forth by the Plaintiff to initiate this legal proceeding, submit complaints and reports to the appropriate parties and entities.

      l. implement common law practices where the court sees fit for violations herein.

      m. Granting the Plaintiff such other and further relief as may be just and proper.


**WHEREFORE,** Plaintiff respectfully requests judgment against Defendant **Glens Falls Hospital** as follows:

      a. Train all Defendant's current and future employees and agents with responsibilities related to the design, implementation, and operation of Defendants' Patients Rights Laws, both State and Federal,

      b. Train all Defendant's current and future employees and agents with responsibilities related to the design, implementation, and operation of HIPAA's privacy rule.

      c. Train all Defendant's current and future employees and agents with responsibilities related to the design, implementation, and operation of EMTALA.

d. Implementing and allowing a full audit of claims made to medicare and medicaid as found to be appropriate by CMS as the court sees appropriate.

e. Train all Defendant's current and future employees and agents with responsibilities related to the design, implementation, and operations of discrimination law, both state and federal.

f. Awarding such damages to Plaintiff as will fully compensate it for the diversion of rights and privileges, frustration, physical distress caused by Defendant's unlawful practices;

g. Awarding punitive damages to the Plaintiff for complacency in the actions of their employees and the damages caused as a result.

h. Awarding the Plaintiff reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action;

i. Awarding compensation for travel expenses and medical care outside of Plaintiffs local area

j. Awarding damages to the Plaintiff for psychological distress and post traumatic stress disorder.

k. Awarding compensation for aiding, abetting, and complacency with the violations and harassment  that occurred.

l. Awarding compensation for frustration, time and effort put forth by the Plaintiff to initiate this legal proceeding, submit complaints and reports to the appropriate parties and entities.

m. implement common law practices where the court sees fit for violations herein.

n. Granting the Plaintiff such other and further relief as may be just and proper.


**WHEREFORE,** Plaintiff respectfully requests judgment against Defendant **Saratoga Hospital** as follows:

a. Train all Defendant's current and future employees and agents with responsibilities related to the design, implementation, and operation of Defendants' Patients Rights Laws, both State and Federal,

b. Train all Defendant's current and future employees and agents with responsibilities related to the design, implementation, and operation of HIPAA's privacy rule.

c. Train all Defendant's current and future employees and agents with responsibilities related to the design, implementation, and operation of EMTALA.

d. Implementing and allowing a full audit of claims made to medicare and medicaid as found to be appropriate by CMS as the court sees appropriate.

e. Train all Defendant's current and future employees and agents with responsibilities related to the design, implementation, and operations of discrimination law, both state and federal.

f. Awarding such damages to Plaintiff as will fully compensate it for the diversion of rights and

privileges, frustration, physical distress caused by Defendant's unlawful practices;

g. Awarding punitive damages to the Plaintiff for complacency in the actions of their employees and the damages caused as a result.

h. Awarding the Plaintiff reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action;

i. Awarding compensation for travel expenses and medical care outside of Plaintiffs local area

j. Awarding damages to the Plaintiff for psychological distress and post traumatic stress disorder.

k. Awarding compensation for aiding, abetting, and complacency with the violations and harassment  that occurred.

l. Awarding compensation for frustration, time and effort put forth by the Plaintiff to initiate this legal proceeding, submit complaints and reports to the appropriate parties and entities.

m. implement common law practices where the court sees fit for violations herein.

n. Granting the Plaintiff such other and further relief as may be just and proper.

**WHEREFORE,** Plaintiff respectfully requests judgment against Defendant **Malta Med Emergent Care** as follows:

a. Train all Defendant's current and future employees and agents with responsibilities related to the design,  implementation, and operation of Defendants' Patients Rights Laws, both State and Federal,

b. Train all Defendant's current and future employees and agents with responsibilities related to the design, implementation, and operation of HIPAA's privacy rule.

c. Train all Defendant's current and future employees and agents with responsibilities related to the design, implementation, and operation of EMTALA.

d. Implementing and allowing a full audit of claims made to medicare and medicaid as found to be appropriate by CMS as the court sees appropriate.

e. Train all Defendant's current and future employees and agents with responsibilities related to the design, implementation, and operations of discrimination law, both state and federal.

f .Awarding such damages to Plaintiff as will fully compensate it for the diversion of rights and privileges, frustration, physical distress caused by Defendant's unlawful practices;

g.  Awarding punitive damages to the Plaintiff for complacency in the actions of their employees and the damages caused as a result.

h.  Awarding the Plaintiff reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action;

i. Awarding compensation for travel expenses and medical care outside of Plaintiffs local area

j. Awarding damages to the Plaintiff for psychological distress and post traumatic stress disorder.

k. Awarding compensation for aiding, abetting, and complacency with the violations and harassment  that occurred.

l. Awarding compensation for frustration, time and effort put forth by the Plaintiff to initiate this legal proceeding, submit complaints and reports to the appropriate parties and entities.

m. implement common law practices where the court sees fit for violations herein.

n. Granting the Plaintiff such other and further relief as may be just and proper.

Dated: Dec 2. 2023

By: Tara Rule

# EXHIBIT A

Drugs & Diseases

# erenumab (Rx)

Brand and Other Names: Aimovig

Classes: CGRP Monoclonal Antibodies; Antimigraine Agents

 8 

| Dosing & Uses |
| Interactions |
| Adverse Effects |
| Warnings |
| • Pregnancy |
| Pharmacology |
| Administration |
| Images |
| Patient Handout |
| Formulary |

## Pregnancy

### Pregnancy

Data are not available regarding fetal risk if used in pregnant women

Animal studies

- No adverse effects on offspring were observed when pregnant monkeys were administered erenumab-aooe throughout gestation

Clinical considerations

- Data suggest that women with migraine may be at increased risk of preeclampsia and gestational hypertension during pregnancy

### Lactation

Data are not available on the presence in human milk, the effects on the breastfed infant, or the effects on milk production

Consider the developmental and health benefits of breastfeeding along with the mother's clinical need for the drug, and any potential adverse effects on the breastfed infant from the drug or from the underlying maternal condition

### Pregnancy Categories

A: Generally acceptable. Controlled studies in pregnant women show no evidence of fetal risk.

B: May be acceptable. Either animal studies show no risk but human studies not available or animal studies showed minor risks and human studies done and showed no risk.

**How should I take AIMOVIG?**

- **See the detailed "Instructions for Use" on complete information on how to take AIMOVIG.**
- Take AIMOVIG exactly as your healthcare provider tells you to take it.
- Before you inject, always check the label of your single-dose prefilled autoinjector or single-dose prefilled syringe to make sure you have the correct medicine and the correct dose of AIMOVIG.
- Also, before you inject, leave AIMOVIG at room temperature for at least 30 minutes protected from direct sunlight.
- AIMOVIG is injected under your skin (subcutaneously) 1 time each month.
- AIMOVIG comes in 2 different types of devices: a single-dose (1 time) prefilled autoinjector or a single-dose (1 time) prefilled syringe. Your healthcare provider will prescribe the type and dose that is best for you.
- If you forget to take AIMOVIG or are not able to take the dose at the regular time, take your missed dose as soon as you remember. After that, you can continue to take AIMOVIG 1 time each month from the date of your last dose.

**What are possible side effects of AIMOVIG?**

**AIMOVIG may cause serious side effects, including:**

- Allergic reactions. Allergic reactions, including rash or swelling can happen after receiving AIMOVIG. This can happen within hours to days after using AIMOVIG. Call your healthcare provider or get emergency medical help right away if you have any of the following symptoms of an allergic reaction:
  - swelling of the face, mouth, tongue, or throat
  - trouble breathing
- Constipation with serious complications. Severe constipation can happen after receiving AIMOVIG. In some cases, people have been hospitalized or needed surgery. Contact your healthcare provider if you have severe constipation or constipation associated with symptoms such as severe or constant belly pain, vomiting, swelling of belly or bloating.
- High blood pressure. High blood pressure or worsening of high blood pressure can happen after receiving AIMOVIG. Contact your healthcare provider if you have an increase in blood pressure.

The most common side effects of AIMOVIG include: pain, redness, or swelling at the injection site and constipation.

Tell your healthcare provider if you have any side effect that bothers you or that does not go away.

These are not all of the possible side effects of AIMOVIG. Ask your pharmacist or healthcare provider for more information.

Call your healthcare provider for medical advice about side effects. You may report side effects to the FDA at 1-800-FDA-1088. You may also report side effects to Amgen at 1-800-77-AMGEN (1-800-772-6436).

**How should I store AIMOVIG?**

- Store AIMOVIG in the refrigerator between 36°F to 46°F (2°C to 8°C)



PATIENT:    TARA RULE
DOB:        ▇▇▇1991

MRN: ▇▇▇
DOS: 07/18/2022

**Surgical History**
1. History of Dental Surgery
2. History of Hernia Repair Inguinal Bilateral

**Family History**
1. Family history of malignant neoplasm (Z80.9) : Mother
2. Family history of Head injury : Father
3. Family history of Seizures : Father

1. Offspring: none
2. Siblings: none
3. Mother: 70 years old. History of migraines, IBS, joint issues and meningioma.
4. MGM: deceased at 86 with a history of hypertension, cardiac issues, joint issues and intussusception.
5. MGF: deceased at age 40, unsure but may be a car accident
6. Father: deceased at age 48 from a car accident with a history of epilepsy and loose joints - father's brother has T1DM and pacemaker (has 1 daughter) - 3 other brothers who are healthy - unsure age but 40's, 50's, 60's - unsure how many cousins and health history
7. PGF: deceased at age 70 with a history of kidney failure and joint issues.
8. PGM: living at age 89 with a history of diabetes and strokes.

Maternal ancestry is reported as German and English.
Paternal ancestry is reported as Irish.
Pedigree on file.

**Social History**
• Unreviewed Unverified: Daily caffeinated coffee consumption
• Feels safe at home
• Former smoker (Z87.891)
• Unreviewed Unverified: Living Situation: Supportive and safe
• Rarely consumes alcohol (Z78.9)
• Single

**Review of Systems**

General: adult female with multiple health issues. She was diagnosed with POTS by an electrophysiologist - is being treated for this and doing well with the treatment.
Diet: Appropriate, does not avoid any specific food groups. She reports a history of both unexplained weight loss and weight gain.
Vision: Intermittent blurry vision - depth perception is very poor without her glasses - myopia, seems to be high
Hearing: described as being very good
Head: Normal
Mouth/Nose/Throat: sensitivity in teeth - had difficulty swallowing for awhile after discharge from ICU
Lungs: SOB, atelectasis
Heart: tachycardia, irregular heart beat, blood pooling
GI: bloating, nausea, diarrhea, constipation - + GERD
GU: irregular periods, for awhile she had urinary retention - but has history of going to the bathroom during the

Albany Medical Center, Document Status: Final
Originating Site: Medical Genetics and Genomics
7/21/22 8:22:51 AM                    2 of 7



PATIENT:     TARA RULE                          MRN:   137202
DOB:              1991                          DOS:   07/18/2022

height loss greater than 1 inch or if x-rays are suggestive of osteopenia.
6. Easy bruising is quite common, frequently without obvious cause. Some patients may respond to extra vitamin C.
7. Headaches, especially migraine, are also common and caused at least in part by cervical muscle tension and temporomandibular dysfunction.
8. Dysautonomia may manifest as functional bowel disorders, cardiovascular autonomic dysfunction, and/or Raynaud syndrome, and neurally mediated hypotension (NMH) and/or postural orthostatic tachycardia syndrome (POTS). These are treated as in the general population.
9. Gastrointestinal complication/ disturbed GI motility related to elastic tissue defect may present with:
 i. Gastroesophageal reflux frequently requires maximal doses of proton pump inhibitors as well as supplementation with acid-neutralizing medications.
 ii. Delayed gastric emptying, and constipation often occur and may be exacerbated by opioid medications. Irritable bowel syndrome may manifest with diarrhea and/or constipation associated with abdominal cramping and rectal mucus.
10. Approximately half of individuals report atypical chest pain, palpitations at rest or on exertion, and/or orthostatic intolerance with syncope or near syncope. Holter monitoring usually shows normal sinus rhythm.
11. About 30% of individuals have aortic root dilatation. Dilation onset is in childhood and is usually stable over time. It is unlikely to progress or to develop later in life. All individuals should have a baseline echocardiogram. Adults: If the aortic root measurements in normal, follow-up echocardiograms can be held until major changes in physical activity or symptoms develop.


Thank you for referring your patient for genetic consultation.

Sincerely,

MJ Hajianpour, MD, PhD, FACMGG
Professor of Pediatrics and OB/GYN
Chief, Division of Medical Genetics and Genomics
Albany Medical College

Cheryl Clow, RN
Clinical Care Coordinator
Inborn Errors of Metabolism
Division of Medical Genetics and Genomics
Albany Medical Center.


**Carbon Copy Recipients**
 MACK DO, KRISTIN L - Default PCP
 PRICE DO, MARC D - RefProv1-Encounter


**Signatures**

Electronically signed by : MJ HAJIANPOUR, MD; Physician Jul 20 2022 10:02PM Eastern Standard Time (Division of Medical Genetics and Genomics)



# EXHIBIT B



**ALBANY MED Health System**

**GLENS FALLS HOSPITAL**

Ms. Tara Rule
P.O. Box 123
Round Lake , NY 12151

November 18, 2022

Dear Ms. Rule,

Thank you for the opportunity to respond to your concerns regarding your experience at Glens Falls Hospital. I understand your experience with our hospital has caused you great concern. It is always our goal to ensure patients are treated with dignity, respect and compassion, and I am sorry that we fell short of your expectations.

I want to assure you that your concerns have been taken seriously and have been addressed as such. Glens Falls Hospital investigates all reported concerns fully and addresses any identified opportunities for improvement.

As part of our review and investigation, I reviewed your medical record and spoke with the provider involved. After review, it was determined that the clinical decisions of the provider were appropriate. It is standard of care to inform patients of contraindications and side effects of specific medications, which are often determined and regulated by the FDA, and it is within a provider's discretion to make prescription decisions based on this information. However, the provider does acknowledge that there were opportunities for a more sensitive and empathetic conversation and has committed to improving communication to ensure that patients feel their concerns are heard.

This completes our formal investigation and follow up to your complaint. If you have any unresolved concerns specific to this complaint, you have the right to contact either of these two organizations:

New York State Department of Health          DNV GL Healthcare
Centralized Hospital Intake Program          400 Techne Center Dr., Suite 100
Mailstop: CA/DCS                             Milford, OH 45150
Empire State Plaza                           Attn: Complaints
Albany, NY 12237                             Hospitalcomplaint@dnvgl.com
(800) 804-5447                               (866) 496-9647

Once again, Ms. Rule, thank you for sharing your concerns and providing us with an opportunity to respond to you.

Sincerely,

Sean R. Bain, MD
Vice President / Medical Affairs and Chief Medical Officer

# EXHIBIT C



MALTA EMERGENT CARE

Malta Med Emergent Care
Saratoga Medical Park at Malta
6 Medical Park Drive, Malta NY 12020
(518) 289-2024

NAME:    RULE,TARA L
ADM/RES DATE:  09/21/22
DICTATED BY: Calistri,Christine NP
ATTENDING MD: Other,Doctor
PRIMARY CARE MD: Mack,Kristin DO

ACCT #:
MED REC #
LOCATION:  HCPUC
DATE OF BIRTH:              /91

**Discontinued Reported Medications**
Clindamycin Phosphate 1

**REVIEW OF SYSTEMS**
**Review of Systems:**
Please see HPI. All other systems are reviewed and are negative.

**EC EXAM**
**Vital Signs:**

| Date Time | Temp | Pulse | Resp | B/P | B/P Mean | Pulse Ox | O2 Delivery | O2 Flow Rate | FiO2 |
|---|---|---|---|---|---|---|---|---|---|
| 09/21 1639 | 98.3 | 90 | 20 | 140/81 | | 100 | Room Air | | |
| 09/21 1308 | 97.5 | 111 | 22 | 137/89 | | 100 | Room Air | | |

**Physical Exam:**
Constitutional: Uncomfortable appearing 31-year-old female crying at time of exam.
HEENT: Pupils equal, round, reactive to light. Extraocular muscles intact. Sclera white. Conjunctiva clear. Oropharynx pink and moist. No lesions, exudate or erythema.
TM pearly gray bilaterally. Neck is supple, no JVD, adenopathy or meningeal signs.
Lungs: Clear with no wheezes, rales, or rhonchi.
Heart: Normal S1, S2. No murmurs, rubs or gallops.
Abdomen: Soft, nondistended, nontender.
GU: No CVA tenderness.
Musculoskeletal: Moving all extremities.
Skin: Warm and dry and intact.
Lymphatics: No peripheral edema.
Neuro: Awake, alert, oriented. Cranial nerves II through XII intact.
Psych: Alert, cooperative, well behaved with normal affect.

**Orders**
**Orders**

MALTA EMERGENT CARE - Additional copy

Page 3 of 5

P33

## MALTA MED EMERGENT CARE

### Blood Pressure/Pain

Blood Pressure was 140/81 today.

If either number of your blood pressure during this ED or Urgent Care was greater than 120/80 you may have prehypertension, and if either was greater than 140/90 you may have hypertension, or high blood p In either event, you should follow up with your Primary Care Provider recheck and reevaluation within four weeks.

Your initial pain scale rating today was 10 out of 10.

If left blank, you did not report any pain.
1 to 10 are worsening levels of pain.

