**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

TARA RULE,

                                    Plaintiff,                    1:23-cv-01218 (BKS/CFH)

v.

JONATHAN BRAIMAN, DONNA KIRKER,
LISA WEST, CHRISTINE CALISTRI (TOWERS),
ALBANY MED HEALTH PARTNERS (SYSTEMS),
GLENS FALLS HOSPITAL, SARATOGA HOSPITAL,
MALTA MED EMERGENT CARE,
                                    Defendants.

_____

**Appearances:**

_Plaintiff Pro Se:_
Tara Rule
Round Lake, New York 12151

_For Defendant Jonathan Braiman:_
Michael J. Murphy
Barclay Damon LLP
80 State Street
Albany, New York 12207

_For Defendants Lisa West and Christine Calistri:_
Karen A. Butler
Maynard, O'Connor, Smith & Catalinotto, LLP
6 Tower Place
Albany, New York 12203

_For Defendants Albany Med Health System, Glens Falls Hospital, Saratoga Hospital,_
_Healthcare Partners of Saratoga Ltd. (dba Malta Med Emergent Care), and Donna Kirker:_
Michael D. Billok
Rebecca J. LaPoint
Bond, Schoeneck & King, PLLC
268 Broadway, Suite 104
Saratoga Springs, New York 12866

Hon. Brenda K. Sannes, Chief United States District Judge:

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

This action stems from Plaintiff pro se Tara Rule's September 14, 2022 appointment with

Defendant Dr. Jonathan Braiman in the neurology department of Glens Falls Hospital and

September 21, 2022 visit to Defendant Malta Med Emergent Care ("Malta Med"). (Dkt. No. 45).

Plaintiff brings this action against Defendants Dr. Braiman, Donna Kirker, Lisa West, Christine

Calistri,[1] Albany Med Health Partners ("Albany Med"), Glens Falls Hospital, Saratoga Hospital,

and Malta Med Emergent Care ("Malta Med"), and alleges: (1) sex, age, and disability

discrimination and retaliation in violation of the Patient Protection and Affordable Care Act

("ACA"), 124 Stat. 260, 42 U.S.C. § 18116 (First Cause of Action); (2) denial of a public

accommodation, in violation of Title II of the Civil Rights Act (Second Cause of Action); (3) age

discrimination in violation of the Age Discrimination Act of 1975, 42 U.S.C. §§ 6101–6107

(Third Cause of Action); (4) a violation of the Patient Self-Determination Act, 42 U.S.C. §

1395cc(f) (Fourth Cause of Action); (5) false statements relating to health care, in violation of 18

U.S.C. § 1035 (Fifth Cause of Action); (6) a violation of the Health Insurance Portability and

Accountability Act of 1996 ("HIPAA"), 42 U.S.C. § 1320d et seq. (Sixth Cause of Action); (7)

violations of 18 U.S.C. §§ 371, 241, 242, and violations of the First and Fourteenth Amendments

under 42 U.S.C. § 1983 (Seventh Cause of Action); (8) a violation of the Emergency Medical

Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395dd (Eighth Cause of Action); (9)

health care fraud, in violation of 18 U.S.C. § 1347 (Ninth Cause of Action); (10) disability

discrimination, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101

---

[1] The caption of the Amended Complaint names Calistri as "Christine Calistri (Towers)." (Dkt. No. 45, at 1). As she refers to herself as "Christine Calistri" in her submissions, (*see* Dkt. No. 63-5, at 1), the Court does likewise.

2

(Tenth Cause of Action); (11) negligence (Eleventh Cause of Action); (12) negligence per se (Twelfth Cause of Action); (13) malpractice (Thirteenth Cause of Action); (14) intentional infliction of emotional distress (Fourteenth Cause of Action); (15) invasion of privacy (Fifteenth Cause of Action); (16) harassment (Sixteenth Cause of Action); and (17) negligent infliction of emotional distress (Seventeenth Cause of Action). (Dkt. No. 45). Presently before the Court are Defendants' motions to dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. (Dkt. Nos. 63, 66, 68). Plaintiff opposes Defendants' motions. (Dkt. Nos. 74, 75, 76). The motions are fully briefed. (Dkt. Nos. 77, 78, 81, 86, 87, 88). For the reasons that follow, Defendants' motions are granted in part and denied in part.

## II.    FACTS[2]

### A.    Parties

Plaintiff is a 32-year-old woman who "suffers from a disabling genetic disorder called Ehlers Danlos Syndrome (EDs) (hypermobile subtype) which causes severe pain and medical complications." (Dkt. No. 45, ¶¶ 1, 42).

Albany Med, Glens Falls Hospital, and Saratoga Hospital are "voluntary non-profit private hospital[s] that receive[] federal funding and accept[] federal Medicare and state Medicaid" located, respectively, in Albany, Glens Falls, and Saratoga Springs, New York. (Dkt. No. 45, ¶¶ 4–6). Albany Med owns Glens Falls Hospital, Saratoga Hospital, and Malta Med. (*Id.* ¶¶ 3, 7, 9).

---

[2] The facts are drawn from the Amended Complaint and the attached exhibits. The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations, *see Lynch v. City of New York*, 952 F.3d 67, 74–75 (2d Cir. 2020), but does not accept as true the legal conclusions, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court declines to consider the exhibits Defendants have filed in support of their motions to dismiss. *See Palin v. New York Times Co.*, 940 F.3d 804, 810–11 (2d Cir. 2019) (explaining that when matters outside the pleadings are presented and are not "integral" to the complaint or subject to judicial notice, Rule 12(d) "presents district courts with only two options: (1) 'the court may exclude the additional material and decide the motion on the complaint alone' or (2) 'it may convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material'" (quoting Fed. R. Civ. P. 12(d))).

As to the individual Defendants, Dr. Jonathan Braiman, is a neurologist in the Department of Neurology at Glens Falls Hospital. (*Id.* ¶ 2). Donna Kirker, MS, RN, NEA-BC, Dr. [] Braiman's superior [and] is the Sr. Vice President/Patient Services and Chief of Nursing at Glens Falls Hospital." (*Id.* ¶ 5). "Lisa West is the Administrative Director of Emergency Services" and "Chief Nursing Officer" at Saratoga Hospital." (*Id.* ¶¶ 6, 83). Christine Calistri "is a nurse practitioner employed by Malta Med." (*Id.* ¶ 8).

**B.      September 14, 2022 – Neurologist Jonathan Braiman, M.D.**

On or about September 14, 2022, Plaintiff was seen by Dr. Braiman for a "comorbid condition to EDS known as cluster headaches." (*Id.* ¶¶ 2, 42–43, 45). Plaintiff and Dr. Braiman "discussed in detail current medications, medication allergies, past failed treatments for cluster headaches, EDS, and comorbid conditions." (*Id.* ¶ 46). "Dr. Braiman informed the Plaintiff that safe, effective treatments were available for cluster headaches, however he could not prescribe them to the Plaintiff, claiming that her health insurance company would not cover any treatments that . . . have the potential to cause birth defects." (*Id.* ¶ 47). Plaintiff responded that her insurance company fully covered . . . the treatment her rheumatologist had prescribed for her autoimmune condition, including Cellcept, Mycophenolate, and Motefil, "and that these treatments" could cause birth defects. (*Id.* ¶ 48). As Dr. Braiman "looked up the side effects Cellcept can have on a fetus and read them aloud," Plaintiff began recording.[3] (*Id.* ¶ 51). Dr. Braiman asked Plaintiff what she would do in the event of a pregnancy and Plaintiff responded that "she would have to get an abortion." (*Id.* ¶ 52). Plaintiff explained that her genetic doctor told her that pregnancy carried a high risk of complications, that there was a "high likelihood of passing the disorder onto offspring," and that it was impossible to test a fetus for EDS. (*Id.* ¶ 52).

---

[3] Plaintiff has submitted the recording as Exhibit U to the Amended Complaint. (Dkt. No. 45, ¶ 51).

Dr. Braiman responded that there were "scans and tests" for birth defects, "but its trickier now with the way things are going" and that Plaintiff "should 'think deeply' . . . about her current medication regimen . . . due to its potential for birth defects, as well as her decision to terminate a non-consensual pregnancy." (*Id.* ¶ ¶ 54–55). Dr. Braiman also told Plaintiff that "she would need to bring her (male) partner in on the conversation regarding her medical care and treatment." (*Id.* ¶ 56). Plaintiff stated that "her partner had a vasectomy and that pregnancy wasn't a concern." (*Id.* ¶ 57). When Plaintiff asked Dr. Braiman whether the "treatments he was unwilling to prescribe would be safe and effective for those who have gone through menopause and hence were no longer of childbearing age," he replied "Yeah, they would be." (*Id.* ¶ 58). When Plaintiff then asked Dr. Braiman whether "the only reason" he would not prescribe Plaintiff "these treatments" was because she "could get pregnant?" Dr. Braiman asked about her sleep. (*Id.* ¶ 58). "Dr. Braiman . . . refused to tell the Plaintiff the names, risks, and benefits of all available treatments." (*Id.* ¶ 59). "Dr. Braiman suggested a number of off-label treatments that, as the Plaintiff had already discussed with Dr. Braiman, she had already tried and failed." (*Id.* ¶ 61). "Dr. Braiman informed the Plaintiff that he would not be willing to prescribe any medication to her that had the potential to cause birth defects." (*Id.* ¶ 66).

"On September 15, 2022, Plaintiff made a formal complaint to the Glens Falls Hospital Patient Relations." (*Id.* ¶ 72). Plaintiff does not detail the content of her "formal complaint."[4]

---

[4] In a letter to Plaintiff dated November 18, 2022, Sean Bain, MD, Glen Falls Vice President and Chief Medical Officer responded: "I understand your experience with our hospital has caused you great concern. It is always our goal to ensure patients are treated with dignity, respect and compassion, and I am sorry that we fell short of your expectations." (Dkt. No. 45, at 110). Dr. Bain stated that Glens Falls Hospital reviewed and investigated Plaintiff's "concerns," and that he reviewed Plaintiff's medical record and "spoke with the provider involved," and that:

> It was determined that the clinical decisions of the provider were appropriate. It is standard of care to inform patients of contraindications and side effects of specific medications . . . and it is within a provider's discretion to make prescription decisions based on this information. However, the provider does

On or about September 22, 2022, Dr. Braiman sent a Aimovig, a medication, to "Plaintiff's pharmacy without her consent or discussing the risks and benefits of the medication." (*Id.* ¶ 62). Plaintiff returned the Aimovig to the pharmacy after reading the warnings and side effects, which included "serious injury or death." (*Id.* ¶ 65).

### C.    September 21, 2022 – Malta Med Emergent Care

On September 21, 2022, Plaintiff was experiencing "complications due to the untreated cluster headaches and went to the emergency department at Malta Med Emergent Care." (Dkt. No. 45, ¶ 73). Plaintiff's "vitals . . . were dangerously out of range due to the pain of the untreated condition" and she arrived at the emergency department "crying, sweating, shaking," with "heightened blood pressure and pulse due to the pain." (*Id.* ¶ 73–74). Plaintiff was seen by Defendant Christine Calistri, a nurse practitioner. (*Id.* ¶ 75). Plaintiff received "one round of non-narcotic migraine cocktail and oxygen therapy, which did not stabilize her condition." (*Id.* ¶ 76). Calistri "ordered additional IV medications . . . as soon as Plaintiff's initial IV bag was finished." (*Id.* ¶ 77). A nurse "informed Plaintiff that she was being discharged from Malta Med Emergent Care without transfer because Glens Falls Hospital called them and told them to discharge Plaintiff for "live streaming." (*Id.* ¶ 78). When Plaintiff asked for "additional information," The nurse stated "she was not sure" and would send in Calistri. (*Id.* ¶ 79). "Plaintiff began recording on her cell phone." (*Id.* ¶ 80).

Calistri and the nurse returned to Plaintiff's room and "[a]rmed security guards walked over to the Plaintiff's room and stood outside the door in the hallway." (*Id.* ¶¶ 81–82). Calistri

---

acknowledge that there were opportunities for a more sensitive and empathetic conversation.

(*Id.*). Dr. Bain advised Plaintiff of her right to contact the New York State Department of Health or to submit a complaint to "DNV GL Healthcare." (*Id.*).

told Plaintiff that Kirker, at Glens Falls Hospital, had called Defendant Lisa West, at Saratoga Hospital, who called the Malta Med "Emergency Department Director," who called the Malta Med "Emergency Care Charge Nurse" to say that Plaintiff "was live streaming."[5] (*Id.* ¶ 83). "Plaintiff was not live streaming and denied the allegations." (*Id.* ¶ 84). When Plaintiff asked "how anyone from another hospital system would know that she was in the emergency department," Calistri said "[t]hey looked you up on the tracker" and "gave your room number" and the nurse added that "[w]e searched your name." (*Id.* ¶¶ 85–86). Calistri told Plaintiff "that live streaming in the hospital was '100% illegal.'" [6] (*Id.* ¶ 87). Plaintiff continued to deny live streaming and Calistri told Plaintiff: "I don't know what you did, and I don't really care because you're lying (about live streaming)" "[y]ou can take it up with security and our legal department." (*Id.* ¶¶ 89–90).