Your comfort and improvement in pain are important to us. The in plan outlined by your Emergency Department or Urgent Care prov effect until follow-up. You have been referred to the provider lis Patient Visit Information page of these instructions. You should today or the next business day to be scheduled for further evalu management of your pain. You can go to the Emergency Depart you have worsening pain.



# EXHIBIT D



```
RUN DATE: 09/22/22                    Saratoga Hospital Order Entry **LIVE**                    PAGE 2
RUN TIME: 0037                              Discharge Report
RUN USER: DR.CALCHR

PATIENT:  RULE,TARA L              A/S:  31 F        ADMIT:     09/21/22
ACCOUNT NO:                        LOC:  HCPUC       DISCH/DEP: 09/21/22
                                   RM:              STATUS:    DEP ER
ATTEND DR: Calistri,Christine NP   BD:              UNIT NO:   MH094144
```

```
Category  Procedure  Order Number  Date      Time Pri Qty Ord Source Status   Ordered By
MXD       MED        20220921-1640 09/21/22 1350 S       POM        CMP   CALCHR0
Other Provider :                   Sig Lvl Provider :
RX: HC00327667                               Start: 09/21/22 1350    STA  CMP
                                             Stop: 09/21/22 1351

      diphenhydrAMINE (Benadryl)
      Dose: 25 MG
      Route: IV PUSH              Direction: 1X (ONE TIME ONLY)

      Order's Audit Trail of Events
1     09/21/22 1350 DR.CALCHR  Order ENTER in EDM/POM
2     09/21/22 1350 DR.CALCHR  Ordering Doctor: Calistri,Christine NP
3     09/21/22 1350 DR.CALCHR  Order Source: Physician OE
4     09/21/22 1350 DR.CALCHR  Signed by Calistri,Christine NP
5     09/21/22 1351 SCHEDULER  DISCONTINUE in PHA
6     09/21/22 1355 MMEC.JG6   order acknowledged
```

```
Category  Procedure  Order Number  Date      Time Pri Qty Ord Source Status   Ordered By
MXD       MED        20220921-1821 09/21/22 1511 S       POM        CMP   CALCHR0
Other Provider :                   Sig Lvl Provider :
RX: HC00327677                               Start: 09/21/22 1511    STA  CMP
                                             Stop: 09/21/22 1512

      Ketorolac (Toradol)
      Dose: 15 MG
      Route: IV PUSH              Direction: 1X (ONE TIME ONLY)

      Order's Audit Trail of Events
1     09/21/22 1511 DR.CALCHR  Order ENTER in EDM/POM
2     09/21/22 1511 DR.CALCHR  Ordering Doctor: Calistri,Christine NP
3     09/21/22 1511 DR.CALCHR  Order Source: Physician OE
4     09/21/22 1511 DR.CALCHR  Signed by Calistri,Christine NP
5     09/21/22 1512 SCHEDULER  DISCONTINUE in PHA
6     09/21/22 1514 MMEC.JG6   order acknowledged
```

```
                          PERMANENT MEDICAL RECORD COPY
```



```
RUN DATE: 09/22/22                                                              PAGE 1
RUN TIME: 0037                    Saratoga Hospital Order Entry **LIVE**
RUN USER: DR.CALCHR                    Discharge Report

PATIENT:    RULE,TARA T
ACCOUNT NO:                          A/S: 31 F            ADMIT:    09/21/22
                                     LOC: HCPUC          DISCH/DEP: 09/21/22
ATTEND DR: Calistri,Christine NP     RM:                 STATUS:   DEP ER
                                     BD:                 UNIT NO:  MH094144

Order Date: 09/21/22
Category  Procedure  Order Number  Date            Service
UCWMA     00008       20220921-0011 09/21/22 1350 R   Time Pri Qty Ord Source Status   Ordered By
Other Provider :                                      POM        TRN            CALCHR0
                            Sig Lvl Provider :

    Order's Audit Trail of Events
1    09/21/22 1350 DR.CALCHR  Order ENTER in EDM/POM
2    09/21/22 1350 DR.CALCHR  Ordering Doctor: Calistri,Christine NP
3    09/21/22 1350 DR.CALCHR  Order Source: Physician OE
4    09/21/22 1350 DR.CALCHR  Signed by Calistri,Christine NP

Category  Procedure  Order Number  Date            Time Pri Qty Ord Source Status   Ordered By
ED        MMECSALINE  20220921-0245 09/21/22 1350 R   POM        TRN            CALCHR0
Other Provider :                            Sig Lvl Provider :

    Order's Audit Trail of Events
1    09/21/22 1350 DR.CALCHR  Order ENTER in EDM/POM
2    09/21/22 1350 DR.CALCHR  Ordering Doctor: Calistri,Christine NP
3    09/21/22 1350 DR.CALCHR  Order Source: Physician OE
4    09/21/22 1350 DR.CALCHR  Signed by Calistri,Christine NP

Category  Procedure  Order Number  Date            Time Pri Qty Ord Source Status   Ordered By
MED       MED         20220921-1638 09/21/22 1347 S   POM        CMF            CALCHR0
Other Provider :                            Sig Lvl Provider :
RX: HC00327665
                                   Start: 09/21/22 1347   STA CMP
                                   Stop: 09/21/22 1348
    Ketorolac (Toradol)
    Dose: 15 MG
    Route: IV PUSH              Direction: 1X (ONE TIME ONLY)

    Order's Audit Trail of Events
1    09/21/22 1350 DR.CALCHR  Order ENTER in EDM/POM
2    09/21/22 1350 DR.CALCHR  Ordering Doctor: Calistri,Christine NP
3    09/21/22 1350 DR.CALCHR  Order Source: Physician OE
4    09/21/22 1350 DR.CALCHR  Signed by Calistri,Christine NP
5    09/21/22 1350 SCHEDULER  DISCONTINUE in PHA
6    09/21/22 1355 MMEC.JG6   order acknowledged

Category  Procedure  Order Number  Date            Time Pri Qty Ord Source Status   Ordered By
MED       MED         20220921-1639 09/21/22 1348 S   POM        CMP            CALCHR0
Other Provider :                            Sig Lvl Provider :
RX: HC00327666
                                   Start: 09/21/22 1348   STA CMP
                                   Stop: 09/21/22 1349
    Metoclopramide (Reglan)
    Dose: 5 MG
    Route: IV PUSH              Direction: 1X (ONE TIME ONLY)

    Order's Audit Trail of Events
1    09/21/22 1350 DR.CALCHR  Order ENTER in EDM/POM
2    09/21/22 1350 DR.CALCHR  Ordering Doctor: Calistri,Christine NP
3    09/21/22 1350 DR.CALCHR  Order Source: Physician OE
4    09/21/22 1350 DR.CALCHR  Signed by Calistri,Christine NP
5    09/21/22 1350 SCHEDULER  DISCONTINUE in PHA
6    09/21/22 1355 MMEC.JG6   order acknowledged



                    PERMANENT MEDICAL RECORD COPY

                                              <Continued>
```

# **EXHIBIT E**

```
RUN DATE: 09/26/22                    EDM *LIVE*
RUN TIME: 0000                   ED/UC PATIENT RECORD
RUN USER: MMEC.HC                                              PAGE 3

Patient Name: RULE-TARA L                    Acct No: MX06475248
Age/Sex: 31/F                                Unit No: MH094144

Medication
              Sch Date-Time  Ordered Dose  Admin Dose
              Override Comment
                    Acute or chronic+
                        Location+
                         Quality+
                        Duration+
                        Frequency+
                    Sedation Status+
                      Interventions+
                   Additional for Children+
                   Comment: 7/10
                   Medication Reason+
                   Pain Score (0-10):
                        Location+
                        Duration+
                         Quality+

Prescriptions/Reported Meds                  Type   Issued    Provider   Last Edit
Butalb/Acetaminophen/Caffeine (Fioricet 50-300-40 MG   Rx   09/21/22 CALCHRO   09/21/22
  Capsule) 50 MG-300 MG-40 MG CAPSULE
  1-2 CAPS ORAL
  EVERY FOUR HOURS AS NEEDED As Needed for Headache
  not to exceed 6 CAPS per day #20 CAPS REF 0
Amphetamine-Dextroamphetamine (Adderall XR 30 MG) 30  Reported              11/09/21
  MG CAP
  20 MG ORAL TWICE A DAY not to exceed 1 per day
Mycophenolate Mofetil (Cellcept 500 MG) 500 MG TAB    Reported              11/09/21
  2,500 MG ORAL TWICE A DAY
Hydroxyzine HCl (Hydroxyzine HCl 25mg) 25 MG TAB      Reported              03/16/21
  25 MG ORAL EVERY EVENING

                      Smart Pump Start/Stop times


                            NOTES

Entered by GAILOR,JENNY, RN on 09/21/22 at 1408
  CONFIRMED WITH PATIENT THAT SHE IS NOT ALLERGIC TO BENADRYL

Entered by SMITH,ERIN, RN on 09/21/22 at 1744
LISA VEST CALLED IN REGARDS TO A PATIENT LIVE STREAMING IN OUR FACILITY.
  GAVE THE PATIENTS NAME AND ROOM NUMBER. WRITER WAS INFORMED THAT LISA GOT A
CALL FROM GLENS FALLS WHO CALLED AND SARATOGA WHO TOLD HER THE PATIENT WAS LIVE
STREAMING. WAS INFORM TO ENCOURAGE PATIENT TO STOP LIVE STREAMING OR TO BE
ESCORTED OFF PREMISES.

                          ALLERGIES

No Known Food or Latex allergy; cephalexin; ciprofloxacin;
lamotrigine (STEVEN JOHNSON'S SYNDROME); trazodone; diphenhydramine; modafinil (PSYCHOSIS);
oxcarbazepine (STEVEN JOHNSON'S SYNDROME)

                                                   Acct No: MX06475248

Patient: RULE,TARA L
```

# EXHIBIT F

## For Your Convenience

**Flowers and Gifts**
Flowers, plants and gifts are delivered on a daily basis. For safety reasons, patients in special (critical) care units cannot accept deliveries. In these instances, the nurse will hold the delivery at the nursing station and have you decide whether you would like your family to bring the gifts/flowers home or you would prefer to have the gift/flowers displayed at the nursing station for everyone on the unit to enjoy.

**Pharmacy**
The pharmacy is located on the first floor of the main hospital building at 43 New Scotland Ave. It is open to the public for prescriptions and a variety of over-the-counter medications and other items.

We also serve discharged patients and employees working on our main campus. For employees we offer reduced prescription co-pays (compared to commercial pharmacies) and 90-day supplies if prescriptions are filled at our pharmacy and you are enrolled in our employer-sponsored health insurance plan.

| **Hours and Contact Information** |
| Monday – Friday: 7 a.m. – 7 p.m. |
| Saturday: 7:30 a.m. - 3:30 p.m. |
| Sunday: Closed |
| Phone: **(518) 262-3263** |
| Fax: **(518) 262-801** |

Curbside pickup of prescriptions is available by calling **518-262-MEDS** (6337).

Our Specialty Pharmacy has dedicated liaisons to help patients obtain financial assistance, medication adherence programs, personalized refill reminders, on-call pharmacist support and home delivery.

Albany Med provides **free language assistance** to patients whose primary language is not English, or who are hearing or visually impaired (TDD/TDY).

**Mail**
You can send and receive stamped mail Monday-Friday. If you receive mail following your discharge, we will forward it to your home. Stamps are available for purchase in the Gift Shop.

**Meals**
Your health care team prescribes dietary guidelines according to your individual medical needs. We use those guidelines to construct a daily menu from which you select your favorite breakfast, lunch and dinner meals. Kosher meals are available upon request. If you have any concerns about your diet or food quality, please do not hesitate to contact Food and Nutrition Services at **518-262-3205**.

To help ensure that you receive the full benefits of a carefully constructed diet, we ask that you do not bring food from home unless you receive permission from the nursing staff.

**Personal Call Button**
For prompt assistance, you can use your personal call button. Your nurse will show you how to use it.

**Phone Service**
Cell phones are allowed in most areas of the hospital. Signs are posted in certain areas where cell phone use may interfere with patient care. We appreciate your cooperation where cell phone use is prohibited.

Bedside phone service is available on a rental basis in most patient rooms. Telephone activation and payment can be made at any time from your bedside telephone by dialing 2-6000. Payment for service may be charged to your home telephone or major credit card. Family and friends can request your phone number by calling our Information Desk at **518-262-3791**. You may request that the Information Desk keep your number confidential.

**TV Service**
Most patient rooms are equipped with televisions. Patient education and information programming are provided at no charge. Cable TV (including closed-captioned programming) is available on a rental basis.

To activate your television, call 2-6000 from your bedside phone. Payment for service may be charged to a credit card.

**Wireless Internet**
Most patient rooms and common areas are provided with complimentary wireless Internet service.

**ATMs**
Key Bank and SEFCU ATMs are located at the entrance to Choices Café. Both ATMs accept cards from a number of financial networks.



York
- Creating Healthy
  Schools and
  Communities
- Volunteer Services
- Minimally Invasive/ Robotic Surgery
- Patients & Visitors
  - Patient Testimonials
  - Patients
    - Patient Financial Assistance
    - Patient Bill of Rights
    - Patient Information Guide
  - Patient Portal
  - Visitors
    - Send an eCard
  - Directions and Parking
  - Gift Atrium
  - Helpful Information
- Sitemap
- Thank You

## Posts by category



hours per day, seven days per week. They patrol the corridors and grounds, provide escorts, help with parking and vehicle problems and assist in fire prevention. The Glens Falls Hospital security team will also provide visitor passes for those visiting the main hospital campus. To learn more about our visitor management process, please click here.  If you require assistance from Security, please call 518-926-2100 or dial 0 for the Operator using any hospital phone.

## Cell Phone Use

Cell phones may be used if they are more than one meter (40 inches) from any energized piece of medical equipment. If any medical equipment shows signs of malfunction, the cell phone, PDA or wireless phone must be shut off immediately. In the immediate vicinity of T5, T6 or the Cardiac Cath Lab, visitors are encouraged to turn off their cell phones.

## Smoking and Vaping is Prohibited

**EXHIBIT G**



2:41

September 21
8:55 PM

Edit

### Updates

TikTok LIVE Center is live!

### LIVE Analytics ⓘ

Your latest LIVE - September 19 20:34 92 mins

Total views
**1,490**
+1,033 ⬆

New followers
**22**
+20 ⬆

Diamonds
💛 **46**
-253 ⬇

Gifters
**3**
+2 ⬆

### Viewer ranking

# EXHIBIT H





# EXHIBIT I



**SARATOGA HOSPITAL**
Corporate Compliance

November 4, 2022

Ms. Tara Rule
P.O. Box 123
Round Lake, NY 12151

Re:    Privacy Complaints

Dear Ms. Rule:

As part of our commitment to patient privacy, we are sending this letter to notify you of the results of a recent investigation into your concerns.  We are in receipt of your complaint regarding privacy violations related to your visit to Malta Med Emergent Care.   We have carefully reviewed each allegation and have been unable to confirm that any impermissible HIPAA disclosures have occurred.

Finally, you have indicated that you would like to request a copy of your medical records.  On October 26 2022, the appropriate authorization/access form was sent to you.  If you still desire copies of your medical records, please complete it and send it to The Saratoga Hospital, Medical Record Department, 211 Church Street, Saratoga Springs NY 12866.

Respectfully,

*Corporate Compliance and Audit Department*
*Saratoga Hospital – Malta Med Emergent Care*
*Albany Med Health System*

th St, Saratoga Springs, NY 12866 |
spital.org

# EXHIBIT J



THE STATE EDUCATION DEPARTMENT / THE UNIVERSITY OF THE STATE OF NEW YORK / ALBANY, NY

Office of Professional Discipline, 80 Wolf Road, Suite 204, Albany, NY 12205-2843
Tel. (518) 485-9350
Fax (518) 485-9361

May 22, 2023

Tara Rule
PO Box 123
Round Lake, NY 12151

Re: Christine Calistri
Case No. 4300308
Profession: Nurse Practitioner FH

Dear Tara Rule,

The investigation of your complaint is complete. The case has been referred to the Prosecutions Division of the Office of Professional Discipline for further action. The assigned prosecutor will contact you as necessary and you will be informed of the outcome of the case.