The "additional treatment ordered while Plaintiff was in the emergency room on September 21, 2022 were [sic] canceled immediately following the call from Defendant Lisa West, and . . . this action was signed off on by" Calistri. (*Id.* ¶ 104). Medical records from September 21, 2022 state that after the first "migraine cocktail" of Reglan, Toradol, and Benadryl, Plaintiff reported "minimal improvement" and was given additional Toradol, and that "[a]fter another hour and half [Plaintiff] reported improvement" from an 8 to a "6 out of 10" and stated "this is typical and she at this point would like to be discharged." (*Id.* at 128). Plaintiff

---

[5] "Malta Med Emergent Care's audit trail noted that Defendant Lisa West had called Malta Med Emergent Care and spoke to the Charge Nurse and the Defendant Christine Calistri and provided the Plaintiff's room number as well as instructions to ask the Plaintiff to, 'stop live streaming or to be escorted off premises.'" (Dkt. No. 45, ¶ 91; *see also* Dkt. No. 45, at 115 (nurse notes stating "Lisa West called in regards to a patient live streaming in our facility gave the patients [sic] name and room number. Writer was informed that Lisa got a call from Glens Falls who calledand [sic] Saratoga who told her the patient was live streaming was inform [sic] to encourage patient to stop live streaming or to be escorted off premises")).

[6] Neither Malta nor Albany Med had "policies regarding social media use on September 21, 2022." (Dkt. No. 45, ¶ 84).

claims this was "false and contradicted notes input to the hospital's pharmacy for additional

treatment." (Dkt. No. 45, ¶ 105 (citing Dkt. No. 45, at 124)).[7] "At the time Plaintiff was being

asked to leave the premises, Plaintiff was not stabilized and records indicate her blood pressure

and pulse were still abnormally high." (*Id.* ¶ 93 (citing Dkt. No. 45, at 111 (vital signs noted at

4:39 p.m., pulse 90 and blood pressure 140/81)).

### D. "Forged" Insurance Documents

Plaintiff was billed "for services that were never provided" at Malta Med as well as

"additional treatment that had been ordered and subsequently canceled."[8] (Dkt. No. 45, ¶ 107

(citing Dkt. No. 45, at 132 (bill from Malta Med for September 21, 2022 care)). Plaintiff's

insurance company "denied the claim due to a lack of consent forms signed by the Plaintiff."

(*Id.* ¶ 108). A "Patient Signature Page" listing the medications Plaintiff received, advises the

patient to read through before signing and states "I have read and understand the instructions

given to me by my caregivers." (Dkt. No. 45, at 134). "Verbalized" is written on the patient

signature line, and dated "9/28/22" at 6:00 p.m. (*Id.*). Plaintiff did not authorize "[t]he consent

documents" and they were "signed off by a provider whose name does not appear to be listed

anywhere within the Albany Med Health System." (Dkt. No. 45, ¶ 112).

---

[7] The "pharmacy" "notes" that Plaintiff refers to do not necessarily show a "contradiction." These "notes" are a "Discharge Report" containing an "Audit Trail of Events," and show little more than an "Order" for Benadryl at 1:50 p.m. by Calistri and "Discontinue in PHA" by "Scheduler" at 1:51 p.m., and an "Order" for Toradol by Calistri at 3:11 p.m. and "Discontinue in PHA" by "Scheduler" at 3:12 p.m.. (Dkt. No. 45, at 124). There are similar "Audit Trails" for earlier orders of Toradol and Reglan. (*Id.* at 125).

[8] Plaintiff alleges that "[i]nsurance documents . . . show that Christine Calistri" attempted to bill Plaintiff for these services and medications. (Dkt. No. 45, ¶ 107). However, as the documents Plaintiff attached as exhibits reflect that the bill was from Malta Med and contain no indication that *Calistri* was responsible for billing, (Dkt. No. 45, at 132), the Court need not accept Plaintiff's allegations as true. *See Blau v. Allianz Life Ins. Co. of N. Am.*, 124 F. Supp. 3d 161, 176 n. 7 (E.D.N.Y. 2015) ("[W]here 'the allegations of a complaint are contradicted by documents made a part thereof, the document controls and the court need not accept as true the allegations of the complaint." (quoting *Barnum v. Millbrook Care Ltd. P'ship*, 850 F. Supp. 1227, 1232–33 (S.D.N.Y. 1994)).

###### E.       Google Review and Facebook Messages

On September 21, 2022, Plaintiff's "boyfriend left a negative Google review of the facility wherein he did not mention the plaintiffs [sic] name or any identifying information."[9] (Dkt. No. 45, ¶ 95). On September 30, 2022, Plaintiff's boyfriend "received a Facebook message" from Calistri disclosing "Plaintiff's private health information." (*Id.* ¶ 96; *see also* Dkt. No. 45, at 120 (message from Calistri stating "Do you understand I was given orders by my administration to confront Tara about posting a video? I knew nothing about her history with her care in Glens Falls . . . . As Tara's nurse practitioner, I did everything I knew how to do to help her feel better."). Calistri further stated that she was receiving threats from Plaintiff's social media followers and that she feared for her children's safety. (Dkt. No. 45, at 120). On October 1, 2022, Calistri sent Plaintiff's boyfriend another Facebook message: "Since she has shared my above note that I sent to you privately and I am now getting more threats, please have her share your comments that you posted publicly on the Maltmed google reviews. It's no mystery who you are." (Dkt. No. 45, ¶ 98; Dkt. No. 45, at 121).

###### F.       Attempts to Find New Neurologist

On or about October 25, 2022, Plaintiff was denied as a new patient by Saratoga Headache Center[10] even though it was accepting new patients at the time. (Dkt. No. 45 ¶ 119). Medical contact notes indicate that on October 21, 2022, Plaintiff asked one of her providers for a referral to Dr. Jackson at Saratoga Headache and a referral was faxed that day. (Dkt. No. 45, at 178). Approximately two hours after the referral was faxed, Dr. Jackson called Plaintiff's provider "to speak regarding this pt.," and subsequently told Plaintiff's provider that he "is not

---

[9] Although Plaintiff does not identify it as such, there appears to be a screenshot of the Google review attached to the Amended Complaint. (Dkt. No. 45, at 121).

[10] Saratoga Headache Center is a partner company of Albany Med, Saratoga Hospital, and Glens Falls Hospital. (Dkt. No. 45, ¶ 119).

taking on this patient he believes her case isn't qualified for their care" and that Plaintiff "would need to go to a different neurologist." (*Id.* at 178).

December 15, 2022, Plaintiff's primary care provider, Marc Price, DO, an employee of Albany Med, "cut[] [Plaintiff] off from all medications and medical services with no legitimate reason and without notice." (Dkt. No. 45, ¶ 120). In a letter to Plaintiff dated December 15, Dr. Price wrote: "It is with regret that this letter serves to officially inform you that Family Medicine of Malta will no longer be able to provide medical care for you at this time." (Dkt. No. 45, at 181).

### G.    Damages

On September 29, 2023, Plaintiff filed the present action. (Dkt. No. 1). Plaintiff claims that the actions by Kirker, West, and Calistri in accusing her of live streaming and asking her to leave the emergency department have caused "severe emotional distress" and that Calistri "caused interpersonal struggles between the plaintiff and her boyfriend as a result of her Facebook messages which caused the plaintiff and her boyfriend serious emotional distress." (Dkt. No. 45, ¶¶ 235–36). In addition, Plaintiff "has developed PTSD," and has "experienced significant emotional and physical harm, pain and suffering, additional medical expenses as she is too afraid to go to any local hospital due to the retaliatory actions of multiple local hospital systems and frequently travels out of state for medical care." (*Id.* ¶¶ 325–26).

## III.    STANDARD OF REVIEW

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Although a complaint need not contain detailed factual allegations, it may not rest on mere labels, conclusions, or a formulaic recitation

of the elements of the cause of action, and the factual allegations 'must be enough to raise a right to relief above the speculative level.'" *Lawtone-Bowles v. City of New York*, No. 16-cv-4240, 2017 WL 4250513, at *2, 2017 U.S. Dist. LEXIS 155140, at *5 (S.D.N.Y. Sept. 22, 2017) (Nathan, J.) (quoting *Twombly*, 550 U.S. at 555). A court must accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Finally, a *pro se* plaintiff's complaint "must be construed liberally with 'special solicitude' and interpreted to raise the strongest claims that it suggests." *Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013) (quoting *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011)).

## IV.    DISCUSSION

### A.    Affordable Care Act (First Cause of Action)

Defendants move to dismiss Plaintiff's ACA claim on the grounds that it fails to allege sex or age-based discrimination and that it fails to allege retaliation for engaging in protected activity under the ACA. (Dkt. No. 63-5, at 13–16; Dkt. No. 68-4, at 16–20; Dkt. No. 66-1, at 12–13). Dr. Braiman seeks dismissal of the ACA claim against him on the ground that there is no individual liability under the ACA. (Dkt. No. 68-4, at 15–16). Defendants also seek dismissal of emotional distress and punitive damages, asserting that there is no right to recovery for such damages under the ACA. (Dkt. No. 63-5, at 16–17; Dkt. No. 68-4, at 20). Plaintiff opposes Defendants' motions. (Dkt. No. 74, at 10–11; Dkt. No. 75 at 7–9; Dkt. No. 76, at 5–7).

The ACA "outlaws discrimination" "by healthcare entities receiving federal funds" on the grounds prohibited by Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., (race, color, and national origin discrimination), Title IX of the Education Amendments of 1972,

20 U.S.C. §1681 et seq., (sex-based discrimination), the Rehabilitation Act, 29 U.S.C. § 794,

(disability discrimination), or the Age Discrimination Act of 1975, 42 U.S.C. § 6101 et seq., (age

discrimination). *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 218 (2022) (citing

42 U.S.C. § 18116). It is "beyond dispute that private individuals may sue to enforce" these

antidiscrimination statutes. *Id.* at 218 (quoting *Barnes v. Gorman*, 536 U.S. 181, 185 (2002)).

 Courts analyze ACA claims under the framework applicable to the statute corresponding

to the discrimination alleged. *See Klaneski v. Bristol Hosp., Inc.*, No. 22-cv-1158, 2023 WL

4304925, at *4, 2023 U.S. Dist. LEXIS 113107, at *9 (D. Conn. June 30, 2023) ("The Supreme

Court in *Cummings* noted that the Affordable Care Act 'incorporates the rights and remedies'

provided by the statutes it incorporates." (quoting *Cummings*, 596 U.S. at 218)). Thus, where, as

here, Plaintiff claims sex, age, and disability discrimination, the Court analyzes her claims under

the framework applicable to Title IX, the Age Discrimination Act, and the Rehabilitation Act.

*See id.* 2023 WL 4304925, at *3–4, 2023 U.S. Dist. LEXIS 113107, at *9–10 (analyzing the

plaintiff's claims for discrimination based on gender identity or expression and discrimination

based on sex under Title IX).

### 1. Individual Defendants

 Dr. Braiman seeks dismissal on the ground that individuals may not be held liable under

the Affordable Care Act. (Dkt. No. 68-4, at 15–16). The Court agrees. Indeed, there is no

individual liability under Title IX, Title VI, the Age Discrimination Act, or the Rehabilitation

Act. *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009) ("Title IX reaches

institutions and programs that receive federal funds, 20 U.S.C. § 1681(a), which may include

nonpublic institutions, § 1681(c), but it has consistently been interpreted as not authorizing suit

against school officials, teachers, and other individuals."). Further, the Affordable Care Act,

which was enacted pursuant to Congress' authority under the Spending Clause, *see Cummings*,

596 U.S. at 220 (describing the ACA as a "Spending Clause statute[]"), allows the imposition of liability on certain recipients of federal funding, *cf. Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640–41(1999) (holding that for Title IX, "enacted pursuant to Congress' authority under the Spending Clause," "[t]he Government's enforcement power may only be exercised against the funding recipient"); *see Abadi v. NYU Langone Health Sys.*, No. 21-cv-11073, 2023 WL 8461654, at *9, 2023 U.S. Dist. LEXIS 217627, at *27 (S.D.N.Y. Dec. 7, 2023) (denying amendment to include claim under ACA on grounds of futility, explaining that such claim lacks merit as it is "consistent only with claims brought against NYU Langone, not individual defendants."); *Rightmyer v. Philly Pregnancy Ctr., P.C.*, No. 23-cv-1925, 2024 WL 897983, at *3, 2024 U.S. Dist. LEXIS 35906 *7–8 (E.D. Pa. Mar. 1, 2024) (granting the individual defendants' motion to dismiss the plaintiff's ACA claim alleging racial discrimination (Title VI), noting that Third Circuit precedent held that entities, not individuals could be sued under Title VI); *Owens v. Pearl River Cmty. Coll.*, No. 21-cv-140, 2022 WL 1434651, at *11, 2022 U.S. Dist. LEXIS 81530, at *34 (S.D. Miss. May 5, 2022) ("Because Plaintiff cannot state a claim for individual liability under Title VI, Title IX, the Rehabilitation Act, or the ADA, Plaintiff cannot state such a claim under [the Affordable Care Act]."). Accordingly, to the extent Plaintiff asserts an Affordable Care Act claim against the individual Defendants, such claims are dismissed.