Thank you for bringing this matter to our attention

Sincerely,

Kristan Arculeo Wait
Senior Investigator

# EXHIBIT K



```
RUN DATE: 09/22/22                    Saratoga Hospital Order Entry **LIVE**              PAGE 2
RUN TIME: 0037                              Discharge Report
RUN USER: DR.CALCHR
```

```
PATIENT:  RULE,TARA L                    A/S: 31 F        ADMIT:      09/21/22
ACCOUNT NO:                              LOC: HCPUC       DISCH/DEP: 09/21/22
                                         RM:              STATUS:     DEP ER
ATTEND DR: Calistri,Christine NP         BD:              UNIT NO:    MI094144
```

```
Category   Procedure   Order Number   Date       Time Pri Qty Ord Source Status   Ordered By
MXD        MED         20220921-1640 09/21/22 1350 S      POM         CMP     CALCHRO
Other Provider :                    Sig Lvl Provider :
RX: HC00327667                             Start: 09/21/22  1350     STA CMP
                                           Stop: 09/21/22  1351

     diphenhydrAMINE (Benadryl)
     Dose: 25 MG
     Route: IV PUSH                    Direction: 1X (ONE TIME ONLY)

   Order's Audit Trail of Events
1   09/21/22 1350 DR.CALCHR  Order ENTER in EDM/POM
2   09/21/22 1350 DR.CALCHR  Ordering Doctor: Calistri,Christine NP
3   09/21/22 1350 DR.CALCHR  Order Source: Physician OE
4   09/21/22 1350 DR.CALCHR  Signed by Calistri,Christine NP
5   09/21/22 1351 SCHEDULER  DISCONTINUE in PHA
6   09/21/22 1355 MMEC.JG6   order acknowledged
```

```
Category   Procedure   Order Number   Date       Time Pri Qty Ord Source Status   Ordered By
MXD        MED         20220921-1821 09/21/22 1511 S      POM         CMP     CALCHRO
Other Provider :                    Sig Lvl Provider :
RX: HC00327677                             Start: 09/21/22  1511     STA CMP
                                           Stop: 09/21/22  1512

     Ketorolac (Toradol)
     Dose: 15 MG
     Route: IV PUSH                    Direction: 1X (ONE TIME ONLY)

   Order's Audit Trail of Events
1   09/21/22 1511 DR.CALCHR  Order ENTER in EDM/POM
2   09/21/22 1511 DR.CALCHR  Ordering Doctor: Calistri,Christine NP
3   09/21/22 1511 DR.CALCHR  Order Source: Physician OE
4   09/21/22 1511 DR.CALCHR  Signed by Calistri,Christine NP
5   09/21/22 1512 SCHEDULER  DISCONTINUE in PHA
6   09/21/22 1514 MMEC.JG6   order acknowledged
```

```
                    PERMANENT MEDICAL RECORD COPY
```



```
RUN DATE: 09/22/22
RUN TIME: 0037                    Saratoga Hospital Order Entry **LIVE**              PAGE 1
RUN USER: DR.CALCHR                     Discharge Report

PATIENT:   RULE,TARA                   A/S: 31 F          ADMIT:    09/21/22
ACCOUNT NO:                            LOC: HCPUC         DISCH/DEP: 09/21/22
                                       RM:                STATUS:   DEP ER
ATTEND DR: Calistri,Christine NP       BD:                UNIT NO:  MH094144

Order Date: 09/21/22
Category   Procedure  Order Number  Date          Service
UCWMA      00008      20220921-0011 09/21/22 1350 R     POM   TRN    CALCHR0
Other Provider :            Sig Lvl Provider :

   Order's Audit Trail of Events
1    09/21/22 1350 DR.CALCHR  Order ENTER in EDM/POM
2    09/21/22 1350 DR.CALCHR  Ordering Doctor: Calistri,Christine NP
3    09/21/22 1350 DR.CALCHR  Order Source: Physician OE
4    09/21/22 1350 DR.CALCHR  Signed by Calistri,Christine NP

Category   Procedure  Order Number  Date          Time Pri Qty Ord Source Status   Ordered By
ED         MMECSALINE 20220921-0245 09/21/22 1350 R     POM   TRN    CALCHR0
Other Provider :            Sig Lvl Provider :

   Order's Audit Trail of Events
1    09/21/22 1350 DR.CALCHR  Order ENTER in EDM/POM
2    09/21/22 1350 DR.CALCHR  Ordering Doctor: Calistri,Christine NP
3    09/21/22 1350 DR.CALCHR  Order Source: Physician OE
4    09/21/22 1350 DR.CALCHR  Signed by Calistri,Christine NP

Category   Procedure  Order Number  Date          Time Pri Qty Ord Source Status   Ordered By
MED        MED        20220921-1638 09/21/22 1347 S     POM   CMP    CALCHR0
Other Provider :            Sig Lvl Provider :
RX: HC00327665                             Start: 09/21/22 1347    STA CMP
                                           Stop: 09/21/22 1348

    Ketorolac (Toradol)
    Dose: 15 MG
    Route: IV PUSH              Direction: 1X (ONE TIME ONLY)

   Order's Audit Trail of Events
1    09/21/22 1350 DR.CALCHR  Order ENTER in EDM/POM
2    09/21/22 1350 DR.CALCHR  Ordering Doctor: Calistri,Christine NP
3    09/21/22 1350 DR.CALCHR  Order Source: Physician OE
4    09/21/22 1350 DR.CALCHR  Signed by Calistri,Christine NP
5    09/21/22 1350 SCHEDULER  DISCONTINUE in PHA
6    09/21/22 1355 MMEC.JG6   order acknowledged

Category   Procedure  Order Number  Date          Time Pri Qty Ord Source Status   Ordered By
MED        MED        20220921-1639 09/21/22 1348 S     POM   CMP    CALCHR0
Other Provider :            Sig Lvl Provider :
RX: HC00327666                             Start: 09/21/22 1348    STA CMP
                                           Stop: 09/21/22 1349

    Metoclopramide (Reglan)
    Dose: 5 MG
    Route: IV PUSH              Direction: 1X (ONE TIME ONLY)

   Order's Audit Trail of Events
1    09/21/22 1350 DR.CALCHR  Order ENTER in EDM/POM
2    09/21/22 1350 DR.CALCHR  Ordering Doctor: Calistri,Christine NP
3    09/21/22 1350 DR.CALCHR  Order Source: Physician OE
4    09/21/22 1350 DR.CALCHR  Signed by Calistri,Christine NP
5    09/21/22 1350 SCHEDULER  DISCONTINUE in PHA
6    09/21/22 1355 MMEC.JG6   order acknowledged


                 PERMANENT MEDICAL RECORD COPY

                                                      <Continued>
```

```
RUN DATE: 09/26/22                           EDM *LIVE*
RUN TIME: 0000                          ED/UC PATIENT RECORD
RUN USER: MMEC.HC                                                          PAGE 3
```

Patient Name: RULE ,TARA L
Age/Sex: 31/F                                    Acct No: MX06475248
                                                 Unit No: HH094144

**Medication**

```
          Sch Date-Time  Ordered Dose   Admin Dose
          Override Comment
                    Acute or chronic+
                        Location+
                         Quality+
                        Duration+
                       Frequency+
                     Sedation Status+
                     Interventions+
                 Additional for Children+
                 Comment: 7/10
                 Medication Reason+
                 Pain Score (0-10):
                    Location+
                    Duration+
                    Quality+
```

**Prescriptions/Reported Meds**

| | Type | Issued | Provider | Last Edit |
|---|---|---|---|---|
| Butalb/Acetaminophen/Caffeine (Fioricet 50-300-40 MG Capsule) 50 MG-300 MG-40 MG CAPSULE<br>1-2 CAPS ORAL<br>EVERY FOUR HOURS AS NEEDED As Needed for Headache<br>not to exceed 6 CAPS per day #20 CAPS REF 0 | Rx | 09/21/22 | CALCHRO | 09/21/22 |
| Amphetamine-Dextroamphetamine (Adderall XR 30 MG) 30 MG CAP<br>20 MG ORAL TWICE A DAY not to exceed 1 per day | Reported | | | 11/09/21 |
| Mycophenolate Mofetil (Cellcept 500 MG) 500 MG TAB<br>2,500 MG ORAL TWICE A DAY | Reported | | | 11/09/21 |
| Hydroxyzine HCl (Hydroxyzine HCl 25mg) 25 MG TAB<br>25 MG ORAL EVERY EVENING | Reported | | | 03/16/21 |

Smart Pump Start/Stop times

**NOTES**

*Entered by GAILOR, JENNY, RN on 09/21/22 at 1408*
CONFIRMED WITH PATIENT THAT SHE IS NOT ALLERGIC TO BENADRYL

*Entered by SMITH, ERIN, RN on 09/21/22 at 1744*
LISA WEST CALLED IN REGARDS TO A PATIENT LIVE STREAMING IN OUR FACILITY. GAVE THE PATIENTS NAME AND ROOM NUMBER. WRITER WAS INFORMED THAT LISA GOT A CALL FROM GLENS FALLS WHO CALLEDAND SARATOGA WHO TOLD HER THE PATIENT WAS LIVE STREAMING. WAS INFORM TO ENCOURAGE PATIENT TO STOP LIVE STREAMING OR TO BE ESCORTED OFF PREMISES.

**ALLERGIES**

No Known Food or Latex allergy; cephalexin; ciprofloxacin; lamotrigine (STEVEN JOHNSON'S SYNDROME); trazodone; diphenhydramine; modafinil (PSYCHOSIS); oxcarbazepine (STEVEN JOHNSON'S SYNDROME)

                                                 Acct No: MX06475248

Patient: RULE,TARA L

Nov 17,2022  7:57 AM

```
RUN DATE: 09/26/22                    EDM *LIVE*                        PAGE 4
RUN TIME: 0000                   ED/UC PATIENT RECORD
RUN USER: MMEC.HC
```

Patient Name: RULE,TARA L                          Acct No.
Age/Sex:  31/F                                      Unit No: MH094144

## ORDERS

| Ordered | Order | Ordering Provider | E-Signed |
|---------|-------|-------------------|----------|
| 09/21/22 1350 | OXYGEN UCVMA/MMEC/ADK ONLY | Calistri,Christine NP | Yes |
| 09/21/22 1350 | *MMEC SALINE WELL | Calistri,Christine NP | Yes |
| 09/21/22 1350 | Toradol | Calistri,Christine NP | Yes |
| 09/21/22 1350 | Reglan | Calistri,Christine NP | Yes |
| 09/21/22 1350 | Benadryl | Calistri,Christine NP | Yes |
| 09/21/22 1511 | Toradol | Calistri,Christine NP | Yes |

## TREATMENTS

*09/21/22  1408    Round*                                          CARR, HANNAH
Time: 1408; Comments: RN AT BEDSIDE

*09/21/22  1512    Round*                                          CARR, HANNAH
Time: 1512; Comments: RN AT BEDSIDE

*09/21/22  1639    Round*                                          CARR, HANNAH
Time: 1639; Comments: NO ACUTE CHANGES, CALL BELL WITHIN REACH. ALL NEEDS MET AT THIS TIME

*09/21/22  1639    Repeat Vital Signs*                             CARR, HANNAH
BP: 140/81; BP Location+ R Up Arm; BP Position+ Sitting; Temperature: 98.3; Temp Source+
ORAL; Pulse: 90; Pulse Source+ Monitor; Respirations: 20; Resp Quality+ REGULAR/UNLABORED;
SpO2: 100; Oxygen Source+ Room Air

*09/21/22  1752    Saline Well (MMEC)*                             GAILOR, JENNY, RN
Time: 1620; Site+ A/C LEFT; IV Size+ 20g; IV Patency+ PATENT; # Attempts: 1

## ASSESSMENTS

*09/21/22  1309    UC Nursing - Part 2*                           MCNEFF, SHANNON, RN
PAST MEDICAL HISTORY? Y; Other:  AUTOIMMUNE DISEASE NOS MASS L PARIETAL LOBE - BENIGN?
BRAIN LESIONS - PREVIOUS NEURO DEFICITS HIATAL HERNIA IBS IDIOPATHIC TACHYCARDIA OVARIAN
CYST EHLORS; Stroke: N; PAST SURGERY? Y; Other:  HERNIA REPAIR X 2 WISDOM TEETH LYMPH NODE
BIOPSY MULTIPLE BIOPSIES, SCOPES LPS WITH BLOOD PATCHES; Last Tetanus+ LESS THAN 10 YEARS;
or 14 days post Johnson and Johnson) N; Update Allergies Now? Y

*09/21/22  1337    Neurological Assessment*                        GAILOR, JENNY, RN
Symptoms related to Neurological system+ Pt complains of symptoms; LOC+ Alert;
Oriented to: Person: Y; Place: Y; Time: Y; RT Pupil Size+ 3MM; RT Pupil Reac+ Brisk;
LT Pupil Reac+ Brisk; Speech+ Clear; Facial Sym+ Symmetrical; RU+ 5; LU+ 5; RL+ 5; LL+ 5;
Sensation: RU+ Intact; LU+ Intact; RL+ Intact; LL+ Intact; Stroke: N; Seizures or Epilepsy:
Y; Headache: Y; Head Injury: N; LOC: N; Seizure: N; Photophobia: N; Stroke Symptoms: N;
Eye Opening: 5; Verbal: 5; Motor: 5; Total GCS score: 15

*09/21/22  1752    UC Discharge/Transfer*                          GAILOR, JENNY, RN
  N; Do you have pain: N; Go to eMAR to enter reassessment times? N;
Saline well Discontinued, Date: 09/21/22; Time: 1752;
IV site clean with no signs of redness or swelling: Y; Discharged To: D/C Home; Comments:
PATIENT DISCHARGED VIA RN DEE C

## DEPARTURE

Primary Impression: Cluster headache

Patient: RULE,TARA L                                Acct No:

# EXHIBIT L



MALTA EMERGENT CARE

Malta

NAME:   RULE,TARA L

ACCT #:
MED REC #
LOCATION: HCPUC
DATE OF BIRTH:        /91

**Orders**

| Procedure | Date/time | Status |
|---|---|---|
| OXYGEN UCWMA/MMEC/ADK ONLY | 09/21 1350 | Active |
| *MMEC SALINE WELL | 09/21 1350 | Active |

## DIAGNOSTIC STUDIES

**HIV Testing**
HIV testing offered+ Declined
Date offered: 09/04/22

## MDM

**Emergent Care Course:**
Patient with a history of both migraine and cluster headaches who is followed by neurology presents
complaining of a cluster headache. She is started on oxygen at 2 L. She is also then given a migraine
cocktail which included 5 mg of Reglan 15 mg of Toradol and 25 mg of Benadryl. She received a bolus of
normal saline. She reported only minimal improvement after this with her headache still being an 8 out of
10. She was then given an additional 50 mg of Toradol IV. After another hour would a half she reported
improvement to a 6 out of 10. She states this is typical and she at this point would like to be discharged.
She will be given a prescription for Fioricet and encouraged to follow-up with her neurologist.

**Pain Score (0-10):** 10
**BMI:** 19.2
**Medications/allergies reviewed** Yes
**Tobacco Use+** Never Used

## Departure

**Patient Instructions:** Cluster Headache (ED)
**Prescriptions:**
**Current Visit Scripts**
Butalb/Acetaminophen/Caffeine (Fioricet 50-300-40 MG Capsule) 1-2 CAPS ORAL Q4H PRN PRN
Headache MDD 6 CAPS
    Butalb/Acetaminophen/Caffeine (Fioricet 50-300-40 MG Capsule) 1-2 CAPS ORAL Q4H PRN PRN
Headache MDD 6 CAPS#20 CAPS

MALTA EMERGENT CARE - Additional copy

Page 4



Lymphatics: No peripheral edema.
Neuro: Awake, alert, oriented. Cranial nerves II through XII intact.
Psych: Alert, cooperative, well behaved with normal affect.

Orders
Orders
Orders
Procedure Date/time Status
OXYGEN UCWMA/MMEC/ADK ONLY 09/21 1350 Active
*MMEC SALINE WELL 09/21 1350 Active

DIAGNOSTIC STUDIES

HIV Testing
HIV testing offered+ Declined
Date offered: 09/04/22

MDM
Emergent Care Course:
Patient with a history of both migraine and cluster headaches who is followed by neurology
presents complaining of a cluster headache. She is started on oxygen at 2 L. She is also
then given a migraine cocktail which included 5 mg of Reglan 15 mg of Toradol and 25 mg o
Benadryl. She received a bolus of normal saline. She reported only minimal improvement
after this with her headache still being an 8 out of 10. She was then given an additional
50 mg of Toradol IV. After another hour and a half she reported improvement to a 6 out of
10. She states this is typical and she at this point would like to be discharged. She will
be given a prescription for Fioricet and encouraged to follow-up with her neurologist.
Pain Score (0-10): 10
BMI: 19.
Medications/allergies reviewed Yes
Tobacco Use+ Never Used



Nov 17, 2022 7:57 AM

Nov 17, 2022 7:57 AM

*MALTA EMERGENT CARE*

Malta Med Emergent Care
Saratoga Medical Park at Malta
6 Medical Park Drive, Malta NY 12020
(518) 289-2024

NAME:   RULE,TARA L                           ACCT #: ▉▉▉▉▉▉▉
ADM/RES DATE:   09/21/22                       MED REC # MH094144
DICTATED BY: Calistri,Christine NP             LOCATION: HCPUC
ATTENDING MD: Other,Doctor                     DATE OF BIRTH: ▉▉▉ 91
PRIMARY CARE MD: Mack,Kristin DO

**Additional Instructions:**
Continue to hydrate and rest.  Take the Fioricet as prescribed as needed.  Follow-up with your neurologist.
**Departure Forms:**
**Adult Blood Pressure/Pain**
**Return to Work/School Release**
**Referrals:**
Mack,Kristin DO (PCP)

**Clinical Impression:**
**Primary Impression:** Cluster headache
**Disposition:** * Routine Discharge Home
**Condition** STABLE

Electronically Signed by Calistri,Christine NP on 09/21/22 at 1727

MALTA EMERGENT CARE – Additional copy                                Page 5 of 5

P35

# EXHIBIT M



Nov 17, 2022  7:57 AM

```
RUN DATE: 09/26/22                    EDM *LIVE*                         PAGE 3
RUN TIME: 0000                   ED/UC PATIENT RECORD
RUN USER: MMEC.HC

Patient Name: RULE, TARA L                          Acct No:
Age/Sex:  31/F                                      Unit No: MH094144
```

Medication

Sch Date-Time  Ordered Dose   Admin Dose
Override Comment
Acute or chronic+
Location+
Quality+
Duration+
Frequency+
Sedation Status+
Interventions+
Additional for Children+
Comment: 7/10
Medication Reason+
Pain Score (0-10):
Location+
Duration+
Quality+

| Prescriptions/Reported Meds | Type | Issued | Provider | Last Edit |
|---|---|---|---|---|
| Butalb/Acetaminophen/Caffeine (Fioricet 50-300-40 MG Capsule) 50 MG-300 MG-40 MG CAPSULE | Rx | 09/21/22 | CALCHRO | 09/21/22 |
| 1-2 CAPS ORAL | | | | |
| EVERY FOUR HOURS AS NEEDED As Needed for Headache | | | | |
| not to exceed 6 CAPS per day #20 CAPS REF 0 | | | | |
| Amphetamine-Dextroamphetamine (Adderall XR 30 MG) 30 MG CAP | Reported | | | 11/09/21 |
| 20 MG ORAL TWICE A DAY not to exceed 1 per day | | | | |
| Mycophenolate Mofetil (Cellcept 500 MG) 500 MG TAB | Reported | | | 11/09/21 |
| 2,500 MG ORAL TWICE A DAY | | | | |
| Hydroxyzine HCl (Hydroxyzine HCl 25mg) 25 MG TAB | Reported | | | 03/16/21 |
| 25 MG ORAL EVERY EVENING | | | | |

Smart Pump Start/Stop times

NOTES

*Entered by GAILOR, JENNY, RN on 09/21/22 at 1408*
CONFIRMED WITH PATIENT THAT SHE IS NOT ALLERGIC TO BENADRYL

*Entered by SMITH, ERIN, RN on 09/21/22 at 1744*
LISA WEST CALLED IN REGARDS TO A PATIENT LIVE STREAMING IN OUR FACILITY.
GAVE THE PATIENTS NAME AND ROOM NUMBER. WRITER WAS INFORMED THAT LISA GOT A
CALL FROM GLENS FALLS WHO CALLED AND SARATOGA WHO TOLD HER THE PATIENT WAS LIVE
STREAMING. WAS INFORM TO ENCOURAGE PATIENT TO STOP LIVE STREAMING OR TO BE
ESCORTED OFF PREMISES.