### 2.      Sex-Based Discrimination

Albany Med, Saratoga Hospital, Glens Falls Hospital, and Malta Med (the "Hospital Defendants")[11] move to dismiss on the ground that Plaintiff fails to allege sex-based

---

[11] The Hospital Defendants' briefing does not meaningfully address the basis for liability of the four entities Plaintiff sues: Albany Med, Saratoga Hospital, Glens Falls Hospital, or Malta Med. Accordingly, the Court addresses Plaintiff's claims against the Hospital Defendants as a collective, without considering the theories of liability under which they

discrimination, arguing that Plaintiff by her "own account," alleges that Dr. Braiman withheld treatment because of concerns regarding "medical appropriateness." (Dkt. No. 66-1, at 12). They assert that to the extent Plaintiff contends she "should have been prescribed a medication regardless of the fact that she was a woman of childbearing age, that is a question about the professional standard in that medical situation, and not a question of discrimination." (*Id.*).

The Second Circuit has held that "a complaint under Title IX, alleging that the plaintiff was subjected to discrimination on account of sex . . . is sufficient with respect to the element of discriminatory intent, like a complaint under Title VII, if it pleads specific facts that support a minimal plausible inference of such discrimination." *Doe v. Columbia Univ.*, 831 F.3d 46, 56 (2d Cir. 2016).

There may be, as the Hospital Defendants contend, a "wide range of legitimate factors" that informed Dr. Braiman's decision not to prescribe certain medications to Plaintiff. *Klaneski*, 2023 WL 4304925, at *5, 2023 U.S. Dist. LEXIS 113107, at *12. However, drawing all inferences in Plaintiff's favor, the allegations that Dr. Braiman questioned Plaintiff about what she would do in the event of a pregnancy and told her that she should "think deeply" about her current medication regimen, which included a medication that could cause birth defects, as well as any decision to terminate a pregnancy, and that she "would need to bring her (male) partner in on the conversation regarding her medical care and treatment," (Dkt. No. 45, ¶¶ 47–56), allow a plausible inference that Dr. Braiman's decision not to prescribe an otherwise appropriate medication was based on impermissible sex-based discrimination. *Cf.*, *e.g.*, *Klaneski*, 2023 WL 4304925, at *5–6, 2023 U.S. Dist. LEXIS 113107, at *12 (granting the plaintiff leave to amend

---

may be liable, such as vicarious liability, (Dkt. No. 66-1, at 26) as a "partner" of Albany Med, (*see* Dkt. No. 45, ¶ 12). Moving forward, the parties should endeavor to identify the proper Defendants for each claim.

claim that hospital pharmacy's failure to stock progesterone constituted intentional

discrimination against transgender females under the ACA, recognizing that although a "wide

range of legitimate factors likely contribute to a hospital's decision to stock particular

medications" such issues raise "factual matters that the Court should not resolve at the pleading

stage"). As the Hospital Defendants advance no arguments concerning Plaintiff's claims of age

or disability discrimination, the Court does not consider those claims at this time.

### 3.     Retaliation

The Hospital Defendants argue that the ACA does not support an independent cause of

action for retaliation and that, in any event, Plaintiff fails to allege she engaged in protected

activity. (Dkt. No. 66-1, at 12–13 (citing *Lucas by & through Lucas v. VHC Health*, No. 22-cv-

00987, 2023 WL 5615970, at *5, 2023 U.S. Dist. LEXIS 153820, at *14–15 (E.D. Va. Aug. 30,

2023)). In *Lucas*, the Eastern District of Virginia dismissed the plaintiff's claim that the

defendants retaliated against her because of her complaint of intentional discrimination, noting it

was "unaware of any case law that supports an independent cause of action under Section 1557

of the ACA for retaliation." *Lucas*, 2023 WL 5615970, at *5. However, other courts have

assumed the viability of such claims. *See*, *e.g.*, *Scott v. St. Louis Univ. Hosp.*, 600 F. Supp. 3d

956, 965 & n.2 (E.D. Mo. 2022) (applying Title IX standards to retaliation claim under the ACA,

explaining "that when a funding recipient retaliates against a person *because* he complains of sex

discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of

Title IX" (quoting *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005)). As

Defendants proffer no analysis regarding their argument, the Court declines to dismiss on this

basis at this time.

The Hospital Defendants' second argument—that Plaintiff fails to allege that her

complaint to Glens Falls Hospital following her appointment with Dr. Braiman "involved

allegations protected by the Affordable Care Act"—is more fruitful. To state a claim of retaliation under Title IX, a plaintiff must show: "(1) protected activity by the plaintiff; (2) knowledge by the defendant of the protected activity; (3) adverse . . . action; and (4) a causal connection between the protected activity and the adverse action." *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 91 (2d Cir. 2011). "A 'protected activity' 'refers to action taken to protest or oppose statutorily prohibited discrimination,' and includes a wide range of activities, like reporting discrimination, testifying in a proceeding, or otherwise participating in an investigation about discrimination." *Castro v. Yale Univ.*, 518 F. Supp. 3d 593, 611 (D. Conn. 2021) (quoting *Siuzdak v. Sessions*, 295 F. Supp. 3d 77, 96 (D. Conn. 2018)).

Here, Plaintiff alleges that on September 15, 2022 she "made a formal complaint to Glens Falls Hospital Patient Relations." (Dkt. No. 45, ¶ 72). As Plaintiff does not allege any facts about what she wrote in the complaint, and there is nothing in the response she received from Glens Falls Hospital that illuminates the nature of her complaint, (Dkt. No. 45, at 110) (recognizing Plaintiff's "concerns" and the need for a "more sensitive and empathetic conversation"), Plaintiff fails to allege facts suggesting she complained about sex-based discrimination or engaged in conduct otherwise protected by Title IX. *See Sutton v. Stony Brook Univ.*, No. 18-cv-7434, 2020 WL 6532937, at *10, 2020 U.S. Dist. LEXIS 206999, at *25–26 (E.D.N.Y. Nov. 5, 2020) (dismissing Title IX retaliation claim, explaining that the plaintiff's alleged complaints about a "personal beef" "contained no references to gender-based discrimination or sexual harassment" and thus failed to allege protected activity under Title IX); *see also*, *e.g.*, *O'Connor v. New York State Dep't of Fin. Servs.*, No. 21-cv-00828, 2022 WL 3998099, at *7, 2022 U.S. Dist. LEXIS 157933, at *18 (N.D.N.Y. Sept. 1, 2022) (finding that the plaintiff's "conclusory allegations" were "devoid of any facts that would allow an inference that Plaintiff complained of disability

discrimination" and that there was therefore "no basis to infer that Plaintiff's vague complaints constituted protected activity under the Rehabilitation Act"). Thus, Plaintiff has failed to allege facts that would allow a plausible inference that she engaged in protected activity. Accordingly, Plaintiff's retaliation claim is dismissed.

### 4.   Damages

Defendants properly argue that emotional distress and punitive damages are unavailable under the Affordable Care Act. In *Cummings v. Premier Rehab Keller, P.L.L.C.*, the Supreme Court held that "emotional distress damages are not recoverable" under the Rehabilitation Act and the Affordable Care Act, the two "Spending Clause antidiscrimination statutes" under consideration in that case. 596 U.S. 212, 230 (2022); *see also id.* at 216 (noting that punitive damages are also unavailable (citing *Barnes v. Gorman*, 536 U.S. 181, 189 (2002)). The Court reasoned that "Spending Clause legislation operates based on consent" and therefore that the "scope of available remedies" depends on whether a prospective funding recipient would have been aware that it might face such liability. *Id.* at 219–20. Because it is "hornbook law that 'emotional distress is generally not compensable in contract,'" the Court could not "treat federal funding recipients as having consented to be subject to damages for emotional distress," and such damages therefore are not recoverable under the Rehabilitation Act and ACA. *Id.* at 221–22 (citation omitted). Accordingly, Plaintiff's claims for emotional distress and punitive damages under the ACA are dismissed.

### B.   Title II of the Civil Rights Act and Title IX (Second Cause of Action)

Dr. Braiman and the Hospital Defendants move to dismiss Plaintiff's Second Cause of Action, which, read liberally, appears to allege a claim under Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a and Title IX. (Dkt. No. 45, at 23–31). Plaintiff opposes Defendants' motion. (Dkt. No. 76, at 7–14).

### 1.    Title II of the Civil Rights Act of 1964

Title II of the Civil Rights Act of 1964 provides: "All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation . . . without discrimination or segregation on the ground of race, color, religion, or national origin." 42 U.S.C. § 2000a(a). However, Plaintiff fails to allege discrimination based on race, color, religion, or national origin. And to the extent Plaintiff seeks to assert a discrimination claim based on sex, Title II is inapplicable. *See Antonetti on Behalf of C.J.A. v. Dave & Busters 42nd St. Times Square*, No. 23-cv-0101, 2023 WL 1869012, at \*4, 2023 U.S. Dist. LEXIS 22487, at \*8–9 (S.D.N.Y. Feb. 6, 2023) (finding the plaintiff's Title II claim fails "because Title II, by its own terms, does not protect against gender discrimination") (collecting cases). Accordingly, Plaintiff's Title II claim is dismissed.

### 2.    Title IX

The Hospital Defendants assert that to the extent Plaintiff asserts a claim of sex-based discrimination under Title IX, it must be dismissed because Plaintiff fails to allege she experienced any discrimination in connection with an educational institution. (Dkt. No. 66-1, at 14–15 & n.4). Plaintiff opposes dismissal. (Dkt. No. 76, at 7).

"A threshold issue" in any Title IX case is whether the defendant "is 'an education program or activity receiving Federal financial assistance.'" *Romero v. City of New York*, 839 F. Supp. 2d 588, 613 (E.D.N.Y. 2012) (quoting 20 U.S.C. § 1681). Thus, "in order to implicate Title IX in the first instance, an entity must have features such that one could reasonably consider its mission to be, at least in part, educational." *O'Connor v. Davis*, 126 F.3d 112, 117 (2d Cir. 1997). Here, the only conduct alleged in the Amended Complaint that could arguably fall under Title IX is Dr. Braiman's allegedly gender-based denial of prescription medicine to

18

Plaintiff on September 14, 2022.[12] According to the Amended Complaint, Dr. Braiman is

employed by the Neurology Department at Glens Falls Hospital, a voluntary non-profit private

hospital owned by Albany Med. (Dkt. No. 45, ¶ 2). Plaintiff alleges that "Albany Medical Center

and Albany Med[] provide educational programs and services as an integral part of their

mission," including "medical training, clinical education, internships, residencies, or other

educational activities," and "receives federal funding specifically for educational programs."

(Dkt. No. 45, at 27). However, the Amended Complaint is devoid of allegations that the Glens

Falls Hospital has any educational "features," *see Davis*, 126 F.3d at 117, or that Glens Falls

Hospital has any connection to the educational component of Albany Med beyond being owned

by Albany Med. *Cf.*, *Castro v. Yale Univ.*, 518 F. Supp. 3d 593, 604–05 (D. Conn. 2021) (finding

allegations that the contractual arrangement between the defendant hospital and university

"formally integrat[ed] the hospital with the university to share both staff and resources" and that

the hospital received "federal funding because of its status as a teaching hospital" were sufficient

to demonstrate hospital was subject to Title IX); *see also Gillen v. Borough of Manhattan Cmty.*

*Coll.*, No. 97-cv-3431, 1999 WL 221105, at *3, 1999 U.S. Dist. LEXIS 4862, at *8 (S.D.N.Y.

Apr. 14, 1999) (finding that because complaint did not set out the relationship between the

defendant labor union and the defendant community college or the defendant university and did

not specify "who among the Defendants would constitute a recipient of federal funds," there was

no basis to infer that the defendant labor union, which represented college/university employees,

was subject to Title IX); *Romero v. City of New York*, 839 F. Supp. 2d 588, 614 (E.D.N.Y. 2012)

(rejecting, at summary judgment, the plaintiff's argument that the defendant department was

---

[12] The Court recognizes that a plaintiff may bring a retaliation claim under Title IX. Here, however, Plaintiff fails to allege protected conduct and thus fails to state a retaliation claim.

subject to Title IX as an "agent of the city, which operates educational programs and received federal funding, explaining that there were no facts suggesting that the department's mission was educational, and that without more, the city's receipt of "federal funding and operat[ion of] educational programs or activities does not mandate a finding that all of its various departments . . . and the subdivisions of those departments . . . are subject to Title IX"). Thus, Plaintiff's Title IX claim is dismissed.

Accordingly, Defendants' motion to dismiss Plaintiff's Title IX claim (Second Cause of Action) is granted.

### C.    Age Discrimination Act of 1975 (Third Cause of Action)

Dr. Braiman and the Hospital Defendants move to dismiss Plaintiff's claim of discrimination under the Age Discrimination Act of 1975, 42 U.S.C. § 6101 et seq., on the grounds that Plaintiff has failed to allege exhaustion of administrative remedies and that the Amended Complaint fails to state a claim for relief. (Dkt. No. 68-4, at 22; Dkt. No. 66-1, at 15–17). Plaintiff opposes Defendants' motions. (Dkt. No. 75, at 14; Dkt. No. 76, at 10–14)

Section 6102 of the Age Discrimination Act prohibits discrimination on the basis of age under any program or activity that receives federal financial assistance. 42 U.S.C. § 6102. "A plaintiff alleging a claim pursuant to the Act must first exhaust administrative remedies." *Esposito v. Hofstra Univ.*, No. 11-cv-2364, 2012 WL 607671, at *4, 2012 U.S. Dist. LEXIS 2397, at *10 (E.D.N.Y. Feb. 24, 2012) (citing 42 U.S.C. § 6104(f)). Section 6104(e)(1) provides:

> When any interested person brings an action in any United States district court for the district in which the defendant is found or transacts business to enjoin a violation of this Act by any program or activity receiving Federal financial assistance, such interested person shall give notice by registered mail not less than 30 days prior to the commencement of that action to the Secretary of Health and Human Services, the Attorney General of the United States, and the person against whom the action is directed.