ALLERGIES

No Known Food or Latex allergy; cephalexin; ciprofloxacin;
lamotrigine (STEVEN JOHNSON'S SYNDROME); trazodone; diphenhydramine; modafinil (PSYCHOSIS);
oxcarbazepine (STEVEN JOHNSON'S SYNDROME)

Patient: RULE, TARA L                              Acct No.



PO BOX
**MALTA MED EMERGENT CARE**
6 MEDICAL PARK DRIVE, MALTA, NY 12020

Phone (518) 886-5404
Fax (518) 580-2597

NOV 17, 2022  7:57 AM

AMOUNT ENCLOSED    TYPE    1

FINAL

● ● **PLEASE DETACH AT PERFORATION AND RETURN THIS PORTION WITH YOUR REMITTANCE** ● ●

| PATIENT NAME | | | | | |
|---|---|---|---|---|---|
| RULE, TARA L | | | | | |

GUARANTOR

PATIENT ACCOUNT NO.  MX064752248

ADMISSION DATE 09/21/22  DISCHARGE DATE 09/21/22  BILLING DATE 10/08/22

RULE, TARA L
PO BOX 123
ROUND LAKE  NY  12151

HUMANA CHOICECARE NET H▓8695932

POLICY NO.

| SERVICE DATE | | DESCRIPTION | QTY. | AMOUNT |
|---|---|---|---|---|
| | *** | IV THERAPY *** | | |
| 09/21/22 | 671690774 | IV PUSH, 1ST DRUG, 1ST PUSH | 1 | 426.00 |
| 09/21/22 | 671690775 | IV PUSH, ADD'L DRUGS | 2 | 288.00 |
| 09/21/22 | 671696376 | IV PUSH, ADD'L PUSH, SAME DRUG | 1 | 144.00 |
| | | | | ---------- |
| | | | | 858.00 |
| | *** | URGENT CARE CLINIC *** | | |
| 09/21/22 | 671699214M | ESTAB PT OFFC/OP COMP MOD COMP | 1 | 754.00 |
| | | | | ---------- |
| | | | | 754.00 |
| | *** | DRUGS REQUIRING DETAIL CODING * | | |
| 09/21/22 | 3200958 | KETOROLAC  30 MG/1 ML SYRINGE; | 1 | 38.42 |
| | | Ketorolac Trometh. 30 MG/1 ML | | |
| 09/21/22 | 3201154 | METOCLOPRAMIDE 10 MG/2 ML | 1 | 7.15 |
| | | VIAL; Metoclopramide HCl 10 | | |
| 09/21/22 | 3200525 | DIPHENHYDRAMINE 50 MG VIAL; | 1 | 16.67 |
| | | diphenhydrAMINE 50 MG/1 ML | | |
| 09/21/22 | 3200958 | KETOROLAC  30 MG/1 ML SYRINGE; | 1 | 38.42 |
| | | Ketorolac Trometh. 30 MG/1 ML | | |
| | | | | ---------- |
| | | | | 100.66 |
| | *** | RECEIPTS, ADJUSTMENTS, ETC. *** | | |
| 10/08/22 | AHUMANAMCR | CONTRAC-HUMANAMCR | 1 | -1505.21 |
| 10/28/22 | PHUMANAMCR | PAYMENT-HUMANAMCR; CLM# | 1 | -199.60 |
| | | 820222860376438 CHRG 1712.66 | | |
| 11/07/22 | AHUMANAMCR | CONTRAC-HUMANAMCR | -1 | 22.01 |
| | | | | ---------- |
| | | | | -1682.80 |

| | | |
|---|---|---|
| PATIENT ACCOUNT NO.: | MX064752248 | |
| | TOTAL: | 1712.66 |
| | TOTAL CREDITS: | -1682.80 |
| | TOTAL DUE: | 29.86 |
| | ESTIMATED INSURANCE COVERAGE: | .00 |
| | ESTIMATED DUE FROM PATIENT: | |

THIS IS THE ONLY COPY OF THIS BILL YOU WILL RECEIVE.
PLEASE SAVE FOR ANY MAJOR MEDICAL BILLING.

HIS BILL CONTAINS CHARGES FOR HOSPITAL SERVICES ONLY.
HARGES FOR PHYSICIAN SERVICES RELATED TO YOUR CARE WILL

P54

# EXHIBIT N

**Malta Med Emergent Care**

RULE, TARA L
MX06475248
DOB: ██████1991
09/21/2022

MR: █████
Sex: F

## General Consent

(A) I, RULE,TARA L _____ hereby appoint _____
as my Health Care Agent to make any and all health care decisions for me, except to the extent that I state
otherwise. This proxy shall take effect only when and if I become unable to make my own health care decisions.

(B) Optional: Alternate Agent: If the person I appoint is unwilling or unavailable to act as my health care agent, I
hereby appoint _____ as my Health Care Agent
to make any and all health care decisions for me except to the extent that I state otherwise.

(C) Unless I revoke it or state an expiration date or circumstances under which it will expire, this proxy shall remain in
effect indefinitely. If you would like to place an expiration date or conditions, you may do so here:

_____

(D) Optional: I direct my Health Care Agent to make health care decisions according to my wishes and limitations as
he/she knows or as stated below. I direct my Health Care Agent to make health care decisions in accordance
with the following limitations/instructions: _____

In order for your agent to make health care decisions for you about artificial nutrition and hydration (nourishment
and water provided by feeding and intravenous lines), he/she must reasonably know your wishes. You can
either confirm that your agent knows your wishes or include them in this section.

(E) Your identification:
Printed Name: RULE,TARA L
Address: PO BOX 123, ROUND LAKE NY 12151

09/21/2022 13:19

Patient Signature                                      Date/Time

(F) Statement by witnesses (must be 18 years of age or older and NOT the healthcare agent or alternate)
I declare that the person who signed this document is personally known to me and appears to be of sound
mind and acting of his/her own freewill. He/She signed (or asked another to sign for him/her) in my presence.
Witness #1 Printed Name: _____
Address: _____

_____
Witness #1 Signature                          Date/Time
Witness #2 Printed Name: _____
Address: _____

_____
Witness #2 Signature                          Date/Time
Form M4059 (5/13, Rev 6/20) Healthcare Partners of Saratoga, Ltd.

P51

HealthCare Partners
Malta Med Emergent Care
Malta, NY 12020
518-289-2020

Patient Name: RULE,TARA L
Unit Number:
Account Number:

**Patient Signature Page**

**Patient Name: RULE,TARA L**

Date of Birth: ____ 1991

**Guardian Name:**

**The above-named patient and/or guardian has received the following:**

Patient Visit Report
Drug Monographs:
  Butalb/Acetaminophen/Caffeine (Fioricet 50-300-40 MG Capsule)
Patient Instructions:
  Cluster Headache
Forms:
  Adult Blood Pressure/Pain
  Return to Work/School Release

Please make sure you have read through this information before signing.

I have read and understand the instructions given to me by my caregivers.

TARA L RULE

Print Patient Name

_Verbalized_                    9/28/22        1800
Patient (or Guardian) Signature        Date        Time

_Leanne Caputo_                 9/28/22        1800
Caregiver/RN/Doctor Signature          Date        Time

P52

# EXHIBIT O



**5:24**

Harassment, threats, intimidation, and disclosure of PHI from your staff.

me  Dec 14, 2022
to Anthony

📄 IMG_6428.PNG
📄 IMG_6434.jpg
📄 IMG_6443.PNG
📄 IMG_6444.PNG
📄 IMG_6446.jpg
📄 IMG_6450.PNG
📄 IMG_6453.PNG
📄 IMG_6459.PNG
📄 IMG_6460.PNG

Hi Anthony,

I see that somehow your establishment concluded that no HIPAA violations occurred despite a nurse practitioner contacting my boyfriend on social media and disclosing my PHI. Despite including screenshots and recordings, your establishment said no violations occurred, so I don't expect much to come of this, however - I am now being threatened by your Patient Account Representative on a public forum saying I am lying about my experience with your hospital, ruining lives for money and clout.

She has threatened me and told me she will deal with this with me "personally" and that she knows my information because she works at Malta Med Emergent Care. She also threatened to call the police on me for reasons I don't understand since she is literally harassing me on my own social media page, and



# Tara Rule - Requested Info    Inbox

**me**  Oct 23, 2022
to Amontello

Hi Anthony,

I have included the original email I sent off when I reported the incident and responses I got.

I have included PDF files outlining the incidents. They include detailed accounts of the incidents as well as any relevant screen shots. I sent the attachments to patient relations at Glens Falls hospital, Albany Med, Malta Med emergent care and Saratoga hospital.

The harassing messages (attached) from Christine Calistri happened after I reported the incident the first time, so clearly, nothing was done to remedy the situation since the retaliation from her only got worse. Had the reported incident been taken seriously, it would not have escalated.

The massive privacy violations that the chief nursing officer at Glens Falls Hospital, the Chief Nursing officer at Saratoga Hospital, and all involved at Malta Med Emergent care committed need to be addressed. The illegal actions of Christine Calistri need to be addressed. The fact that nothing has been done about this, nor has any attempt been made by any of the entities involved to make this right with me is astounding.

I have included recordings of all of the interactions I had with all parties involved, as well as all documentation, screen shots, etc.

Please confirm that you have received this email and that all of the attachments are accessible on your end. If I have not received confirmation within 2 business days, I

# EXHIBIT P



..., Dr. Braiman encouraged Complainant to contemplate the possibility of pregnancy and think deeply about what she would do if she became pregnant because birth defects were a potential side effect. Dr. Braiman never told Complainant that she should not get an abortion or must wait for "tests and scans" prior to receiving an abortion. *See* Complaint. Rather, he stated an abortion may not be a necessity because she "could have things tested," but acknowledged this option was tricky because it is difficult to see how a fetus develops before having to make a choice. *See* Exhibit B at 0:00:42. Complainant alleged that Dr. Braiman stated she would have to bring her partner into his office to discuss medications that could cause birth defect, but that is not what he said—the recordings show that Dr. Braiman stated "if [Complainant] was with a steady person [she] would have to bring him in on the conversation" regarding what to do if she became pregnant

15322892.4 1/23/2023



Victor P. DeAmelia, Esq., Regional Director
January 23, 2023
Page 3

In order to better understand Complainant's health and prescribe the most appropriate treatment, Dr. Braiman inquired as to whether Complainant was sexually active–a common and important question when assessing proper treatment due to potential side effects. During this discussion, Dr. Braiman mentioned a medication that is sometimes used to treat cluster headaches but would be inappropriate to prescribe to Complainant ("Medication 2"). Dr. Braiman did not believe Medication 2 was appropriate for Complainant because it was possible that Complainant could become pregnant and it could cause birth defects. For patients capable of having children, doctors–regardless of their specialty–generally consider the possibility of pregnancy when assessing treatment options because the patient could change their mind and decide to carry to term, and

# EXHIBIT Q

```
RUN DATE: 09/26/22
RUN TIME: 0000                              EDM *LIVE*
RUN USER: MMEC.HC                    ED/UC PATIENT RECORD                        PAGE 3

Patient Name: RULE-TARA L                                    Acct No: MX06475248
Age/Sex: 31/F                                                Unit No: HH094144

Medication
                     Sch Date-Time  Ordered Dose  Admin Dose
                     Override Comment
                           Acute or chronic+
                                  Location+
                                   Quality+
                                  Duration+
                                 Frequency+
                               Sedation Status+
                              Interventions+
                         Additional for Children+
                         Comment: 7/10
                         Medication Reason+
                         Pain Score (0-10):
                              Location+
                              Duration+
                               Quality+

Prescriptions/Reported Meds                        Type    Issued    Provider   Last Edit
Butalb/Acetaminophen/Caffeine (Fioricet 50-300-40 MG  Rx   09/21/22  CALCHR0   09/21/22
  Capsule) 50 MG-300 MG-40 MG CAPSULE
  1-2 CAPS ORAL
  EVERY FOUR HOURS AS NEEDED As Needed for Headache
  not to exceed 6 CAPS per day #20 CAPS REF 0
Amphetamine-Dextroamphetamine (Adderall XR 30 MG) 30  Reported            11/09/21
  MG CAP
  20 MG ORAL TWICE A DAY not to exceed 1 per day
Mycophenolate Mofetil (Cellcept 500 MG) 500 MG TAB    Reported            11/09/21
  2,500 MG ORAL TWICE A DAY
Hydroxyzine HCl (Hydroxyzine HCl 25mg) 25 MG TAB      Reported            03/16/21
  25 MG ORAL EVERY EVENING

                          Smart Pump Start/Stop times


                                  NOTES

Entered by GAILOR, JENNY, RN on 09/21/22 at 1408
CONFIRMED WITH PATIENT THAT SHE IS NOT ALLERGIC TO BENADRYL

Entered by SMITH, ERIN, RN on 09/21/22 at 1744
LISA VEST CALLED IN REGARDS TO A PATIENT LIVE STREAMING IN OUR FACILITY.
  GAVE THE PATIENTS NAME AND ROOM NUMBER. WRITER WAS INFORMED THAT LISA GOT A
  CALL FROM GLENS FALLS WHO CALLEDAND SARATOGA WHO TOLD HER THE PATIENT WAS LIVE
  STREAMING. WAS INFORM TO ENCOURAGE PATIENT TO STOP LIVE STREAMING OR TO BE
  ESCORTED OFF PREMISES.

                                 ALLERGIES

No Known Food or Latex allergy; cephalexin; ciprofloxacin;
  lamotrigine (STEVEN JOHNSON'S SYNDROME); trazodone; diphenhydramine; modafinil (PSYCHOSIS);
  oxcarbazepine (STEVEN JOHNSON'S SYNDROME)

                                                    Acct No: MX06475248
Patient: RULE,TARA L
```

# EXHIBIT R



## EXHIBIT S



**ALBANY MED Health System**

**GLENS FALLS HOSPITAL**

Ms. Tara Rule
P.O. Box 123
Round Lake , NY 12151

November 18, 2022

Dear Ms. Rule,

Thank you for the opportunity to respond to your concerns regarding your experience at Glens Falls Hospital. I understand your experience with our hospital has caused you great concern. It is always our goal to ensure patients are treated with dignity, respect and compassion, and I am sorry that we fell short of your expectations.

I want to assure you that your concerns have been taken seriously and have been addressed as such. Glens Falls Hospital investigates all reported concerns fully and addresses any identified opportunities for improvement.

As part of our review and investigation, I reviewed your medical record and spoke with the provider involved. After review, it was determined that the clinical decisions of the provider were appropriate. It is standard of care to inform patients of contraindications and side effects of specific medications, which are often determined and regulated by the FDA, and it is within a provider's discretion to make prescription decisions based on this information. However, the provider does acknowledge that there were opportunities for a more sensitive and empathetic conversation and has committed to improving communication to ensure that patients feel their concerns are heard.

This completes our formal investigation and follow up to your complaint. If you have any unresolved concerns specific to this complaint, you have the right to contact either of these two organizations:

New York State Department of Health          DNV GL Healthcare
Centralized Hospital Intake Program      400 Techne Center Dr., Suite 100
Mailstop: CA/DCS                 Milford, OH 45150
Empire State Plaza                 Attn: Complaints
Albany, NY 12237             Hospitalcomplaint@dnvgl.com
(800) 804-5447                 (866) 496-9647

Once again, Ms. Rule, thank you for sharing your concerns and providing us with an opportunity to respond to you.