43 U.S.C. § 6104(e)(1); *see also* 42 U.S.C. § 6104(f) (providing that "administrative remedies shall be deemed exhausted upon the expiration of 180 days from the filing of an administrative complaint during which time the Federal department or agency makes no finding with regard to the complaint, or upon the day that the Federal department or agency issues a finding in favor of the recipient of financial assistance, whichever occurs first"). Here, Plaintiff states in her opposition papers, that "she did submit [notice], by certified and registered mail, no less than 30 days prior to the commencement of [this action] to Health and Human Services and contacted the Attorney General and the state obudsman [sic]." (Dkt. No. 76, at 10). Defendants reply that even crediting this statement, Plaintiff fails to state that notice was provided to "the person against whom the action is directed." (Dkt. No. 78, at 8 (quoting 42 U.S.C. § 6104(e)(1)). The Court agrees. Section 6104(e)(1) requires that notice be provided to "the person against whom the action is directed," and here Plaintiff fails to allege that she provided notice to Dr. Braiman or the Hospital Defendants. Accordingly, Plaintiff's Age Discrimination Act claim is dismissed. *Lipsman v. Cortés-Vázquez*, No. 21-cv-4631, 2021 WL 5827129, at *3, 2021 U.S. Dist. LEXIS 234203, at *6 (S.D.N.Y. Dec. 7, 2021) (dismissing Age Discrimination Act claim where the plaintiff "did not satisfy the notice and exhaustion requirements of the statute"); *Morales v. SUNY Purchase Coll.*, No. 14-cv-8193, 2015 WL 7430864, at *4, 2015 U.S. Dist. LEXIS 157314, at *12 (S.D.N.Y. Nov. 19, 2015) ("Without giving the required notice, Plaintiff's [Age Discrimination Act] claim is improperly filed and requires dismissal.").

### D.   Patient Self-Determination Act (Fourth Cause of Action)

Dr. Braiman, Albany Med, and Glens Falls Hospital move to dismiss Plaintiff's claim under the Patient Self-Determination Act, 42 U.S.C. § 1395cc(f) on the ground that it does not create a private right of action. (Dkt. No. 68-4, at 22–23; Dkt. No. 66-1, at 18–19). Plaintiff opposes Defendants' motion. (Dkt. No. 76, at 14–15).

The Second Circuit has instructed that a "court must 'begin [its] search for Congress's intent with the text and structure' of the statute, and cannot ordinarily conclude that Congress intended to create a right of action when none was explicitly provided." *Olmsted v. Pruco Life Ins. Co. of New Jersey*, 283 F.3d 429, 432 (2d Cir. 2002) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 288 (2001)). As the Seventh Circuit described it, the provision at issue here, Section 1395cc(f), requires that a "hospital that accepts Medicare and Medicaid payments must give an adult individual who is 'receiving medical care' as an inpatient written material explaining the rights to refuse treatment and to create an advance directive under state law." *Winfield v. Mercy Hosp. & Med. Ctr.*, 591 F. App'x 518, 519 (7th Cir. 2015) (citing 42 U.S.C. §§ 1395cc(f)(1), (2)(A)). Courts have found that no express private right of action in 42 U.S.C. § 1395cc in general, or in the written materials requirement set forth in § 1395cc(f), in particular. *Wentz v. Kindred Hosps. E., L.L.C.*, 333 F. Supp. 2d 1298, 1301, 1303 (S.D. Fla. 2004) (finding "§ 1395cc contains no express" or implied right of action); *Winfield v. Mercy Hosp. & Med. Ctr.*, 591 F. App'x 518, 519 (7th Cir. 2015) (observing that the district court found no explicit private right of action); *Asselin v. Shawnee Mission Med. Ctr., Inc.*, 894 F. Supp. 1479, 1485 (D. Kan. 1995) (noting that it had previously found that 42 U.S.C. § 1395cc(f)(1)(A) and § 1395cc(f)(2)(A) "do not afford plaintiff a private cause of action" and further finding "no implied private cause of action"). Further, Plaintiff does not argue that there is an implied private right of action under §1395cc(f), *see Olmstead*, 283 F.3d at 433 ("A strong presumption that Congress did not intend a private right of action places a heavy burden on the plaintiffs to demonstrate otherwise."), and the Court is not aware of any case finding an implied right of action, *see*, *e.g.*, *Myers v. UCSF Med. Ctr.*, No. 22-cv-07813, 2023 WL 6202065, at *5, 2023 U.S. Dist. LEXIS 169630, at *14 (N.D. Cal. Mar. 2, 2023) ("Nor has the undersigned found any

case in which a court has held that the PSDA implicitly creates a private right of action."), *report and recommendation adopted*, 2023 WL 6202063, 2023 U.S. Dist. LEXIS 172197 (N.D. Cal. June 22, 2023). Accordingly, Plaintiff's Patient Self-Determination Act claim[13] is dismissed.[14]

### E.  Federal Criminal Statutes (Fifth, Seventh, and Ninth Causes of Action)

Dr. Braiman and the Hospital Defendants move to dismiss Plaintiff's claim that they made "false statements relating to healthcare," in violation of 18 U.S.C. § 1035, (Dkt. No. 68-4, at 23–24), Kirker, West, Calistri, and Albany Med move to dismiss Plaintiff's claims under 18 U.S.C. §§ 241 (conspiracy against rights), 242 (deprivation of rights under color of law), 371 (conspiracy), (Dkt. No. 63-5, at 19–20; Dkt. No. 66-1, at 21), and Defendants Calistri, Albany Med, and Malta Med move to dismiss Plaintiff's claims under 18 U.S.C. § 1347 (health care

---

[13] The Hospital Defendants note Plaintiff's citation to "New York Public Health Law Article 29-B – Patients' Bill of Rights" under the Fourth Cause of Action in the Amended Complaint. (Dkt. No. 45, at 37–38). Plaintiff outlines the provisions of this New York law in the Amended Complaint, but does not appear to assert a cause of action under the "Patients' Bill of Rights." Nor does Plaintiff mention the "Patients' Bill of Rights" in her opposition. (*See* Dkt. No. 76). Accordingly, the Court does not read the Amended Complaint as attempting to assert such a claim.

[14] In her submissions, Plaintiff cited a number of cases that the Court and defense counsel were unable to find or verify, including "Delany v. Cade (5th Cir. 1994)," which Plaintiff cited for the proposition that the Fifth Circuit "allowed a private cause of action under the [Patient Self-Determination Act]." (Dkt. No. 75, at 14; *see* Dkt. No. 81, at 8 (Defendants explaining that "[u]pon thorough review . . . no such case exists")). To the extent Plaintiff intended to cite the Tenth Circuit case, *Delaney v. Cade*, 986 F.2d 387 (10th Cir. 1993), it offers no support for her position. Plaintiff also cited "Acosta v. Byrum (M.D. Tenn. 2008)," (Dkt. No. 45, ¶ 326), and although the Court located a case by the same name, it is not a federal district court case, but a case from the Court of Appeals of North Carolina, *Acosta v. Byrum*, 638 S.E.2d 246 (N.C. Ct. App. 2006), applying North Carolina law. Other cases Plaintiff cited in her submissions that the defense counsel or the Court were unable to locate or verify include: "Swafford v. Maricop County Public Hospital," "Tatum v. Black (1991)," "Estate of Behringer v. WCA Hospital (2013)," "Oliveira v. Providence Health System of Southern California (2004)," and Roe v. Lewisville Memorial Hospital (2008)," (Dkt. No. 45, ¶ 279); and "Zinman v. Shalala (D.N.J. 2003)," "Knepper v. Ogden Regional Medical Center (D. Utah 2006)," and "Dwyer v. American Express Co. (S.D.N.Y. 2007)," (Dkt. No. 45, ¶ 326). In any future filings Plaintiff must include a full citation of any case cited. The Court will not consider any case that is only cited with the parties' names and the date of the case; every case cite must include a citation to the reporter or online legal service, like Westlaw or LexisNexis, or the court and court case number and docket number where the case may be found. The Court notes that "ChatGPT and similar AI programs are capable of generating fake case citations and other misstatements of law." *Dukuray v. Experian Info. Sols. (Dukuray I)*, No. 23-cv-9043, 2024 WL 3812259, at *11–12, 2024 U.S. Dist. LEXIS 132667, at *29 (S.D.N.Y. July 26, 2024), *adopted by Dukuray v. Experian Info. Sols. (Dukuray II)*, 2024 WL 3936347, 2024 U.S. Dist. LEXIS 152287 (S.D.N.Y. Aug. 26, 2024). **Plaintiff is warned that any future filings "with citations to nonexistent cases may result in sanctions, such as her submissions being stricken, filing restrictions or monetary penalties being imposed, or the case being dismissed."** *Dukuray,* 2024 WL 3812259 at *12, 2024 U.S. Dist. LEXIS 132667, at *30; *see also Dukuray II*, 2024 WL 3936347, at *4, 2024 U.S. Dist. LEXIS 152287, at *12 (same).

fraud), (Dkt. No. 63-5, at 33–34; Dkt. No. 66-1, at 21). Defendants seek dismissal on the ground that there is no private right of action under the federal criminal statutes on which Plaintiff relies. (Dkt. No. 63-5, at 19–20; Dkt. No. 68-4, at 23–24; Dkt. No. 66-1, at 21). Plaintiff opposes dismissal. (Dkt. No. 74, at 11–12; Dkt. No. 75, at 14; Dkt. No. 76, at 16).

Section 1035, which criminalizes false statements relating to healthcare, does not provide a private right of action. *See Rodriguez v. Dougherty*, No. 23-cv-1542, 2024 WL 896752, at *9, 2024 U.S. Dist. LEXIS 36056, at *25 (D. Conn. Mar. 1, 2024) (dismissing the plaintiff's claim that various defendants violated his rights under several federal criminal statutes, including 18 U.S.C. § 1035, on the ground that the statutes at issue did not provide a private right of action). Plaintiff's claims based on Defendants' alleged violation of other federal criminal statutes, 18 U.S.C. §§ 241, 242, 371, 1347 likewise fail. *Dyce v. Doe*, No. 23-cv-8730, 2024 WL 1468305, at *2, 2024 U.S. Dist. LEXIS 62419, at *4 (E.D.N.Y. Apr. 4, 2024) ("To the extent that Plaintiff seeks to invoke the Court's jurisdiction by bringing her claims under 18 U.S.C. § 242 ('Section 242'), a criminal civil rights statute, she may not do so. Section 242 does not provide a private right of action." (citing *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009)); *see also Sheehy*, 335 F. App'x at 104 ("[C]laims based on the violation of federal criminal statutes, such as 18 U.S.C. §§ 241–242 . . . are not cognizable, as federal criminal statutes do not provide private causes of action."); *Hom v. Brennan*, 840 F. Supp. 2d 576, 582 (E.D.N.Y. 2011) (explaining that "[t]he law in this Circuit is clear that there is no private right action under" 18 U.S.C. § 371) (citing cases); *Graham v. Yazdani*, No. 14-cv-6020, 2014 WL 5506719, at *1, 2014 U.S. Dist. LEXIS 154428, at *3 (E.D.N.Y. Oct. 31, 2014) (finding no private right of action under 18 U.S.C. § 1347). Accordingly, Plaintiff's claim under 18 U.S.C. §§ 241, 242, 371, 1035, 1347 are dismissed.

F.    **HIPAA (Sixth Cause of Action)**

Defendants Kirker, West, Calistri, and the Hospital Defendants move to dismiss Plaintiff's HIPAA claim on the ground that HIPAA does not provide a private right of action. (Dkt. No. 63-5, at 17–19; Dkt. No. 66-1, at 18–19). Plaintiff opposes dismissal. (Dkt. No. 74, at 11; Dkt. No. 76, at 14–15). The Second Circuit has held that "HIPAA confers no private cause of action, express or implied." *Meadows v. United Servs., Inc.*, 963 F.3d 240, 244 (2d Cir. 2020). Accordingly, Defendants' motion to dismiss Plaintiff's HIPAA claim is granted.

G.    **42 U.S.C. § 1983 (Seventh Cause of Action)**

Kirker, West, Calistri, and Albany Med move to dismiss Plaintiff's claim under 42 U.S.C. § 1983, including any allegation that Defendants violated Plaintiff's First Amendment rights, on the ground that the Amended Complaint fails to allege any Defendant is a "state actor." (Dkt. No. 66-1, at 21–23). Plaintiff opposes dismissal. (Dkt. No. 74, at 13–16; Dkt. No. 76, at 16).

It is well-settled that a plaintiff alleging a violation of her constitutional rights under Section 1983 must show state action. *Fabrikant v. French*, 691 F.3d 193, 206 (2d Cir. 2012); *see also* 42 U.S.C. § 1983 (imposing liability on persons who act "under color of any [state] statute, ordinance, regulation, custom, or usage"). While private parties generally are not state actors, their conduct can be attributed to the state for Section 1983 purposes if "(1) the State compelled the conduct [the "compulsion test"], (2) there is a sufficiently close nexus between the State and the private conduct [the "joint action test" or "close nexus test"], or (3) the private conduct consisted of activity that has traditionally been the exclusive prerogative of the state [the "public function test"]." *Hogan v. A.O. Fox Mem'l Hosp.*, 346 F. App'x 627, 629 (2d Cir. 2009) (summary order) (citing *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257

25

(2d Cir. 2008)). The "fundamental question" for each test is whether the private party's conduct is "fairly attributable" to the state such that it bears responsibility. *Fabrikant*, 691 F.3d at 207.