Sincerely,

Sean R. Bain, MD
Vice President / Medical Affairs and Chief Medical Officer

## <u>EXHIBIT T</u>

 [View printable version](#)

# Mycophenolate Mofetil (MMF)
(Date: September 2021. Version: 3)

This factsheet has been written for members of the public by the UK Teratology Information Service (UKTIS). UKTIS is a not-for-profit organisation funded by the UK Health Security Agency (UKHSA) on behalf of UK Health Departments. UKTIS has been providing scientific information to health care providers since 1983 on the effects that medicines, recreational drugs and chemicals may have on the developing baby during pregnancy.

### *What is it?*

Mycophenolate mofetil ('mycophenolate') is known as an immunosuppressant as it dampens the immune response. It is taken to prevent organ rejection in people who have received a transplant and is also used to treat autoimmune diseases such as psoriasis and lupus.

### *What are the benefits of using mycophenolate in pregnancy?*

Mycophenolate helps to stop your body rejecting a transplanted organ and improves symptoms in those with lupus and some skin conditions. It is only used in pregnancy in rare cases where a doctor believes that switching from this drug may lead to rejection of a transplanted organ.

### *What are the risks of using mycophenolate in pregnancy?*

Mycophenolate can cause miscarriage and severe birth defects in the baby. These include ear, eye and other facial defects, heart malformations, problems with the diaphragm and oesophagus (gullet), and spinal and bone defects.

MotherToBaby | **FACT SHEET**

# Mycophenolate (Cellcept®)

This sheet is about exposure to mycophenolate in pregnancy and while breastfeeding. This information should not take the place of medical care and advice from your healthcare provider.

*What is mycophenolate?*

Mycophenolate is a medication that lowers the function of the body's immune system. Your immune system helps your body fight infection. Mycophenolate has been used to treat some autoimmune conditions like rheumatoid arthritis and lupus. Mycophenolate may also be taken to help prevent the body from rejecting an organ, such as a kidney, after a transplant. It is sold under the brand name Cellcept®. A related medication called mycophenolic acid is sold under the brand name of Myfortic®.

Sometimes when people find out they are pregnant, they think about changing how they take their medication, or stopping their medication altogether. However, it is important to talk with your healthcare providers before making any changes to how you take this medication. Your healthcare providers can talk with you about the benefits of treating your condition and the risks of untreated illness during pregnancy.

*I am taking mycophenolate, but I would like to stop taking it before getting pregnant. How long does the drug stay in my body?*

People eliminate medication at different rates. In healthy adults, it takes up to one week, on average, for most of the mycophenolate to be gone from the body.

*I take mycophenolate. Can it make it harder for me to get pregnant?*

It is not known if mycophenolate can make it harder to get pregnant.

The U.S. Food and Drug Administration (FDA) requires people who may become pregnant and healthcare providers to participate in a mycophenolate education program. This program includes confirmation of a negative pregnancy test before starting mycophenolate and a negative pregnancy test at eight to ten days after treatment begins. The program also recommends using effective birth control while taking mycophenolate. Birth control should continue for 6 weeks after stopping mycophenolate. It is important to know that mycophenolate may reduce the ability of hormonal birth control methods, like birth control pills, to prevent pregnancy.

*Does taking mycophenolate increase the chance for miscarriage?*

Miscarriage is common and can occur in any pregnancy for many different reasons. Studies suggest there is an increased chance of miscarriage if mycophenolate is taken during pregnancy. People who have had organ transplants and/or have autoimmune conditions like rheumatoid arthritis and lupus also have an increased chance for miscarriage based on their medical condition, so it is hard to know the exact risks due to mycophenolate. One report suggests the chance for miscarriage with mycophenolate use during pregnancy may be close to 50% (1 in every 2 pregnancies).

*Does taking mycophenolate increase the chance of birth defects?*

Every pregnancy starts out with a 3-5% chance of having a birth defect. This is called the background risk. A pattern of birth defects has been reported with the use of mycophenolate during pregnancy. There may be one defect, or a combination of birth defects. Possible birth defects include unusually small or absent ears, eyes, and/or jaw; heart defects, cleft lip and/or palate (openings in the lip or the roof of the mouth), and others. Not all babies with this exposure will have a birth defect.

*Does taking mycophenolate in pregnancy increase the chance of other pregnancy-related problems?*

Based on the studies reviewed, it is not known if mycophenolate can cause other pregnancy-related problems, such as preterm delivery (birth before week 37) or low birth weight (weighing less than 5 pounds, 8 ounces [2500 grams] at birth).

*Does taking mycophenolate in pregnancy affect future behavior or learning for the child?*

Mycophenolate (Cellcept®)
January 1, 2022

page 1 of 2

# **EXHIBIT U**

(Recordings - Braiman)

0:00 - 6:16

Submitted to Court via thumb drive.

Submitted to Defendants via thumb drive or electronically.

## **EXHIBIT V:**

(Recordings - Malta Med)

6:16 - 13:32

Submitted to Court via thumb drive.

Submitted to Defendants via thumb drive or electronically.

# EXHIBIT A 1

PATIENT:    TARA RULE
DOB:              ████1991

MRN: ████
DOS:    07/18/2022

**Assessment**
1. Ehlers-Danlos, hypermobile type (Q79.62)
2. Joint hyperextensibility of multiple sites (M24.80)
3. Depression (F32.A)
4. Migraines (G43.909)
5. Urinary dysfunction (R39.198)

Tara is a 31 yo female with a history of joint pain (knees and fingers), joint hypermobility (knees), joint subluxation (popping - knees, elbows, wrists, ankles, shoulders), headaches (constantly), backaches, easy bruising, poor wound healing, IBS with intermittent diarrhea and constipation, GERD, myopia and astigmatism (wearing glasses since 22 yeas of age). She has also a history of chronic fatigue, "brain fog," "poor blood circulation in her legs even though she is very active. She is having difficulty hiking with pain in her knees (when hiking down). She has reportedly had syncopal episodes and has been diagnosed with POTS (postural orthostatic tachycardia syndrome) by an electrophysiologist.

Past medical history is remarkable for hospitalization at 25 years of age for 14 days in the ICU at Ellis, diagnosed with encephalitis, could not walk and had tremors; and difficulty talking. She later developed seizure, and the brain MRI showed "white matter lesions." She was also seen at "Mass General" by a neurologist , but no specific neurological disorder was considered. She is no longer on medication for seizures (No further seizures). She is being treated for an "autoimmune disorder."

On physical examination today, Her weight, height, and head size are in normal range. She has minor dysmorphic features, such as wide palpebral fissures, prominent eyes; high nasal bridge; mild micrognathia, slight prognathia, and pes planus

She has some joint hypermobility with a Beighton score of 4/9 (Cutoff in adults: 4/9). She does not have arachnodactyly: thumb sign negative, wrist sign positive. She has a good muscle tone and strength; no tremor, normal gait.

Clinical features in Tara stated above (including POTS) are compatible with a connective tissue disorder, most likely hypermobility type of Ehlers-Danlos syndrome (hEDS).

EHLERS-DANLOS SYNDROME (HYPERMOBILITY TYPE: hEDS)
Ehlers-Danlos syndrome (EDS) is a heterogeneous group of heritable connective tissue disorders, characterized by hypermobility, skin extensibility and tissue fragility. The different types of EDS are classified according to their manifestations of signs and symptoms. There are over 13 types of EDS, with the six major types stated below. Diagnosis of EDS is based upon clinical findings and upon the family history, as well molecular studies for some).

(1) Classical (Formerly Types I & II);
(2) Hypermobility (Formerly Type III);
(3) Vascular (Formerly Type IV);
(4) Kyphoscoliosis (Formerly Type VI);
(5) Arthrochalasia (Formerly Type VIIB);
(6) Dermatosparaxis (Formerly Type VIIC).

EDS, hypermobility type (hEDS) is generally considered the least severe type of EDS, although significant complications, primarily musculoskeletal, can and do occur. Subluxations and dislocations are common and represent the major manifestation of the condition. Poor balance is also common with increased incidence of falls.

Chronic pain is a serious complication of the condition and can be both physically and psychosocially disabling. It is distinct from pain associated with acute dislocations or advanced osteoarthritis and is variable in age of onset, number of sites, duration, quality, severity, and response to therapy. The severity is typically greater than expected based on physical and radiological examination.

There are four recognizable pain syndromes:
1. Muscular (myofascial) pain is localized around or between joints. It is often described as aching, throbbing, or stiff in quality.
2. Myofascial spasm with tender points (consistent with fibromyalgia) is often demonstrable especially in the



PATIENT:    TARA RULE
DOB:         ████ 1991                                    MRN: ████████
                                                         DOS:  07/18/2022

paravertebral musculature. Myofascial release often provides temporary relief.
3. Neuropathic pain is variably described as electrical, burning, shooting, tingling, or hot or cold discomfort. It may
occur in a radicular or peripheral nerve distribution or may appear to localize to an area surrounding one or more
joints. Nerve conduction studies are usually nondiagnostic.
4. Osteoarthritic pain occurs later in life (but earlier than in the general population). It typically presents as aching
pain in the joints and is frequently associated with stiffness. It is often exacerbated by stasis, resistance, and/or
highly repetitive activity.

For individuals with significant pain and/or fatigue, screening for and correction of other potential causes, including
(but not limited to) vitamin D deficiency, vitamin B12 deficiency, folate deficiency, iron deficiency, celiac disease,
or hypothyroidism, should be obtained.

Non-steroidal anti-inflammatory agents are the first medication to try for pain. We recommend taking
over-the-counter medications such as ibuprofen or other NSAID on a regular basis for several weeks at a large
enough dose to decrease inflammation. It is important to control pain to improve compliance with the home toning
program.

Individuals are often diagnosed with chronic fatigue syndrome, fibromyalgia, depression, hypochondriasis, and/or
malingering prior to establishment of the correct underlying diagnosis.

Emotional problems are common:
Specific manifestations may include depression, anxiety, affective disorder, low self-confidence, negative thinking,
hopelessness, and desperation. Fatigue and pain impact emotional issues and the ensuing psychological distress
worsens pain. Avoidance behavior may also exacerbate emotional issues and physical disability. Individuals may
feel misunderstood, disbelieved, marginalized, and alone.

Bone mineral density may be reduced. DEXA should be obtained at any age if there is height loss greater than 1
inch or if x-rays are suggestive of osteopenia. Women should have their first study no later than menopause.
DEXA should be obtained every other year if bone loss is confirmed. Therapy is the same as for any other
individual with low bone density. The home toning program should not be overlooked as a means to help maintain
bone density as well as improve resting muscle tone.

Easy bruising is quite common, frequently without obvious cause. Mildly prolonged bleeding, epistaxis, and
menometrorrhagia also occur. Hematology evaluation is almost always normal. Some patients may respond to
extra vitamin C.

Temporomandibular dysfunction is common. Headaches, especially migraine, are also common and caused at
least in part by cervical muscle tension and temporomandibular dysfunction.

Dysautonomia may manifest as functional bowel disorders, cardiovascular autonomic dysfunction, and/or
Raynaud syndrome. Functional bowel disorders commonly go unrecognized. Gastroesophageal reflux frequently
requires maximal doses of proton pump inhibitors as well as supplementation with acid-neutralizing medications.
Early satiety, delayed gastric emptying, and constipation often occur and may be exacerbated by opioid
medications. Irritable bowel syndrome may manifest with diarrhea and/or constipation associated with abdominal
cramping and rectal mucus.

Approximately half of individuals report atypical chest pain, palpitations at rest or on exertion, and/or orthostatic
intolerance with syncope or near syncope. Holter monitoring usually shows normal sinus rhythm, but sometimes
reveals premature atrial complexes or paroxysmal supraventricular tachycardia. Tilt table testing may reveal
neurally mediated hypotension (NMH) and/or postural orthostatic tachycardia syndrome (POTS). These are
treated as in the general population.

About 30% of individuals have aortic root dilatation. Dilation onset is in childhood and is usually stable over time. It
is unlikely to progress or to develop later in life. All individuals should have a baseline echocardiogram. If the study
is normal during childhood, we recommend followup in three to five years. Yearly monitoring of the aorta is not
necessary if the baseline examination is normal. If dilatation is present, we usually do not recommend treating with
a beta blocker. Current guidelines suggest that with normal aortic root measurements in adulthood,
echocardiograms can be held until major changes in physical activity or symptoms develop.

PATIENT:    TARA RULE
DOB:        ████/1991                          MRN: ████
                                               DOS:  07/13/2022

paravertebral musculature. Myofascial release often provides temporary relief.
3. Neuropathic pain is variably described as electrical, burning, shooting, tingling, or hot or cold discomfort. It may occur in a radicular or peripheral nerve distribution or may appear to localize to an area surrounding one or more joints. Nerve conduction studies are usually nondiagnostic.
4. Osteoarthritic pain occurs later in life (but earlier than in the general population). It typically presents as aching pain in the joints and is frequently associated with stiffness. It is often exacerbated by stasis, resistance, and/or highly repetitive activity.

For individuals with significant pain and/or fatigue, screening for and correction of other potential causes, including (but not limited to) vitamin D deficiency, vitamin B12 deficiency, folate deficiency, iron deficiency, celiac disease, or hypothyroidism, should be obtained.

Non-steroidal anti-inflammatory agents are the first medication to try for pain. We recommend taking over-the-counter medications such as Ibuprofen or other NSAID on a regular basis for several weeks at a large enough dose to decrease inflammation. It is important to control pain to improve compliance with the home toning program.

Individuals are often diagnosed with chronic fatigue syndrome, fibromyalgia, depression, hypochondriasis, and/or malingering prior to establishment of the correct underlying diagnosis.

Emotional problems are common:
Specific manifestations may include depression, anxiety, affective disorder, low self-confidence, negative thinking, hopelessness, and desperation. Fatigue and pain impact emotional issues and the ensuing psychological distress worsens pain. Avoidance behavior may also exacerbate emotional issues and physical disability. Individuals may feel misunderstood, disbelieved, marginalized, and alone.

Bone mineral density may be reduced. DEXA should be obtained at any age if there is height loss greater than 1 inch or if x-rays are suggestive of osteopenia. Women should have their first study no later than menopause. DEXA should be obtained every other year if bone loss is confirmed. Therapy is the same as for any other individual with low bone density. The home toning program should not be overlooked as a means to help maintain bone density as well as improve resting muscle tone.

Easy bruising is quite common, frequently without obvious cause. Mildly prolonged bleeding, epistaxis, and menometrorrhagia also occur. Hematology evaluation is almost always normal. Some patients may respond to extra vitamin C.

Temporomandibular dysfunction is common. Headaches, especially migraine, are also common and caused at least in part by cervical muscle tension and temporomandibular dysfunction.

Dysautonomia may manifest as functional bowel disorders, cardiovascular autonomic dysfunction, and/or Raynaud syndrome. Functional bowel disorders commonly go unrecognized. Gastroesophageal reflux frequently requires maximal doses of proton pump inhibitors as well as supplementation with acid-neutralizing medications. Early satiety, delayed gastric emptying, and constipation often occur and may be exacerbated by opioid medications. Irritable bowel syndrome may manifest with diarrhea and/or constipation associated with abdominal cramping and rectal mucus.

Approximately half of individuals report atypical chest pain, palpitations at rest or on exertion, and/or orthostatic intolerance with syncope or near syncope. Holter monitoring usually shows normal sinus rhythm, but sometimes reveals premature atrial complexes or paroxysmal supraventricular tachycardia. Tilt table testing may reveal neurally mediated hypotension (NMH) and/or postural orthostatic tachycardia syndrome (POTS). These are treated as in the general population.

About 30% of individuals have aortic root dilatation. Dilation onset is in childhood and is usually stable over time. It is unlikely to progress or to develop later in life. All individuals should have a baseline echocardiogram. If the study is normal during childhood, we recommend followup in three to five years. Yearly monitoring of the aorta is not necessary if the baseline examination is normal. If dilatation is present, we usually do not recommend treating with a beta blocker. Current guidelines suggest that with normal aortic root measurements in adulthood, echocardiograms can be held until major changes in physical activity or symptoms develop.



PATIENT:     TARA RULE
DOB:           /1991

MRN:
DOS:   07/18/2022

Pelvic prolapse and dyspareunia occur at increased frequency. Pregnancy may be complicated by premature rupture of membranes or rapid labor and delivery (less than four hours), but this is less likely than in the classic type of EDS. This may occur even in primigravid women. Joint laxity and pain typically increase throughout gestation. Pregnant women with known a

**INHERITANCE:**
EDS, hypermobility type is inherited in an autosomal dominant manner. Most individuals diagnosed with the syndrome have an affected parent. The proportion of cases caused by a de novo pathogenic variant is unknown. Each child of an individual with EDS, hypermobility type has a 50% chance of inheriting the disorder. Because the gene(s) and pathogenic variant(s) responsible for EDS, hypermobility type have not been identified, prenatal testing is not possible.

Resources
1. Ehlers-Danlos Society
P.O. Box 87463. Montgomery Village MD 20886. Phone: 410-670-7577 <br>Email: info@ehlers-danlos.com
www.ehlers-danlos.com <https://ehlers-danlos.com/>

2. Ehlers-Danlos Syndrome Network C.A.R.E.S. Foundation
PO Box 66, Muskego WI 53150. Phone: 262-514-2851
Email: EDSLynnCARES@gmail.com <br>www.ehlersdanlosnetwork.org
<http://www.ehlersdanlosnetwork.org/index.html>.