"Under the compulsion test, private behavior becomes state action if 'it results from the State's exercise of coercive power,' or 'the State provides significant encouragement, either overt or covert.'" *Jackson v. Barden*, No. 12-cv-1069, 2018 WL 340014, at *14, 2018 U.S. Dist. LEXIS 3861, at *39 (S.D.N.Y. Jan. 8, 2018) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 296 (2001)). Here, there are no allegations that the state was involved with the activities that occurred in the emergency department at Malta Med on September 21, 2022, or thereafter. Plaintiff alleges that Kirker and West acted on their individual authority and judgment, and that Calistri acted at Kirker and West's directions and on her own authority and judgment in telling Plaintiff to stop "live streaming" and discharging Plaintiff from the emergency department. *See Sybalski*, 546 F.3d at 257–58 (pleading that the "state was involved 'with the *activity that caused the injury*' giving rise to the action" is necessary to allege state action under the compulsion test (quoting *Schlein v. Milford Hosp., Inc.*, 561 F.2d 427, 428 (2d Cir. 1977))).

"The close nexus test attributes private action to the state when there is 'a sufficiently close nexus between the State and the challenged action of the [private] regulated entity so that the action of the latter may be fairly treated as that of the State itself.'" *McGugan v. Aldana-Bernier*, No. 11-cv-00342, 2012 WL 1514777, at *5, 2012 U.S. Dist. LEXIS 60340, at *13–14 (E.D.N.Y. Apr. 30, 2012) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004, (1982)), *aff'd*, 752 F.3d 224 (2d Cir. 2014). This requirement assures "that constitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains." *Blum*, 457 U.S. at 1004. Thus, to satisfy the "'joint action test' or 'close nexus

test,'" a plaintiff must allege that "the state provides '*significant encouragement*' to the entity, the entity is a 'willful participant in *joint activity* with the [s]tate,' or the entity's functions are '*entwined*' with state policies." *Hollander v. Copacabana Nightclub*, 624 F.3d 30, 34 (2d Cir. 2010) (quoting *Sybalski*, 546 F.3d at 257). Here, however, there are no allegations that the Kirker, West, Calistri, or anyone from the Defendant Hospitals worked with state employees in connection with any interaction with, or decision they made regarding Plaintiff or her health care. *See McGugan*, 2012 WL 1514777, at *6, 2012 U.S. Dist. LEXIS 60340, at *16 (finding "no sufficiently close nexus between the state and the defendant's decisions because the private hospital did not consult or contact state employees regarding the evaluation or commitment of plaintiff nor did state officials participate in the commitment process in any way").

According to the Amended Complaint, Kirker is the senior vice president of patient services and chief of nursing at Glens Falls Hospital, a private hospital. (Dkt. No. 45, ¶ 5). West is the Administrative Director of Emergency Services at Saratoga Hospital, a private hospital. (*Id.* ¶ 6). Calistri is a nurse practitioner, employed by Malta Med, a private hospital. (*Id.* ¶ 8). Other than allegations that each hospital receives federal funding and accepts federal Medicare and state Medicaid, there are no other factual allegations connecting these Defendants to the state. *See Lagueux v. Bridgeport Hosp. Sch. of Nursing*, No. 11-cv-01933, 2013 WL 1310557, at *4, 2013 U.S. Dist. LEXIS 43211, at *12 (D. Conn. Mar. 27, 2013) ("Although the complaint contains references to federal funding received by one or more of the defendants, such funding does not demonstrate that those defendants were state actors.").

Nor has Plaintiff alleged facts establishing the applicability of the public function test. Plaintiff alleges that Defendants were acting in their capacity of as healthcare providers employed by Albany Med and its subsidiaries, that this employment "constitutes state action"

and that the provision of "essential healthcare services" are "functions traditionally reserved to the state." (Dkt. No. 45, at 51–52). In general, "a private hospital will not be considered a state actor." *Giraldo v. United States*, No. 14-cv-5568, 2015 WL 1476409, at *2, 2015 U.S. Dist. LEXIS 42746 *5 (E.D.N.Y. Mar. 31, 2015). Further, as the Second Circuit has explained, although a hospital's activities "are clearly 'affected with a public interest,' the functions performed by it have not been 'traditionally associated with sovereignty,' and have long been relegated to the private domain, rather than treated as 'traditionally the exclusive prerogative of the State.'" *Schlein*, 561 F.2d at 429 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 353 (1974)). Accordingly, Plaintiff's claims under 42 U.S.C. § 1983 are dismissed.

### H.   EMTALA (Eighth Cause of Action)

Kirker, West, Calistri, Albany Med, and Malta Med move to dismiss Plaintiff's claims under EMTALA, 42 U.S.C. § 1395dd. (Dkt. No. 63-5, at 29–33; Dkt. No. 66-1, at 19–21). Plaintiff opposes Defendants' motions. (Dkt. No. 74, at 16; Dkt. No. 76, at 15;). Kirker, West, and Calistri move for dismissal on the ground that liability under EMTALA is available against hospitals, but not against individual healthcare providers. (Dkt. No. 63-5, at 31). Albany Med and Malta Med move to dismiss on the ground that the Amended Complaint fails to state a claim for relief. (Dkt. No. 66-1, at 20–21).

#### 1.   Individual Defendants

"The purpose of EMTALA is to prevent 'patient dumping, the practice of refusing to provide emergency medical treatment to patients unable to pay, or transferring them before emergency conditions [are] stabilized.'" *Hardy v. New York City Health & Hosp. Corp.*, 164 F.3d 789, 792 (2d Cir. 1999) (quoting *Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 856 (4th Cir. 1994)). EMTALA expressly allows a patient to bring a civil suit for damages for an EMTALA violation against a "participating hospital." 42 U.S.C. § 1395dd(d)(2)(A). Here,

however, in addition to suing Albany Med and Malta Med, Plaintiff sues three of the individual Defendants: Kirker, West, and Calistri. (Dkt. No. 45, ¶ 269). Although the Second Circuit has not addressed the issue, the Fourth, Sixth, Eighth, Ninth, and Tenth Circuits have held that EMTALA does not allow a private right of action against individual physicians. *See Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 877 (4th Cir. 1992) ("Although the statute clearly allows a patient to bring a civil suit for damages for an EMTALA violation against a participating hospital, no section permits an individual to bring a similar action against a treating physician.") (internal citation omitted) (citing 42 U.S.C. § 1395dd(d)(2)(A)); *Moses v. Providence Hosp. & Med. Centers, Inc.*, 561 F.3d 573, 587 (6th Cir. 2009); *King v. Ahrens*, 16 F.3d 265, 271 (8th Cir. 1994); *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1256 (9th Cir. 1995); *Delaney v. Cade*, 986 F.2d 387, 393–94 (10th Cir. 1993); *see also Gatewood v. Wash. Healthcare Corp.*, 933 F.2d 1037, 1040 n.1 (D.C. Cir. 1991) (dicta). District courts within the Circuit have held likewise. *See Fisher by Fisher v. New York Health & Hosps. Corp.*, 989 F. Supp. 444, 448 (E.D.N.Y. 1998) ("Congress obviously considered enforcement mechanisms against participating hospitals and physicians, and chose to provide a private right of action against only hospitals, while authorizing the Secretary of Health and Human Services to proceed administratively against both hospitals and physicians.") (internal citation omitted) (citing 42 U.S.C. §§ 1395dd(d)(1), (2)(A), (2)(B)); *Hylton v. New York Methodist Hosp.*, 708 F. Supp. 2d 248, 252 (E.D.N.Y. 2009) ("There is no dispute that EMTALA is inapplicable to individual physicians."). Kirker, West, and Calistri are healthcare providers and hospital administrators, not physicians, but this is a distinction without a difference as the only defendant EMTALA, by its terms, allows an individual to sue is a "participating hospital." 42 U.S.C. § 1395dd(d)(2)(A). Thus, the EMTALA claims against Kirker, West, and Calistri are dismissed.

2.    **Hospital Defendants**[15]

The Hospital Defendants seek dismissal of Plaintiff's EMTALA claim on the ground that

Plaintiff "fails to allege facts sufficient to show she suffered from an emergency medical

condition upon arriving at Malta Med." (Dkt. No. 66-1, at 20). EMTALA "imposes two relevant

obligations on a hospital receiving an emergency patient": (1) the hospital "must provide for an

appropriate medical screening examination . . . to determine whether or not an emergency

medical condition . . . exists" ("screening requirement"); and (2) if the hospital "determines that

that an individual has an 'emergency medical condition,' it 'must provide . . . for such further

medical examination and such treatment as may be required to stabilize the medical condition,'"

("stabilization requirement"). *Perez v. Brookdale Univ. Hosp. & Med. Ctr.*, 981 F. Supp. 2d 175,

177 (E.D.N.Y. 2013) (quoting 42 U.S.C. §§ 1395dd(a)–(b)). In this case, Plaintiff alleges that the

Defendant Hospitals failed to meet the stabilization requirement: they failed to stabilize her

emergency medical condition prior to discharge, (Dkt. No. 45, ¶ 275 (alleging that Plaintiff was

"escorted off hospital premises after an [emergency medical condition] was found to exist

without first stabilizing the Plaintiff's condition or transferring the Plaintiff to another

facility")).[16]

In order to state a claim under EMTALA, a plaintiff must allege that she "went to the

emergency room of a participating hospital seeking treatment for a medical condition, and that

the hospital . . .  discharged or transferred her before such [her emergency medical] condition

---

[15] Malta Med argues that as it an emergent care center and does not provide inpatient care, it is not a hospital subject to EMTALA. (Dkt. No. 66-1, at 20–21). Whether Malta Med provides inpatient care concerns a factual matter outside the Amended Complaint. Therefore, the Court declines to consider this argument. Moreover, the Amended Complaint alleges that Plaintiff was, at some point, "inpatient at Malta Med," (Dkt. No. 45, at 76), a fact the Court must accept as true at this stage of the litigation.

[16] Plaintiff states she received a "full screening" at Malta Med. (*See* Dkt. No. 45, ¶ 280 ("Malta Med Emergent Care conducted a full screening on the plaintiff and noted a number of concerning symptoms that they deemed needed stabilization.")).

had been stabilized." *Brenord v. Cath. Med. Ctr. of Brooklyn & Queens, Inc.*, 133 F. Supp. 2d 179, 185 (E.D.N.Y. 2001) (citing *Fisher*, 989 F. Supp. at 448). Here, the Defendant Hospitals argue that Plaintiff's EMTALA claim fails because she fails to allege facts sufficient to show she suffered from an emergency medical condition. The statute defines "emergency medical condition" as "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in . . . placing the health of the individual . . . in serious jeopardy; serious impairment to bodily functions; or . . . [s]erious dysfunction of any bodily organ or part." 42 U.S.C. § 1395dd(e)(1). The Hospital Defendants argue Plaintiff's allegations that she was "crying, sweating, and shaking with a heightened pulse and blood pressure" upon arrival are insufficient to allow a plausible inference "that her health was in serious jeopardy, that her body functions were seriously impaired, or that any bodily organ or part was seriously dysfunctional." (Dkt. No. 66-1, at 20). However, in support of her claim that she was experiencing an emergency medical condition, Plaintiff also alleges that she was experiencing "complications due to the untreated cluster headaches," including pain, that her "vitals," including her blood pressure and pulse "were dangerously out of range" and "abnormally high," and that her "documented cardiovascular conditions" "including POTS (post orthostatic tachycardia syndrome) and venous insufficiency" "were discussed and documented during her visit to Malta Med." (Dkt. No. 45, ¶¶ 73–74, 93, 279). These allegations are sufficient to allege an emergency medical condition at this stage of the proceedings. As the Hospital Defendants do not otherwise challenge the merits of Plaintiff's EMTALA claim, their motion to dismiss is denied.

Accordingly, Plaintiff's EMTALA claims against Kirker, West, and Calistri are dismissed and the Defendant Hospital's motion to dismiss Plaintiff's EMTALA claims are denied.

## I.   Americans with Disabilities Act (Tenth Cause of Action)

Plaintiff alleges Dr. Braiman, Albany Med, and Glens Falls Hospital subjected her to disability discrimination in violation of Title II and Title III of the ADA. (Dkt. No. 45, ¶ 311). These Defendants move to dismiss Plaintiff's ADA claims. (Dkt. No. 66-1, at 17–18; Dkt. No. 68-4, at 24). Defendants argue that because Plaintiff, as a private individual, can only seek injunctive (as opposed to compensatory) relief under Title III of the ADA,[17] and fails to allege a "material risk of future harm," she lacks standing to pursue a claim of injunctive relief under the ADA. (Dkt. No. 66-1, at 17). Defendants further argue the Amended Complaint fails to allege disability discrimination. (Dkt. No. 66-1, at 17–18; Dkt. No. 68-4, at 24). Plaintiff opposes Defendants' motions. (Dkt. No. 75, at 14; Dkt. No. 76, at 12–14).