# **EXHIBIT B 1**



## EXHIBIT C 1



MALTA MED EMERGENT CARE

Patient: RULE,TARA L
Account No:
Unit No:
Location: HCP URGENT CARE
Physician: Other,Doctor
Date: 09/21/22

**Patient Visit Information**

**You were seen today for:**

Cluster headache

**Staff**

Your caregivers today were:

Physician:     Other,Doctor
Practitioner:  CALISTRI,CHRISTINE

Patient Instructions Reviewed

Cluster Headache

received 09/21/22 - 1728

## EXHIBIT D 1



```
RUN DATE: 09/22/22                     Saratoga Hospital Order Entry **LIVE**            PAGE 2
RUN TIME: 0037                              Discharge Report
RUN USER: DR.CALCHR

PATIENT:     RULE,TARA L                  A/S: 31 F        ADMIT:      09/21/22
ACCOUNT NO:                               LOC: HCPUC       DISCH/DEP:  09/21/22
                                          RM:              STATUS:     DEP ER
ATTEND DR: Calistri,Christine NP          BD:              UNIT NO:

Category  Procedure  Order Number  Date     Time Pri Qty Ord Source Status  Ordered By
MED       MED        20220921-1640 09/21/22 1350 S      POM         CMP     CALCHR0
Other Provider :             Sig Lvl Provider :
RX: HC00327667                             Start: 09/21/22  1350      STA CMP
                                           Stop: 09/21/22  1351

     diphenhydrAMINE (Benadryl)
     Dose: 25 MG
     Route: IV PUSH              Direction: 1X (ONE TIME ONLY)

   Order's Audit Trail of Events
   1   09/21/22 1350 DR.CALCHR  Order ENTER in EDM/POM
   2   09/21/22 1350 DR.CALCHR  Ordering Doctor: Calistri,Christine NP
   3   09/21/22 1350 DR.CALCHR  Order Source: Physician OE
   4   09/21/22 1350 DR.CALCHR  Signed by Calistri,Christine NP
   5   09/21/22 1351 SCHEDULER  DISCONTINUE in PHA
   6   09/21/22 1355 MMEC.JG6   order acknowledged

Category  Procedure  Order Number  Date     Time Pri Qty Ord Source Status  Ordered By
MED       MED        20220921-1821 09/21/22 1511 S      POM         CMP     CALCHR0
Other Provider :             Sig Lvl Provider :
RX: HC00327677                             Start: 09/21/22  1511      STA CMP
                                           Stop: 09/21/22  1512

     Ketorolac (Toradol)
     Dose: 15 MG
     Route: IV PUSH              Direction: 1X (ONE TIME ONLY)

   Order's Audit Trail of Events
   1   09/21/22 1511 DR.CALCHR  Order ENTER in EDM/POM
   2   09/21/22 1511 DR.CALCHR  Ordering Doctor: Calistri,Christine NP
   3   09/21/22 1511 DR.CALCHR  Order Source: Physician OE
   4   09/21/22 1511 DR.CALCHR  Signed by Calistri,Christine NP
   5   09/21/22 1512 SCHEDULER  DISCONTINUE in PHA
   6   09/21/22 1514 MMEC.JG6   order acknowledged

                    PERMANENT MEDICAL RECORD COPY
```



```
RUN DATE: 09/22/22                 Saratoga Hospital Order Entry **LIVE**                    PAGE 1
RUN TIME: 0037                              Discharge Report
RUN USER: DR.CALCHR

PATIENT:    RULE,TARA L                         A/S: 31 F        ADMIT:      09/21/22
ACCOUNT NO:                                     LOC: HCPUC       DISCH/DEP: 09/21/22
                                                RM:              STATUS:    DEP ER
ATTEND DR: Calistri,Christine NP                BD:             UNIT NO:

Order Date: 09/21/22
Category    Procedure  Order Number  Date      Time Pri Qty Ord Source Status   Ordered By
UCWMA        00008      20220921-0011 09/21/22 1350 R         POM    TRN    CALCHR0
Other Provider :               Sig Lvl Provider :

    Order's Audit Trail of Events
    1    09/21/22 1350 DR.CALCHR  Order ENTER in EDM/POM
    2    09/21/22 1350 DR.CALCHR  Ordering Doctor: Calistri,Christine NP
    3    09/21/22 1350 DR.CALCHR  Order Source: Physician OE
    4    09/21/22 1350 DR.CALCHR  Signed by Calistri,Christine NP

Category    Procedure  Order Number  Date      Time Pri Qty Ord Source Status   Ordered By
ED          MMECSALINE 20220921-0245 09/21/22 1350 R         POM    TRN    CALCHR0
Other Provider :               Sig Lvl Provider :
    Order's Audit Trail of Events
    1    09/21/22 1350 DR.CALCHR  Order ENTER in EDM/POM
    2    09/21/22 1350 DR.CALCHR  Ordering Doctor: Calistri,Christine NP
    3    09/21/22 1350 DR.CALCHR  Order Source: Physician OE
    4    09/21/22 1350 DR.CALCHR  Signed by Calistri,Christine NP

Category    Procedure  Order Number  Date      Time Pri Qty Ord Source Status   Ordered By
MED          MED        20220921-1638 09/21/22 1347 S         POM    CMP    CALCHR0
Other Provider :               Sig Lvl Provider :
RX: HC00327665                                  Start: 09/21/22 1347     STA  CMP
                                                Stop:  09/21/22 1348

    Ketorolac (Toradol)
    Dose: 15 MG
    Route: IV PUSH                    Direction: 1X (ONE TIME ONLY)

    Order's Audit Trail of Events
    1    09/21/22 1350 DR.CALCHR  Order ENTER in EDM/POM
    2    09/21/22 1350 DR.CALCHR  Ordering Doctor: Calistri,Christine NP
    3    09/21/22 1350 DR.CALCHR  Order Source: Physician OE
    4    09/21/22 1350 DR.CALCHR  Signed by Calistri,Christine NP
    5    09/21/22 1350 SCHEDULER  DISCONTINUE in PHA
    6    09/21/22 1355 MMEC.JG6   order acknowledged

Category    Procedure  Order Number  Date      Time Pri Qty Ord Source Status   Ordered By
MED          MED        20220921-1639 09/21/22 1348 S         POM    CMP    CALCHR0
Other Provider :               Sig Lvl Provider :
RX: HC00327666                                  Start: 09/21/22 1348     STA  CMP
                                                Stop:  09/21/22 1349

    Metoclopramide (Reglan)
    Dose: 5 MG
    Route: IV PUSH                    Direction: 1X (ONE TIME ONLY)

    Order's Audit Trail of Events
    1    09/21/22 1350 DR.CALCHR  Order ENTER in EDM/POM
    2    09/21/22 1350 DR.CALCHR  Ordering Doctor: Calistri,Christine NP
    3    09/21/22 1350 DR.CALCHR  Order Source: Physician OE
    4    09/21/22 1350 DR.CALCHR  Signed by Calistri,Christine NP
    5    09/21/22 1350 SCHEDULER  DISCONTINUE in PHA
    6    09/21/22 1355 MMEC.JG6   order acknowledged


             PERMANENT  MEDICAL  RECORD  COPY

                                                <Continued>
```

## **EXHIBIT E 1**

 Gmail                                    Tara Rule <ruleartsandproductions@gmail.com>

**Misconduct, negligence, retaliation, privacy violation, harassment, discrimination**

**DPLSDSU** <DPLSDSU@nysed.gov>                                    Wed, Oct 12, 2022 at 9:26 AM
To: Tara Rule <ruleartsandproductions@gmail.com>

Good morning,

The department of health oversees medical doctors and physicians assistants. Please reach out to them by email :

opmc@health.ny.gov

Phone 1-800-663-6114(for complaints)

Or (518)402-0836

Web address : www.health.ny.gov

[Quoted text hidden]

**Confidentiality Notice**

This email including all attachments is confidential and intended solely for the use of the individual or entity to which it is addressed. This communication may contain information that is protected from disclosure under State and/or Federal law. Please notify the sender immediately if you have received this communication in error and delete this email from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

 Gmail

Tara Rule <ruleartsandproductions@gmail.com>

---

**NYS Division of Human Rights, Case #10221187, Request for Rebuttal**

**dhr.sm.AlbanyBingOfficeFax** <AlbanyBingOfficeFax@dhr.ny.gov>          Mon, Feb 13, 2023 at 10:01 AM
To: "ruleartsandproductions@gmail.com" <ruleartsandproductions@gmail.com>

Good morning Ms. Rule,

Attached is the response from Albany Med Helath System, as well as a request for you to submit a rebuttal to their response. Currently, your rebuttal is due on February 28, 2023, and may be submitted directly to this email address (AlbanyBingOfficeFax@dhr.ny.gov). If you have any questions, please let us know.

Thank you,

**Adam Herman**

Program Aide

**New York State Division of Human Rights**

Empire State Plaza

Agency Building 1, 2nd Floor

Albany NY, 12220

(518) 474-2705 | fax: (518) 473-2955

Adam.Herman@dhr.ny.gov

www.dhr.ny.gov



 Gmail

### NYS Division of Human Rights, Case #10221187, Request for Rebuttal

**Tara Rule** <ruleartsandproductions@gmail.com>                    Sat, Apr 29, 2023 at 6:24 PM
To: "Herman, Adam (DHR)" <Adam.Herman@dhr.ny.gov>

Hi Adam,
Just following up. Any idea on the projected timeline about updates?
Thank you!

[Quoted text hidden]

 Tara Rule <ruleartsandproductions@gmail.com>

## Request for clarification regarding investigation

**Tara Rule** <ruleartsandproductions@gmail.com>                             Wed, Jan 4, 2023 at 8:08 PM
To: OCR.NewYork@ed.gov

Hi,

My name is Tara Rule. I submitted a form regarding unauthorized disclosures of my PHI by my provider on social media. I received an email and form (attached) stating that the claim would not be investigated and that it was to be closed with no further action. It did not give me the option to appeal. I have attached the letter,  a copy of the incident summary and proof of violations of my right to privacy to an unauthorized individual from my provider via facebook. I am requesting a reason for refusal of investigation.

Thank you.

--
RuleArts&Productions
(518) 450 3868
www.tararule.com



**3 attachments**

📄 **Closure Letter.pdf**
145K

📄 **Incident Report .pdf**
24K

📄 **Unauthorized PHI disclosures.pdf**
2394K

 Gmail

Tara Rule <ruleartsandproductions@gmail.com>

---

**Automatic reply: FINAL request before proceeding**

**OCR Mail** <OCRMail@hhs.gov>                                        Sun, Jan 15, 2023 at 2:45 PM
To: Tara Rule <ruleartsandproductions@gmail.com>

Thank you for contacting the U.S. Department of Health and Human Services, Office for Civil Rights (OCR).  OCR enforces federal civil rights laws which prohibit discrimination in the delivery of health and human services based on race, color, national origin, disability, age, sex, religion, and the exercise of conscience, and also enforces the Health Insurance Portability and Accountability Act (HIPAA) Privacy, Security and Breach Notification Rules.

We are in the process of reviewing your correspondence.  We will complete our initial review as quickly as possible.

For information about OCR's authorities and COVID-19, please visit: https://www.hhs.gov/ocr/index.html.


If you have general questions about the novel coronavirus, COVID-19, please go to the Centers for Disease Control website at https://www.cdc.gov.


For additional information about OCR, including the complaint review process, and our HIPAA, civil rights, and conscience and religious freedom regulations, please see the following links:

https://www.hhs.gov/ocr/complaints/index.html
https://www.hhs.gov/hipaa/index.html
https://www.hhs.gov/civil-rights/index.html
https://www.hhs.gov/conscience/index.html

If you have any additional questions or need a reasonable accommodation, please contact OCR's Customer Response Center at 1-800-368-1019, Monday through Friday, 8:00 am to 6:00 pm, ET.

**Please do not reply to this email.** Thank you.

**NOTE:** This e-mail may contain sensitive and/or privileged information. If you are not the intended recipient, please notify the sender immediately and destroy this e-mail. Please be advised that communication by unencrypted email presents a risk of disclosure of the transmitted information to, or interception by, unintended third parties. Your use of



**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**
# Office for Civil Rights

Eastern and Caribbean Region ● Jacob Javits Federal
26 Federal Plaza, Suite 3312   ● New York, NY 10278
Voice: (800) 368-1019 ● TDD: (800) 537-7697
Fax: (212) 264-3039  ● www.hhs.gov/ocr

January 4, 2023

Tara Rule
8 Saratoga Ave
Round Lake, NY 12151

RE: OCR Transaction Number:  02-23-499342

Rule, Tara v Calistri, Christine

Dear Sir or Madam:

On October 2, 2022, the U.S. Department of Health and Human Services (HHS), Office for Civil Rights (OCR), received your complaint alleging a violation of the Health Insurance Portability and Accountability Act (HIPAA) Privacy, Security and/or Breach Notification Rules.

OCR enforces federal civil rights laws which prohibit discrimination in the delivery of health and human services based on race, color, national origin, disability, age, sex, religion, and the exercise of conscience, and also enforces the HIPAA Privacy, Security and Breach Notification Rules.

We have reviewed your allegations against Calistri, Christine and have determined that OCR will not investigate your complaint.  Therefore, OCR is closing this complaint with no further action, effective the date of this letter.

OCR's determination as stated in this applies only to the allegations in this complaint that were reviewed by OCR.

                                    Tara Rule <ruleartsandproductions@gmail.com>

## Automatic reply: Request for clarification regarding investigation

**OCR Mail** <OCRMail@hhs.gov>                                    Thu, Jan 5, 2023 at 1:11 PM
To: Tara Rule <ruleartsandproductions@gmail.com>

Thank you for contacting the U.S. Department of Health and Human Services, Office for Civil Rights (OCR). OCR enforces federal civil rights laws which prohibit discrimination in the delivery of health and human services based on race, color, national origin, disability, age, sex, religion, and the exercise of conscience, and also enforces the Health Insurance Portability and Accountability Act (HIPAA) Privacy, Security and Breach Notification Rules.

We are in the process of reviewing your correspondence. We will complete our initial review as quickly as possible.

For information about OCR's authorities and COVID-19, please visit: https://www.hhs.gov/ocr/index.html.

If you have general questions about the novel coronavirus, COVID-19, please go to the Centers for Disease Control website at https://www.cdc.gov.

For additional information about OCR, including the complaint review process, and our HIPAA, civil rights, and conscience and religious freedom regulations, please see the following links:

https://www.hhs.gov/ocr/complaints/index.html
https://www.hhs.gov/hipaa/index.html
https://www.hhs.gov/civil-rights/index.html
https://www.hhs.gov/conscience/index.html

If you have any additional questions or need a reasonable accommodation, please contact OCR's Customer Response Center at 1-800-368-1019, Monday through Friday, 8:00 am to 6:00 pm, ET.

**Please do not reply to this email.** Thank you.

**NOTE:** This e-mail may contain sensitive and/or privileged information. If you are not the intended recipient, please notify the sender immediately and destroy this e-mail. Please be advised that communication by unencrypted email presents a risk of disclosure of the transmitted information to, or interception by, unintended third parties. Your use of



Tara Rule <ruleartsandproductions@gmail.com>

---

### Automatic reply: Discrimination in care/retaliation for reporting

---

**OCR Mail** <OCRMail@hhs.gov>                                                Mon, Sep 26, 2022 at 1:56 PM
To: Tara Rule <ruleartsandproductions@gmail.com>

Thank you for contacting the U.S. Department of Health and Human Services, Office for Civil Rights (OCR).  OCR enforces federal civil rights laws which prohibit discrimination in the delivery of health and human services based on race, color, national origin, disability, age, sex, religion, and the exercise of conscience, and also enforces the Health Insurance Portability and Accountability Act (HIPAA) Privacy, Security and Breach Notification Rules.

We are in the process of reviewing your correspondence.  We will complete our initial review as quickly as possible.

For information about OCR's authorities and COVID-19, please visit: https://www.hhs.gov/ocr/index.html.


If you have general questions about the novel coronavirus, COVID-19, please go to the Centers for Disease Control website at https://www.cdc.gov.


For additional information about OCR, including the complaint review process, and our HIPAA, civil rights, and conscience and religious freedom regulations, please see the following links:

https://www.hhs.gov/ocr/complaints/index.html
https://www.hhs.gov/hipaa/index.html
https://www.hhs.gov/civil-rights/index.html
https://www.hhs.gov/conscience/index.html

If you have any additional questions or need a reasonable accommodation, please contact OCR's Customer Response Center at 1-800-368-1019, Monday through Friday, 8:00 am to 6:00 pm, ET.

**Please do not reply to this email.** Thank you.

**NOTE:** This e-mail may contain sensitive and/or privileged information. If you are not the intended recipient, please notify the sender immediately and destroy this e-mail. Please be advised that communication by unencrypted email presents a risk of disclosure of the transmitted information to, or interception by, unintended third parties. Your use of

 Gmail                                    Tara Rule <ruleartsandproductions@gmail.com>

## NYS Division of Human Rights, Case #10221187, Request for Rebuttal

**Herman, Adam (DHR)** <Adam.Herman@dhr.ny.gov>                    Fri, Mar 10, 2023 at 2:53 PM
To: Tara Rule <ruleartsandproductions@gmail.com>

Good afternoon Ms. Rule,

We received your rebuttal.