### 1.   Standing

"Article III, Section 2 of the Constitution limits the jurisdiction of the federal courts to the resolution of 'cases' and 'controversies.' To ensure that this bedrock case-or-controversy requirement is met, courts require that plaintiffs establish their standing as the proper parties to bring suit." *Sonterra Capital Master Fund Ltd. v. UBS AG*, 954 F.3d 529, 533-34 (2d Cir. 2020) (quoting *Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 92 (2d Cir. 2018)). To establish standing a plaintiff must demonstrate (1) an "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical," (2) "a causal connection between the injury and the conduct complaint of," and (3) redressability of the injury

---

[17] "Monetary relief, however, is not available to private individuals under Title III of the ADA." *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 86 (2d Cir. 2004))

by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations

omitted). Where "a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts

demonstrating' each element." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Warth

v. Seldin*, 422 U.S. 490, 518 (1975)). "For injunctive relief, a plaintiff has suffered an injury in

fact if the plaintiff has alleged past injury under the ADA and it is reasonable to conclude that, in

the future, the discriminatory treatment would continue and the plaintiff intended to return to the

subject location." *Woods v. Centro of Oneida, Inc.*, 103 F.4th 933, 940 (2d Cir. 2024) (internal

quotations and citation omitted).

Plaintiff appears to seek injunctive relief in the form of "[t]rain[ing] all Defendant's

current and future employees and agents" regarding "discrimination law, both state and

federal."[18] (Dkt. No. 45, at 103). Here, Plaintiff alleges that she believed she was subject to

disability discrimination by Dr. Braiman in the neurology department of Glens Falls Hospital and

that she "is afraid to go to any local hospital" and now "frequently travels out of state for medical

care." (Dkt. No. 45, ¶¶ 325–326). Liberally construing these allegations, it is reasonable to infer

that Plaintiff would continue to seek treatment outside the Glens Falls Hospital neurology

department until its staff was properly trained and the alleged discriminatory practices were

eradicated. *See Woods v. Centro of Oneida, Inc.*, 103 F.4th 933, 940 (2d Cir. 2024) (concluding

the plaintiff established standing to seek injunctive relief against public bus service under Title II

of the ADA, explaining "it is reasonable to infer that Woods will continue to be deterred as long

as Centro's transit system remains inaccessible, his alleged injury is also sufficient with respect

---

[18] As the Court finds below, however, Plaintiff wholly fails to plausibly allege disability discrimination against any
party.

to his claims for injunctive relief."). Accordingly, Defendants' motion to dismiss for lack of standing is denied.

### 2.     Individual Defendant

Plaintiff asserts her ADA claims against Dr. Braiman and the Hospital Defendants. However, as there is no individual liability under the ADA, *see MacPherson v. Eversource Energy Serv. Corp.*, No. 19-cv-01569, 2019 WL 13125523, at *3, 2019 U.S. Dist. LEXIS 241378, at *7 (D. Conn. Dec. 10, 2019) ("[M]any cases from this and other circuits have held that individuals cannot be held personally liable for damages under the ADA, regardless of which title of the ADA is at issue." (quoting *Murray v. Tanea*, 357 F. Supp. 3d 226, 230 (W.D.N.Y. 2019))), Plaintiff's ADA claims against Dr. Braiman are dismissed.

### 3.     Hospital Defendants

The Hospital Defendants move to dismiss Plaintiff's ADA claims for failure to allege disability bias. (Dkt. No. 66-1, at 17–18). "[A] plaintiff pleads an actionable claim of discrimination in the medical treatment context under the ADA . . . if she alleges that the defendants made treatment decisions based on factors that are 'unrelated to, and thus improper to consideration of' the inquiry in question." *McGugan v. Aldana-Bernier*, 752 F.3d 224, 234 (2d Cir. 2014) (quoting *United States v. Univ. Hosp.*, 729 F.2d 144, 156 (2d Cir. 1984)); *see also id.* at 231 ("[A] doctor who inflicts or withholds a type of medical treatment for reasons having no relevance to medical appropriateness—reasons dictated by bias rather than medical knowledge— is practicing the pejorative form of discrimination."). Although Plaintiff alleges disability due to Ehlers Danlos Syndrome and cluster headaches, she does not allege Dr. Braiman or any other medical provider withheld medical treatment for reasons dictated by bias on the basis of disability. Plaintiff alleges that "Dr. Braiman reportedly refused to prescribe certain treatments based solely on concerns about potential pregnancy risks, despite the plaintiff's assurances that

pregnancy was not a possibility." (Dkt. No. 76, at 13). However, pregnancy does not typically constitute a disability under the ADA. *Sam-Sekur v. Whitmore Grp., Ltd.*, No. 11-cv-4938, 2012 WL 2244325, at *7, 2012 U.S. Dist. LEXIS 83586, at *24 (E.D.N.Y. June 15, 2012) (citing *Leahy v. Gap, Inc.*, 07-cv-2008, 2008 WL 2946007, at *5, 2008 U.S. Dist. LEXIS 58812, at *14 (E.D.N.Y. July 29, 2008)). Thus, Plaintiff's disability claim fails. Accordingly, Defendants' motion to dismiss Plaintiff's claim under the ADA (Tenth Cause of Action) is granted.

### J.   Negligence (Eleventh Cause of Action) and Malpractice (Thirteenth Cause of Action)[19]

Plaintiff sues all Defendants for negligence and advances several different theories. (Dkt. No. 45, ¶¶ 315–28, 340–53). Construing the Amended Complaint liberally, it appears Plaintiff brings: (1) medical malpractice claims against all Defendants, in connection with her September 14 and 21, 2022 medical treatment, (2) a claim that Kirker, West, and Calistri breached their duty of confidentiality, violated Plaintiff's privacy, and failed to protect Plaintiff's private health information, and (3) a claim that Kirker, West, and Calistri falsely accused her of "live streaming" leading to her removal from the emergency department. (Dkt. No. 45, ¶¶ 315–28, 340–53). Defendants move to dismiss Plaintiff's negligence claim. (Dkt. No. 63-5, at 34–42; Dkt. No. 66-1, at 23–29; Dkt. No. 68-4, at 25). Plaintiff opposes Defendants' motions. (Dkt. No. 74, at 17–25; Dkt. No. 75, at 14–15; Dkt. No. 76, at 16–23).

### 1.   Medical Malpractice

Defendants argue that to the extent Plaintiff's negligence claims arises in the context of her medical care, such claims can only be asserted as medical malpractice claims. (Dkt. No. 63-5, at 34–35; Dkt. No. 68-4, at 25). "To show negligence under New York state law, a plaintiff

---

[19] As Plaintiff's theories of liability in her negligence and malpractice causes of action overlap, the Court considers them together.

must demonstrate '(1) the defendant owed the plaintiff a cognizable duty of care; (2) the defendant breached that duty; and (3) the plaintiff suffered damage as a proximate result.'" *Ferreira v. City of Binghamton*, 975 F.3d 255, 266 (2d Cir. 2020) (quoting *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006)). However, "[w]hen the duty arises from the physician-patient relationship or is substantially related to medical treatment, the breach gives rise to an action sounding in medical malpractice, not simple negligence." *La Russo v. St. George's Univ. Sch. of Med.*, 747 F.3d 90, 101 (2d Cir. 2014) (quoting *Stanley v. Lebetkin*, 123 A.D.2d 854, 854 (N.Y. App. Div. 2d Dep't 1986)). A medical malpractice claim requires a showing of "(1) a deviation or departure from accepted practice, and (2) evidence that such departure was a proximate cause of injury or damage." *Schoolcraft v. City of N.Y.*, 103 F. Supp. 3d 465, 534 (S.D.N.Y. 2015) (citing *Stukas v. Streiter*, 83 A.D.3d 18, 23 (N.Y. App. Div. 2d Dep't 2011)). Because both negligence and medical malpractice claims require proximate causation and "there is no prohibition against simultaneously pleading both an ordinary negligence cause of action and one sounding in medical malpractice," the Court need not determine whether the action sounds in medical malpractice at this time. *Jones v. Beth Israel Hosp.*, No. 17-cv-3445, 2018 WL 1779344, at *9, 2018 U.S. Dist. LEXIS 62228, at *24 (S.D.N.Y. Apr. 12, 2018) (collecting cases); *see Gilinsky v. Indelicato*, 894 F. Supp. 86, 94 n.5 (E.D.N.Y. 1995) (finding no need to determine at the summary judgment stage "whether [the] action [was] more appropriately considered a medical malpractice action, as opposed to an ordinary negligence claim").

As relevant here, Plaintiff alleges Dr. Braiman breached the standard of care by denying medical treatment on the basis of age and sex, failing to consider Plaintiff's "wish not to have children," deprioritizing Plaintiff's safety, failing to respect Plaintiff's choice not to have

children, and encouraging Plaintiff not to get an abortion in the event of pregnancy. (Dkt. No. 45, ¶ 323).

### a.      Dr. Braiman and Hospital Defendants

Dr. Braiman argues that because the duty at issue arose from the medical treatment provided at Plaintiff's September 14, 2022 appointment, "Plaintiff's allegations sound in medical malpractice and not negligence" and asserts that, in any event Plaintiff fails to allege facts showing that Dr. Braiman was negligent or "deviated from an accepted standard of care." (Dkt. No. 68-4, at 25–26). The Hospital Defendants also seek dismissal of any medical malpractice claim. (Dkt. No. 66-1, at 27). Plaintiff opposes dismissal. (Dkt. No. 75, at 14–15; Dkt. No. 76, at 16–22).

Plaintiff alleges that during her September 14, 2022, appointment with Dr. Braiman regarding treatment for cluster headaches, the only treatments Dr. Braiman was willing to prescribe were those that Plaintiff—as she told Dr. Braiman—"had already tried and failed," (Dkt. No. 45, ¶ 60), that Dr. Braiman "sent in an injectable medication (Aimovig) to the Plaintiff's pharmacy without her consent or discussing the risks and benefits of the medication," (*id.* ¶ 62), and which she therefore returned to the pharmacy, (*id.* ¶ 65), and that on September 21, 2022, "Plaintiff experienced complications due to the untreated cluster headaches," including "crying, sweating, shaking, and . . . heightened blood pressure and pulse due to the pain," (*id.* ¶ 73–74). Viewing Plaintiff's pro se allegations liberally, the Court concludes that it is plausible to infer that Dr. Braiman's failure to prescribe appropriate medication for Plaintiff's cluster headaches, or obtain informed consent regarding Aimovig, proximately caused Plaintiff's injuries. *See, e.g., Henderson v. Takemoto*, 202 N.Y.S.3d 817, 822 (N.Y. App. Div. 3d Dep't 2024) (denying summary judgment where the plaintiff adduced evidence showing that the "individual defendants all departed from the accepted standard of care by failing to prescribe

vitamin C to plaintiff in a timely manner and that such was a proximate cause of her injuries");
*see also Muchler v. Penwarden*, 617 N.Y.S.2d 87, 87 (N.Y. App. Div. 4th Dep't 1994) ("The
allegation that defendant failed to inform plaintiff of the risks associated with the use of the
prescribed medications . . . could support plaintiff's right to recover for medical malpractice
based on a lack of informed consent."). The Hospital Defendants argue that Plaintiff fails to
allege how they deviated from the standard of care, (Dkt. No. 66-1, at 26–27), but accepting as
true Plaintiff's allegation that Dr. Braiman acknowledged that the medications would be "safe
and effective" for her condition, (Dkt. No. 45, ¶ 58), but refused to prescribe them, their
argument is without merit. Accordingly, their motion to dismiss Plaintiff's medical malpractice
(negligence) claim is denied.

### b.   Informed Consent

To the extent Plaintiff also alleges medical malpractice based on Dr. Braiman's alleged
failure to obtain informed consent before prescribing Aimovig, Defendants argue they are
entitled to dismissal because Plaintiff refused Dr. Braiman's prescribed treatment. (Dkt. No. 66-
1, at 28). The Court agrees.

To establish a "medical malpractice cause of action premised on lack of informed
consent," a plaintiff must show that "(1) the practitioner failed to disclose the risks, benefits and
alternatives to the procedure or treatment that a reasonable practitioner would have disclosed[,]
(2) a reasonable person in the plaintiff's position, fully informed, would have elected not to
undergo the procedure or treatment," *I.M. v. United States*, 362 F. Supp. 3d 161, 203 (S.D.N.Y.
2019) (quoting *Orphan v. Pilnik*, 15 N.Y.3d 907, 908 (N.Y. 2010)), and "(3) that the lack of
informed consent is a proximate cause of the injury," *Walker v. Saint Vincent Cath. Med.
Centers*, 114 A.D.3d 669, 670 (N.Y. App. Div. 2d Dep't 2014); *see also* N.Y. Pub. Health Law
§§ 2805–d(1), (3)). Here, Plaintiff expressly alleges that she returned the Aimovig and there are

no allegations that she used the "injectable medication" or that she was injured in any way. (Dkt. No. 45, ¶¶ 62–65). Accordingly, any "informed consent" claim is dismissed.

### c.      Kirker, West, Calistri, and Hospital Defendants

Plaintiff alleges that Kirker, West, Calistri, and the Hospital Defendants breached the duty of care by making false allegations against her and denying care and treatment in the emergency department at a point when she was "in urgent need." (Dkt. No. 45, ¶¶ 324–25). As the Amended Complaint is devoid of allegations that Kirker or West provided medical care to Plaintiff, any negligence claim based on medical malpractice is dismissed. *See Herman v. Kveton-Cattani*, 123 A.D.3d 1093, 1095 (N.Y. App. Div. 2d Dep't 2014) (dismissing medical malpractice claim where the "plaintiff's factual allegations failed to state that [the defendant] herself actually rendered or attempted to render any medical care or treatment to the plaintiff"). However, construed liberally, Plaintiff's claim that Calistri discontinued the medication she previously ordered for Plaintiff, without stabilizing Plaintiff's headache pain or elevated blood pressure and pulse, are sufficient, at this stage, to state a claim of medical malpractice. Accordingly, Plaintiff's medical and professional malpractice claims against Kirker and West are dismissed, Defendants' motions to dismiss Plaintiff's medical malpractice claims are otherwise denied.