Thank you,

## Adam Herman

Program Aide

**New York State Division of Human Rights**

Empire State Plaza

Agency Building 1, 2nd Floor

Albany NY, 12220

(518) 474-2705 | fax: (518) 473-2955

Adam.Herman@dhr.ny.gov

www.dhr.ny.gov



*The contents of this email and any attachments to it may contain privileged and confidential information. This information is only for the viewing or use of the intended recipient. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of, or the taking of any action in reliance upon, the information contained in this e-mail, or any of the attachments to this e-mail, is strictly prohibited and that this e-mail and all of the attachments to this e-mail, if any, must be immediately returned to the sender or destroyed and, in either case, this e-mail and all*

Misconduct, retaliation, privacy violations, intimidation, blacklisting.

 **Tara Rule**                                                                                                                                  Sat, Sep 24, 2022, 9:00 PM
to patientrelations

Hi,

My name is Tara Rule. My DOB is 04/07/1991.

I have included recordings of the incident that happened at Malta Med Emergent Care on September 21. I have sent recordings of the incident that happened between myself and Dr. Braiman to Glens Falls Hospital patient relations. They should be able to provide you with such recordings. I am happy to provide national proof of anything upon request. Please let me know that you have received this email as well as the attached recordings. If I do not hear back by Wednesday, I will assume you did not receive this email and will proceed accordingly.

On September 14, 2022, I had an appointment with Dr. Braiman at Glens Falls Hospital Neurology regarding a resurgence of cluster headaches (Also known as suicide headaches) I was requesting an MRI and possible medication to help (non narcotic medication.) and/or oxygen treatment to help.
After discussing symptoms, Dr. Braiman informed me that there were a few "very effective" treatment options available, but that my insurance would not pay for them because they can cause birth defects if taken while pregnant. I informed him that I am not pregnant, and that I do not plan on becoming pregnant. He asked what kind of sex I was having, which felt very inappropriate to me. I tried to change the subject and again reiterated that I would not be having children. He alluded to forced pregnancy due to assault. "Well, things can happen even if you don't want or plan them to happen, and you need to think about that." At that point, I became very uncomfortable. I told him that I did not think it would be an issue with insurance because the treatment I currently take for my autoimmune condition causes some of the worst birth defects out there if I were to become pregnant while taking the medication and my insurance fully covers it without question and the prescriber never even

Discrimination in care/retaliation for reporting

 **Tara Rule**                                                                                                                                  Mon, Sep 26, 2022, 1:55 PM
to OCRComplaint

· Your name - Tara Rule
· Full address -
· Telephone numbers -
· E-mail address (if available) -
· Name, full address and telephone number of the person, agency or organization you believe discriminated against you:
· Dr. Johnathan Braiman, Neurologist. Glens Falls Hospital Neurology. 100 Park Street, Pruyn Pavilion, 3rd floor, Glens Falls NY 12801. 518 926 2910
· Christine Calistri, NP, Malta Med Emergent Care. 6 Medical Park Drive, Malta, NY 12020. 518 289 2024
·     Donna Kirker, MS, RN, NEA-BC
      Vice President / Patient Services and Chief Nursing Officer at Glens Falls Hospital. 100 Park Street, Glens Falls, NY 12801
·                                                                211 Church Street, Saratoga Springs NY 12866. 518 587 3322
· Albany Medical Center: 43 New Scotland Ave Albany NY 12208 518 262 3125
· A brief description of what happened, including how, why, and when you believe your (or someone else's) civil rights were violated:
· (I have included recordings of the incidents between myself and Dr. Braiman, and myself and Christine Calistri in this email.)
· On September 14, 2022, I had an appointment with Dr. Braiman regarding a resurgence of cluster headaches (Also known as suicide headaches) I was requesting an MRI and possible medication to help (non narcotic medication.) and/or oxygen treatment to help.
      After discussing symptoms, Dr. Braiman informed me that there were a few "very effective" treatment options available, but that my insurance would not pay for them because they can cause birth defects if taken while pregnant. I informed him that I am not pregnant, and that I do not plan on becoming pregnant. At that point, I became very uncomfortable. I told him that I did not think it would be an issue with insurance because the treatment I currently take for my autoimmune condition causes some of the worst birth defects out there if I were to become pregnant while taking the medication and that my insurance fully covers it without question and the prescriber never even needed to appeal it. I asked him to please tell me the names of the most effective treatments so that I could possibly see if I could pay out of pocket. He refused to tell me the names of the medication and turned his computer screen away from me so that I could not see it. He then told me that "mycophenolate doesn't cause birth defects." I told him that it does, and I told him that I may actually have my bottle with me and it has the warning labels on the bottle itself. When I reached into my bag to look, I began recording because the questions he asked me about my sexual activity made me really uncomfortable. I am happy to provide the recordings upon request. He read the birth defects aloud that the current treatment I take for my immune system, (mycophenolate) causes. He said, "so, you're not having intercourse?" "I am" "Well then you could become pregnant" "I use protection." "That's not - that's something you need to think about, what would happen if you were to become pregnant" "I would have to get an abortion." "Why?! because of the Ehlers Danlos?" (Ehlers Danlos Syndrome is a genetic condition that I have.) I said, "yes, and because of the cellcept" (cellcept - brand name for mycophenolate) He then berated me on the topic of abortion, told me I needed to really think about the treatments I'm currently taking which are life saving. I told him pregnancy would likely kill me, and he told me that I shouldn't get an abortion on the off chance I become pregnant and that I would need to wait and get scans and tests. He told me that I would have to bring my partner into his office to discuss possible medications that could cause birth defects. He told me he would not prescribe me the most effective medication on the off chance I could become pregnant due to being "child bearing age." I asked, "if I even start menopause would those options be the most effective?" "Yes." "So, the only reason you're not prescribing them is that I could become pregnant at some point?" He abruptly changed the subject, "How's your sleep?"
      He prescribed me a very dangerous injectable medication that I have an allergy to. It is not recommended for those who are severely immunocompromised, which I am, or have tachycardia, which I do. He was willing to put my life and health at risk for a hypothetical fetus.
      His misconduct was appalling. He is in violation of the patients bill of rights in NYS. He put his personal and religious agenda above my care, even though the headaches are 10/10 on a pain scale. His questions regarding my sex life and sexual activity were absolutely inappropriate especially for a neurologist. He discriminated and denied me the best care for my very complex medical condition because I am a woman and are of child bearing age. He is discriminating against me due to my disability, Ehlers Danlos, my sex (female) and my age (child bearing age, whatever age he considers that to be.)
      I posted a recording of my interaction between Dr. Braiman and myself on social media. The video went viral and news outlets reached out to me. I filed a complaint with the administration board at Glens Falls Hospital and was told it would take 45 days to hear anything about an investigation. I called the patient relations person I spoke to about the recordings.
· On Sept. 21, I went to Malta Med Emergent Care to get Oxygen treatment for my cluster headache that had returned. While there, I posted a video onto my location. In the post, I was visibly in a hospital gown wearing an oxygen cannula. I didn't want to miss a concert the next day. Again, I said nothing about my location. I jokingly said I would sue the neurologist if I missed the concert on the 22nd. Again, this was my PERSONAL social media page. I had also gotten an email while I was in the ED of Malta Med that the local paper had reached out to Glens Falls hospital and the doctor for comment. Moments after posting the video, Christine Calistri NP came in with 3 nurses, 3 other staff members, and security and threatened me. I have the entire event recorded and am happy to send it upon request. She came in to tell me I was being discharged and that "The chief nursing director at Glens Falls Hospital the Chief nursing director at Saratoga hospital who called the nursing manager and the admin at Malta Med Emergent care because I was live streaming." I told her that I was not live streaming, (I also have proof that the last time I had live streamed was Sept. 19th, I am happy to provide that proof upon request.) She asked me how they would know where I was then because I "said what room I was in in the live stream, room 9." I told her I did not live stream, that I didn't have wifi so I couldn't anyway, but that it would be 100% within my legal right to do so even if I did. I told her I would not put my safety at risk by letting my social media followers know my location. I questioned how she knew anything about my social media and she said, "well do you post under your own name?" "Yes." "Well, we looked you up, and we watched your video saying you didn't want to miss the concert tomorrow and that's 100% illegal. I told her it was not illegal, and I again asked how she knew any of this and she told me that they "called around to each hospital and looked me up in their tracker." She threatened me with their legal team and security. I told her I did not do anything wrong. She raised her voice and said, "I don't believe a word coming out of your mouth because you lied." "I did not lie." "Did you post something in this room?" "Yes, but that's not what you asked. I said I did not live stream." "Okay whatever. You're a liar!" I asked her to please send in the legal administrator of the hospital and she stormed out and mumbled something about getting me someone's phone number to another nurse that was in the room. Again, I am happy to send the recording of this entire event.
      Needless to say, I was discharged, harassed, threatened, lied to, stalked, and looked up on social media because I had complained about a doctor at Glens Falls Hospital. I do not know if Christine Calistri lied about the phone call, or if the other hospitals truly were involved.
· Any other relevant information: Audio/video of incidents attached. (first video attachment "dr. braiman" began recording as he read about the birth defects my current treatment causes after he told me my current treatment doesn't cause birth defects so I told him to look it up)
· Your signature and date of complaint
· September 26, 2022.
· Electronically signed: Tara Rule

You may also include:
· Contact information for someone who can help you reach you if we cannot reach you directly: Carol Rule (mother) 518 366 8257
· If you have filed your complaint somewhere else and where you've filed: I called Glens Falls Hospital Administration/patient relations regarding the incident with Dr. Braiman on September 15th.



HHS OCR Transaction #CU-23-511449

February 27, 2023

Tara Rule
▬▬▬▬▬▬▬▬▬▬▬

Re:  OCR Transaction Number:  CU-23-511449
     Rule, Tara vs. Calistri, Christine

Dear Tara Rule:

On January 4, 2023, the U.S. Department of Health and Human Services (HHS), Office for Civil Rights (OCR), received your complaint.

OCR enforces federal civil rights laws which prohibit discrimination in the delivery of health and human services based on race, color, national origin, disability, age, sex, religion, and the exercise of conscience, and also enforces the Health Insurance Portability and Accountability Act (HIPAA) Privacy, Security and Breach Notification Rules.

Upon review of your allegations, OCR has decided to consolidate this complaint into OCR Transaction Number 23-499342, which you previously filed with this office. Accordingly, we are closing the subject transaction, CU-23-511449, effective the date of this letter.

OCR's determination as stated in this letter applies only to the allegations in this complaint that OCR reviewed.  If you have any questions about this letter, please contact Centralized Case Management Operations at (800) 368-1019 or (202) 619-3257 (TDD).

Sincerely,

Supervisor, Centralized Case Management Operations (CCMO)

---

HHS OCR Transaction #CU-23-511449

OS OCR CIU/CRC <osocrciu@hhs.gov>

Mon 2/27, 4:25 PM

511449 CL to C.pdf
399 KB

Dear Complainant,

Thank you for your complaint filed with the U.S. Department of Health and Human Services, Office for Civil Rights. We have carefully reviewed your complaint. Please find our determination attached to this email.
<< 511449 CL to C.pdf >>
Sincerely,

Office for Civil Rights
Centralized Case Management Operations
U.S. Department of Health and Human Services

**NOTE:** This e-mail may contain sensitive and/or privileged information. If you are not the intended recipient, please notify the sender immediately and destroy this e-mail. Please be advised that communication by unencrypted email presents a risk of disclosure of the transmitted information to, or interception by, unintended third parties. Your use of email to communicate Protected Health Information or other Personally Identifiable Information with the Office for Civil Rights indicates that you acknowledge and accept the possible risks associated with such communication. If you do not wish to have your information sent by email, please contact the sender immediately.

---

Disclaimer: This message is intended only for the use of the individual or entity to which it is addressed and may contain information which is privileged, confidential, proprietary, or exempt from disclosure under applicable law. If you are not the intended recipient or the person responsible for delivering the message to the intended recipient, you are strictly prohibited from disclosing, distributing, copying, or in any way using this message. If you have received this communication in error, please notify the sender and destroy and delete any copies you may have received.

 **Gmail**                                              Tara Rule <ruleartsandproductions@gmail.com>

---

## Tara Rule - Requested Info

**Tara Rule** <ruleartsandproductions@gmail.com>                              Sun, Oct 23, 2022 at 6:42 PM
To: Amontello@saratogahospital.org

Hi Anthony,

I have included the original email I sent off when I reported the incident and responses I got.

I have included PDF files outlining the incidents. They include detailed accounts of the incidents as well as any relevant screen shots. I sent the attachments to patient relations at Glens Falls hospital, Albany Med, Malta Med emergent care and Saratoga hospital.

The harassing messages (attached) from Christine Calistri happened after I reported the incident the first time, so clearly, nothing was done to remedy the situation since the retaliation from her only got worse. Had the reported incident been taken seriously, it would not have escalated.

The massive privacy violations that the chief nursing officer at Glens Falls Hospital, the Chief Nursing officer at Saratoga Hospital, and all involved at Malta Med Emergent care committed need to be addressed. The illegal actions of Christine Calistri need to be addressed. The fact that nothing has been done about this, nor has any attempt been made by any of the entities involved to make this right with me is astounding.

I have included recordings of all of the interactions I had with all parties involved, as well as all documentation, screen shots, etc.

Please confirm that you have received this email and that all of the attachments are accessible on your end. If I have not received confirmation within 2 business days, I will assume that this email has not been received and will proceed appropriately.

If you have any further questions or need clarification on anything, please let me know.

Thank you,

Tara Rule.

--
RuleArts&Productions
(518) 450 3868
www.tararule.com

---

**6 attachments**

 Tara Rule <ruleartsandproductions@gmail.com>

---

**Tara Rule - Requested Info**

---

**Montello, Anthony** <AMontello@saratogahospital.org>         Mon, Oct 24, 2022 at 8:40 AM
To: Tara Rule <ruleartsandproductions@gmail.com>

Hi Tara,

I received your e-mail and have sent it to appropriate management. Thank you!

Anthony J Montello (AJ)

**Patient Relations Professional**

Quality Support Services

 ALBANY MED Health System

**Saratoga Hospital**



P: 518-580-4182 F: 518-580-4278 E: amontello@saratogahospital.org

**From:** Tara Rule <ruleartsandproductions@gmail.com>
**Sent:** Sunday, October 23, 2022 6:43 PM
**To:** Montello, Anthony <AMontello@saratogahospital.org>
**Subject:** Tara Rule - Requested Info

f:1747666163470786831
Gmail - Tara Rule - Requested Info                                                                    11/21/23, 5:58 PM

 **Gmail**                                    Tara Rule <ruleartsandproductions@gmail.com>

## Tara Rule - Requested Info

**Montello, Anthony** <AMontello@saratogahospital.org>              Tue, Oct 25, 2022 at 9:25 AM
To: Tara Rule <ruleartsandproductions@gmail.com>

Good morning,

You should have a response to these concerns within thirty days. This is following our CMS guidelines.

[Quoted text hidden]



Tara Rule <ruleartsandproductions@gmail.com>

## Harassment, threats, intimidation, and disclosure of PHI from your staff.

**Tara Rule** <ruleartsandproductions@gmail.com>    Wed, Dec 14, 2022 at 11:35 PM
To: "Montello, Anthony" <Amontello@saratogahospital.org>

| 📄 **IMG_6428.PNG** |
|---|
| 📄 **IMG_6434.jpg** |
| 📄 **IMG_6443.PNG** |
| 📄 **IMG_6444.PNG** |
| 📄 **IMG_6446.jpg** |
| 📄 **IMG_6450.PNG** |
| 📄 **IMG_6453.PNG** |
| 📄 **IMG_6459.PNG** |
| 📄 **IMG_6460.PNG** |

Hi Anthony,

I see that somehow your establishment concluded that no HIPAA violations occurred despite a nurse practitioner contacting my boyfriend on social media and disclosing my PHI. Despite including screenshots and recordings, your establishment said no violations occurred, so I don't expect much to come of this, however - I am now being threatened by your Patient Account Representative on a public forum saying I am lying about my experience with your hospital, ruining lives for money and clout.

She has threatened me and told me she will deal with this with me "personally" and that she knows my information because she works at Malta Med Emergent Care. She also threatened to call the police on me for reasons I don't understand since she is literally harassing me on my own social media page, and disclosing my PHI. I don't know her, never met her, and she sought ME OUT on social media. I have included screenshots. Having your staff threaten a disabled woman with the police is disgusting. Why are you letting them get away with this? Why are you complicit with the repeated illegal activities, retaliation, threats, and intimidation against a disabled woman?

You need to get your employees under control. This is ridiculous. Fix this. Make this right. I've included screenshots.

Seriously, you guys need to do the right thing for once. This whole experience is absolutely disgusting.

If I do not receive a confirmation email within 48 hours, I will try once more before pursuing other options that I should have honestly pursued a long time ago. Everything your organization is doing is against the law. We both know just how illegal this all is. Your hospital can say all it wants that it didn't do anything wrong, but we both know that's not how the law works.

FIX. THIS.

I have also included the audit trail for your review, it clearly shows Glens Falls hospital LOOKED ME UP ON SOCIAL MEDIA and then called YOUR HOSPITAL looking for me and had Lisa West call Malta Med to have me thrown out.