### 2.      Private and Confidential Information

Plaintiff's negligence claim against Kirker and West is premised on their allegedly improper accessing of her confidential information and assertion of a false claim against her leading to her removal from the emergency department: "Donna Kirker and Lisa West had no right to access the plaintiff's private health information and used such protected information to create false allegations against the plaintiff to get her thrown out of an emergency room mid treatment." (Dkt. No. 45, ¶ 326). The Court analyzes this claim *infra* section IV.M.

### K.     Negligence Per Se (Twelfth Cause of Action)

Defendants move to dismiss Plaintiff's negligence per se claim. Under New York law, "[a] duty of care established by statute implicates the rule of negligence per se." *Rand v. Travelers Indem. Co.*, 637 F. Supp. 3d 55, 71 (S.D.N.Y. 2022) "Under the rule of negligence per se, if a statute is designed to protect a class of persons, in which the plaintiff is included, from the type of harm which in fact occurred as a result of its violation, the issues of the defendant's duty of care to the plaintiff and the defendant's breach of that duty are conclusively established upon proof that the statute was violated." *Id.* (quoting *German by German v. Fed. Home Loan Mortg. Corp.*, 896 F. Supp. 1385, 1396 (S.D.N.Y. 1995)). Plaintiff responds that Defendants' violation of HIPAA, EMTALA, federal criminal statutes, and "a number of state/common laws" give rise to negligence per se. (Dkt. No. 74, at 26). However, as discussed, HIPAA and the federal criminal statutes cited in the Amended Complaint do not provide a private right of action and EMTALA does not provide a right of action against Plaintiff's individual medical providers. *See Cohen v. Ne. Radiology, P.C.*, No. 20-cv-1202, 2021 WL 293123, at *7, 2021 U.S. Dist. LEXIS 16497, at *19 (S.D.N.Y. Jan. 28, 2021) ("Indeed, that neither statutory scheme creates a private right of action weighs heavily against implying a private right of action necessary to sustain a negligence per se claim based upon either HIPAA or the FTC Act."). Accordingly, Plaintiff's negligence per se claims against Dr. Braiman, Kirker, West, and Calistri are dismissed.

The Hospital Defendants argue that Plaintiff's negligence per se claim must be dismissed because Plaintiff "has not set forth a cause of action against any Defendant for violation of any statute." (Dkt. No. 66-1, at 28). However, the Court has denied the Hospital Defendants' motion to dismiss the EMTALA claim, thus their argument is without merit. Although the Hospital Defendants recite the above-referenced legal standard, and further argue that Plaintiff has "failed to articulate how she is among the class of people for whose benefit any of the statutes

mentioned has been enacted, or how a violation of any named statutes would constitute negligence per se," Defendants have not provided any factual or legal analysis.

Accordingly, Dr. Braiman, Kirker, West, and Calistri's motion to dismiss Plaintiff's negligence per se claim is granted, and the Hospital Defendants' motion to dismiss Plaintiff's negligence per se claim is denied.

## L.   Intentional Infliction of Emotional Distress (Fourteenth Cause of Action)

Plaintiff's intentional infliction of emotional distress ("IIED") claim against Defendants is based on her allegations that: (1) Dr. Braiman's refusal to prescribe safe and effective treatment for her cluster headaches, leaving her "unable to find relief from the disabling pain," and (2) Kirker, West, and Calistri's false allegations of live streaming, threats of "security and legal action," and removal of Plaintiff "from emergency services while her condition was unstable and she was in immense pain," and "harass[ment] . . . via social media," caused severe emotional distress. (Dkt. No. 45, ¶¶ 354–70). Defendants move to dismiss Plaintiff's IIED claim on the grounds that it is barred by the one-year statute of limitations and that the Amended Complaint fails to allege facts showing extreme and outrageous conduct, (Dkt. No. 63-5, at 45–48; Dkt. No. 66-1, at 30–31; Dkt. No. 68-4, at 28–29).

A claim of intentional infliction of emotional distress under New York law is subject to a one-year statute of limitations. *Verschleiser v. Frydman*, No. 22-cv-7909, 2023 WL 5835031, at *10, 2023 U.S. Dist. LEXIS 158963, at *26 (S.D.N.Y. Sept. 7, 2023) (citing *Ross v. Louise Wise Servs., Inc.*, 868 N.E.2d 189, 197 (N.Y. 2007)). Plaintiff filed this action on September 29, 2023. (Dkt. No. 1). Thus, insofar as Plaintiff's IIED claim is based on her September 14, 2022 appointment with Dr. Braiman, or his September 22, 2022 Aimovig prescription, it appears to be barred by the one-year statute of limitations. Plaintiff asserts that she was "informed by Meaghan Ginsberg at the NYS Department of Health and Human Services Office of Civil Rights that the

statute of limitations for claims against the defendant begin one year AFTER the complaint is made to the appropriate state and federal entities at the time the investigation is closed or concluded, or after 180 days, whichever comes first." (Dkt. No. 75, at 17). This appears to be a reference to the statute of limitations applicable to discrimination claims subject to administration exhaustion. However, the Second Circuit has expressly held that, "as a matter of federal law[,] filing an EEOC charge does not toll the time for filing state tort claims, including those that arise out of the same nucleus of facts alleged in the charge of discrimination filed with the EEOC." *Castagna v. Luceno*, 744 F.3d 254, 258 (2d Cir. 2014). Thus, because Plaintiff filed this action on September 29, 2023, more than one year later, to the extent Plaintiff's IIED claim is based on Dr. Braiman's alleged conduct, it is time-barred. Likewise, to the extent Plaintiff's IIED claim stems from the events arising during her visit to the Malta Med emergency department on September 21, 2022, it is time-barred. However, Plaintiff additionally alleges that Calistri contacted Plaintiff's boyfriend on Facebook on September 30 and October 1, 2022, and disclosed private health information. As this alleged conduct occurred less than one-year before the September 29, 2023 action was filed, to the extent Plaintiff's IIED claim is based on this conduct, it would not be time-barred.

In New York, "a claim for intentional infliction of emotional distress requires a showing of (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999). "New York sets a high threshold for conduct that is 'extreme and outrageous' enough to constitute intentional infliction of emotional distress." *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996). "Whether the alleged conduct is sufficiently outrageous to satisfy [this

element] is a matter of law for a court to decide." *Baez v. JetBlue Airways*, 745 F. Supp. 2d 214, 223 (E.D.N.Y. 2010).

Plaintiff alleges that Calistri sent Facebook messages to Plaintiff's boyfriend on September 30, 2022 and October 1, 2022, disclosing private medical information about Plaintiff. (Dkt. No. 45, ¶¶ 96–97). Even assuming this claim is not duplicative of the breach of confidentiality claim discussed below, *see Fischer v. Maloney*, 43 N.Y.2d 553 (N.Y. 1978) (stating IIED claims may be dismissed where they "falls well within the ambit of traditional tort liability" and are in fact duplicates of other claims put forward); *see also Franco v. Diaz*, 51 F. Supp. 3d 235, 243–44 (E.D.N.Y.2014) ("Because precisely the same conduct and the same injury fall within the ambit of defendants' proposed defamation counterclaim, their IIED counterclaim in the Amended Answer must be dismissed as duplicative."), the Court concludes that two messages sent privately to one individual fail to allow a plausible inference of extreme and outrageous conduct. *See Stuto*, 164 F.3d at 827 (explaining that conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society"); *see also Lan Sang v. Ming Hai*, 951 F. Supp. 2d 504, 530 (S.D.N.Y. 2013) (The "'rigor of the outrageousness standard [for intentional infliction of emotional distress] is well-established,'" and the threshold is "exceedingly difficult to meet." (quoting *Mesa v. City of N.Y.*, No. 09-cv-10464, 2013 WL 31002, at *28, 2013 U.S. Dist. LEXIS 1097, at *85 (S.D.N.Y. Jan. 3, 2013))). Accordingly, Defendants' motions to dismiss Plaintiff's IIED claim are granted.

### M.   Invasion of Privacy/Breach of Confidentiality (Fifteenth Cause of Action)

Plaintiff sues Kirker, West, Calistri, and the Hospital Defendants for invasion of privacy. Specifically, Plaintiff claims Kirker and West engaged in "intrusion upon seclusion" by accessing her private health information and that Calistri invaded her privacy by posting

Plaintiff's private information on social media. (Dkt. No. 45, ¶¶ 377–78). Plaintiff also asserts

her invasion of privacy claim against the Hospital Defendants. (*Id.* ¶ 378). Defendants move to

dismiss Plaintiff's invasion of privacy claim.

As New York has "no common law right of privacy," Plaintiff's "intrusion upon

seclusion" claim is dismissed. *See Hamlett v. Santander Consumer USA Inc.*, 931 F. Supp. 2d

451, 457 (E.D.N.Y. 2013) ("New York has consistently refused to recognize a common law right

of privacy, and hence there is no cause of action of intrusion upon seclusion under New York

law."). In New York, "the right to privacy is governed exclusively by sections 50 and 51 of the

Civil Rights Law." *Howell v. New York Post Co.*, 81 N.Y.2d 115, 123 (N.Y. 1993). "Section 50

prohibits the use of a living person's name, portrait or picture for 'advertising' or 'trade'

purposes without prior written consent."[20] *Id.* No such allegations are present in this case.

However, construing Plaintiff's allegations liberally to raise the strongest claims they

suggest, it appears Plaintiff is attempting to assert that Kirker, West, Calistri, and the Hospital

Defendants violated the physician-patient privilege, codified under New York law by section

4504 of the New York Civil Practice Law and Rules. Section 4505(a) provides: "Unless the

patient waives the privilege, a person authorized to practice medicine . . . shall not be allowed to

disclose any information which he acquired in attending a patient in a professional capacity, and

which was necessary to enable him to act in that capacity." N.Y. C.P.L.R. § 4504(a). The Court

of Appeals of New York has explained that:

> The privilege applies not only to information orally communicated
> by the patient, but also to information ascertained by observing the
> patient's appearance and symptoms, unless those factual
> observations would be obvious to lay observers. Generally, the
> privilege covers all  information relating to the nature of the

---

[20] "Section 50 provides criminal penalties and section 51 a private right of action for damages and injunctive relief." *Howell*, 81 N.Y.2d at 123 (citing N.Y. Civ. Rights Law §§ 50–51).

> treatment rendered and the diagnosis made. Although not covered
> by the statute, information obtained in a professional capacity but
> not necessary to enable the physician to fulfill his or her medical
> role is a protected confidence, the disclosure of which constitutes
> professional misconduct in the absence of patient consent or legal
> authorization.

*Chanko v. Am. Broad. Cos. Inc.*, 27 N.Y.3d 46, 53 (N.Y. 2016) (internal citations and quotation

marks omitted). To allege "breach of physician-patient confidentiality," a plaintiff must allege:

> (1) the existence of a physician-patient relationship; (2) the
> physician's acquisition of information relating to the patient's
> treatment or diagnosis; (3) the disclosure of such confidential
> information to a person not connected with the patient's medical
> treatment, in a manner that allows the patient to be identified; (4)
> lack of consent for that disclosure; and (5) damages.

*Chanko*, 27 N.Y.3d at 53–54.

Plaintiff alleges that Kirker, the "Chief Nursing Officer of Glens Falls Hospital," called

West, the "Administrative Director of Emergency Services" and also the "Chief Nursing

Officer" of Saratoga Hospital, to say that Plaintiff "was live streaming," and that West relayed

this information to an administrator at Malta Med, who relayed it to a "Charge Nurse" at Malta

Med. (*Id.* ¶¶ 5–6, 83). The recording Plaintiff submitted as an exhibit to the Amended Complaint

suggests that Kirker, West, or employees at Malta Med used a "tracker" to find Plaintiff and her

room number and then disclosed that information, which ultimately reached Calistri and

Plaintiff. (Dkt. No. 45, ¶ 85; *id.* at 144 (Exh. V)). Kirker seeks dismissal on the ground that she

"acted within the bounds of patient privacy regulations" because neither Plaintiff's "live

streaming" nor Plaintiff's room number at Malta Med constituted "private health information"

and her alleged "disclosure" of this information to West at Saratoga Hospital was "from one

covered entity to another" and made pursuant to the "operations exception." (Dkt. No. 66-1, at

25 & n.6 (asserting that "when a hospital administrator receives a report about an issue with

someone who is possibly a patient in the hospital, the operations exception allows the administrator to look up where that person is to address the problem." (citing 45 C.F.R. § 164.506(c))). West seeks dismissal on the ground that she conveyed the information at issue "to the people personally connected to the plaintiff's diagnosis and treatment" at Malta Med. (Dkt. No. 63-5, at 39). 45 C.F.R. § 164.506 governs "uses and disclosures" of "protected health care information" "to carry out treatment, payment or health care operations." While § 164.506(c) details four instances in which a "covered entity" may "disclose protected health information," no party has briefed the definition of these terms, or the applicability of any of these provisions here. The Court therefore declines to dismiss Plaintiff's breach of confidentiality claim at this juncture. Further, although West asserts she only disclosed Plaintiff's information to the people personally connected to the Plaintiff's treatment at Malta Med, the allegations before the Court do not indicate who West spoke with at Malta Med. (Dkt. No. 45, at 115 (patient record with notation by "Smith, Erin, RN" that "Lisa West called in regards to a patient live streaming in our facility gave the patients name and room number. Writer was informed that Lisa got a call from Glens Falls."). Accordingly, absent further briefing, the Court declines to dismiss on these grounds.