 Gmail                                    Tara Rule <ruleartsandproductions@gmail.com>

## Harassment, threats, intimidation, and disclosure of PHI from your staff.

**Tara Rule** <ruleartsandproductions@gmail.com>                    Mon, Dec 19, 2022 at 8:09 PM
To: "Montello, Anthony" <Amontello@saratogahospital.org>

Second attempt

[Quoted text hidden]

 **Thown out of Malta Med (full recording up until I got to my car).m4a**
3441K

# EXHIBIT F 1



**ALBANY MED** Health System

**Malta Med Emergent Care**

October 3, 2022



Dear Ms. Rule,

Our mission at Malta Med Emergent Care is to serve the people of our community by responding to their healthcare needs in a supportive and caring environment. This letter is in response to a communication we received from you regarding concerns you had with a provider during a visit to our facility on September 21, 2022.

I appreciate you bringing these concerns to our attention. We take pride in our professionalism, and it is very important to us that you know you may continue to trust us, not only as health practitioners but as working professionals who are passionate about caring for our patients.

We let ourselves down on September 21—and more importantly, we let you down.

Please know we truly value your feedback, as it has helped us identify opportunities for education and improvement. Should you have additional questions, I encourage you to reach out.

Respectfully,

*Richard P. Falivena, DO, MPH*

**Richard P. Falivena, DO, MPH**
VP, Chief Medical & Physician Integration Officer

You may appeal our response by contacting the Patient Representative at 518.580.4182, who will coordinate further review and response. You may also share this matter with the New York State Department of Health. If you are a Medicare patient and have a concern about your care or discharge, you may reach out to Livanta, a Beneficiary and Family Centered Care Quality Improvement Organization.

New York State Department of Health
Centralized Hospital Intake Program
Mailstop: CA/DCS
Empire State Plaza
Albany, NY 12237
1.800.804.5447
https://apps.health.ny.gov/surveyd8/facility-complaint

Livanta, LLC.
BFCC-QIO Area 10
10820 Guilford Rd., Ste 202
Annapolis Junction, MD 20701-1105
1.877.588.1123

# **EXHIBIT G 1**



Tara Rule <ruleartsandproductions@gmail.com>

---

## **Rule v Albany Med Health System - Case #10221187**

---

**Ginsburg, Meghan (DHR)** <Meghan.Ginsburg@dhr.ny.gov>                    Mon, May 1, 2023 at 4:42 PM
To: "ruleartsandproductions@gmail.com" <ruleartsandproductions@gmail.com>

Good afternoon,

I have been assigned to investigate this complaint and I am currently reviewing the materials in the file. If I need additional information, I will reach out to you.

I did notice that you have CCed an attorney, Michael T. Horan, in some correspondence with the Division. We have not received a Notice of Appearance from Mr. Horan indicating that he is representing you in this matter before the Division. The Division is unable to contact or communicate with an attorney on your behalf, unless we receive a Notice of Appearance from that attorney stating that they are representing you in this matter. If you wish to have Mr. Horan correspond with the Division as your attorney with respect to this complaint, please ask him to send a Notice of Appearance to my attention. Thank you.

Regards,

**Meghan Ginsburg**

**Human Rights Specialist 2**

*she/her/hers*

**New York State Division of Human Rights**

Empire State Plaza, Agency Bldg. 1, 2nd Fl.

PO Box 2049

Albany, NY 12220

P: (518) 473-8709 | F: (518) 473-2955

 Gmail                                              Tara Rule <ruleartsandproductions@gmail.com>

## Rule v Albany Med Health System - Case #10221187

**Tara Rule** <ruleartsandproductions@gmail.com>                        Fri, Jun 23, 2023 at 3:26 PM
To: "Ginsburg, Meghan (DHR)" <Meghan.Ginsburg@dhr.ny.gov>

Thank you for the update and getting back to me so quickly.
I do have a couple of questions :

1. Will I be informed of the outcome of the investigation?
2. Is there a ballpark timeline for how long the remainder of the investigation will take?
3. Do I need to wait for the investigation to be completed in order to pursue legal action against the hospital/individuals involved?
4. Do I need to inform you or anyone else involved in the investigation that I have begun legal proceedings?

Thank you so much!
[Quoted text hidden]

Gmail - Rule v Albany Med Health System - Case #10221187                     11/21/23, 5:30 PM

 Gmail

Tara Rule <ruleartsandproductions@gmail.com>

## Rule v Albany Med Health System - Case #10221187

**Ginsburg, Meghan (DHR)** <Meghan.Ginsburg@dhr.ny.gov>            Fri, Jun 23, 2023 at 3:56 PM
To: Tara Rule <ruleartsandproductions@gmail.com>

Hi Tara,

I'm happy to answer these questions to the extent I can.

1. Yes, you will absolutely be informed of the outcome. The Regional Director is the person who ultimately makes the determination on each case, and the determination will be sent to all parties by mail. The determination will either be that the investigation revealed sufficient evidence to find probable cause that you may have experienced unlawful discrimination, in which case the complaint would proceed to a public hearing with an Administrative Law Judge; or, if the investigation does not reveal sufficient evidence to find probable cause, the complaint would be dismissed for lack of probable cause.

2. I can't give you a specific timeframe, because the timing of the Regional Director's determination depends to a large degree on our current caseload and capacity; we are currently handling a backlog of complaints but we are steadily working through each case. I wouldn't want to give you a ballpark only to find that the determination wouldn't actually be ready by that date.

3. As a neutral party, I'm not able to provide you (or anyone) with any legal advice. But the answer to this question would be that it depends on what legal action you might be talking about. When you filed your complaint here with the Division, you elected a remedy under the Human Rights Law. This means you cannot file a separate discrimination claim based on these same events in state court, under the Human Rights Law. There is a procedure where you could choose to annul this complaint with the Division and file in state court instead, and I can answer questions about that if you like. But you can't do both at the same time under the Human Rights Law. If you believe you may have some other claim that doesn't fall under the Human Rights Law, or if you have questions about what other legal action you may be able to take, I would suggest that you consider consulting with an attorney. While we can't recommend specific attorneys, we can suggest that you contact the County bar association for the county in which you live.

4. Possibly, depending on the nature of the legal proceeding. Like I said in #3, you can't file two discrimination claims under the NYS Human Rights Law with both the Division, and in state court, at the same time. If you do want to file a discrimination claim in state court, please let me know and I can talk through the annulment process with you, which would allow you to annul this complaint and file a new claim in state court.

 Gmail

Tara Rule <ruleartsandproductions@gmail.com>

## Rule v Albany Med Health System - Case #10221187

**Ginsburg, Meghan (DHR)** <Meghan.Ginsburg@dhr.ny.gov>             Mon, Jun 26, 2023 at 2:01 PM
To: Tara Rule <ruleartsandproductions@gmail.com>

Hi Tara,

I can certainly get the annulment process started if that's what you want. As I mentioned in our phone conversation, there will be a 15-day notice period during which you can change your mind. If you annul this complaint, you can then pursue your Human Rights Law claim in state court, against the same entities. As we tell anyone considering an annulment, we suggest that you consider consulting with an attorney before filing in state court to make sure you understand the procedure and your rights.

In order to request an annulment, I just need you to submit a letter (or email) which includes the following information and confirmation from you:

Case Name: Tara Lyn Rule v Albany Med Health System; Dr. Jonathan Braiman

Case #10221187

I request to annul my complaint, in order to file a claim in state court.

Once I have that confirmation in writing from you, I will send you the 15-day notice. At any point during that 15-day period, you can let me know if you change your mind about annulment. Otherwise, after 15 days, the Division will issue an annulment, which will be sent to all parties.

[Quoted text hidden]

 Gmail

Tara Rule <ruleartsandproductions@gmail.com>

## Rule v Albany Med Health System - Case #10221187

**Ginsburg, Meghan (DHR)** <Meghan.Ginsburg@dhr.ny.gov>    Mon, Jun 26, 2023 at 12:56 PM
To: Tara Rule <ruleartsandproductions@gmail.com>

Hello Tara,

Attached please find the combined PDF of your complaint. Let me know if you have further questions.

Regards,

**Meghan Ginsburg**

**Human Rights Specialist 2**

*she/her/hers*

**New York State Division of Human Rights**

Empire State Plaza, Agency Bldg. 1, 2nd Fl.

PO Box 2049

Albany, NY 12220

P: (518) 473-8709 | F: (518) 473-2955

www.dhr.ny.gov | meghan.ginsburg@dhr.ny.gov

*This transmission and its attachments may contain confidential or privileged information which is intended for use by the*

**NEW YORK STATE | Division of Human Rights**

**KATHY HOCHUL**
Governor

**MARIA L. IMPERIAL**
Commissioner

June 26, 2023

*Via email only to ruleartsandproductions@gmail.com*
Tara Lyn Rule
PO Box 123
Round Lake, NY 12151

> Re:    Tara Lyn Rule v. Albany Med Health System, Dr. Jonathan Braiman
>        Case No. 10221187

Dear Tara Lyn Rule:

The Division has received your request to dismiss your complaint and annul the election of remedies so that your Human Rights Law claim may be pursued in court.

**Where a complaint is dismissed on the grounds that the election of remedies is annulled, any subsequent Human Rights Law action must be brought in state court within three years from the original date that the discrimination occurred.**

The Human Rights Law provides that where a case is dismissed on the grounds that the complainant's election of remedies is annulled, there is no tolling of the statute of limitations for the period of time that the complaint has been at the Division. The party's right to bring a lawsuit in court is limited by the statute of limitations in effect at the time the complaint was initially filed with the Division. See, Human Rights Law (Executive Law, Art. 15)  The statutes of limitations for bringing a Human Rights Law claim in state court is three years. *Murphy v. American Home Products Corp.*, 58 N.Y.2d, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983).

Please also note that Human Rights Law limits the exception to the tolling of the statute of limitations to those cases which are dismissed on the grounds that the complainant's election of remedies is annulled. There is no similar restriction if the complaint is dismissed for untimeliness or for administrative convenience. Where a complainant intends to pursue Human Rights Law claims in connection with federal anti-discrimination remedies, in federal or state court, an administrative convenience dismissal may be requested from the Division.

If you have any questions about these matters, you may wish to consult with an attorney. Although by this notice you are informed of pertinent aspects of the Human Rights Law, the Division cannot advise you as to the appropriate course of action for you to take with regard to a requested dismissal of your case. You may, of course, continue your case at the Division.

# EXHIBIT H 1



Glens Falls Hospital
102 Park St
Glens Falls, NY 12801-4403

| Patient: | **RULE, TARA** | | |
|---|---|---|---|
| MRN: | | Admit: | 9/14/2022 |
| Account#: | | Disch: | 9/14/2022 |
| DOB/Age/Sex: | 991    31 years    FEMALE | Admitting: | |
| Location | Neurology; Exam Room 01 | Attending: | BRAIMAN MD,JONATHAN |
| Race: | WHITE | Ethnicity: | NOT OF SPANISH/HISPANIC ORIGIN |

### Allergies

| Substance | Allergy Type | Reaction Symptom |
|---|---|---|
| LaMICtal | Allergy | |
| Trileptal | Allergy | |

### Progress Notes

DOCUMENT NAME:          Progress Note-Nurse
SERVICE DATE/TIME:       9/14/2022 13:08 EDT
RESULT STATUS:           Modified
PERFORM INFORMATION:

**Addendum by Girard RN, Betty J on September 22, 2022 9:31 EDT**
Aimovig approved from 9/14/22-12/13/22.
CVS Pharmacy states Aimovig is ready for pick up; pharmacy tech states they will notify Pt that med is ready or Pt will be notified automatically by the pharmacy computer system that med is ready.

Received approval letter from                                    my
meds.

Report ID:  164979879          Page 1 of 23          Print Date/Time:  11/18/2022 12:59 EST

# EXHIBIT I 1

Triage - Patient Contact Message

| | | |
|---|---|---|
| riage#: ▆ | Ref    : Tara L Rule | Acct#: ▆  DOB: ▆ 1991 |
| or   : MANGONA,NICHOLE L | Status: Closed | Ph#:( ▆ c#:(518)-450- |
| eason : PT QUES | Rating: 1 Normal | Wk#:( )- - Ext: |
| ubject: PT QUESTIONS | | |

*10/21/22 (Fri Oct 21) 07:34 AM  Melissa Rumpf*
Tara and I both have appointments with you onWednesday 11/2.  She continues to suffer
from extreme cluster headaches.  She stilll does not have a neurologist.  Is it possible (prior
to her appointment) to send a referral to Dr. Jackson (neurologist) at the Saratoga Headache
Center, 7 Southsid eDr, Clifton Park 12065  518 709-0005.  I have already had Ellis send her
neuro reports, I have past scans to hand them, they just need the referral.  Thank you for
your consideration.

PS I am doing better ev. day.  Steroids are handling the autoimmune response.

*10/21/22 (Fri Oct 21) 07:34 AM  Melissa Rumpf*
*Sent to Marc D Price*

*10/21/22 (Fri Oct 21) 09:03 AM  Betsy Loika*
Referral: 10/21/23 - Loika, B Physician Assistant (Ref To Saratoga)

*10/21/22 (Fri Oct 21) 09:03 AM  Betsy Loika*
orwar▆▆▆▆▆▆▆▆ Rumpf

*10/21/22 (Fri Oct 21) 11:37 AM  Melissa Rumpf*
ferral faxed

*10/21/22 (Fri Oct 21) 01:58 PM  Nichole L Mangona*
Dr.Jackson called to speak regarding this pt. He asked for either Betsy or Dr.Price. He gave
me his cell number 646-957-7648. He said you can call him on that he would just like to
discuss this pt.
*10/21/22 (Fri Oct 21) 01:58 PM  Nichole L Mangona*
*Forwa▆▆▆▆▆ to Betsy Loika*

*10/26/22 (Wed Oct 26) 07:59 AM  Betsy Loika*
Dr. Jackson is not taking on this patient he believes her case isn't qualified for their care.
Therefore, please advise patient or her mother she would need to go to a different
Neurologist. Also per Dr. Price and Dr. Carle, we will be unable to give Tara any controlled
medications through this office if she returns. She will need to get this through psychiatry,
sleep center if it deals with her sleeping issues, neurologist.
*10/26/22 (Wed Oct 26) 07:59 AM  Betsy Loika*
*Forwarded to Nichole L Mangona*

*10/27/22 (Thr Oct 27) 11:47 AM  Nichole L Mangona*
lmtcb

*11/01/22 (Tue Nov 1) 11:50 AM  Nichole L Mangona*
Pt has an appt on Nov 2nd with Betsy will be discussed then.
*11/01/22 (Tue Nov 1) 11:50 AM  Nichole L Mangona Closed*

10/24/22, 3:55 PM                    AdvancedFax™
10/24/22 11:00 AM    SaatleMedicineMalta            P 1/7

Oct.25.2022 12:01 PM   Saratoga Headache Center          5182802275

**Dr. Richard Jackson,** Dr. Konstantin Timofeev, William Owens, PA       **SARATOGA**
                                                                          HEADACHE CENTER

**Saratoga Headache Center**              **Saratoga Neurology Specialists**
7 Southside Dr. Suite 206                 3 LearJet Ln. Suite 203
Clifton Park, NY 12065                    Latham, NY 12110
P: 518-709-0005                           P: 518-250-5154
F: 844-907-2966                           F: 844-907-2966

# Fax Cover Sheet

To: Betsy Loika, PA          From: SHC
Fax: 518/899-5395            Pages:
Phone:                       Date:
RE: Tara Rule                CC:
      DoB 4/7/91

Urgent_____ For Review_____ Please comment_____ Please Reply_____

Referral reviewed by provider.
Not an appropriate referral for
this practice.
            Thank you

                                    OK

# **EXHIBIT J 1**



FAMILY MEDICINE OF MALTA
2299 ROUTE 9
MECHANICVILLE, NY 12118-3024

December 15, 2022

Carol Rule
5227 Lake Road
Galway, NY 12074

Dear Ms. Rule ,

It is with regret that this letter serves to officially inform you that Family Medicine of Malta will no longer be able to provide medical care for you at this time. We will continue to provide you with medication as well as urgent medical care for the next thirty (30) days, during which time you must find and transition your medical care to another physician. So that there is no delay in your future health care, we will be happy to send or fax copies of your medical records, free of charge, to either you or your new physician once a signed medical release is received by this office. To find a list of eligible physicians in your area who participate with your insurance plan, please contact your health insurance company.

Sincerely yours,

Electronically signed by Loika, Betsy, PA on 12/15/2022 at 10:52 am

Betsy Loika, PA-C

Electronically signed by Marc D.Price, DO on 12/15/2022 at 5:09 pm

FAMILY MEDICINE OF MALTA
2299 ROUTE 9
MECHANICVILLE, NY 12118-3024

December 15, 2022

Tara L. Rule
8 Saratoga Ave
Round Lake, NY  12151

Dear Ms. Rule ,

It is with regret that this letter serves to officially inform you that Family Medicine of Malta will no longer be able to provide medical care for you at this time.  We will continue to provide you with medication as well as urgent medical care for the next thirty (30) days, during which time you must find and transition your medical care to another physician.  So that there is no delay in your future health care, we will be happy to send or fax copies of your medical records, free of charge, to either you or your new physician  once a signed medical release is received by this office.  To find a list of eligible physicians in your area who participate with your insurance plan, please contact your health insurance company.

Sincerely yours,

Electronically signed by agent of provider: Marc D Price on 12/15/2022 at  5:10 pm
Betsy Loika PA-C

Electronically signed by Marc D.Price, DO on 12/15/2022 at  5:10 pm