Plaintiff alleges that Calistri's September 30 and October 1, 2022 Facebook messages to Plaintiff's boyfriend regarding Plaintiff's September 21, 2022 visit to the emergency department violated physician-patient confidentiality. Calistri only challenges the third and fourth elements—whether Plaintiff has alleged the disclosure of confidential information and whether Plaintiff adequately alleges the lack of consent for that disclosure. Specifically, Calistri argues that the information at issue was contained in a "private FB message" to Plaintiff's boyfriend, she did not discuss Plaintiff's "health information such as her diagnosis or the specific care she

received," and, in any event, that there was "nothing in either of these messages which defendant Calistri sent privately to" Plaintiff's boyfriend "that plaintiff had not previously disclosed in a" September 23, 2022 TikTok post. (Dkt. No. 63-5, at 40). In the messages at issue, Calistri referred to "Tara" and "your girlfriend," thus disclosing Plaintiff's identity and status as a patient to Plaintiff's boyfriend. (Dkt. No. 45, at 120). Further, Calistri allegedly disclosed to Plaintiff's boyfriend that Plaintiff received "care in Glens Falls," that Calistri was Plaintiff's "nurse practitioner," that she "did everything [she] knew to help [Plaintiff] feel better," and that Plaintiff "was taken care of and got everything she requested and needed while under my care on September 21st." (*Id.* at 120–21). While these statements may be viewed as non-specific, construed liberally, they refer to Plaintiff's treatment by Calistri on September 21, 2022, and thus allow a plausible inference that Calistri disclosed information regarding Plaintiff's treatment to Plaintiff's boyfriend, "a person not connected with [Plaintiff's] medical treatment." Although Calistri argues that Plaintiff herself previously disclosed the same information publicly on social media, the facts (and scope) of the alleged prior disclosure are outside the Amended Complaint. Thus, Calistri's waiver argument is unavailing at this stage of the litigation.[21] The Court observes, however, that voluntary disclosure may, in some instances, constitute waiver. *See*, *e.g.*, *Liverano v. Devinsky*, 278 A.D.2d 386, 387 (N.Y. App. Div. 2d Dep't 2000) (concluding that "the physician-patient privilege was waived when [the patient] voluntarily disclosed the nature and extent of his glaucoma to members of the media, which resulted in the subsequent publication of his condition").

---

[21] Calistri has attached a "Sep 23" screenshot of a social media post by Plaintiff. (Dkt. No. 63-4). However, this document contains material outside the Amended Complaint and the Court declines to consider it. To the extent Calistri points to Plaintiff's boyfriend's Google review, there are no allegations that Plaintiff herself wrote or authorized that review.

Accordingly, Defendants' motion to dismiss Plaintiff's breach of confidentiality claim is denied.

### N.        Harassment (Sixteenth Cause of Action)

Kirker, West, Calistri, Albany Med, Malta Med, and Saratoga Hospital move to dismiss Plaintiff's harassment claim on the ground that New York does not recognize a common law harassment claim. (Dkt. No. 63-5, at 60 (citing *Hartman v. 536/540 E. 5th St. Equities*, 19 A.D.3d 240 (N.Y. App. Div. 1st Dep't 2005)) Dkt. No. 63-5, at 50; Dkt. No. 66-1, at 29). Plaintiff opposes dismissal. (Dkt. No. 74, at 31–32; Dkt. No. 76, at 24). "New York does not recognize a common-law cause of action alleging harassment[.]" *Nolan v. Cnty. of Erie*, No. 19-cv-01245, 2020 WL 1969329, at *9, 2020 U.S. Dist. LEXIS 72729, at *27 (W.D.N.Y. Apr. 24, 2020) (quoting *Mago, LLC v. Singh*, 47 A.D.3d 772, 773 (N.Y. App. Div. 2d Dep't 2008)). Accordingly, Defendants' motions to dismiss Plaintiff's harassment claim is granted.

### O.        Negligent Infliction of Emotional Distress (Seventeenth Cause of Action)

Plaintiff's negligent infliction of emotional distress claim against Defendants is premised on: (1) Dr. Braiman's allegedly discriminatory conduct during the September 14, 2022 appointment and alleged failure to provide adequate treatment and obtain informed consent for the Aimovig prescription; and (2) Kirker, West, and Calistri's allegedly false accusations of "live streaming," discharge of Plaintiff from the emergency department based on false information, and provision of false and forged documents to Plaintiff's insurance company. (Dkt. No. 45, ¶¶ 391–97). Defendants move to dismiss on the grounds that Plaintiff fails to allege sufficient facts to show a direct duty or to "satisfy the necessary damages elements" of a negligent infliction of emotional distress claim. (Dkt. No. 63-2, at 51; Dkt. No. 66-1, at 25–26; Dkt. No. 68-4, at 29–30). Plaintiff opposes Defendants' motions. (Dkt. No. 74, at 32–33; Dkt. No. 75, at 18–20; Dkt. No. 76, at 16–23).

"To plead a negligent infliction of emotional distress claim under New York law, a plaintiff must allege (1) a breach of a duty owed to the plaintiff; (2) emotional harm; (3) a direct causal connection between the breach and the emotional harm; and (4) circumstances providing some guarantee of genuineness of the harm." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 81 (2d Cir. 2021).

A plaintiff may establish a claim for negligent infliction of emotional distress under "(1) the bystander theory," which is inapplicable here as it typically involves witnessing harm to a close family member, "or (2) the direct duty theory," which allows a plaintiff to recover for emotional injury caused by a defendant's breach of a duty which "unreasonably endangered" the plaintiff's physical safety. *Baker v. Dorfman*, 239 F.3d 415, 421 (2d Cir. 2000). Under both theories, the duty owed "must be specific to the plaintiff, and not some amorphous, free-floating duty to society." *Truman v. Brown*, 434 F. Supp. 3d 100, 123 (S.D.N.Y. 2020) (quoting *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996)). As stated, "[b]oth theories require 'physical injury or the threat of danger, either to the plaintiff . . . or to a close family member.'" *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 298 (S.D.N.Y. 2015) (quoting *Vaughn v. Am. Multi Cinema, Inc.*, No. 09-cv-8911, 2010 WL 3835191, at *5, 2010 U.S. Dist. LEXIS 96609, at *16 (S.D.N.Y. Sept. 13, 2010)); *see also Tigano v. United States*, 527 F. Supp. 3d 232, 249 (E.D.N.Y. 2021)

The "guarantee of genuineness" element "requires a specific, recognized type of negligence that obviously has the propensity to cause extreme emotional distress such as the mishandling of a corpse or the transmission of false information that a parent or child had died." *Selvam v. United States*, 570 F. Supp. 3d 29, 50 (E.D.N.Y. 2021) (quotation marks omitted) (quoting *J.H. v. Bratton*, 248 F. Supp. 3d 401, 416 (E.D.N.Y. 2017)), *aff'd*, No. 21-2513-cv,

2022 WL 6589550, 2022 U.S. App. LEXIS 28208 (2d Cir. Oct. 11, 2022). "Alternatively, the breach 'must have at least endangered the plaintiff's physical safety or caused the plaintiff to fear for his or her own safety.'" *Selvam*, 570 F. Supp. 3d at 50 (quotation marks omitted) (quoting *Bratton*, 248 F. Supp. 3d at 416). "[B]y mandating some guarantee of the genuineness of the emotional injury, the Court of Appeals has recognized a standard that is effective to filter out petty and trivial complaints and to ensure that the alleged emotional distress is real." *Taggart v. Costabile*, 131 A.D.3d 243, 253 (App. Div. 2d Dep't 2015).

To the extent Plaintiff's claim is based on Dr. Braiman's alleged failure to treat her cluster headaches, and Calistri's allegedly premature discharge of her from the emergency department, they are duplicative of her medical malpractice claims. *Virgil v. Darlak*, No. 10-cv-6479, 2013 WL 4015368, at *10, 2013 U.S. Dist. LEXIS 110411, at *27 (W.D.N.Y. Aug. 6, 2013) (dismissing the plaintiff's negligent infliction of emotional distress claim as duplicative of his medical malpractice claim, explaining that "[a] claim for negligent infliction of emotional distress cannot be asserted if it is 'essentially duplicative of tort or contract causes of action.'"). Further, none of Plaintiff's remaining allegations against Dr. Braiman, including his discriminatory treatment and prescription of Aimovig, which she returned, allow a plausible inference that Dr. Braiman engaged in conduct that endangered Plaintiff's physical safety or caused Plaintiff to fear for her physical safety. Nor is it plausible to infer that Kirker, West, and Calistri's allegedly false accusations of "live streaming," the presence of "armed security" outside Plaintiff's hospital room, or Calistri's alleged provision of false and forged documents to Plaintiff's insurance company endangered Plaintiff's physical safety or caused her to fear for her physical safety. (Dkt. No. 45, ¶¶ 391–97). *See Hecht v. Kaplan*, 221 A.D.2d 100, 105 (App. Div. 2d Dep't 1996) ("Since the plaintiff . . . is seeking to recover solely for emotional harm,

unaccompanied by any form of physical trauma, and has not alleged any physical harm, there is no cause of action to recover damages for the negligent infliction of emotional distress."). Thus, Plaintiff fails to state a negligent infliction of emotional distress claim against Defendants.

Accordingly, Defendants' motion to dismiss Plaintiff's claim of negligent infliction of emotional distress is granted.

## V.   CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motions to dismiss (Dkt. Nos. 63, 66, 68) are **GRANTED in part** and **DENIED in part** as follows:[22]

- Plaintiff's Affordable Care Act Claim (First Cause of Action), against the individual Defendants and to the extent it seeks emotional and punitive damages is **DISMISSED with prejudice**. Plaintiff's Affordable Care Act Claim against the Hospital Defendants may otherwise proceed.

- Plaintiff's Title II and Title IX claims (Second Cause of Action) **is DISMISSED without prejudice** as to all Defendants.

- Plaintiff's Age Discrimination Act claim (Third Cause of Action) is **DISMISSED without prejudice** as to all Defendants.

- Plaintiff's Patient Self-Determination Act claim (Fourth Cause of Action) is **DISMISSED with prejudice** as to all Defendants.

- Plaintiff's claims under the Federal Criminal Statutes (Fifth, Seventh, and Ninth Causes of Action) are **DISMISSED with prejudice** as to all Defendants.

- Plaintiff's HIPAA (Sixth Cause of Action) is **DISMISSED with prejudice** as to all Defendants.

- Plaintiff's claim under 42 U.S.C. § 1983 (Seventh Cause of Action) is **DISMISSED without prejudice** as to all Defendants.

---

[22] Should Plaintiff seek to pursue a claim that the Court has dismissed without prejudice she must seek leaved to file an amended complaint by filing a motion to amend the complaint in accordance with Federal Rule of Civil Procedure 15 and Local Rule 15.1.

- Plaintiff's EMTALA claim (Eighth Cause of Action) **is DISMISSED with prejudice** as to the individual Defendants but may proceed as to the Hospital Defendants.

- Plaintiff's Americans with Disabilities Act claim (Tenth Cause of Action) against Dr. Braiman is **DISMISSED with prejudice** and is **DISMISSED without prejudice** as to the Hospital Defendants.

- Plaintiff's Medical Malpractice claims (as alleged in her Eleventh and Thirteenth Causes of Action) against Dr. Braiman, Calistri, and Hospital Defendants may proceed. Plaintiff's negligence claim is otherwise **DISMISSED without prejudice**.

- Plaintiff's Negligence per se claim (Twelfth Cause of Action) is **DISMISSED without prejudice** as to Dr. Braiman, Kirker, West, and Calistri.

- Plaintiff's Intentional Infliction of Emotional Distress claim (Fourteenth Cause of Action) is **DISMISSED without prejudice**.

- Plaintiff's Invasion of Privacy (Breach of Confidentiality) claim (Fifteenth Cause of Action) is **DISMISSED without prejudice** as to Plaintiff's claim of intrusion upon seclusion but her claims based on breach of confidentiality may proceed.

- Plaintiff's Harassment claim (Sixteenth Cause of Action) is **DISMISSED with prejudice**.

- Plaintiff's Negligent Infliction of Emotional Distress (Seventeenth Cause of Action) is **DISMISSED without prejudice**.

Thus, as outlined above, the following claims proceed: Plaintiff's Affordable Care Act claim (First Cause of Action) against the Hospital Defendants, Plaintiff's EMTALA claim (Eighth Cause of Action) against the Hospital Defendants, Plaintiff's negligence (medical malpractice) claim (Eleventh and Thirteenth Causes of Action) against Dr. Braiman, Calistri, and the Hospital Defendants, Plaintiff's negligence per se claim (Twelfth Cause of Action) against the Hospital Defendants, and Plaintiff's breach of confidence claims (Fifteenth Cause of Action) against the Hospital Defendants, Calistri, West, and Kirker.

The Clerk of the Court is directed to serve this decision on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated:  September 4, 2024
        Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge